**Nos. 22-2217, 23-1021**

United States Court of Appeals
for the Federal Circuit

UNITED THERAPEUTICS CORPORATION,

*Plaintiff-Cross-Appellant*,

v.

LIQUIDIA TECHNOLOGIES, INC.,

*Defendant-Appellant*.

*Appeal from the United States District Court for the District of Delaware, No. 20-755, Judge Richard Andrews*

# DEFENDANT-APPELLANT'S OPENING BRIEF

DEEPA KANNAPPAN
COOLEY LLP
3175 Hanover Street
Palo Alto, CA 94304
Telephone: (650) 843-5000
Facsimile: (650) 849-7400
dkannappan@cooley.com

ERIK B. MILCH
COOLEY LLP
11951 Freedom Plaza
Reston, VA 20190
Telephone: (703) 456-8000
Facsimile: (703) 456-8100
emilch@cooley.com

SANYA SUKDUANG
JONATHAN R. DAVIES
COOLEY LLP
1299 Pennsylvania Ave NW
Washington, DC 20004
Telephone: (202) 842-7800
Facsimile: (202) 842-7899
ssukduang@cooley.com
jdavies@cooley.com

*Counsel of Record for Defendant-Appellant Liquidia Technologies, Inc.*

# CLAIMS AT ISSUE

| U.S. Patent No. 9,593,066 | |
|---|---|
| 1 | A pharmaceutical composition comprising treprostinil or a pharmaceutically acceptable salt thereof, said composition prepared by a process comprising providing a starting batch of treprostinil having one or more impurities resulting from prior alkylation and hydrolysis steps, forming a salt of treprostinil by combining the starting batch and a base, isolating the treprostinil salt, and preparing a pharmaceutical composition comprising treprostinil or a pharmaceutically acceptable salt thereof from the isolated treprostinil salt, whereby a level of one or more impurities found in the starting batch of treprostinil is lower in the pharmaceutical composition, and wherein said alkylation is alkylation of benzindene triol. |
| 2 | The pharmaceutical composition of claim **1**, wherein the salt is isolated in crystalline form. |
| 3 | The pharmaceutical composition of claim **1**, wherein the base is selected from the group consisting of sodium, ammonia, potassium, calcium, ethanolamine, diethanolamine, N-methylglucamine, and choline. |

| U.S. Patent No. 10,716,793 | |
|---|---|
| 1 | A method of treating pulmonary hypertension comprising administering by inhalation to a human suffering from pulmonary hypertension a therapeutically effective single event dose of a formulation comprising treprostinil or a pharmaceutically acceptable salt thereof with an inhalation device, wherein the therapeutically effective single event dose comprises from 15 micrograms to 90 micrograms of treprostinil or a pharmaceutically acceptable salt thereof delivered in 1 to 3 breaths. |
| 4 | The method of claim **1**, wherein the inhalation device is a dry powder inhaler. |
| 6 | The method of claim **4**, wherein the formulation is a powder. |
| 7 | The method of claim **6**, wherein the powder comprises particles less than 5 micrometers in diameter. |
| 8 | The method of claim **1**, wherein the formulation contains no metacresol. |

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 22-2217, 23-1021

**Short Case Caption** United Therapeutics Corporation v. Liquidia Technologies, Inc.

**Filing Party/Entity** Liquidia Technologies, Inc.

**Instructions:** Complete each section of the form. In answering items 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance. **Please enter only one item per box; attach additional pages as needed and check the relevant box**. Counsel must immediately file an amended Certificate of Interest if information changes. Fed. Cir. R. 47.4(b).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 10/21/2022

Signature: /s/ Sanya Sukduang

Name: Sanya Sukduang

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☐ None/Not Applicable |
| Liquidia Technologies, Inc. | | Liquidia Corporation |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| Sanya Sukduang, Cooley LLP | Erik B. Milch, Cooley LLP | |
| Deepa Kannappan, Cooley LLP | Jonathan Davies, Cooley LLP | |
| | | |

**5. Related Cases.** Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s) for this case. Fed. Cir. R. 47.4(a)(5). See also Fed. Cir. R. 47.5(b).

☐ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| United Therapeutics Corporation v. Liquidia Technologies, Inc., IPR2020-00770 | United Therapeutics Corporation v. Liquidia Technologies, Inc. (Fed. Cir.) No. 22-2174 | |
| United Therapeutics Corporation v. Liquidia Technologies, Inc., IPR2021-00406 | | |
| United Therapeutics Corporation v. Liquidia Technologies, Inc. (Fed. Cir.) No. 22-2133 | | |

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

TABLE OF CONTENTS ..... i
TABLE OF AUTHORITIES ..... iv
TABLE OF ABBREVIATIONS ..... vii
STATEMENT OF RELATED CASES ..... 1
JURISDICTIONAL STATEMENT ..... 1
ISSUES PRESENTED ..... 1
INTRODUCTION ..... 2
STATEMENT OF THE CASE ..... 6
I. YUTREPIA™ ..... 6
II. Pulmonary Hypertension ..... 7
III. The Challenged Patents ..... 9
A. The ’793 Patent ..... 9
B. The ’066 Patent ..... 11
C. The ’901 Patent ..... 12
IV. Proceedings Below ..... 13
A. The District Court Proceeding ..... 13
B. The Board’s Decision Rendering the ’793 Patent Claims Unpatentable ..... 14
C. The Board’s Decision Rendering Unpatentable Claims 1-5, 8 and 9 of the ’901 Patent ..... 15
D. The District Court’s Trial Opinion ..... 16
a. The district court interpreted the “method of treating pulmonary hypertension” to include treatments that cause patient death, leading to a finding of adequate enablement and written description ..... 16
b. The district court found Liquidia will induce infringement of the invalid ’793 patent ..... 18

c. The district court found Liquidia will infringe claims 1, 2, and 3 of the ’066 patent despite UTC not comparing the accused product to the asserted claims ........ 19

SUMMARY OF ARGUMENT ........ 21

ARGUMENT ........ 22

I. Standard of Review ........ 22

II. The District Court Erred In Excluding “Safety” from the Scope of “Treating Pulmonary Hypertension” ........ 23

A. The ’793 Patent Specification Requires that the Method of Treating Pulmonary Hypertension Be Safe and Effective ........ 24

B. The District Court’s Construction Permits Inclusion of Pulmonary Hypertension Patients That Die as a Result of Treprostinil Administration ........ 28

III. The ’793 Patent Does Not Adequately Enable the Full Scope of “Treating Pulmonary Hypertension” ........ 29

A. When Properly Construed to Include Safety, the District Court Erred in Finding the ’793 Patent Enabled for the Full Scope of “Treating Pulmonary Hypertension” ........ 30

B. Even Excluding Safety from the Construction of “Treating Pulmonary Hypertension,” the District Court Erred in Finding the ’793 Patent Is Enabled ........ 36

IV. The ’793 Patent Does Not Adequately Describe the Full Scope of “Treating Pulmonary Hypertension” ........ 40

A. The District Court Erred in Finding the ’793 Patent Provides Sufficient Written Description When “Treating Pulmonary Hypertension” Is Properly Construed to Include Safety ........ 41

B. Even Excluding Safety from the Construction of “Treating Pulmonary Hypertension,” the District Court Erred in Finding the ’793 Patent Has Adequate Written Description ........ 43

V. The District Court Improperly Found Liquidia Induced Infringement of the Invalidated ’793 Patent ........ 46

A. The Supreme Court's Decision in *Commil* Necessitates a Finding of No Induced Infringement .............................. 48

B. The District Court Improperly Required Collateral Estoppel to Negate Liability for Induced Infringement.. 52

VI. The District Court Erred in Finding Infringement of Claims 1-3 of the '066 Patent, where UTC Used a Proxy for the Allegedly Infringing "Pharmaceutical Composition" ................................ 54

A. UTC Failed to Compare LIQ861 Bulk Powder to the Claim ........................................................................ 54

B. TN Cannot Be Used as a Proxy for LIQ861 Bulk Powder to Establish Infringement ............................................... 56

CONCLUSION ........................................................................... 60

# TABLE OF AUTHORITIES

## CASES

*ALZA Corp. v. Andrx Pharms., LLC*,
603 F.3d 935 (Fed. Cir. 2010) .......... 23, 29

*ALZA Corp. v. Mylan Lab'ys, Inc.*,
464 F.3d 1286 (Fed. Cir. 2006) .......... 23

*Ariad Pharms., Inc. v. Eli Lilly & Co.*,
598 F.3d 1336 (Fed. Cir. 2010) .......... 40

*Ariosa Diagnostics v. Verinata Health, Inc.*,
805 F.3d 1359 (Fed. Cir. 2015) .......... 50

*BioDelivery Scis. Int'l, Inc. v. Aquestive Therapeutics, Inc.*,
946 F.3d 1382 (Fed. Cir. 2020) .......... 53

*Biogen Int'l GMBH v. Mylan Pharms. Inc.*,
18 F.4th 1333 (Fed. Cir. 2021) .......... 42

*Bos. Sci. Corp. v. Johnson & Johnson*,
647 F.3d 1353 (Fed. Cir. 2011) .......... 40

*Cardinal Chem. Co. v. Morton Int'l, Inc.*,
508 U.S. 83 (1993) .......... 59

*Commil USA, LLC v. Cisco Systems, Inc.*,
575 U.S. 632 (2015) .......... *passim*

*Eli Lilly & Co. v. Hospira, Inc.*,
933 F.3d 1320 (Fed. Cir. 2019) .......... 23

*Eon Corp. IP Holdings LLC v. Silver Springs Networks, Inc.*,
815 F.3d 1314 (Fed. Cir. 2016) .......... 25

*Ferring B.V. v. Watson Labs., Inc.-Fla.*,
764 F.3d 1401 (Fed. Cir. 2014) .......... 55, 56

*Global-Tech Appliances, Inc. v. SEB S.A.*,
563 U.S. 754 (2011) .......... 47, 48

*Kim v. ConAgra Foods, Inc.*,
465 F.3d 1312 (Fed. Cir. 2006) ........................................................ 57, 58

*L & W, Inc. v. Shertech, Inc.*,
471 F.3d 1311 (Fed. Cir. 2006) ............................................................... 59

*Medrad, Inc. v. MRI Devices Corp.*,
401 F.3d 1313 (Fed. Cir. 2005) ............................................................... 25

*Merck Sharp & Dohme Corp. v. Hospira Inc.*,
221 F. Supp. 3d 497 (D. Del. 2016).......................................................... 50

*Morton Int'l, Inc. v. Cardinal Chem. Co.*,
959 F.2d 948 (Fed. Cir. 1992) .................................................................. 58

*Novartis Pharms. Corp. v. Accord Healthcare, Inc.*,
38 F.4th 1013 (Fed. Cir. 2022) ................................................... 23, 42, 44

*Nuvo Pharms. (Ireland) Designated Activity Co. v. Dr. Reddy's Lab'ys, Inc.*,
923 F.3d 1368 (Fed. Cir. 2019) ............................................. 43, 44, 45, 46

*Omega Patents, LLC v. CalAmp Corp.*,
920 F.3d 1337 (Fed. Cir. 2019) ............................................................... 46

*Papst Licensing GMBH & Co. KG v. Samsung Elecs. Am., Inc.*,
924 F.3d 1243 (Fed. Cir. 2019) ............................................................... 52

*Par Pharm., Inc. v. Eagle Pharms., Inc.*,
44 F.4th 1379 (Fed. Cir. 2022) ......................................................... 22, 23

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) ............................................................... 25

*Purdue Pharma L.P. v. Faulding Inc.*,
230 F.3d 1320 (Fed. Cir. 2000) ............................................................... 41

*Regents of the Univ. of Minn. v. LSI Corp.*,
926 F.3d 1327 (Fed. Cir. 2019) ............................................................... 50

*Roche Diagnostics Corp. v. Meso Scale Diagnostics, LLC*,
30 F.4th 1109 (Fed. Cir. 2022) ................................................... 47, 51, 52

*Saab Cars USA, Inc. v. United States*,
434 F.3d 1359 (Fed. Cir. 2006) .............................................................. 60

*Sandt Tech., Ltd. v. Resco Metals & Plastics Corp.*,
264 F.3d 1344 (Fed. Cir. 2001) .............................................................. 50

*Teva Pharms. USA, Inc. v. Corcept Therapeutics, Inc.*,
PGR2019-00048, 2020 WL 6809812 (P.T.A.B. Nov. 18, 2020) ............ 27

*Trs. Of Bos. Univ. v. Everlight Elecs. Co.*,
896 F.3d 1357 (Fed. Cir. 2018) .............................................................. 39

*In re Wands*,
858 F.2d 731 (Fed. Cir. 1988) .......................................................... 29, 33

*Wyeth & Cordis Corp. v. Abbott Lab'ys*,
720 F.3d 1380 (Fed. Cir. 2013) .............................................................. 29

**STATUTES**

28 U.S.C. § 1295 ........................................................................................ 1

28 U.S.C. § 1331 ........................................................................................ 1

28 U.S.C. § 1338(a) .................................................................................... 1

35 U.S.C. § 103 .......................................................................................... 14

35 U.S.C. § 112 .......................................................................................... 40

35 U.S.C. § 271(b) ................................................................................ 46, 48

35 U.S.C. § 316 .......................................................................................... 49

35 U.S.C. § 316(a)(11) .......................................................................... 19, 50

**OTHER AUTHORITIES**

157 Cong. Rec. S1352 (daily ed. Mar. 8, 2011) ........................................... 53

H.R. Rep. No. 112-98 (2011) ...................................................................... 53

# TABLE OF ABBREVIATIONS

| Abbreviation | Full Term |
|---|---|
| ’066 patent | U.S. Patent No. 9,593,066 |
| ’901 patent | U.S. Patent No. 9,604,901 |
| ’793 patent | U.S. Patent No. 10,716,793 |
| ’793 FWD | Final Written Decision in IPR2021-00406 |
| ’901 FWD | Final Written Decision in IPR2020-007700 |
| Asserted claims of the ’066 patent | Claims 1, 2, 3, 6, 8, 9 |
| Asserted claims of the ’793 patent | Claims 1, 4, 6, 7, 8 |
| Asserted Patents | ’066, ’901, and ’793 patents |
| BOARD or PTAB | Patent Trial and Appeal Board |
| DMF | Drug Master File |
| cl. | claim |
| FDA | Food and Drug Administration |
| FIRST | Flolan International Randomized Survival Trial |
| FWD | Final Written Decision |
| IPR | *Inter partes* review |
| LHD | Left heart disease |
| Liquidia | Liquidia Technologies, Inc |
| NDA | New Drug Application |
| PAH | Pulmonary arterial hypertension (Group 1 PH) |
| PAP | Pulmonary arterial pressure |
| PH | Pulmonary hypertension |
| POSA | Person of ordinary skill in the art |
| PVR | Pulmonary vascular resistance |
| TN | Treprostinil sodium |
| TRE or TN02 | Treprostinil |
| UTC | United Therapeutics Corporation |
| WHO | World Health Organization |
| Yonsung | Yonsung Fine Chemicals |

## STATEMENT OF RELATED CASES

Three patents were involved in the district court proceeding, U.S. Patent Nos. 9,604,901; 9,593,066; and 10,716,793. After Liquidia appealed the district court decision, UTC filed a cross-appeal (No. 23-1021), which has been consolidated with this appeal. The ’901 patent was partially invalidated in IPR2020-00770, and that decision is on appeal and cross-appeal as Nos. 22-2133 and 22-2174, which are companion cases to the present appeals. The ’793 patent was fully invalidated in IPR2021-00406, and UTC’s rehearing and precedential opinion panel review requests are still pending before the Board.

## JURISDICTIONAL STATEMENT

Liquidia appeals the August 31, 2022, opinion and September 9, 2022, final judgment of the United States District Court for the District of Delaware, finding claims 1, 4, and 6-8 of the ’793 patent valid and infringed and claims 1, 2, and 3 of the ’066 patent infringed. Appx00020-00074, Appx00075-00077. The district court had jurisdiction over this matter, filed against Liquidia on June 4, 2020, under 28 U.S.C. §§ 1331 and 1338(a). Liquidia promptly noticed this appeal on September 12, 2022. This Court has jurisdiction under 28 U.S.C. § 1295.

## ISSUES PRESENTED

1. Did the district court err, as a matter of law, in construing “treating pulmonary hypertension” to exclude safety when the plain meaning, consistent with the

specification of the ’793 patent, indicates “treating pulmonary hypertension” requires both safety and efficacy?

2. Did the district court err in finding the full scope of the ’793 patent claims enabled a method of treating isolated Group 2 pulmonary hypertension when a POSA knew at the time of the invention that treprostinil did not treat this patient population safely or effectively?

3. Did the district court err in finding the full scope of the ’793 patent claims adequately described a method of treating isolated Group 2 pulmonary hypertension when a POSA, reviewing the specification, would conclude that the inventors were not in possession of a method of administering inhaled treprostinil to treat this patient population?

4. Did the district court err in finding Liquidia liable for induced infringement of the ’793 patent even though the Board had already determined that all claims of the ’793 patent were unpatentable?

5. Did the district court err in finding infringement of claims 1-3 of the ’066 patent where UTC did not compare the construed claims to the accused product?

## INTRODUCTION

This appeal concerns Liquidia’s YUTREPIA™ product, a dry powder inhalation formulation of treprostinil tentatively approved by the FDA for the

treatment of pulmonary arterial hypertension, a chronic, life-threatening disease. Liquidia successfully proved at the district court that two asserted Orange Book listed patents—the ’901 and ’066 patents—were not infringed and, with respect to the ’066 patent, also invalid. Liquidia also successfully challenged the ’901 patent in an IPR, obtaining FWD from the Board that asserted claims 1–5, 8, and 9 were unpatentable. Yet, Liquidia’s FDA approval for YUTREPIA™ remains tentative only because the district court found the asserted claims of the ’793 patent, also listed in the Orange Book, valid and infringed despite an earlier IPR FWD from the Board finding all asserted claims unpatentable.

The ’793 patent claims include two pertinent limitations: (1) “treating pulmonary hypertension,” through (2) administration by inhalation of a “therapeutically effective single event dose” of treprostinil. The specification makes clear that pulmonary hypertension (“PH”) may occur for various reasons and, is categorized into five (5) different Groups by the WHO (Groups 1, 2, 3, 4 and 5). The specification and examples also make clear that the claimed method requires safely and effectively treating a patient’s PH by administering treprostinil by inhalation. While the court correctly construed the scope of “treating pulmonary hypertension” to include all five Groups of PH, the court strayed from the specification and confirmatory expert testimony and determined, *sua sponte*, that the construction of this phrase does not require “safely and effectively” treating PH, but

instead merely administering a dose of treprostinil that affects the hemodynamics of a patient. Based on this incorrect construction, and a clinical study that showed a change in hemodynamics, but was prematurely stopped due to increased mortality and lack of efficacy in treating Group 2 PH, the court found the ’793 patent claims adequately enabled and described the full scope of treating PH.

The court’s enablement and written description decisions stand in stark contrast to the specification, expert testimony, and state of the art at the time of the invention. Both parties’ experts agreed that among the five PH Groups, the specification only describes and includes examples of treating Groups 1, 3 and 4, but no information about treating isolated Group 2 PH—a Group that accounts for 50% of all PH patients. The lack of disclosure is not surprising because the prior art clinical study established that administering prostacyclin vasodilators, like treprostinil, not only has no beneficial effect in treating an isolated Group 2 patient’s PH, but the hemodynamic effect itself leads to death and/or an increased risk of death such that the study was stopped. Indeed, the experts also agreed that vasodilators, like treprostinil, were not and still are not used today to treat isolated Group 2 PH patients due to these significant safety issues, and the demonstrated lack of efficacy in this large patient population. The evidence at trial leads to the inescapable conclusion that the asserted ’793 patent claims are not enabled for their full scope, including isolated Group 2 PH, and the inventors never possessed a method of

treating this large group of PH patients. The court's decision on validity must be reversed and the '793 patent invalidated.

Separately, the court found Liquidia liable for induced infringement of the '793 claims despite that, nearly a month prior, the Board issued its IPR FWD rendering unpatentable all claims of the '793 patent. In doing so, the court disregarded the Supreme Court's *Commil* decision, indicating that actual knowledge of patent invalidity, obtained through a successful IPR FWD decision, negates an accused inducer's liability for infringement under 35 U.S.C. § 271(b). Despite the lack of any requirement for finality upon appeal in *Commil*, the court required collateral estoppel to take effect before liability is negated, thereby improperly conflating liability for infringement and invalidity. This decision was clearly wrong and requires reversal.

Finally, claims 1, 2, and 3 of the '066 patent require, in pertinent part, "a level of one or more impurities found in the starting batch of treprostinil is lower in the pharmaceutical composition[.]" Despite never presenting evidence comparing the level of impurities in Liquidia's "pharmaceutical composition" to the impurities in the "starting batch of treprostinil" as required by the claims, the court found infringement by relying on UTC's proxy for the pharmaceutical composition and speculative testimony from UTC's expert that, based on this proxy, he would "expect" the impurities in the actual pharmaceutical composition to be lower.

UTC's proxy, however, is not representative of the identified "pharmaceutical composition," and the court's reliance on such evidence was clearly erroneous, requiring reversal.

## STATEMENT OF THE CASE

### I. YUTREPIA™

Pulmonary hypertension is a potentially life-threatening condition characterized by persistent and progressive shortness of breath, fatigue and dizziness. Appx13165-13166 (562:18-563:2); Appx13197 (685:22-686:9). Liquidia developed YUTREPIA™ (formerly LIQ861) to treat pulmonary arterial hypertension ("PAH"), one of five sub-groups of PH.

Liquidia filed its NDA for YUTREPIA™ on January 24, 2020. Appx08605 (¶ 2); Appx13206 (722:20-723:9). YUTREPIA™ is not a generic version of any currently marketed drug but is instead a new product developed by Liquidia that utilizes Liquidia's proprietary PRINT technology. Appx13200 (696:6-12); Appx13206 (721:17-722:19); Appx13448-13464. YUTREPIA™ is a first-of-its-kind powder formulation that is easier to use than other PAH drugs, leading to improved patient compliance and disease outcomes. Appx13206 (721:17-25), Appx13207 (724:19-725:1), Appx13211 (741:17-19); Appx29466-29467. Liquidia was the first company to receive tentative FDA approval for a dry powder formulation of treprostinil for the treatment of "pulmonary arterial hypertension

(PAH; WHO Group 1)," which is one of the five recognized PH Groups. Appx13207 (724:19-725:1); Appx29537, Appx29540-29541; Appx13450-13452.

Treprostinil is the active pharmaceutical ingredient ("API") in YUTREPIA™. Liquidia obtains treprostinil from a third party-contractor, Yonsung, who manufactures the treprostinil according to its DMF. Appx13126-13127 (406:23-407:1, 408:3-21); Appx13593. Yonsung makes treprostinil (identified as "TN02") and then makes a salt of treprostinil, treprostinil sodium (identified as "TN"). Appx00024; Appx13127 (408:3-21). Using the TN from Yonsung as a starting material, Liquidia prepares a treprostinil bulk powder (LIQ861 bulk powder) using its proprietary PRINT process and further processes this bulk powder into capsules. Appx13126-13127 (406:23-407:1, 408:3-21); Appx13137 (447:12-449:9); Appx13211 (741:7-16); Appx14131-14144.

## II. PULMONARY HYPERTENSION

The pulmonary circulation supplies oxygenated blood to the body. The circulation carries deoxygenated blood from the right side of the heart to the lungs, where it is oxygenated in the pulmonary capillaries. Appx13477-13481; Appx13166 (563:14-564:17). The circulation then carries the blood back to the left side of the heart and then out to the body. *Id.*

PH is a chronic condition and generally refers to elevated pressure in the lungs. Appx13165 (562:13-22), Appx13183 (629:9-630:13); Appx00162 (1:37-40);

Appx00146-00170; Appx31018 (¶ 127); Appx00059. The elevated pressure does not have a single cause. Instead, PH includes a range of conditions classified into five different groups, first designated by the WHO. Appx0059-00060; Appx00162 (1:41-46); Appx13166 (563:3-10, 564:18-566:24), Appx13169 (575:22-576:25), Appx13177 (609:18-610:11); Appx29475-29482. Groups 1, 3, and 4 PH are caused by conditions affecting the precapillary vessels of the lungs—either by thickening of the precapillary vessels (Group 1), damage to or destruction of the lung tissue and precapillary vessels (Group 3), or blood clots in the precapillary vessels resulting in blockage of blood flow (Group 4). Appx13166 (564:18-566:4); Appx29475-29476. Group 5 includes miscellaneous causes for PH that do not fit well into Groups 1, 2, 3 or 4. Appx13166 (566:5-7). In all of Groups 1, 3, and 4, resistance to blood flow in the precapillary vessels of the lungs increases because the vessel walls are narrowed, damaged, or blocked. Appx13166 (564:18-566:4); Appx29475-29476. Because this condition affects blood vessels found before the pulmonary capillaries, Groups 1, 3, 4 (and 5) are also referred to as ***pre***capillary PH. Appx00059-00060, Appx13166 (563:3-565:3, 564:18-566:4), Appx13169-13170 (577:14-579:24), Appx13173 (591:24-592:2), Appx13184 (634:24-635:10). PAH is one form of precapillary PH.

In contrast, the defect in Group 2 PH patients is *not* in the narrowing, damage, or blockage of the precapillary vessels of the lungs, but instead a defect in the left

side of the heart. Appx00059-00060; Appx13166 (565:4-16), Appx13168 (571:17-24), Appx13183 (630:10-13); Appx29476. Because the underlying cause of PH in these patients is left heart disease ("LHD") or conditions affecting the left heart (to which the blood flows after the capillaries in the lung), Group 2 PH is also referred to as ***post***capillary PH. Appx00059-00060; Appx13166 (564:5-17, 565:4-16), Appx13168 (571:17-24), Appx13183 (630:4-17).

Approximately fifty percent (50%) of all PH patients have isolated Group 2 PH, meaning they have only LHD and no precapillary cause for their PH. Appx13167-13168 (568:9-569:5, 569:9-570:25, 571:2-573:1), Appx13172 (589:14-17); Appx30699-30710 (reporting 52% of PH patients had isolated Group 2 PH); Appx29500-29513 (reporting that 78.7% of PH patients had LHD). Accordingly, approximately 50% of PH patients (isolated Group 2), have a completely different cause for their PH than the precapillary Groups 1, 3, 4 and 5 PH patients. *Cf. id.*

## III. THE CHALLENGED PATENTS

### A. The '793 Patent

The '793 patent, which has a priority date of May 15, 2006, is directed to a "[a] method of treating pulmonary hypertension comprising administering by inhalation to a human suffering from pulmonary hypertension a therapeutically effective single event dose of a formulation comprising treprostinil[.]" Appx00146, Appx00170 (cl. 1). Treprostinil belongs to a class of compounds known as

prostacyclins, which dilate precapillary blood vessels and can, in some cases, help to decrease pulmonary arterial pressure ("PAP") or pulmonary vascular resistance ("PVR") in the lungs. Appx00058 (¶¶ 4-5); Appx13168 (573:19-574:15); Appx00164 (5:37-39). This decrease in pressure or resistance is referred to as a hemodynamic change. Appx00058 (¶¶ 4-5); Appx13169 (577:21-578:8), Appx13175 (602:14-22).

The '793 patent describes PH broadly, stating that "[g]enerally, pulmonary hypertension is defined through observations of pressures above the normal range" (Appx00162 (1:37-38)), and that PH "may occur due to various reasons and the different entities of pulmonary hypertension were classified based on clinical and pathological grounds in 5 categories according to the latest WHO convention, see e.g., Simonneau G., et al. J. Am. Coll. Cardiol. 2004; 43(12 Suppl S):5S-12S." Appx00162 (1:41-46). Based on these disclosures, and the fact that the specification "does not contain any disclosures which limit the scope of 'pulmonary hypertension' to any particular subset of PH patients[,]" the court construed "treating pulmonary hypertension" to encompass "treating all five Groups of PH[,]" including isolated Group 2 PH. Appx00059-00061.

Although the '793 patent claims are directed broadly to a method of treating all five Groups of PH, the two Examples in the specification only describe administering treprostinil to precapillary, and not postcapillary isolated Group 2, PH

patients. Appx00062 (noting the "experts agree that the '793 patent only describes treating Groups 1, 3, and 4 PH, which are all precapillary"). Example 1 describes a study to examine the safety, tolerability, and potency of inhaled treprostinil applied in seconds using a soft-mist inhaler. Appx00165 (8:63-67). All 54 patients in the study had "moderate to severe precapillary pulmonary hypertension." Appx00166 (9:35-36). Example 1 identifies patients with Groups 1, 3, and 4 PH. Appx00166 (9:44-47) (describing "[d]isease etiologies were idiopathic PAH (iPAH) (n=13), PAH other (n=11), chronic thromboembolic pulmonary hypertension (CTEPH) (n=17) and pulmonary fibrosis (n=4)"); Appx13169-13170 (577:14-579:6).

Example 2 describes measuring hemodynamic changes after treprostinil inhalation in only precapillary PH patients. Appx00167 (12:8-27). Example 2 contains three studies, all of which describe administration of an inhaled solution of treprostinil. Appx00167-00168 (12:60-14:47). Like Example 1, Example 2 only identifies patients in Groups 1, 3, and 4. Appx00168 (Table 3) (explaining "[e]tiology of pulmonary hypertension was classified as idiopathic PAH (i), PAH of other causes (o), chronic thromboembolic PH (t), and pulmonary fibrosis (f)"); Appx13170 (579:7-580:23).

### B. The '066 Patent

The '066 patent's product-by-process claims (1-3, 6 and 9) are directed to treprostinil, or a pharmaceutically acceptable salt thereof, made by a specific

process. Appx00121-00132. Claim 1 and dependent claims 2, 3, and 6 include the following process step: "starting batch of treprostinil having one or more impurities resulting from prior alkylation and hydrolysis steps . . . whereby a level of one or more impurities found in the starting batch of treprostinil is lower in the pharmaceutical composition, and wherein said alkylation is alkylation of benzindene triol." Appx00132 (cl. 1).

Claim 6, which depends from claim 1, and claim 8 require storage. Claim 6 of the '066 patent recites "the isolated salt is stored at ambient temperature"; and claim 8 recites "storing the treprostinil salt at ambient temperature, and preparing a pharmaceutical product from the treprostinil salt after storage[.]" Appx00132 (cls. 6, 8).

### C. The '901 Patent

The claims of the '901 patent, like the claims of the '066 patent, are product-by-process claims directed to treprostinil made by a specific process. Appx00133-00145. The '901 patent is a continuation of U.S. Application No. 13/933,623, and the '066 patent is a divisional of the same application. Appx00133 (Related U.S. Application Data); Appx00121 (Related U.S. Application Data). As such, the '066 and '901 patents share a specification.

## IV. PROCEEDINGS BELOW

### A. The District Court Proceeding

UTC asserted the '901 and '066 patents against Liquidia on June 4, 2020. Appx00171. After Liquidia filed its NDA, UTC filed the application leading to the '793 patent, which issued on July 21, 2020, and this patent was added to the district court action on July 22, 2020. Appx08603-08609 (¶ 35); Appx00146; Appx00187-00207. On June 16, 2021, the court issued its first claim construction order and, in pertinent part, construed "stored"/"storage"/"storing" in claims 6 and 8 of the '066 and claim 6 of the '901 patent to have their plain and ordinary meaning and "ambient temperature" to mean "room temperature (equal to or less than the range of 15°C to 30°C)." Appx04889-04890; Appx00031. The court, however, deferred on construing additional disputed terms in the '901 patent. Appx04889 (n.1). Later, on November 18, 2021, the court construed the phrase "contacting the solution comprising treprostinil from step (b) with a base to form a salt of treprostinil" in claims 1 and 8 of the '901 patent to mean "contacting the solution comprising treprostinil from step (b) with a base to form a salt of treprostinil, wherein the salt is formed without isolation of treprostinil after alkylation and hydrolysis." Appx06245, Appx06235-06244. Based on this construction, UTC stipulated to partial judgment of non-infringement of the '901 patent. Appx06711-06713. In view of UTC's stipulation, Liquidia stipulated not to present evidence of non-

infringement and invalidity of the asserted claims of the ’901 patent at trial, but expressly reserved its right to present the evidence at a future trial should UTC prevail in any appeal of the court’s claim construction. Appx12982-12984.

The district court conducted a bench trial from March 28 to 31, 2022, where Liquidia presented non-infringement and invalidity defenses with respect to the ’066 and ’793 patents. As discussed below, the court issued its opinion on August 31, 2022. Appx00020-00074.

### B. The Board’s Decision Rendering the ’793 Patent Claims Unpatentable

On November 3, 2020, the district court denied UTC’s motion to dismiss Liquidia’s invalidity defenses based on assignor estoppel. Appx01358-01360. UTC continued to pursue its assignor estoppel defense, including in pre-trial submissions, but ultimately did not try the issue. Appx08938-08940 (¶¶ 136-140). Due to UTC’s assignor estoppel allegations, and because assignor estoppel does not apply to IPR proceedings, Liquidia filed an IPR petition on the ’793 patent to preserve its prior art invalidity defenses. The IPR was instituted on August 11, 2021. Appx31149.

On July 19, 2022, before the district court issued its opinion, the Board found all claims of the ’793 patent unpatentable as obvious over the prior art under 35

U.S.C. § 103. Appx31145-31196.[1] Liquidia submitted the ’793 FWD to the district court on July 19, 2022 (Appx31145-31196), and subsequently, the court requested additional briefing to address the issue as to whether the ’793 FWD “compels that [the district court] treat the 793 patent as being invalid.” Appx00118 (D.I. 426). The parties submitted their additional briefing on August 15, 2022. *Id*; Appx31197-31201; Appx31202-31205.

### C. The Board’s Decision Rendering Unpatentable Claims 1-5, 8 and 9 of the ’901 Patent

On March 30, 2020, Liquidia petitioned for IPR of the ’901 patent. Appx05838, Appx05893. The Board instituted the IPR on October 13, 2020, and on October 8, 2021, the Board concluded that claims 1-5, 8 and 9 were unpatentable. Appx05832-05900. In its FWD, the Board construed “storing”/”storage” (terms recited in claim 6) to “require storing or storage for a period of at least three months.” Appx05835, Appx05861. The Board’s construction is materially different from, and non-overlapping with the district court’s construction of these same terms to have their “plain and ordinary meaning,” without a specified time requirement. Appx04889. Based on its construction, the Board determined that Liquidia did not meet its burden to establish claims 6 and 7 unpatentable. Appx05838. UTC filed a

[1] UTC requested rehearing of the ’793 FWD on August 18, 2022, but the Board has not yet issued its decision.

request for rehearing on November 8, 2021, which the Board denied on June 14, 2022. Appx31367; Appx31383-31387. The ’901 FWD is now on appeal before this Court as Case Nos. 22-2133, 22-2174.

### D. The District Court’s Trial Opinion

Following trial and post-trial briefing, the court found all asserted claims of the ’793 patent valid and infringed and claims 1, 2, 3, 6, and 9 of the ’066 patent invalid and claims 6, 8 and 9 not infringed. Although the district court determined that claims 1, 2, and 3 of the ’066 patent are invalid, it determined these claims were nonetheless infringed. Appx00031, Appx00045, Appx00055, Appx00065, Appx00068, Appx00073; Appx13221 (780:19-22). The district court entered judgment, staying the approval of Liquidia’s NDA for YUTREPIA™ until the May 5, 2027, the expiration date of ’793 patent. Appx00076 (¶ 4).

#### a. The district court interpreted the “method of treating pulmonary hypertension” to include treatments that cause patient death, leading to a finding of adequate enablement and written description

The district court construed “treating pulmonary hypertension” to encompass “treating all five Groups of PH,” including isolated Group 2 PH. Appx00058 (¶ 3), Appx00059-00061. The court further determined, however, that the “method of treating pulmonary hypertension” “do[es] not require ‘*safely and effectively* treating pulmonary hypertension,’” as “[t]he only effectiveness that is claimed is ‘a therapeutically effective single event dose of ... treprostinil.’” Appx00063 (emphasis

in original), Appx00065 ("Liquidia's position seems to be based on the flawed premise that the claims require 'a method of safely and effectively treating pulmonary hypertension.'"). Based on the court's construction of "treating pulmonary hypertension" to exclude safety, and its construction of "therapeutically effective single event dose" to require only "a dose [of treprostinil] given in a single treatment session that causes an improvement in a patient's hemodynamics (reduced PAP or PVR)[,]" the court concluded that the claimed "method of treating" isolated Group 2 PH patients was adequately enabled and described. Appx00052, Appx00063-00065. The court did so because, in its view, treprostinil can impact a Group 2 PH patient's hemodynamics. Appx00063-00065. Liquidia appeals the district court's judgment with respect to its exclusion of "safety" from the "method of treating pulmonary hypertension" as it is contrary to the plain meaning and unsupported by the specification. Liquidia also appeals the district court's determinations that the method of treating isolated Group 2 PH patients—over 50% of all PH patients encompassed by the asserted claims—is enabled and adequately described. Indeed, the sole basis for the district court's determination that treprostinil can be used to treat isolated Group 2 PH is a clinical trial, the FIRST study, where it was demonstrated that while some Group 2 PH patients experienced changes in PAP and PVR, those changes did not impart a beneficial impact to the patients' condition and, more critically, the study was prematurely stopped because

of increased mortality rates in the treated patient group. Appx00063-00064; Appx29455-29465.

#### b. The district court found Liquidia will induce infringement of the invalid '793 patent

Even though the Board found the '793 patent unpatentable over the prior art before the district court issued its opinion, the court found that Liquidia nonetheless possessed the requisite specific intent to induce infringement. Appx00055-00057. The court acknowledged the Supreme Court's decision in *Commil USA, LLC v. Cisco Systems, Inc.*, 575 U.S. 632, 644 (2015), which states "if . . . an act that would have been infringement or an inducement to infringe pertains to a patent that is shown to be invalid, there is no patent to be infringed[,]" and that "if the patent is indeed invalid, and shown to be so under proper procedures, there is no liability." Appx00056 (quoting *Commil*, 575 U.S. at 644). The court nonetheless determined that the Board's conclusion of unpatentability, and Liquidia's knowledge of it, does not negate liability for infringement until collateral estoppel is in effect, which would not apply until the '793 FWD is "affirmed or the parties waive their appeal rights." Appx00056-00057. Liquidia appeals the district court's judgment with respect to induced infringement. Under *Commil*, "seek[ing] *inter partes* review at the [Board] and receiv[ing] a decision as to validity within 12 to 18 months[,]" is a "proper procedure[]" that, if successful as here, precludes Liquidia from being liable for

induced infringement and eliminates Liquidia's subjective intent to infringe. *Commil*, 575 U.S. at 644-45; 35 U.S.C. § 316(a)(11).

**c. The district court found Liquidia will infringe claims 1, 2, and 3 of the '066 patent despite UTC not comparing the accused product to the asserted claims**

The district court found, as argued by UTC, that Liquidia's LIQ861 bulk powder is a "pharmaceutical composition" that infringes claims 1, 2, and 3. Appx00025-00031. The parties' infringement dispute for claims 1, 2, and 3 centered on the impurity process steps in claim 1, which requires a "pharmaceutical composition comprising treprostinil" "prepared by a process comprising a starting batch of treprostinil having one or more impurities resulting from prior alkylation and hydrolysis steps . . . whereby a level of one or more impurities found in the starting batch of treprostinil is lower in the pharmaceutical composition." Appx00023, Appx00025-00026. Accordingly, claim 1 requires a comparison of the impurities in the "starting batch of treprostinil" to those same impurities in the "pharmaceutical composition." UTC identified TN02 as the "starting batch of treprostinil," and LIQ861 bulk powder as the "pharmaceutical composition" of claim 1. Appx00026. As the court found, the production of Liquidia's LIQ861 bulk powder begins with third-party contractor Yonsung, who manufactures treprostinil (TN02) and combines it with a base (sodium) to make treprostinil sodium salt (TN). Appx00024; Appx13126-13127 (406:23-407:1, 408:3-21); Appx13593. TN is then

shipped to Liquidia in the United States, who subjects TN to its proprietary PRINT process to make LIQ861 bulk powder by first dissolving TN in solution. Appx13126-13127 (406:23-407:1, 408:3-21), Appx13137 (447:12-448:23, 448:449:9); Appx13211 (741:7-16); Appx13206 (722:10-19).

To determine whether Liquidia infringed claim 1, the court relied on testimony from UTC's expert, Dr. Nuckolls, comparing the impurity profile of TN02 to TN to conclude "impurities that were generated during the alkylation and hydrolysis steps . . . were reduced" and "Liquidia will meet the impurities limitation of claim 1." Appx00030-00031. TN, however, is not the "pharmaceutical composition" of claim 1. UTC's expert admitted that he did not compare impurities in the LIQ861 bulk powder to the starting batch of TN02 or determine if there was an actual reduction in impurities between the two. Appx13055 (122:24-123:1 ("Q. Did you look at the impurities in the pharmaceutical composition of LIQ861 in your analysis? A. No.")); Appx13058 (133:22-134:3). Without evidence, Dr. Nuckolls instead speculated that he "wouldn't expect" Liquidia's processing of TN to impact the impurities. Appx13064 (157:14-17); Appx00027. Liquidia appeals the district court's judgment with respect to infringement of claims 1, 2 and 3 because UTC did not properly compare the accused product "LIQ861 bulk powder" to the claims and instead improperly used TN, which is the starting material used to make LIQ861

bulk powder, as a proxy for the claimed "pharmaceutical composition" without demonstrating TN is representative of LIQ861 bulk powder.

## SUMMARY OF ARGUMENT

This Court should reverse the district court's validity and infringement decisions with respect to the '793 patent for the following reasons:

1. The district court legally erred by misconstruing "treating pulmonary hypertension" to exclude safely treating this disease because the plain meaning, supported by the specification, publications and expert testimony, all indicate that "treating pulmonary hypertension" requires safety and efficacy;
2. Regardless of whether the Court applies the proper construction of "treating pulmonary hypertension" to include safety and efficacy, the '793 patent is not enabled for the full scope of treating isolated Group 2 PH with inhaled treprostinil because the evidence establishes that treprostinil is neither safe nor effective, and would not treat this patient population;
3. Regardless of whether the Court applies the proper construction of "treating pulmonary hypertension" to include safety and efficacy, the '793 patent does not adequately describe the full scope of "treating pulmonary hypertension" with inhaled treprostinil because the specification fails to provide any

information sufficient for a POSA to conclude that the inventors were in possession of this invention; and

4. Liquidia is not liable for induced infringement of the ’793 patent because the Board’s FWD, rendering unpatentable all claims of the ’793 patent, negates Liquidia’s liability.

This Court should also reverse the district court’s infringement decision with respect to the ’066 patent because:

1. UTC failed to meet its burden on infringement of claims 1, 2, and 3 because it failed to compare the impurities in TN02 (the identified “starting batch of treprostinil”) to the impurities in LIQ861 bulk powder (the identified “pharmaceutical composition”) and did not establish that TN is representative of LIQ861 bulk powder for infringement purposes.

## ARGUMENT

## I. STANDARD OF REVIEW

The Court reviews the district court’s conclusions of law *de novo* and its factual findings for clear error. *Par Pharm., Inc. v. Eagle Pharms., Inc.*, 44 F.4th 1379, 1383 (Fed. Cir. 2022). A factual finding is clearly erroneous when the Court is left with a definite and firm conviction that a mistake has been made. *Par Pharm.*, 44 F.4th at 1383.

Claim construction is ultimately an issue of law, which this Court reviews *de novo*. *Eli Lilly & Co. v. Hospira, Inc.*, 933 F.3d 1320, 1328 (Fed. Cir. 2019). The district court's findings of fact on "evidence 'intrinsic to the patent (the patent claims and specification, along with the patent's prosecution history)'" are reviewed *de novo* while extrinsic findings of fact are reviewed for clear error. *Id.* (citations omitted).

Whether a claim satisfies the written description requirement is a question of fact, reviewed for clear error following a bench trial. *Novartis Pharms. Corp. v. Accord Healthcare, Inc.*, 38 F.4th 1013, 1016 (Fed. Cir. 2022) (citations and internal quotation marks omitted). Enablement is a question of law that the Court reviews *de novo* with underlying factual underpinnings reviewed for clear error. *ALZA Corp. v. Andrx Pharms., LLC*, 603 F.3d 935, 940 (Fed. Cir. 2010).

Patent infringement is a question of fact that is reviewed for clear error. *Par Pharm.*, 44 F.4th at 1383 (citing *ALZA Corp. v. Mylan Lab'ys, Inc.*, 464 F.3d 1286, 1289 (Fed. Cir. 2006)).

## II. THE DISTRICT COURT ERRED IN EXCLUDING "SAFETY" FROM THE SCOPE OF "TREATING PULMONARY HYPERTENSION"

In evaluating whether the full scope of "treating pulmonary hypertension" was adequately enabled and described, the district court concluded that the claimed method "do[es] not require '*safely and effectively* treating pulmonary hypertension[.]'" Appx00063 (emphasis in original), Appx00065 ("Liquidia's

position seems to be based on the flawed premise that the claims require 'a method of safely and effectively treating pulmonary hypertension."). It instead found the claims "require 'treating pulmonary hypertension comprising administering . . . a therapeutically effective single event dose of a formulation comprising treprostinil[,]'" which in the district court's view only requires "vasodilat[ion of] the pulmonary vasculature, affect[ing the] hemodynamics," and thus effectively "treat[ing]" a patient's elevated blood pressure. Appx00063-00064. As a consequence, the court's construction absurdly means that PH patients that exhibited an improvement in hemodynamics, including reduced PAP or PVR, but nonetheless received no benefit in the actual treatment of their condition or died as a result of the therapy, are deemed to have had their PH "treated" with a "therapeutically effective dose." This construction is unmoored from a common sense understanding of the claimed method of treatment, ignores the '793 patent claims and specification, and is inconsistent with expert testimony reflecting how a POSA would understand the claims.

### A. The '793 Patent Specification Requires that the Method of Treating Pulmonary Hypertension Be Safe and Effective

Although neither party advocated that the claimed "method of treating pulmonary hypertension" excluded safety, the court, *sua sponte*, reached this construction in its trial opinion. Appx00063. In doing so, the court pointed to the claim, noting "***[t]he claims*** do not require '*safely and effectively* treating pulmonary

hypertension,'" but instead only administering "a therapeutically effective single event dose of a formulation comprising treprostinil." Appx00063.[2] By reaching this decision, the court ignored the plain meaning of "treating," the express purpose of the claimed invention, as well as the Examples in the specification.

Claim construction begins with the claims themselves, and terms are generally given their plain and ordinary meaning. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-14 (Fed. Cir. 2005). "[T]he context in which a term is used in the asserted claim can be highly instructive[,]" and that "use of a term within the claim provides a firm basis for construing the term." *See id.* at 1314. Here, "treating" is used within the context of a method associated with a specific condition, pulmonary hypertension. As such, a POSA would understand the plain and ordinary meaning of "treating pulmonary hypertension" to include a method that accomplishes this goal both safely and effectively.

The specification of the '793 patent requires the method of treating pulmonary hypertension to be safe. *Eon Corp. IP Holdings LLC v. Silver Springs Networks, Inc.*, 815 F.3d 1314, 1320 (Fed. Cir. 2016) ("A party is, therefore, not entitled to a claim construction divorced from the context of the written description[.]" (citation and internal quotation marks omitted)); *Medrad, Inc. v. MRI Devices Corp.*, 401

[2] All emphasis added unless otherwise noted.

F.3d 1313, 1319 (Fed. Cir. 2005) ("We cannot look at the ordinary meaning of the term . . . in a vacuum. Rather, we must look at the ordinary meaning in the context of the written description and the prosecution history." (citations omitted)). In the "Detailed Description of the Invention," the specification states:

> [T]he inventors discovered that such administering ***does not cause significant side effects***, especially no significant side effects related to systemic blood pressure and circulation as well as no gas exchange deteriorations or disruptions.

Appx00164 (5:16-20). Example 1, titled: "Open Label Study Upon Acute ***Safety, Tolerability*** and Hemodynamic Effects of Inhaled Treprostinil Delivered in Seconds," concluded that "[t]he acute application of inhaled treprostinil . . . was ***safe, well tolerated*** and induced a strong and sustained pulmonary selective vasodilation." Appx00165 (8:59-61, 9:30-33); *see also* Appx00166 (10:53-57), Appx00167 (11:61-63). Example 2 also addressed safety upon inhaled administration of treprostinil, stating: "Inhaled treprostinil . . . could be ***safely*** applied in a few breaths or even one breath." Appx00167 (12:15-18). Example 2 further states that "treprostinil could be ***safely*** utilized up to a concentration of 2000 μg/ml ***without considerable side effects***." Appx00169 (16:26-27). UTC's expert, Dr. Clark, reading the '793 patent, testified that the examples "deliver a bolus of [t]reprostinil, still get efficacy, and not generate any tolerability issues[,]" and "of course, in this particular case, you need to know that it's ***safe to deliver*** it in a single bolus" of

treprostinil. Appx13234 (832:19-833:20). The court ignored this evidence and, as such, the court's construction, excluding safety from the "method of treating pulmonary hypertension" was legally incorrect as it contradicted the plain meaning as understood by a POSA and was not supported by the specification or the evidence at trial. *See Teva Pharms. USA, Inc. v. Corcept Therapeutics, Inc.*, PGR2019-00048, 2020 WL 6809812, at *7-9 (P.T.A.B. Nov. 18, 2020) (finding that the patent's claims and specification make it clear that the recited methods of treatment for controlling hyperglycemia necessarily require drug administration in a safe manner), *aff'd*, 18 F.4th 1377 (Fed. Cir. 2021).

The uncontroverted testimony at trial, credited by the district court, further confirms the "method of treating pulmonary hypertension" requires safely doing so. As recognized by the court, Dr. Hill (Liquidia's expert) testified that "as of May 15, 2006, a POSA would have had significant ***safety*** concerns about administering inhaled treprostinil ***to treat*** Group 2 PH patients." Appx00061; Appx13170-13171 (582:11-586:5), Appx13171-13172 (586:22-588:5), Appx13172 (588:9-589:10), Appx13173 (592:10-593:18); Appx13196 (681:12-682:1). The court also credited Dr. Hill's testimony concerning the FIRST study, where epoprostenol, a prostacyclin like treprostinil, was administered to Group 2 PH patients but the study failed and was prematurely stopped due to increased mortality in the treated patients as a result

of the drug. Appx00061-00062; Appx13171 (583:2-13, 585:10-14, 585:20-586:5); Appx29455, Appx29462-29463.

Accordingly, "treating pulmonary hypertension" encompasses treating all five PH groups, including isolated Group 2 PH, safely and effectively.

### B. The District Court's Construction Permits Inclusion of Pulmonary Hypertension Patients That Die as a Result of Treprostinil Administration

By excluding safety, the district court's construction of the "method of treating pulmonary hypertension" nonsensically includes treatment of patients that die due to treprostinil administration despite exhibiting "an improvement in . . . hemodynamics (reduced PAP or PVR)." Appx00063. As recognized by the district court, patients in the FIRST study exhibited changes in their hemodynamic measurements, including PAP and PVR, but ultimately, the study was stopped because patients administered epoprostenol, a prostacyclin like treprostinil, showed increased mortality rates compared to patients who were not given the drug. Appx00061-00062, Appx00064; Appx13171 (583:4-13, 585:10-14, 585:21-586:2); Appx13197-13198 (687:6-688:9); Appx29455, Appx29461 ("Despite the theoretical rationale . . . chronic infusion of epoprostenol in patients with [isolated Group 2 left heart disease] was associated with increased mortality rates and no improvement in quality of life"). Clearly, the plain meaning of "treating pulmonary

hypertension" requires safe and effective treatment that benefits patients in all five PH Groups as opposed to killing them.

## III. THE '793 PATENT DOES NOT ADEQUATELY ENABLE THE FULL SCOPE OF "TREATING PULMONARY HYPERTENSION"

"Claims are not enabled when, at the effective filing date of the patent, [a POSA] could not practice their full scope without undue experimentation." *Wyeth & Cordis Corp. v. Abbott Lab'ys*, 720 F.3d 1380, 1384 (Fed. Cir. 2013) (citation omitted); *ALZA Corp.*, 603 F.3d at 940. The Federal Circuit has set forth eight "[f]actors to be considered in determining whether a disclosure would require undue experimentation": "(1) the quantity of experimentation necessary, (2) the amount of direction or guidance presented, (3) the presence or absence of working examples, (4) the nature of the invention, (5) the state of the prior art, (6) the relative skill of those in the art, (7) the predictability or unpredictability of the art, and (8) the breadth of the claims." *In re Wands*, 858 F.2d 731, 737 (Fed. Cir. 1988).

Here, the court properly construed "treating pulmonary hypertension" to include treating all five Groups of PH, which includes isolated Group 2 PH patients. Appx00061; *see also* Appx00162 (1:37-38, 1:41-46); Appx13169-13170 (575:19-576:25, 580:24-581:2). But, by improperly excluding safety from the claimed method, the court was able to conclude that the '793 patent enables the full scope of "treating pulmonary hypertension." The court completely disregarded the elevated risk of death and concluded that "even with a risk of pulmonary edema, a POSA

would understand that the claimed administration of treprostinil would vasodilate the pulmonary vasculature, affect hemodynamics, and treat a patient's elevated pulmonary blood pressure, i.e., treat PH[,]" including isolated Group 2 PH. Appx00063-00064. The court's sole evidence for any alleged effectiveness of treprostinil in isolated Group 2 PH, and ultimately to support its enablement opinion, is the FIRST study. Appx00064. The court characterized the findings of the FIRST study as demonstrating that "treating isolated Group 2 PH patients with a prostacyclin had preliminary clinical evidence of benefit and a statistically significant acute hemodynamic improvement, including a reduction of mean PAP, wedge pressure, and PVR, and improvements in exercise duration and dyspnea score." *Id.* But the court's fact finding is clearly erroneous in view of the express findings of the FIRST study and undisputed testimony by the parties' clinical experts that prostacyclin administration did not provide a benefit to the patients in the study.

### A. When Properly Construed to Include Safety, the District Court Erred in Finding the '793 Patent Enabled for the Full Scope of "Treating Pulmonary Hypertension"

Liquidia's expert, Dr. Hill, testified on the considerable evidence at the time of the filing of the '793 patent that demonstrated the grave risk of administering prostacyclins like treprostinil to isolated Group 2 PH patients. As Dr. Hill explained, using a prostacyclin vasodilator, like treprostinil, in isolated Group 2 PH patients that have LHD is problematic because the purpose of the vasodilator is to open blood

vessels, permitting more blood flow, which would increase the pressure in the left heart "creating a potentially life-threatening situation." Appx13172 (587:8-22). Because of these significant safety concerns, a POSA would have been discouraged from using inhaled prostacyclins in isolated Group 2 PH patients, as further increasing the pressure in the left heart (the locus of their pathology), could create this life-threatening scenario. Appx13172 (587:5-588:5, 588:20-589:10), Appx13196 (681:8-682:1); *see also* Appx29438-29454; Appx29468-29474.

Additionally, in the prior art FIRST study, patients with Group 2 PH were treated with epoprostenol, a prostacyclin similar to treprostinil that also vasodilates blood vessels. Appx13168 (573:19-574:15), Appx13170-13171 (582:6-583:23). Rather than supporting any "clinical evidence of benefit" of a vasodilator to isolated Group 2 PH patients as the district court found, the FIRST study concluded "[c]hronic intravenous epoprostenol therapy ***is not associated*** with improvement in distance walked, quality of life, or morbid events and ***is associated with an increased risk of death***." Appx29455; *see also* Appx13171 (585:21-586:2). The paper further concluded:

> In summary, despite both conceptual and preliminary clinical evidence of benefit, ***chronic epoprostenol infusion*** in severe left ventricular failure [which would include isolated Group 2 PH] ***resulted in increased mortality rates and no evidence of improved quality of life***. Efforts to improve the plight of severely symptomatic patients caused by left ventricular failure should focus on other avenues.

Appx29462-29463; *see also* Appx00061-00062. Because more people died in the epoprostenol treatment group than the control group, the study was prematurely stopped. Appx13171 (583:4-13, 585:10-14, 585:21-586:2); Appx29455, Appx29461.

Dr. Hill similarly concluded that the FIRST study, rather than supporting any treatment of isolated Group 2 PH patients with prostacyclins, actually found "increased mortality rates and no evidence of improved quality of life[,]" and therefore raised concerns about administering prostacyclins like treprostinil in isolated Group 2 PH patients. Appx13171 (585:25-586:5). While some patients in the FIRST study showed acute changes in hemodynamics, vasodilator administration caused increased risk of death and was not a successful treatment for isolated Group 2 PH. Appx13171 (583:4-585:14, 585:21-586:5); Appx29461 ("These trials together lend considerable support to the concept that systemic vasodilators may be detrimental in terms of clinical outcome despite short-term symptomatic benefit."). Dr. Hill concluded that the FIRST study was a "negative trial," which demonstrated that "an acute vasodilator that looks promising does not necessarily translate into an effective therapy." Appx13171 (585:10-14, 585:21-586:2).

Similarly, the label for Ventavis®, a prior art approved inhaled prostacyclin treatment for Group 1 PAH, came with a warning that it could cause pulmonary

edema (swelling in the lungs). Clinicians were advised to stop treatment if pulmonary edema occurs as the edema could be a sign of pulmonary venous hypertension (also known as Group 2 PH), or increased pressure in the postcapillary vasculature returning blood to the left heart. Appx29443; Appx13171-13172 (586:6-588:5); Appx13167 (567:19-568:2); Appx13177 (609:22-25). Dr. Hill explained that the Ventavis® warning counseled patients against using prostacyclins in Group 2 PH because:

> [I]f you open up the precapillary vessels and allow more blood to flow through into the capillaries and then into the pulmonary veins, it could increase the pulmonary venous pressure, the pressure filling the left heart, and that increase in the capillaries can cause leakage of fluid into the gas exchanging areas of the lungs, interfering with oxygenation and creating a potentially life-threatening situation.

Appx13172 (587:13-22). And if Dr. Hill's unrebutted testimony and the actual conclusions from the FIRST study and the Ventavis® label were insufficient, the court expressly found a "physician would have certain safety concerns about treating Group 2 PH patients–particularly isolated Group 2 PH patients–with treprostinil." Appx00063. The court credited Dr. Hill's testimony on the FIRST study and Ventavis® (Appx00061-00062), and UTC offered no expert testimony to rebut it.

Based on these facts, and applying the *Wands* factors, a POSA would have required undue experimentation to practice the full scope of the claimed "treating pulmonary hypertension," including isolated Group 2 PH patients. The claims, as

the court found, are broad, covering a method of treating all five groups of PH, including isolated Group 2 PH patients. Appx00061; *see also* Appx00162 (1:37-38, 1:41-46); Appx13169-13170 (575:19-576:25, 580:24-581:2). Thus, the '793 patent must enable treating isolated Group 2 PH patients, who make up 50% of all PH patients, with inhaled treprostinil.

At trial, the experts agreed that the '793 patent provides ***no*** guidance or working examples for treating isolated Group 2 PH patients as it never describes administering treprostinil to any Group 2 PH patient, let alone addressing whether it is safe or effective in these patients. Appx00062 (noting "[t]he experts agree that the '793 patent only describes treating Groups 1, 3, and 4 PH, which are all precapillary"); Appx13169-13170 (577:14-581:2); Appx13172-13173 (590:25-592:2); Appx13184-13185 (634:22-636:5); *see generally* Appx00165-00170 (8:57-18:20). The specification has two Examples, each of which only describe treating Groups 1, 3, and 4 PH patients with inhaled treprostinil, but never treating any Group 2 PH patient. Appx00166 (9:35-36, 9:44-47), Appx00168 (Table 3); Appx13169-13170 (577:16-580:23). Because isolated Group 2 PH patients have an entirely different underlying cause for their PH than Groups 1, 3, and 4 PH patients—one that is not characterized by changes in the precapillary lung vasculature on which vasodilators like treprostinil act—disclosure of the use of inhaled treprostinil in Groups 1, 3, 4 PH patients is insufficient. Appx00060; *see* Appx13168 (574:10-15),

Appx13172 (589:24-590:10), Appx13185 (637:2-12), Appx13191 (661:14-20, 662:19-25). Even today, no prostacyclin therapy—treprostinil or otherwise—is approved to treat Group 2 PH patients, and prior attempts to use treprostinil in Group 2 PH patients have not been successful. Appx13170 (581:13-582:5), Appx13171-13172 (586:25-587:2, 588:22-589:10), Appx13173 (594:7-8), Appx13174 (595:7-12), Appx13175 (599:9-14); Appx29472.

In fact, because treprostinil's vasodilating effect (*i.e.*, opening up the precapillary vessels) and accompanying hemodynamic change it induces (*i.e.*, reduced PAP and PVR)—the basis for the court's conclusion on enablement—is the very effect that leads to death in isolated Group 2 PH patients, a POSA would not conclude that the '793 patent enables treatment of 50% of all PH patients. Given the differences in the underlying etiology and significant safety concerns, Dr. Hill testified that a POSA would need to start at "square one" to determine whether treprostinil could be used in isolated Group 2 patients at all.[3] Appx13173 (592:25-593:18). Even assuming a POSA administered inhaled treprostinil to an isolated Group 2 PH patient, the outcome would have been highly unpredictable as the prior

[3] UTC's expert did not rebut this, but instead explained a POSA would not treat an isolated Group 2 PH patient with treprostinil. Appx13185 (636:2-5, 637:2-12, 639:12-16), Appx13190-13191 (658:2-14, 659:18-660:2, 661:14-20, 662:15-25).

art establishes patients may die due to drug administration. Appx13173 (592:13-16).

Given the considerable safety concerns—including increased risk of death—associated with using a prostacyclin like treprostinil in isolated Group 2 PH patients; the vasodilating effect of treprostinil directly leading to this increased risk of death in isolated Group 2 patents; the ’793 patent’s failure to address these unique isolated Group 2 safety concerns; and the absence of any information in the literature to ameliorate a POSA’s trepidation in administering treprostinil to an isolated Group 2 patient; undue experimentation would be required to practice the ’793 patent invention in isolated Group 2 PH patients. Appx13173 (592:3-593:18), Appx13174 (595:13-20); Appx13196 (681:8-682:1). Accordingly, the district court’s conclusion that the full scope of the ’793 patent claims was enabled for “treating pulmonary hypertension” was clearly erroneous.

### B. Even Excluding Safety from the Construction of “Treating Pulmonary Hypertension,” the District Court Erred in Finding the ’793 Patent Is Enabled

Even if the Court were to adopt the district court’s construction of “treating pulmonary hypertension,” which excludes “safety,” the full scope of the ’793 patent claims are not enabled. To find enablement, the court relied on the disclosure in the FIRST study and treprostinil’s mechanism of action as a vasodilator. Appx00064. But in doing so, the court ignored the trial testimony that (1) the FIRST study

concluded that prostacyclin treatment was not effective in treating isolated Group 2 PH; and (2) treprostinil would not be given to an isolated Group 2 PH patient because, even if it has a vasodilating effect, the vasodilatory effect is not effective in treating isolated Group 2 PH. Because the underlying cause of isolated Group 2 PH is LHD, which is postcapillary, the court correctly found that the "mainstay" of treatment for isolated Group 2 PH is a diuretic, not a vasodilator like treprostinil. Appx00060.

Both parties' experts agreed that a POSA ***would not*** administer treprostinil to treat an isolated Group 2 PH patient because it would not be needed or beneficial. Dr. Hill testified that administering treprostinil to an isolated Group 2 PH patient "really doesn't make any sense because we're talking about a condition where the pressure is filling the left ventricle up. . . . And if you administer Treprostinil, the aim of which is to distend the vessels more, I don't think it would have any effect, and it would not provide any benefit." Appx13172 (590:2-10); *see also* Appx13175 (599:9-14 (Dr. Hill testifying his attempt at using treprostinil in a Group 2 PH patient was not successful)).

UTC's expert, Dr. Waxman, agreed with Dr. Hill. He testified that "any pulmonary vasodilator would probably not be needed" in isolated Group 2 PH patients and that "we wouldn't treat a postcapillary disease [like isolated Group 2 PH] with a pulmonary vasodilator of any kind." Appx13185 (637:8-12, 638:12-14);

*see also* Appx13184 (633:24-634:2 (Dr. Waxman explaining clinicians would use treprostinil for any form of ***pre***capillary, but not ***post***capillary, disease)). Dr. Waxman further testified that "patients with an increased pulmonary vascular resistance" "would be candidates for treatment with pulmonary vasodilators[,]" but "we ***wouldn't treat*** a patient whose [PVR] was normal, and in the isolated [Group 2 PH] disease state, the [PVR] is normal." Appx13191 (661:14-20, 662:21-25). Thus, UTC's own expert testified that improved hemodynamic changes, of which reductions in PVR are one type, would not be effective or needed in treating isolated Group 2 PH patients. The district court ignored this uniform expert testimony in its opinion. *Cf.* Appx00059-00064.

Finally, UTC admitted that treprostinil would not be used to treat isolated Group 2 PH patients. In its pre-trial and post-trial briefing, UTC argued that a POSA would have known and understood that inhaled treprostinil would not be used to treat an isolated Group 2 PH patient. Appx08650 (¶ 339); Appx30988-30989. Indeed, UTC recognized the difference in underlying cause of isolated Group 2 PH meant treprostinil would be ineffective in these patients. Appx30988 ("But because the cause [of Group 2 PH] is the left heart, not precapillary resistance, the POSA in practice would use a different drug"); Appx31019-31020 (¶ 132 ("Treprostinil thus treats PH by counteracting the constriction of pulmonary blood vessels.")); Appx31018-31019 (¶¶ 127-128 ("In precapillary disease, narrowed pulmonary

arteries or other causes increase resistance to blood flow . . . [Group 2] PH is caused by stiffening in the left ventricle of the heart")).

Consistent with the testimony, the court also expressly found (1) Group 1, 3, and 4 PH patients are classified as "precapillary PH" where isolated Group 2 PH patients are classified as "postcapillary PH"; (2) the underlying cause of PH in isolated Group 2 PH patients ***is different*** from Group 1, 3, and 4 PH patients; (3) because the cause of isolated Group 2 PH is LHD and not narrowed, damaged, or blocked precapillary vessels, the "'mainstay of treatment' by POSAs for postcapillary PH is a diuretic, not a vasodilator like treprostinil;" and (4) the parties' experts agree that "a POSA would not treat postcapillary PH [isolated Group 2] with treprostinil" and, in fact, in Dr. Hill's case, it would "stupid" to do so because of treprostinil's mechanism of action. Appx00060, Appx00062, Appx00063. Thus, ***even ignoring safety*** as the district court did, any changes in hemodynamics caused by the inhalation of treprostinil provide no actual benefit to a Group 2 PH patient—it is not effective as a treatment for isolated Group 2 PH. *See Trs. Of Bos. Univ. v. Everlight Elecs. Co.*, 896 F.3d 1357, 1364 (Fed. Cir. 2018) (finding a patent invalid where one of six embodiments encompassed by the claims was not enabled). Regardless of safety issues, the court clearly erred in finding the full scope of "treating pulmonary hypertension" enabled.

As demonstrated at trial, due to significant safety issues associated with administration of vasodilators like treprostinil in isolated Group 2 PH patients and no evidence that they have beneficial effect in isolated Group 2 PH, a POSA would not conclude that the ’793 patent enables the full scope of “treating pulmonary hypertension.” And even when safety is ignored, a POSA would understand that treprostinil would not be effective to treat an isolated Group 2 PH patient. For these reasons, considered collectively or independently, the district court’s finding that the claims of the ’793 patent are enabled should be reversed.

## IV. THE ’793 PATENT DOES NOT ADEQUATELY DESCRIBE THE FULL SCOPE OF “TREATING PULMONARY HYPERTENSION”

Under 35 U.S.C. § 112, the written description of a patent must “reasonably convey[] to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date.” *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (en banc). In determining whether a specification contains an adequate written description, “one must make an ‘objective inquiry into the four corners of the specification from the perspective of a person of ordinary skill in the art.’” *Bos. Sci. Corp. v. Johnson & Johnson*, 647 F.3d 1353, 1366 (Fed. Cir. 2011) (quoting *Ariad*, 598 F.3d at 1351). Written description is not a question of whether a skilled person might be able to construct the patentee’s invention from the teachings of the disclosure; rather, it is a question of whether the application

"necessarily discloses" the particular invention. *See Purdue Pharma L.P. v. Faulding Inc.*, 230 F.3d 1320, 1327 (Fed. Cir. 2000) (citation omitted).

### A. The District Court Erred in Finding the '793 Patent Provides Sufficient Written Description When "Treating Pulmonary Hypertension" Is Properly Construed to Include Safety

Under the correct construction of "treating pulmonary hypertension" to include safety and efficacy, the '793 patent never describes treating isolated Group 2 PH patients. As the court credited, nothing in the specification describes treating isolated Group 2 PH patients with inhaled treprostinil. Appx00062 ("The experts agree that the '793 patent *only* describes treating Groups 1, 3, and 4 PH, which are all precapillary"); Appx00165-00170 (8:57-18:20); Appx13170 (580:16-581:2 ("Q. Based on your review of the patent and other than the general term 'pulmonary hypertension,' does the patent include any specific reference to treatment of group two patients? A. No, it doesn't. Q. Does it include any specific reference to administration of any drugs to group two patients? A. No, it doesn't."); *see also* Appx13170 (579:25-580:15), Appx13172-13173 (590:25-591:10, 591:16-592:2); Appx13184 (634:22-635:13 (Waxman) ("Q. Does this study that you're explaining right now include group two patients? A. Not specifically, no.")); Appx13184-13185 (635:21-636:5 (Waxman) (agreeing with Dr. Hill's opinion that "a POSA would not have understood the inventors were in possession of a method of treating [isolated Group 2 PH]" because a POSA "would not consider any pulmonary vasodilator" in

these patients)); *supra* § III.A. The four corners of the patent provide no information on treating an isolated Group 2 PH patient with inhaled treprostinil. Thus, there is no information within the '793 patent's specification sufficient for a POSA to conclude that the inventors were in possession of a method of treating isolated Group 2 PH with inhaled treprostinil.

It is not surprising the specification lacks this disclosure. By May 2006, neither treprostinil nor any other prostacyclin was used to treat isolated Group 2 PH patients, much less approved to treat Group 2 PH. *See supra* § III.A. Even today, no prostacyclin is approved to treat Group 2 PH. *Id.* Moreover, given the FIRST study and experience with Ventavis®, both demonstrating the significant safety concerns with administering a prostacyclin like treprostinil to isolated Group 2 patients, a POSA would not find treating isolated Group 2 PH patients obvious or necessarily disclosed in the specification's description of treating Groups 1, 3 and 4 PH as the court found. *See supra* §§ II.A-B, III.A; Appx00065; *Novartis Pharms.*, 38 F.4th at 1016 ("[i]t is not enough that a claimed invention is an obvious variant of that which is disclosed in the specification." (citation and internal quotation marks omitted)). Given the asserted claims are directed to a "method of ***treating*** pulmonary hypertension," these safety concerns cannot be ignored. *Biogen Int'l GMBH v. Mylan Pharms. Inc.*, 18 F.4th 1333, 1343 (Fed. Cir. 2021) ("An inventor need not 'prove that a claimed pharmaceutical compound actually achieves a certain result.

But when the inventor expressly claims that result, our case law provides that [such] result must be supported by adequate disclosure in the specification.'" (quoting *Nuvo Pharms. (Ireland) Designated Activity Co. v. Dr. Reddy's Lab'ys, Inc.*, 923 F.3d 1368, 1384 (Fed. Cir. 2019))). Accordingly, the district court's decision that the '793 patent adequately describes the full scope of "treating pulmonary hypertension" was clearly erroneous and requires reversal.

### B. Even Excluding Safety from the Construction of "Treating Pulmonary Hypertension," the District Court Erred in Finding the '793 Patent Has Adequate Written Description

Even assuming the district court's construction of "treating pulmonary hypertension" is correct (it is not), the court erred in finding adequate written description for treating the isolated Group 2 PH patients encompassed by the '793 patent claims.

Despite the lack of any information related to the treatment of isolated Group 2 PH patients in the '793 patent, the court devised its own novel theory to find adequate written description, determining that because: (a) the '793 patent describes treprostinil can "effectively vasodilate the pulmonary vasculature, affect hemodynamics, and treat a patient's elevated pulmonary blood pressure[,]"; and (b) this mechanism of action is also effective in isolated Group 2 patients; thus (c) the "full scope of treating PH" is sufficiently described. Appx00065. The court's rationale, however, was refuted by both parties' experts.

Contrary to the court's finding, both experts testified, and UTC agreed, that despite the '793 patent's disclosure of treating precapillary PH patients, they would not use treprostinil to treat an isolated Group 2 PH patient because vasodilation of the pulmonary vasculature is not effective in treating the LHD in isolated Group 2 patients. *See supra* § III.B. The court credited this testimony, but then ignored it when rendering its decision. *Id.*; Appx00060. In view of this evidence, and even ignoring the significant safety issues, a POSA would have understood that the inventors could not have possessed a method of treating isolated Group 2 PH based on a disclosure of treating Groups 1, 3 and 4 due to the inherently different causes of PH in postcapillary isolated Group 2 PH patients as compared to precapillary Groups 1, 3 and 4 PH patients. Appx00060 ("[T]he high blood pressure in the lungs of Group 2 PH patients has a different underlying cause" than PH Groups 1, 3 and 4); *Novartis Pharms.*, 38 F.4th at 1016.

This case is indistinguishable from this Court's opinion in *Nuvo Pharms.* There, the Court found that the claimed "uncoated PPI" lacked written description for effectiveness and was "fatally flawed[,]" given the record demonstrated that a POSA would not have known or thought the uncoated PPI was effective and the specification was devoid of any disclosures showing the inventors actually invented the claimed uncoated PPI. *Nuvo*, 923 F.3d at 1381, *cert. denied,* 140 S. Ct. 902 (2020). The court specifically found that "the specification lacks 'information

regarding the efficacy of uncoated PPIs,'" but said "it was enough that the specification described the immediate release of uncoated PPI and the potential disadvantages of enteric-coated PPI formulations." *Nuvo*, 923 F.3d at 1377. This Court found those findings inadequate as they "in no way provide[] support for the claimed efficacy of uncoated PPI." *Id.* Moreover, the evidence demonstrated that a POSA "would not have known or understood that uncoated PPI is effective" and "nothing in the specification of the patents-in-suit show[ed] 'that the inventor actually invented the invention claimed.'" *Id.* at 1380. Finally, the Court rejected Nuvo's argument that written description was met because the claim language appears *in ipsis verbis* in the specification. *Id.*

Here, the '793 patent similarly lacks any disclosure that the claimed method is effective in treating isolated Group 2 PH patients, and both parties' experts went even further, testifying that treprostinil would not be effective for treatment of isolated Group 2 PH. *See supra* § III.B. As in *Nuvo*, the written description requirement is also not satisfied by pointing to general disclosures in the patent about treprostinil improving the hemodynamics in non-isolated Group 2 PH patients, as the court did here. *See Nuvo*, 923 F.3d at 1382 ("[t]eaching how to make and use an invention does not necessarily satisfy the written description requirement"); *Cf.* Appx00065 (explaining that disclosures in the '793 patent that generally "describe[] how administering inhaled treprostinil targets the lungs, dilates the blood vessels,

and reduces blood pressure" "'reasonably convey[] to those skilled in the art that the inventor had possession' of the full scope of treating PH as claimed"). As discussed above, the changes in hemodynamics reported for treprostinil in the '793 patent were not measured or observed in isolated Group 2 patients. Finally, simply because the '793 patent generally states that treprostinil can be used to treat PH does not provide adequate support, as *Nuvo* reinforces the general legal concept that *in ipsis verbis* recitation of claim language cannot support a finding of adequate written description, particularly here, when treprostinil's mechanism of action would not lead a POSA to conclude that the inventors actually invented a method of treating isolated Group 2 PH with treprostinil. *Nuvo*, 923 F.3d at 1380. For these additional reasons and even ignoring the safety concerns, the district court's conclusion that the '793 patent adequately describes the full scope of "treating pulmonary hypertension" was erroneous and should be reversed.

## V. THE DISTRICT COURT IMPROPERLY FOUND LIQUIDIA INDUCED INFRINGEMENT OF THE INVALIDATED '793 PATENT

Each asserted claim of the '793 patent is directed to a "method of treating pulmonary hypertension." Appx00170. Accordingly, to establish induced infringement under 35 U.S.C. § 271(b), UTC was required to show (1) that there has been direct infringement, and (2) "that the alleged infringer knowingly induced infringement and possessed specific intent to encourage another's infringement." *Omega Patents, LLC v. CalAmp Corp.*, 920 F.3d 1337, 1345, 1349 (Fed. Cir. 2019)

(citation omitted); *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 766-68 (2011); *Commil*, 575 U.S. at 639. Specific intent "rest[s] on the ***subjective intent*** of the accused infringer," *i.e.*, the "defendant's ***subjective*** state of mind." *Roche Diagnostics Corp. v. Meso Scale Diagnostics, LLC*, 30 F.4th 1109, 1118-19 (Fed. Cir. 2022). Following the Supreme Court's instruction in *Commil*, Liquidia duly sought to invalidate the '793 patent in an IPR proceeding, an effort that proved successful. *Commil*, 575 U.S. at 644; *see also* Appx00031 (n.7). Liquidia established, under *Commil's* "proper procedures," that the '793 patent "is indeed invalid" and thus cannot be liable for induced infringement. *Commil*, 575 U.S. at 644-45.

The district court's infringement decision was based on legal error and misapplication of *Commil* insofar as the court required either the Board's "decision is affirmed or the parties waive their appeal rights[,]" such that collateral estoppel applies. Appx00056. No such requirement exists to negate liability for induced infringement. In refusing to find the '793 FWD negates liability, the court ignored Liquidia's actual knowledge that the '793 patent was found unpatentable by the Board, disregarded Liquidia's subjective state of mind, and improperly collapsed the infringement liability inquiry into one of validity. As discussed here, the district court's infringement decision requires reversal.

### A. The Supreme Court's Decision in *Commil* Necessitates a Finding of No Induced Infringement

In *Commil*, the Supreme Court addressed "a question of first impression: whether ***knowledge of***, or belief in, ***a patent's validity*** is required for induced infringement under § 271(b)." 575 U.S. at 639. In considering this question, the Court first turned to *Global-Tech*, and concluded that induced infringement "requires proof the defendant knew the acts were infringing. And the Court's opinion was clear in rejecting any lesser mental state as the standard." *Id.* at 642 (citing *Global-Tech*, 563 U.S. at 769-70). The Supreme Court ultimately held that a mere ***good faith belief*** of patent invalidity is not a defense to induced infringement. *Commil*, 575 U.S. at 642 ("belief regarding validity cannot negate the scienter required under § 271(b)."). The Supreme Court went further, explaining that a good faith belief of invalidity stood in contrast to actual "knowledge of" invalidity: "[t]o be sure, if at the end of the day, an act that would have been an infringement or an inducement to infringe pertains to a patent that is ***shown to be invalid***, there is no patent to be infringed." *Id.* at 641, 644. The Supreme Court confirmed that the "scienter" or subjective intent element of induced infringement can be negated, and liability eliminated, if "[a]n accused infringer can . . . prove that patent in suit is invalid; [and] ***if the patent is indeed invalid***, ***and shown to be so under proper procedures, there is no liability***." *Id.* at 644.

The *Commil* Court commented that there are "practical reasons not to create a defense based on a *good-faith belief* in invalidity[,]" one of which is because "accused inducers who believe a patent is invalid have various proper ways to obtain a ruling to that effect." *Id.* at 645. The Court enumerated several "proper ways" to obtain such a ruling, including a declaratory judgment action in a district court seeking to declare the patent invalid; *ex parte* reexamination before the PTO; or raising an affirmative defense of invalidity at the district court. *Id.* Important to this appeal, the *Commil* Court also stated an accused inducer "can seek *inter partes* review at the [Board] and receive a decision as to validity within ***12 to 18 months***. See [35 U.S.C.] § 316." *Commil*, 575 U.S. at 645. Under any of these district court, PTO or Board procedures, the accused infringer is able to obtain actual knowledge and confirmation of invalidity, and according to the Supreme Court, ***"[i]f the defendant is successful, he will be immune from liability***." *Id.*

The Supreme Court, in referencing a "decision as to validity within 12 to 18 months," and specifically citing 35 U.S.C. § 316, made clear that finality of an IPR decision with accompanying collateral estoppel effect is not required to negate liability for induced infringement. Section 316 statutorily requires the Board to issue its IPR FWD within 12 to 18 months:

> [T]he final determination in an inter partes review [must] be issued ***not later than 1 year*** after the date on which the Director notices the institution of a review under this chapter, ***except that the Director may, for good cause***

> ***shown, extend the 1-year period by not more than 6 months***, and may adjust the time periods in this paragraph in the case of joinder under section 315(c)[.]

35 U.S.C. § 316(a)(11). This Court is similarly aware of the same rule, citing the 12-18 month timeframe. *Regents of the Univ. of Minn. v. LSI Corp.*, 926 F.3d 1327, 1336-37 (Fed. Cir. 2019); *Ariosa Diagnostics v. Verinata Health, Inc.*, 805 F.3d 1359, 1367 (Fed. Cir. 2015). To remove liability for induced infringement, the Supreme Court could have identified only district court actions as proper procedures, required collateral estoppel, or referenced issuance of a Director's certificate under § 318(b) cancelling claims. It did not. Instead, it ***equated*** IPR decisions obtained in the first instance within 12 to 18 months with district court decisions on invalidity obtained at trial—all of them are "proper procedures" that allow the accuser to obtain actual knowledge of invalidity and immunity from liability. *Commil*, 575 U.S. at 645. *Commil*, therefore, should be understood to mean that "knowledge of" actual patent invalidity, obtained at the first level of review from the Board in an IPR, is a "proper procedure" to remove liability for patent infringement under § 271(b).

This is not a novel concept. District courts and this Court have found no liability for induced infringement when the district court itself finds a patent invalid as part of the same trial. *See, e.g., Merck Sharp & Dohme Corp. v. Hospira Inc.*, 221 F. Supp. 3d 497, 521 n.21 (D. Del. 2016); *Sandt Tech., Ltd. v. Resco Metals & Plastics Corp.*, 264 F.3d 1344, 1356 (Fed. Cir. 2001) ("Here, the district court

determined that the claims . . . asserted to be infringing were invalid; thus it was not necessary for it to determine whether [defendant] infringed those claims; even if it did infringe, the claims were not valid so no judgment of liability could be entered.”). Even here, the district court determined Liquidia was not liable for infringement of the ’066 patent because the claims were invalid. Appx00031 (n.7). *Commil* confirms that regardless of whether the decision on invalidity comes from a district court or the PTAB in a IPR FWD, the impact on induced infringement is the same: an accused inducer is not liable. And here, where the ’793 IPR FWD was issued ***before*** the court’s determination on infringement liability, that prior decision necessarily precludes a later finding of liability.

This Court’s recent decision in *Roche Diagnostics* is instructive. There, a jury found Roche liable for induced infringement, but the district court found that Roche was not liable for willful infringement because, “Roche’s reasonable interpretation of the contract” provision led Roche to conclude that it had no liability for patent infringement. *Roche Diagnostics*, 30 F.4th at 1118. Although a jury concluded Roche’s interpretation of the contract was incorrect, the district court, in granting JMOL of no willful infringement, concluded that Roche lacked the “subjective intent to infringe,” because of its contract analysis. *Id.* In reversing the district court’s finding of induced infringement, this Court reiterated that “[t]he intent standard for inducement, therefore, ‘focuses on, and can be met by proof of, the defendant’s

subjective state of mind[.]'" *Id.* (citation omitted). The Court went on to state that "[i]n some respects, the intent standard for inducement is akin to the one for willfulness, as ***both rest on the subjective intent of the accused infringer***." *Id.* at 1119. Because Roche lacked the "subjective intent" to willfully infringe based on a later proven incorrect interpretation of a contract, Roche also lacked the requisite subjective intent to induce infringement. If an accused infringer's subjective analysis of a contract, proven unsuccessful at trial, is sufficient to negate subjective intent then certainly, under *Commil*, a determination of unpatentability by the Board and Liquidia's actual knowledge of that decision are sufficient to negate Liquidia's specific intent and liability for induced infringement of the '793 patent.

### B. The District Court Improperly Required Collateral Estoppel to Negate Liability for Induced Infringement

The district court's error in requiring collateral estoppel is exemplified by its request for further briefing as to whether the '793 FWD "compels that [the district court] treat the 793 patent as being invalid." Appx00118 (D.I. 426). The court's question as to whether collateral estoppel should apply was the wrong inquiry under *Commil*. Collateral estoppel would prevent UTC from arguing, based on a final decision from an appeal, that the patent is valid. *Papst Licensing GMBH & Co. KG v. Samsung Elecs. Am., Inc.*, 924 F.3d 1243, 1251 (Fed. Cir. 2019). By focusing solely on invalidity via collateral estoppel, and not liability for infringement, the court ignored the Supreme Court's recognition that an IPR FWD will be obtained

"within 12 to 18 months," collapsed the induced infringement inquiry into the ultimate outcome on validity, and failed to consider Liquidia's actual knowledge of the invalidity of the '793 patent. Because "[v]alidity and infringement are distinct issues" (*Commil* 575 U.S. at 643-44 (citation omitted)), the district court erred by requiring a final decision on invalidity before it considered the implications of the Board's '793 FWD on liability for induced infringement.

Supreme Court's analysis leads to the inescapable conclusion that, while an IPR FWD does not have collateral estoppel effect, "[i]f [Liquidia] is successful [in an IPR], [it] will be immune from liability." *Commil*, 575 U.S. at 645. To hold otherwise and require collateral estoppel would ignore the central distinction in *Commil* between a good faith belief of invalidity and knowledge of it, the distinction between liability for infringement and validity, blunt the Board's authority, and undermine Congress's intent in creating IPR proceedings, including providing "additional access to the expertise of the Patent Office on questions of patentability." 157 Cong. Rec. S1352 (daily ed. Mar. 8, 2011) (statement of Sen. Udall); *see also* H.R. Rep. No. 112-98, at 39-40 (2011); *see also BioDelivery Scis. Int'l, Inc. v. Aquestive Therapeutics, Inc.*, 946 F.3d 1382, 1386 (Fed. Cir. 2020) (J. Newman dissent) (the purpose of IPR proceedings is to "provide agency expertise to resolution of patentability issues.").

Because, under *Commil*, a finding of unpatentability by the Board within 12 to 18 months negates an accused inducer's liability for infringement under § 271(b), the district court's conclusion that Liquidia induces infringement of the asserted '793 patent claims was clearly erroneous. Accordingly, the district court's decision that Liquidia is liable for induced infringement of the '793 patent requires reversal.

## VI. THE DISTRICT COURT ERRED IN FINDING INFRINGEMENT OF CLAIMS 1-3 OF THE '066 PATENT, WHERE UTC USED A PROXY FOR THE ALLEGEDLY INFRINGING "PHARMACEUTICAL COMPOSITION"

### A. UTC Failed to Compare LIQ861 Bulk Powder to the Claim

Claim 1 of the '066 patent requires, in relevant part, "a level of one or more impurities found in the starting batch of treprostinil is lower in the pharmaceutical composition[.]" Appx00132 (cl 1). Claims 2 and 3 depend from claim 1, and therefore, have this same requirement. To prove infringement, UTC bore the burden of showing, by a preponderance of the evidence, that the level of at least one impurity in the "starting batch of treprostinil" is lower in the "pharmaceutical composition." UTC failed to meet its burden.

Yonsung is Liquidia's API supplier and begins by making treprostinil, (identified by Yonsung as TN02), and uses that treprostinil (TN02) to make a salt of treprostinil called treprostinil sodium (identified by Yonsung as TN). Appx00024; Appx13126-13127 (406:23-407:1, 408:3-21); Appx13593. Yonsung ships TN to Liquidia in the United States, where it is further process and used to make LIQ861

bulk powder. Appx13126-13127 (406:23-407:1, 408:3-21); Appx13137 (447:12-449:9). The first step in Liquidia's PRINT process, as recognized by the court, is to dissolve TN in solution, which is then poured into pollen shaped molds. Appx00027 ("Liquidia puts the TN in solution, adds excipients, and dries this formulation into [a] powder" to form LIQ861 bulk powder); Appx13137 (447:20-448:23); Appx13211 (741:7-16); Appx14131-14144.

With respect to claim 1, UTC identified the "starting batch of treprostinil" as TN02, and the "pharmaceutical composition" as "LIQ861 bulk powder." Appx00026. But UTC did not present *any* evidence regarding the impurities in the LIQ861 bulk powder or compare the impurities in TN02 to LIQ861 as required by claim 1. Indeed, when UTC's expert Dr. Nuckolls was asked: "Did you look at impurities in the pharmaceutical composition of LIQ861 in your analysis?" he answered "No." Appx13055 (122:24-123:1). This Court's precedent is clear: Determining infringement in a Hatch-Waxman case "is focused on a comparison of the asserted patent claims against the product that is likely to be sold following ANDA approval[.]" *Ferring B.V. v. Watson Labs., Inc.-Fla.*, 764 F.3d 1401, 1408 (Fed. Cir. 2014). Having failed to properly compare the impurities in the "starting batch of treprostinil" (TN02) to the impurities in the "pharmaceutical composition," (LIQ861 bulk powder), UTC failed to meet its burden of proof on infringement and the district court's finding of infringement of claims 1, 2 and 3 should be reversed.

### B. TN Cannot Be Used as a Proxy for LIQ861 Bulk Powder to Establish Infringement

Rather than compare the impurities in LIQ861 bulk powder (to the impurities in TN02 as required by claim 1, UTC compared the impurities in TN02 to the impurities in TN, which, as the court found, goes through further chemical processing to become LIQ861 bulk powder. Appx00027. To find infringement, the court relied on UTC's argument that comparing the impurities in TN02 against those in TN was proper because "processing of TN into LIQ861 bulk powder has no effect on the impurities from these steps." Appx00026 (citing Appx31054). The court also credited the testimony of Dr. Nuckolls, who stated that he "wouldn't expect" Liquidia's PRINT process to impact impurities even though Dr. Nuckolls also testified that "without samples," it would be difficult for a POSA to conduct an impurity analysis because Liquidia's LIQ861 bulk powder is a mixture of excipients and other ingredients. Appx00027; Appx13064 (157:7-17); Appx13058 (133:22-134:3). In sum the court permitted UTC to use TN as a proxy for LIQ861 bulk powder to establish infringement based on attorney argument and an expert's speculative testimony. The court's fact finding amounts to clear error and further ignores additional evidence adduced at trial.

This Court has consistently held that a party may only use a proxy for an accused product for its infringement analysis if that proxy is representative of the accused product. *See, e.g.*, *Ferring B.V.*, 764 F.3d at 1409-10 (reversing a finding

of infringement because the outlier products used to prove infringement "were not representative of [defendant's] ANDA product."); *Kim v. ConAgra Foods, Inc.*, 465 F.3d 1312, 1320 (Fed. Cir. 2006) (affirming district court's grant of JMOL of non-infringement when the patentee failed to present "any examinations or tests of the actual accused products"). UTC presented no evidence, beyond speculation, that TN is representative of LIQ861 bulk powder, the accused "pharmaceutical composition."

TN is a *starting* material in the manufacture of LIQ861 bulk powder and, as the district court noted, LIQ861 bulk powder is prepared by putting "TN in solution, add[ing] excipients, and dr[ying] this formulation into [a] powder." Appx00027; Appx14132; Appx13137 (448:11-23). Once TN is dissolved in water, it is dissociated treprostinil and sodium ions in solution and thus the treprostinil in LIQ861 bulk powder is no longer "TN." Appx13137 (450:1-15); Appx13211 (741:7-13). Indeed, when the court asked UTC at closing whether "[LIQ]861 is essentially what Yonsung send in?" UTC said "No, they send Treprostinil sodium, and then when it gets into the United States, it gets mixed and they create the bulk inhalation powder." Appx13265 (955:3-7). UTC thus acknowledged TN is not representative of LIQ861 bulk inhalation powder. The district court did not consider this evidence (or lack thereof) or this portion of UTC's attorney argument. Appx00026-00027.

Dr. Nuckolls excused his failure to conduct the proper infringement analysis by claiming he did not have samples of LIQ861 bulk powder to analyze impurities. Appx13056 (125:15-21, 127:25-128:1); Appx13058 (133:25-134:8). But Liquidia did provide UTC with samples of LIQ861 bulk powder for analysis, a fact of which Dr. Nuckolls was apparently not aware. Appx11844-11846; Appx11906-11914; Appx11937-11956; Appx13058 (134:4-8). UTC chose not to provide these samples to Dr. Nuckolls. Consequently, despite having the ability to do so, neither Dr. Nuckolls nor UTC conducted any analysis to establish that TN is representative of LIQ861 bulk powder, rendering its infringement proofs inadequate. *Kim*, 465 F.3d at 1320. Here again, the district court's opinion ignores this evidence and testimony. Appx00027.

The only attempt UTC made to establish that TN is representative of LIQ861 bulk powder is Dr. Nuckolls' unsupported trial testimony. Dr. Nuckolls testified that he "wouldn't expect" Liquidia's processing of TN into LIQ861 bulk powder to make a difference. Appx13055 (122:24-123:1); Appx13064 (157:7-17). Dr. Nuckolls' testimony is speculative and, as discussed above, unsupported by any analysis—analysis that could have been conducted. The court relied on this testimony to permit the proxy use of TN for LIQ861 bulk powder, but it was clearly erroneous to do so. *See Morton Int'l, Inc. v. Cardinal Chem. Co.*, 959 F.2d 948, 951-52 (Fed. Cir. 1992) (affirming non-infringement because plaintiff's "theory did

'not demonstrate the existence of claimed compounds in [defendant's] product which is a complex mixture resulting from [defendant's] process . . . our review of the [NMR spectra] record shows that it is mere speculation to assume that what remains is a claimed compound."), *vacated on other grounds*, *Cardinal Chem. Co. v. Morton Int'l, Inc.*, 508 U.S. 83 (1993).

Finally, the court stated that Liquidia provided no expert testimony to rebut Dr. Nuckolls' opinions. Appx00027. This is incorrect. As discussed above, Liquidia did present testimony and documentation establishing TN, because it is dissolved in solution as the first PRINT step, is not in nor representative of LIQ861 bulk powder—evidence the district court ignored. Appx00026-00027; Appx13043 (74:21-75:5), Appx13061 (146:20-147:8); Appx13206 (722:10-19). UTC also repeatedly took a shifting sands approach to what *exactly* it was alleging was the pharmaceutical composition of claims 1-3; alleging at one point that it was TN shipped from Korea, then later changed its mind to assert LIQ861 bulk powder was the "pharmaceutical composition." *See* Appx13253-13254 (909:19-910:15); Appx13265 (954:7-955:10.) Certainly, Liquidia is not required to provide additional expert testimony when UTC's own changing position and speculative testimony is insufficient, on its face, to establish infringement. *L & W, Inc. v. Shertech, Inc.*, 471 F.3d 1311, 1318 (Fed. Cir. 2006) ("[A] patentee with the burden of proof . . . must make a prima facie showing of infringement as to each accused [product] before the

burden shifts to the accused infringer to offer contrary evidence.”); *Saab Cars USA, Inc. v. United States*, 434 F.3d 1359, 1368 (Fed. Cir. 2006) (“[A] party with the ultimate burden of proof . . . must still satisfy its burden by showing that it is entitled to judgment . . . even in the absence of an adequate response by the nonmovant.” (citation omitted)).

Accordingly, the district court erred in crediting UTC’s attorney argument and speculative expert testimony as sufficient to meet the preponderance of evidence standard for proving infringement.

## CONCLUSION

Liquidia respectfully requests reversal of the district court’s judgment. The Court should find that the district court misconstrued “treating pulmonary hypertension” in the ’793 patent claims to exclude safely treating the disease; that the ’793 patent is invalid for failing to enable and adequately describe the full scope of “treating pulmonary hypertension” with inhaled treprostinil, regardless of whether the district court’s construction was correct; and Liquidia is not liable for inducing infringement of the ’793 patent. The Court should find that UTC failed to meet its burden of proving infringement of claims 1, 2 and 3 of the ’066 patent because it did not properly compare the asserted claims with the identified LIQ861 bulk powder “pharmaceutical composition.”

Dated: October 21, 2022

Respectfully submitted,

*/s/ Sanya Sukduang*
Sanya Sukduang
Jonathan R. Davies
Cooley LLP
1299 Pennsylvania Ave., NW
Suite 700
Washington, DC 20004
Telephone: (202) 842-7800
Facsimile: (202) 842-7899

Erik B. Milch
Cooley LLP
11951 Freedom Square
Reston, VA 20190
Telephone: (703) 456-8000
Facsimile: (703) 456-8100

Deepa Kannappan
Cooley LLP
3175 Hanover Street
Palo Alto, CA 94304
Telephone: (650) 843-5000
Facsimile: (650) 849-7400

*Counsel for Defendant-Appellant Liquidia Technologies, Inc.*

# ADDENDUM

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| UNITED THERAPEUTICS CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>LIQUIDIA TECHNOLOGIES, INC.,<br><br>Defendant. | Civil Action No. 20-755-RGA |

# TRIAL OPINION

Jack B. Blumenfeld, Michael J. Flynn, Sarah E. Simonetti, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, DE; Huiya Wu, GOODWIN PROCTER LLP, New York, NY; William C. Jackson, Eric Levi, GOODWIN PROCTER LLP, Washington, DC; Douglas H. Carsten, Mandy H. Kim, Arthur Dykhuis, Jiaxiao Zhang, Katherine Pappas, MCDERMOTT WILL & EMERY LLP, Irvine, CA; Ian B. Brooks, Adam W. Burrowbridge, Joshua Revilla, Timothy M. Dunker, MCDERMOTT WILL & EMERY LLP, Washington, DC; Harrison Gunn, GOODWIN PROCTER LLP, Boston, MA,

Attorneys for Plaintiff.

Karen E. Keller, Nathan R. Hoeschen, SHAW KELLER LLP, Wilmington, DE; Sanya Sukduang, Jonathan Davies, Douglas W. Cheek, Adam Pivovar, Brittany Cazakoff, COOLEY LLP, Washington, DC; Erik Milch, COOLEY LLP, Reston, VA; Ivor Elrifi, COOLEY LLP, New York, NY; Deepa Kannappan, Lauren Krickl, Kyung Taeck Minn, COOLEY LLP, Palo Alto, CA,

Attorneys for Defendant.

August 31, 2022

**ANDREWS, U.S. DISTRICT JUDGE:**

United Therapeutics Corporation ("UTC") brought this action against Liquidia Technologies, Inc. for infringement of U.S. Patent Nos. 9,593,066 ("the '066 patent"), 9,604,901 ("the '901 patent"), and 10,716,793 ("the '793 patent") under 35 U.S.C. § 271(e)(2)(A). (D.I. 1, 16). I held a four-day bench trial. (D.I. 402–405).[1] The disputes at trial were related to the infringement and validity of claims 1, 2, 3, 6, 8, and 9 of the '066 patent and claims 1, 4, 6, 7, and 8 of the '793 patent. The '901 patent is no longer at issue.

I have considered the parties' post-trial submissions. (D.I. 406, 407, 408, 409, 411, 412, 413, 414, 415, 416, 423, 424). Having considered the documentary evidence and testimony, I make the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

## I. BACKGROUND

UTC is the holder of New Drug Application ("NDA") No. 022387 for Tyvaso®, an inhaled solution formulation of treprostinil approved for the treatment of pulmonary arterial hypertension and pulmonary hypertension associated with interstitial lung disease. (D.I. 322-1, Ex. 1, ¶¶ 5, 12). The '066 and '793 patents are listed in the FDA's Orange Book for Tyvaso®. (*Id.*, ¶ 14). The '066 patent discloses an improved process for preparing treprostinil. (*See* JTX 2). The '793 patent discloses a method of administering treprostinil by inhalation. (*See* JTX 3).

Liquidia submitted NDA No. 213005 under § 505(b)(2) of the Federal Food, Drug, and Cosmetic Act seeking FDA approval for the manufacture, use, and sale of its proposed product LIQ861 (Yutrepia™). (D.I. 322-1, Ex. 1, ¶ 2). LIQ861 is a dry powder formulation of

[1] I cite to the trial transcript as "Tr." The trial transcript is consecutively numbered.

treprostinil sodium. (*Id.*, ¶ 16). The FDA tentatively approved LIQ861 for the treatment of pulmonary arterial hypertension. (*Id.*, ¶¶ 17–18).

Liquidia's NDA contains Paragraph IV certifications alleging that both the '066 and '793 patents are invalid and/or will not be infringed by the manufacture, use, or sale of its proposed product. (*Id.*, ¶ 8). UTC received notice of Liquidia's Paragraph IV certifications and initiated the present lawsuit. (*Id.*, ¶ 9).

## II. INFRINGEMENT OF THE '066 PATENT

### A. Legal Standard

A patent is directly infringed when a person "without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent." 35 U.S.C. § 271(a). Determining infringement is a two-step analysis. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). First, the court must construe the asserted claims to ascertain their meaning and scope. *Id.* The trier of fact must then compare the properly construed claims with the accused infringing product. *Id.* This second step is a question of fact. *Bai v. L & L Wings, Inc.*, 160 F.3d 1350, 1353 (Fed. Cir. 1998). The patent owner bears the burden of proving infringement by a preponderance of the evidence. *SmithKline Diagnostics, Inc. v. Helena Lab'ys Corp.*, 859 F.2d 878, 889 (Fed. Cir. 1988).

In a Hatch-Waxman case, the plaintiff's infringement claim is based on the accused infringer's future conduct, rather than past acts of infringement. Under § 271(e)(2), the "infringement inquiry . . . is focused on the product that is likely to be sold following FDA approval." *Abbott Lab'ys v. TorPharm, Inc.*, 300 F.3d 1367, 1373 (Fed. Cir. 2002). "Because drug manufacturers are bound by strict statutory provisions to sell only those products that

comport with the []NDA's description of the drug, an []NDA specification defining a proposed [] drug in a manner that directly addresses the issue of infringement will control the infringement inquiry." *Id.* For product-by-process claims, the infringement inquiry is focused "on the process of making the product as much as it is on the product itself." *Amgen Inc. v. F. Hoffman-La Roche Ltd*, 580 F.3d 1340, 1370 (Fed. Cir. 2009). Thus, "a product-by-process claim is not infringed by a product made by a process other than the one recited in the claim." *Id.*

### B. Asserted Claims of the '066 patent

> 1. A pharmaceutical composition comprising treprostinil or a pharmaceutically acceptable salt thereof, said composition prepared by a process comprising providing a starting batch of treprostinil having one or more impurities resulting from prior alkylation and hydrolysis steps, forming a salt of treprostinil by combining the starting batch and a base, isolating the treprostinil salt, and preparing a pharmaceutical composition comprising treprostinil or a pharmaceutically acceptable salt thereof from the isolated treprostinil salt, whereby a level of one or more impurities found in the starting batch of treprostinil is lower in the pharmaceutical composition, and wherein said alkylation is alkylation of benzindene triol.
>
> **2.** The pharmaceutical composition of claim 1, wherein the salt is isolated in crystalline form.
>
> **3.** The pharmaceutical composition of claim 1, wherein the base is selected from the group consisting of sodium, ammonia, potassium, calcium, ethanolamine, diethanolamine, N-methylglucamine, and choline.
>
> **6.** The pharmaceutical composition of claim 1, wherein the isolated salt is stored at ambient temperature.

**8.** A process of preparing a pharmaceutical product comprising treprostinil or a pharmaceutically acceptable salt thereof, comprising alkylating a triol intermediate of the formula:




hydrolyzing the resulting compound to form treprostinil, forming a salt of treprostinil stable at ambient temperature, storing the treprostinil salt at ambient temperature, and preparing a pharmaceutical product from the treprostinil salt after storage, wherein the pharmaceutical product comprises treprostinil or a pharmaceutically acceptable salt thereof.

**9.** A pharmaceutical product prepared by the process of claim 8.

## C. Findings of Fact

1. A POSA would be either a chemical engineer or process research chemist with 3-5 years of experience in API and drug manufacturing or a master's degree in chemistry or chemical engineering who collaborated with individuals having 3-5 years of experience in API drug manufacturing.

2. Yonsung, based in South Korea, manufactures the treprostinil sodium API used to make Liquidia's LIQ861 product. (Tr. at 74:21–75:5 (Nuckolls); PTX 20 at 7). Yonsung has a Drug Master File ("DMF") for the treprostinil sodium used in LIQ861. (PTX 112 (Open DMF); PTX 201 (Restricted DMF)).

3. Yonsung synthesizes the treprostinil sodium by alkylating a batch of benzindene triol ("BTO") to provide a batch of "TN01" (PTX 201 at 7, 22, 35 (DMF Step 10)), then performing a hydrolysis step to provide a batch of treprostinil ("TN02") (*id.* at 8, 23, 36 (DMF Step 11)), and performing a salt formation step by combining the treprostinil with a base (sodium) to yield treprostinil sodium ("TN") (*id.* at 8, 24, 37 (DMF Step 12); Tr. at 75:19–76:20 (Nuckolls); Tr. at 407:2–408:21 (Winkler)).

4. LGM is a U.S. based administrative intermediary between Yonsung and Liquidia. (Tr. at 346:7–10 (Kindig); Tr. at 439:2–5 (Winkler)). Yonsung's shipments of treprostinil sodium sometimes go through LGM to Liquidia; however, LGM does not manufacture treprostinil sodium, nor is it involved in the development or administration of Liquidia's LIQ861 product. (Tr. at 331:14–21 (Kindig); Tr. at 366:5–16 (Lenox)).

5. A POSA would understand that the impurities limitations in claim 1 of the '066 patent refer to any impurities generated during the process steps of alkylating and hydrolyzing a batch of BTO (including from side reactions, impurities in reagents, solvents, or starting materials).

6. Yonsung's analytical testing of treprostinil sodium is a reliable and accurate measure of impurities in the pharmaceutical composition resulting from the alkylation and hydrolysis steps; Liquidia's processing of the TN into the pharmaceutical composition (LIQ861 bulk powder) does not affect those impurities.

7. Liquidia's proposed LIQ861 product will be prepared by a process which lowers the level of one or more impurities resulting from prior alkylation and hydrolysis steps as claimed in the '066 patent. The percentage of total "related substance" impurities and the amount of total "related substance" impurities increase during the alkylation and hydrolysis steps from BTO to the starting batch of treprostinil (TN02), and then decrease in the TN batch after the salt formation and isolation steps.

8. Liquidia's NDA and Yonsung's DMF require treprostinil sodium to be stored at 2°C to 8°C.

9. Liquidia will not use treprostinil sodium batches which have been stored at ambient temperature for GMP manufacturing.

10. Liquidia begins preparing a pharmaceutical product during Step 1 of its PRINT process.

### D. Conclusions of Law

#### 1. Claims 1, 2, and 3

Liquidia only disputes infringement of the impurities limitations in claims 1, 2, and 3. Claim 1 recites "providing a starting batch of treprostinil having one or more impurities resulting from prior alkylation and hydrolysis steps . . . wherein said alkylation is alkylation of benzindene triol." As a preliminary issue, the parties dispute the proper construction of "impurities resulting from prior alkylation and hydrolysis steps." Liquidia argues that the claimed impurities must result from alkylation and hydrolysis of "BTO," not the alkylation and

hydrolysis of any compound that may be present in the reaction vessel. (D.I. 411 at 3). UTC argues that the claimed impurities encompass any impurities generated during the process steps of alkylating and hydrolyzing a batch of BTO (including from side reactions, impurities in reagents, solvents, or starting materials). (D.I. 408 at 7–8).

UTC's construction is correct. The claim language requires that the impurities result from the "prior alkylation and hydrolysis *steps*." A POSA would understand that the alkylation step involves alkylating all materials in a batch of BTO, not just the single alkylation reaction of BTO. (*See* Tr. at 110:23–111:10 (Nuckolls); Tr. at 810:16–19, 818:18–22 (Scheidt); *see also* Tr. at 423:15–20 (Winkler) ("[A] real batch of – a bottle of benzindene triol could contain impurities.")). Thus, I find that a POSA would understand that any impurities generated during the alkylation and hydrolysis steps (including from side reactions) are within the scope of the claim.

Claim 1 further recites: "whereby a level of one or more impurities found in the starting batch of treprostinil is lower in the pharmaceutical composition." UTC has identified the LIQ861 bulk powder as the "pharmaceutical composition" and Yonsung's TN02 as the "starting batch of treprostinil." Liquidia argues that UTC cannot prove infringement of this limitation because UTC's experts only compared the impurities between TN02 and TN, not the LIQ861 powder. (D.I. 411 at 2). UTC responds that Yonsung's impurities testing for TN is a proper measure of impurities in the pharmaceutical composition resulting from the alkylation and hydrolysis steps because Liquidia's processing of TN into LIQ861 bulk powder has no effect on the impurities from these steps. (D.I. 416 at 4). Once Liquidia receives the TN from Yonsung,

Liquidia uses its proprietary PRINT process[2] to prepare the LIQ861 bulk powder using the TN as the API. (DTX 204; PTX 20). In simple terms, Liquidia puts the TN in solution, adds excipients, and dries this formulation into the powder. (DTX 204 at 2–6; Tr. at 741:7–16 (Gonda)).

UTC's expert Dr. Nuckolls testified that he "wouldn't expect" Liquidia's processing of TN to impact the impurities from the alkylation and hydrolysis steps. (Tr. at 157:7–17 (Nuckolls); *see also* PTX 66 at 96 ("Treprostinil sodium drug substance process impurities are controlled by the manufacturer, Yonsung Fine Chemicals Co., Ltd. (Yonsung).")). Dr. Nuckolls also testified that it would be difficult for a POSA to test the impurities resulting from the alkylation and hydrolysis steps in the LIQ861 bulk powder because the composition has been mixed with other excipients. (Tr. at 133:25–134:3 (Nuckolls)). Liquidia has not provided any expert testimony to rebut these opinions; thus, I will credit Dr. Nuckolls' testimony on this point. I therefore find that the TN impurities are representative of the impurities in the "pharmaceutical composition" (LIQ861 bulk powder) resulting from the prior alkylation and hydrolysis steps. *Cf. Vectura Ltd. v. GlaxoSmithKline LLC*, 397 F. Supp. 3d 579, 587–88 (D. Del. 2019) (finding that comparison testing supported the jury's infringement verdict where there was evidence that the tested products were representative of the accused products), *aff'd*, 981 F.3d 1030 (Fed. Cir. 2020).

To prove infringement of the impurities limitations, UTC compared the (1) amount of total impurities; (2) number of total impurities; and (3) amount of *epi*-treprostinil in BTO, TN02, and TN.

---

[2] PRINT stands for Particle Replication in Nonwetting Templates. (DTX 204 at 2).

First, Dr. Nuckolls analyzed the total "related substance" impurities data provided by Yonsung in its DMF. (*See* PTX 201 at 270–72).[3] For two of the three DMF validation batches (TN117I010, TN117K010), the percentage of total "related substance" impurities increased between BTO and TN02, and then decreased in TN.[4] (Tr. at 77:23–80:18 (Nuckolls); PTX 201 at 270–72; PTX 326 at 4 (identifying the corresponding BTO, TN01, and TN02 batch numbers for each TN batch number)). Dr. Nuckolls opined that these changes in the percentage of total "related substance" impurities between BTO, TN02, and TN show infringement of the impurities limitations. (Tr. at 77:23–80:18 (Nuckolls)).

Second, Dr. Nuckolls analyzed the number of total impurities detected in Yonsung's validation batches. To do so, Dr. Nuckolls looked at Yonsung's underlying high-performance liquid chromatography (HPLC) data. (Tr. at 81:8–84:19 (Nuckolls)). HPLC separates components in a mixture by running the mixture down a column. (Tr. at 81:8–23 (Nuckolls)). The mixture's components are separated based on how they interact with the column, so each component will elute at different retention times, depicted by peaks on a chromatogram. (*Id.*; Tr. at 176:3–18 (Toste)).

To determine the number of impurities, Dr. Nuckolls counted the number of HPLC peaks in the chromatograms for BTO, TN02, and TN, excluding the peaks for "the material of interest"

---

[3] Because Liquidia relies on the same impurities data in its NDA, I find these data to be reliable. (*See* PTX 66 at 96; PTX 105 at 7–11).

[4] For validation batch TN117I010, the percentage of "related substance" impurities was 0.07% in BTO, 0.20% in TN02, and 0.03% in TN. (PTX 201 at 270–72). For validation batch TN117K010, the percentage of "related substance" impurities was 0.08% in BTO, 0.20% in TN02, and 0.01% in TN. (*Id.*). These results are consistent with Yonsung's acceptance criteria, which allow for a greater percentage of "related substance" impurities in TN02 than in TN. (*Id.* (2.0% for TN02; 0.5% for TN)). For validation batch TN117K020, the percentage of "related substance" impurities was 0.38% in BTO, 0.21% in TN02, and 0.01% in TN. (*Id.*).

(e.g., BTO, TN02, and TN) and for the "known impurities" that were "labeled as missing or not detected." (Tr. at 81:24–83:4 (Nuckolls)). For example, the chromatogram for TN02 for validation batch TN117I010 reported six peaks. (PTX 1540 at 79–80). One of these peaks identified TN02, which is the material of interest, not an impurity. (*Id.*). Thus, this peak was excluded from the impurities count. The chromatogram also identifies "15-epi-Treprostinil" and "Treprostinil ethyl ester" as "Peak Names," but reports these impurities as "Missing." (*Id.*). Because these known impurities were not detected in this sample, they are also excluded from the impurities count. Accordingly, Dr. Nuckolls identified three "related substance" impurities in this batch of TN02. (Tr. at 82:3–83:4 (Nuckolls)). Dr. Nuckolls testified that for two validation batches (TN117I010, TN117K010), the number of "related substance" impurities increased between BTO and TN02, and then decreased in TN.[5] (Tr. at 81:24–84:19 (Nuckolls)). Dr. Nuckolls testified that this decrease shows that one or more impurities resulting from the alkylation and hydrolysis steps are lowered from TN02 to TN. (*Id.*).

Liquidia argues that Dr. Nuckolls has failed to show a reduction in impurities "resulting from prior alkylation and hydrolysis steps . . . wherein said alkylation is alkylation of benzindene triol." (D.I. 411 at 4). Liquidia argues that the reported "total impurities" relied on by Dr. Nuckolls in his amount of total impurities analysis include "residual solvents and any impurity

---

[5] For validation batch TN117I010, one "related substance" impurity was identified in BTO, three "related substance" impurities were identified in TN02, and one "related substance" impurity was identified in TN. (Tr. at 82:3–83:4 (Nuckolls); PTX 1536 at 51 (BTO); PTX 1539 at 77 (TN); PTX 1540 at 79–80 (TN02)). For validation batch TN117K010, two "related substance" impurities were identified in BTO, three "related substance" impurities were identified in TN02, and one "related substance" impurity was identified in TN. (PTX 1410 at 59–62 (BTO); PTX 1157 at 33–34 (TN02); PTX 1543 at 83–84 (TN)). The underlying HPLC chromatogram for validation batch TN117K020 was not available to Dr. Nuckolls. (Tr. at 84:14–19 (Nuckolls)).

contained in the reagents or starting materials, not just impurities resulting from the claimed process steps." (*Id.*). Liquidia similarly faults Dr. Nuckolls' number of impurities analysis. Liquidia argues that since Dr. Nuckolls failed to correlate the unidentified HPLC peaks to any specific impurity, he cannot show that these impurities resulted from the alkylation and hydrolysis steps. (*Id.*).

These arguments, however, rely on Liquidia's improper interpretation of the impurities limitations. As concluded above, a POSA would understand that the claimed impurities include any impurities generated during the alkylation and hydrolysis steps, including impurities originating from starting materials or reagents. Thus, Liquidia's arguments rest on an infirm foundation.

As described in its DMF, Yonsung uses a twelve-step process to manufacture TN. (PTX 201 at 3). Step 10 of this process is the alkylation step—BTO is reacted with the alkylating agent to produce TN01. (Tr. at 75:20–76:2, 76:11–13 (Nuckolls); PTX 201 at 7). Next, in Step 11—the hydrolysis step—TN01 is hydrolyzed to produce TN02. (Tr. at 76:1–3, 13–15 (Nuckolls); PTX 201 at 8). In Step 12, TN02 is treated with a base to form TN. (Tr. at 76:3–5, 15–18 (Nuckolls); PTX 201 at 8). Thus, Dr. Nuckolls opined that any increased impurities in TN02 as compared to BTO resulted from the alkylation and hydrolysis steps, because those were the steps that were run to synthesize TN02 from BTO. (Tr. at 80:4–18, 82:3–15 (Nuckolls)). He further opined that the impurities that were generated during the alkylation and hydrolysis steps (Steps 10 and 11) were reduced during the final salt formation step (Step 12), as shown by the reduced levels of impurities in TN as compared to TN02. (*Id.*). I credit Dr. Nuckolls' testimony over Dr. Winkler's contrary testimony, which relied on Liquidia's erroneous construction. (*See* Tr. at 427:19–429:17 (Winkler)).

Based on the total impurities analyses conducted by Dr. Nuckolls, I find that UTC has proven that Liquidia will meet the impurities limitations of claim 1.[6] I therefore find that UTC has proven by a preponderance of the evidence that Liquidia's proposed LIQ861 product will infringe claims 1, 2, and 3 of the '066 patent.[7]

**2. Claim 6**

Claim 6, which depends from claim 1, further requires that "the isolated salt is stored at ambient temperature" before it is used to prepare a pharmaceutical composition. I construed "ambient temperature" as "room temperature (equal to or less than the range of 15°C to 30°C)." (D.I. 119). I construed "stored"/"storing"/"storage" to have its plain and ordinary meaning. (*Id.*).

Liquidia has represented to the FDA that it will store treprostinil sodium between 2°C and 8°C. Yonsung's DMF, which is incorporated in Liquidia's NDA (*see* PTX 105 at 3), specifies the following storage conditions for TN: "STORAGE: Should be kept in a tight container, protected from moisture and light and stored at 2°C to 8°C." (PTX 112 at 517). The certificates of analysis for TN and Yonsung's 2017 List of Finished and Intermediate Products also include these storage requirements. (*Id.* at 448, 450 ("Storage condition: Should be kept in a tight container, protected from moisture and light and stored at 2 °C to 8 °C (Long-term storage)."); DTX 43 at 6 (specifying TN's "Storage Conditions" as "Refrigerated")). LGM, an intermediary between Yonsung and Liquidia, stores TN in accordance with Yonsung's set

---

[6] Because I find UTC's first two analyses sufficient to show infringement, I need not consider UTC's third analysis, which compares the amount of *epi*-treprostinil in TN02 and TN.

[7] "To be sure, if at the end of the day, an act that would have been an infringement . . . pertains to a patent that is shown to be invalid, there is no patent to be infringed." *Commil USA, LLC v. Cisco Sys., Inc.*, 575 U.S. 632, 644 (2015). Since I ultimately conclude that claims 1, 2, and 3 of the '066 patent are invalid as anticipated, there is ultimately no infringement.

storage conditions. (Tr. at 365:23–366:4, 367:9–15, 368:2–7 (Lenox); *see also* DTX 105). Liquidia's raw material specification for treprostinil sodium states: "Storage Conditions: 2° - 8°C, protected from light and moisture." (DTX 9 at 1; *see also* Tr. at 374:12–15, 396:7–10 (Fuson) (testifying that the FDA would expect Liquidia to follow the temperature storage conditions set in its raw material specification and Yonsung's DMF); DTX 407 at 3 (FDA pre-approval inspection report wherein the FDA checked Liquidia's compliance with the 2°C to 8°C storage conditions)).

Despite these clear statements to the FDA, UTC argues that Liquidia's NDA and Yonsung's DMF permit storage of TN at ambient temperature because Yonsung's stability data show that TN is stable at ambient temperature. (*See* PTX 112 at 519–61). The parties' FDA experts Mr. Matto and Mr. Fuson both agree that if there were an out-of-specification temperature excursion (e.g., TN was exposed to ambient temperatures), Liquidia would need to conduct a full investigation before using that TN to make LIQ861. (Tr. at 272:9–274:3 (Matto); Tr. at 378:1–15 (Fuson)). But the fact that Liquidia might, in some circumstances, be permitted to use TN exposed to ambient temperatures is insufficient to show that Liquidia will do so.[8] *See Fujitsu Ltd. v. Netgear Inc.*, 620 F.3d 1321, 1329 (Fed. Cir. 2010) ("[I]t is not enough to simply

---

[8] UTC argues that Liquidia infringes as a matter of law under *Sunovion*. (D.I. 408 at 10–11). *Sunovion* is inapposite. The patent claim at issue in that case limited the concentration of a particular isomer to "less than 0.25%," and the amended ANDA specified a product containing "[not more than] 0.6%" concentration of the same isomer. *Sunovion Pharms., Inc. v. Teva Pharms. USA, Inc.*, 731 F.3d 1271, 1274–75 (Fed. Cir. 2013). Since the ANDA specification of not more than 0.6% necessarily included products meeting the claim limitation of less than 0.25%, the Court held that Defendant had sought "FDA approval to market a generic compound within the scope of a valid patent," and thus infringed as a matter of law. *Id.* at 1280. In contrast, here, Liquidia asks the FDA to approve sales that fall outside the scope of the '066 patent. Liquidia's NDA (through incorporation of Yonsung's DMF) specifically provides that TN should be stored at 2°C to 8°C, not ambient temperature.

show that a product is capable of infringement; the patent owner must show evidence of specific instances of direct infringement.").

UTC further argues that the isolated salt (TN) used to make LIQ861 is stored at ambient temperature at three points in the process: before acceptance into Yonsung's warehouse; during shipment from Yonsung to Liquidia; and during Step 1 of Liquidia's PRINT process. (D.I. 408 at 10). I will address each argument in turn.

First, UTC asserts that TN is stored at ambient temperature in "finished product storage containers" before acceptance into Yonsung's warehouse. Relying on Yonsung's 2017 batch production record for TN117I010, Dr. Nuckolls claimed that Yonsung stored the TN at ambient temperature for 43 days between production and acceptance into the warehouse. (Tr. at 96:10–97:24 (Nuckolls); PTX 1409 at 47–50, 70). Dr. Nuckolls, however, only based his opinion on the lack of temperature notation in this batch record. The absence of temperature notation on a single batch record does not show storage at ambient temperature by a preponderance of the evidence. Rather, Yonsung's List of Finished/Intermediate Products from 2017 required TN to be stored at refrigerated temperatures. (DTX 43 at 6). Further, batch production records from 2019 indicate that TN is "refrigerated" between production and acceptance into the warehouse. (DTX 413 at 12).

Second, UTC contends that TN is stored at ambient temperature when it is shipped from Yonsung to Liquidia.[9] Three batches of TN (TN120C010, TN120G010, and TN120I010)[10]

---

[9] Liquidia argues that the plain and ordinary meaning of "stored" does not include shipping. (D.I. 412 at 8 n.2). I disagree. A POSA would understand that a material can be stored during shipment. (Tr. at 137:6–138:11 (Nuckolls)).

[10] These batches are not listed as "Representative Treprostinil Sodium Drug Substances Batches" in the NDA. (PTX 105 at 8).

experienced ambient temperatures for nine days during shipment from Yonsung to LGM. (PTX 19 at 17, 19–21, 26–27; Tr. at 98:1–13 (Nuckolls)). LGM notified Liquidia that these batches experienced temperature excursions, stating, "[O]ur QC released the shipment because Yonsung has long-term stability showing the Treprostinil is stable at room temperature for 6 months." (PTX 2020 at 475–78). Liquidia accepted these shipments, marking "Requirements Met" for "Transport Conditions (Temperature-if applicable)" on the receiving reports. (PTX 19 at 1; PTX 104 at 1).

UTC provides no evidence showing that Liquidia used these batches in GMP manufacturing to make a pharmaceutical composition, as is required by claim 6. Instead, the evidence shows that Liquidia only used these batches for R&D. Liquidia's Executive Director of Analytical Operation, Mr. Kindig, testified that TN120C010 was ordered specifically for use in R&D, not GMP manufacturing. (Tr. at 309:1–4, 321:1–13 (Kindig)). Mr. Kindig also testified that TN120G010 and TN120I010 were rejected by Liquidia's Quality Unit for GMP use and were relegated to R&D use only. (Tr. at 317:1–320:20 (Kindig)).[11] The fact that Liquidia accepted these out-of-specification batches instead of requesting a refund from Yonsung is not persuasive evidence of infringement, as Liquidia had another use for these batches.

UTC also asserts that three other batches of TN (TN116J010, TN117K010, and TN117I010) were stored at ambient temperature during shipment and were subsequently used for clinical trials. (*See* PTX 105 at 8 (listing these batches as "Representative Treprostinil Sodium

---

[11] Nevertheless, UTC again argues that the FDA will permit Liquidia to use these batches because of Yonsung's stability data. (D.I. 408 at 13–14). But, as discussed above, this does not show by a preponderance of the evidence that Liquidia will use batches exposed to ambient temperatures to prepare pharmaceutical compositions. Liquidia rejected these batches for GMP manufacturing because they were exposed to ambient temperatures, and UTC has failed to provide evidence showing that Liquidia will not continue to do so.

Drug Substances Batches")). While the temperature data loggers for these batches do show a spike to ambient temperature, this spike directly corresponds with Liquidia's receipt of the batches. (PTX 116; PTX 117; Tr. at 324:11–327:24 (Kindig); Tr. at 150:17–153:22 (Nuckolls) (confirming that receipt date and spike date were both December 11, 2017)). Once Liquidia receives the TN shipment, an employee will open the box, set aside the data logger and paperwork, and transfer the TN to the GMP refrigerator. (Tr. at 321:18–323:7 (Kindig)). Because the temperature logger does not automatically stop once the box is opened, the employee will later press the button to stop the data logging when dealing with the paperwork. (Tr. at 322:15–323:2; 327:18–328:8 (Kindig)). This explains why the data loggers immediately spiked into ambient temperature on the date Liquidia received and opened the box. Thus, the temperature data loggers for these three batches do not prove storage at ambient temperature.

The remaining shipments that UTC points to did not include temperature data loggers. (PTX 123; PTX 124; PTX 127; PTX 823; *see also* PTX 126 at 24 (temperature logger showing a maximum temperature of 6.1°C)). Contrary to UTC's assertion, the lack of temperature data is not persuasive evidence that these batches were stored at ambient temperature.

Third, UTC argues that TN is stored at ambient temperature in a drybox during Step 1 of Liquidia's PRINT process. Liquidia's PRINT process has six steps: (1) "Preparation of aqueous stock solution"; (2) "Preparation of engineered particles (particle fabrication)"; (3) "Dry collection of engineered particles as bulk LIQ861 inhalation powder"; (4) "Drying and packaging of bulk LIQ861 inhalation powder"; (5) "Drug Product Primary Packaging – encapsulation of bulk LIQ861 inhalation powder in [HPMC] capsules"; and (6) "Drug Product Secondary Packaging – blister packaging and assembly of commercial drug product kit." (DTX

204 at 2). After Step 4, the LIQ861 bulk powder is shipped to Xcelience for encapsulation and packaging (Steps 5 and 6). (*Id.* at 12).

During Step 1, a sample of TN is placed in a drybox and used to make a stock aqueous solution. (PTX 70 at 9–17). Dr. Nuckolls claims that TN is "stored" in the drybox for three hours. (Tr. at 99:24–100:7 (Nuckolls) (relying on the time stamps in Step 2-2 (8:12am) and Step 2-17 (11:46am) of the Batch Production Record (PTX 70))). A POSA, however, would understand that TN is being used, not stored, during Step 1 of the PRINT process. (*See* DTX 204 at 2 (referring to the PRINT process as "[t]he manufacturing process"). Thus, evidence that Liquidia places TN in a drybox does not prove infringement of the storage limitation.

Liquidia has represented to the FDA that it will store treprostinil sodium at 2°C to 8°C. UTC has failed to prove that Liquidia will go against these representations and store isolated treprostinil sodium at ambient temperature before it is used to prepare a pharmaceutical composition. *See In re Brimonidine Pat. Litig.*, 643 F.3d 1366, 1378 (Fed. Cir. 2011) ("We cannot assume that [the NDA filer] will not act in full compliance with its representations to the FDA."). Accordingly, I find that UTC has failed to prove by a preponderance of the evidence that Liquidia's proposed LIQ861 product will infringe claim 6.

**3. Claims 8 and 9**

Liquidia only disputes infringement of the temperature storage limitation in claims 8 and 9. Claims 8 and 9 require "storing the treprostinil salt at ambient temperature, and preparing a pharmaceutical product from the treprostinil salt after storage." UTC asserts that the three instances of storage discussed above with respect to claim 6 apply equally to claims 8 and 9. (D.I. 408 at 16). This evidence fails to show storage of TN at ambient temperature for the reasons discussed above.

Because claims 8 and 9 require storage of "the treprostinil salt," whether isolated or not, UTC points to three additional instances of storage at ambient temperature to show infringement. Specifically, UTC contends that the LIQ861 bulk powder, which contains the treprostinil salt after it is mixed with excipients, is stored at ambient temperature between PRINT Steps 1 and 2; between PRINT Steps 2 and 3; and between PRINT Steps 3 and 4. (*Id.*).

Claim 8 recites a method for "preparing a pharmaceutical product," while claim 6 recites a "pharmaceutical composition." UTC contends that the LIQ861 bulk powder is the "pharmaceutical composition" and LIQ861 is the "pharmaceutical product." (*Id.*). UTC asserts that Liquidia prepares the pharmaceutical composition during PRINT Steps 1–4 and begins "preparing a pharmaceutical product" at PRINT Step 5. (*Id.*). I disagree. I find that a POSA would understand that Liquidia begins preparing the LIQ861 product at PRINT Step 1, not Step 5.[12] Steps 5 and 6 simply involve encapsulating and packaging the LIQ861 inhalation powder produced in Step 4, i.e., putting it in final dosage form. (Tr. at 455:9–12 (Winkler); DTX 204 at 2). A POSA would understand that the encapsulation and packaging performed during these steps would not change the chemical properties of the bulk LIQ861 inhalation powder produced in Step 4. (Tr. at 455:5–18 (Winkler)). Accordingly, a POSA would understand that Liquidia begins preparing a pharmaceutical product before the final packaging steps.

Any "storage" between steps in the PRINT process thus cannot meet the limitations of claims 8 and 9, which require storage before preparing a pharmaceutical product. I therefore

[12] While I agree with UTC that a POSA would understand the "pharmaceutical product" of claim 8 to be distinct from the "pharmaceutical composition" of claim 6, this does not mean that the preparation of the pharmaceutical composition and pharmaceutical product cannot begin at the same point.

find that UTC has failed to prove infringement of claims 8 and 9 by a preponderance of the evidence.[13]

## III. INVALIDITY OF THE '066 PATENT

### A. Product-by-Process Claims (Claims 1, 2, 3, 6, and 9)

#### 1. Legal Standard

"In determining validity of a product-by-process claim, the focus is on the product and not on the process of making it." *Amgen Inc. v. F. Hoffman-La Roche Ltd*, 580 F.3d 1340, 1369 (Fed. Cir. 2009). "That is because of the . . . long-standing rule that an old product is not patentable even if it is made by a new process." *Id.* at 1370. "If the product in a product-by-process claim is the same as or obvious from a product of the prior art, the claim is unpatentable even though the prior product was made by a different process." *In re Thorpe*, 777 F.2d 695, 697 (Fed. Cir. 1985). However, there is an exception to this general rule when "the process by which a product is made imparts 'structural and functional differences' distinguishing the claimed product from the prior art." *Greenliant Sys., Inc. v. Xicor LLC*, 692 F.3d 1261, 1268 (Fed. Cir. 2012) (quoting *Amgen*, 580 F.3d at 1370). "The party asserting anticipation bears the burden of proving that the process limitations do not result in an invention distinguishable from the prior art." *Cubist Pharms., Inc. v. Hospira, Inc.*, 75 F. Supp. 3d 641, 668 (D. Del. 2014) (citing *Amgen*, 580 F.3d at 1370), *aff'd*, 805 F.3d 1112 (Fed. Cir. 2015).

#### 2. Findings of Fact

1. The priority date of the '066 patent is December 17, 2007.

---

[13] Liquidia also argues that UTC has failed to show that Liquidia uses "a salt of treprostinil stable at ambient temperature" as required by claims 8 and 9. (D.I. 411 at 12). Because I have found that UTC has failed to prove infringement of the storage limitation, I need not address this argument.

2. Treprostinil is also known as UT-15 or treprostinil free acid. (DTX 258 at 1; DTX 674 at 4; Tr. at 408:16–17, 459:5–6, 461:5–6 (Winkler); Tr. at 742:5–9 (Gonda)).

3. A 2004 *Journal of Organic Chemistry* article by Moriarty et al., in relevant part titled "Synthesis of UT-15 (Treprostinil)" ("Moriarty"), teaches the synthesis of 99.7% pure treprostinil free acid, via alkylation and hydrolysis.

4. Moriarty is prior art.

5. The UT-15 treprostinil taught by Moriarty is the same chemical structure as the treprostinil product of claims 1–3, 6, and 9 of the '066 patent.

6. The average purity of UTC's batches of UT-15 treprostinil made by Moriarty and the '066 process are the same: 99.7%.

7. There are no structural or functional differences between the UT-15 treprostinil taught by Moriarty and the treprostinil claimed in the '066 patent.

**3. Conclusions of Law**

Claims 1, 2, 3, 6, and 9 are product-by-process claims, which claim a "pharmaceutical composition[/product] comprising treprostinil or a pharmaceutically acceptable salt thereof." Liquidia argues that these claims are invalid because the claimed product is the same product previously disclosed in the prior art by the 2004 Moriarty publication.[14] (D.I. 406 at 3).

---

[14] UTC faults Liquidia for failing to assert Moriarty as a § 102(a) anticipating reference. (D.I. 413 at 14 & n.10). This argument misunderstands Liquidia's invalidity theory. Liquidia claims that Moriarty anticipates under product-by-process law, not that Moriarty anticipates the claimed process steps. UTC did not object to the admission of evidence relating to this anticipation theory at trial. Thus, UTC cannot now argue that Moriarty is not prior art because Liquidia failed to disclose it as such. UTC also (newly) argues that Liquidia has failed to show that Moriarty was enabled. (*Id.* at 15–16). However, it is UTC's burden to prove that Moriarty is not enabled. *Apple Inc. v. Corephotonics, Ltd.*, 861 F. App'x 443, 450 (Fed. Cir. 2021) (nonprecedential) ("[R]egardless of the forum, prior art patents and publications enjoy a presumption of enablement, and the patentee/applicant has the burden to prove nonenablement for such prior art."); *In re Antor Media Corp.*, 689 F.3d 1282, 1289 (Fed. Cir. 2012) ("[D]uring patent prosecution, an examiner is entitled to reject claims as anticipated by a prior art publication or patent without conducting an inquiry into whether or not that prior art reference is enabling. As long as an examiner makes a proper prima facie case of anticipation . . . , the burden

The 2004 article published in the *Journal of Organic Chemistry* by Robert M. Moriarty et al., entitled, in relevant part, "Synthesis of UT-15 (Treprostinil)" ("Moriarty"), teaches the synthesis of treprostinil free acid by alkylation and hydrolysis of BTO. (DTX 258 at 8; Tr. at 461:17–25 (Winkler)). Liquidia argues that the treprostinil product claimed in the product-by-process claims is identical to the treprostinil free acid of Moriarty.

As a preliminary matter, UTC argues that Moriarty cannot invalidate the product-by-process claims because it only discloses treprostinil, not a "pharmaceutical composition[/product] comprising treprostinil." (D.I. 413 at 8–9). The '066 patent, however, makes no distinction between treprostinil and a pharmaceutical composition/product comprising treprostinil. The specification only describes the steps for synthesizing treprostinil or treprostinil salt. (*See* JTX 2 at 9:46–14:54 (Examples 1–5), 17:23 (Example 6, step 51, final yield is "UT-15"); *see also id.* at 5:57–59 ("The present invention provides for a process for producing treprostinil and other prostacyclin derivatives and novel intermediate compounds useful in the process.")). There is no description of combining treprostinil or treprostinil salt with excipients. Thus, a POSA reading the '066 patent specification would understand that treprostinil is a "pharmaceutical composition[/product] comprising treprostinil." This reading is confirmed by the testimony of both parties' experts. (Tr. at 104:22–105:8 (Nuckolls) (stating that the pharmaceutical composition in claim 1 "could be Treprostinil or the pharmaceutically acceptable [salt thereof]"); Tr. at 462:15–24 (Winkler) (confirming that the product claimed by the product-by-process claims "could just be Treprostinil")).

---

shifts to the applicant to submit rebuttal evidence of nonenablement."). UTC has failed to submit such evidence.

Liquidia's expert Dr. Winkler testified that the UT-15 treprostinil disclosed in Moriarty and the '066 treprostinil were structurally and functionally the same. (Tr. at 457:6–480:2 (Winkler)). Specifically, the UT-15 treprostinil disclosed in Moriarty has the same chemical structure as the treprostinil product of claims 1, 2, 3, 6, and 9. (Tr. at 462:25–463:2, 467:3–5 (Winkler). *Compare* DTX 258 at 3 (depicting the chemical structure of UT-15 treprostinil as compound 7), *with* JTX 2 at 14:20–30 (depicting the chemical structure of treprostinil)). Claims 1, 2, 3, 6, and 9 do not claim any purity percentage, impurity profile, or commercial scale production.[15] (Tr. at 460:8–16 (Winkler)). The specification discloses that the treprostinil generated by the claimed process has a purity ranging from 99.7% to 99.9%. (JTX 2 at 14:55–65). The patent further advises, "In one embodiment, the purity of [treprostinil free acid] is at least 90.0%, 95.0%, 99.0%, 99.5%." (*Id.* at 9:22–23). The UT-15 treprostinil disclosed in Moriarty has a purity of 99.7%, which falls within the disclosures of the '066 patent specification. (DTX 258 at 13; Tr. at 462:9–14 (Winkler)).

Dr. Winkler also testified that UTC manufactured UT-15 treprostinil according to both processes. (Tr. at 463:20–22 (Winkler)). He testified that UTC used the Moriarty process in Chicago starting in 1997,[16] and in 2007, UTC moved the manufacturing process to Silver

---

[15] UTC argues that the claim limitation requiring that the "level of one or more impurities found in the starting batch of treprostinil is lower in the pharmaceutical composition" defines the claimed product. (D.I. 413 at 7–8 (citing *In re Nordt Dev. Co.*, 881 F.3d 1371, 1376 (Fed. Cir. 2018))). I disagree. This impurities limitation is a process limitation that requires comparing the level of certain process impurities in the starting batch of treprostinil and the pharmaceutical composition, as shown in the infringement analysis above. This limitation merely describes the process and does not impart any structural or functional differences in the claimed pharmaceutical composition (as shown in Dr. Winkler's analysis discussed *infra*). *See In re Nordt*, 881 F.3d at 1375–76; *Greenliant*, 692 F.3d at 1268–69.

[16] UTC argues that Dr. Winkler failed to show that UTC's former Chicago process was the same process disclosed in Moriarty. (D.I. 413 at 17–19). In reaching this conclusion, Dr. Winkler compared the Moriarty paper and the description of the Chicago process and determined that

Spring, Maryland and changed to the '066 process. (Tr. at 464:15–465:2 (Winkler) (citing DTX 627A); Tr. at 546:1–4 (Batra); DTX 619). UTC told the FDA that the products made by both processes were the "same" and "equivalent." (DTX 70 at 3 ("[T]he lots of treprostinil API produced by the new process in Silver Spring are of the same high quality and purity as the commercial lots of API produced by the existing process at the Chicago facility."); DTX 619 at 10 ("The release data for the drug substance batch prepared by the revised route of synthesis indicate that it is of equivalent quality to the batches produced by the current synthetic route, particularly with respect to the assay and purity profile."); DTX 646 at 4–5 ("[T]he simplified chemical synthesis of treprostinil will provide API that meets the same acceptance criteria as API obtained from the 20-step chemical synthesis, with a very similar impurity profile and similar acceptance criteria.")).

UTC used both processes to make treprostinil free acid for its drug Remodulin®. (Tr. at 467:17–468:3 (Winkler); Tr. at 545:7–19 (Batra); JTX 2 (titled "Process to Prepare Treprostinil, The Active Ingredient in Remodulin®")). UTC never represented to the FDA that the UT-15 treprostinil made according to the '066 patent in Silver Spring was safer, less toxic, or purer than the UT-15 treprostinil made according to Moriarty in Chicago. (Tr. at 469:7–14, 478:23–479:21 (Winkler)). Based on this, Dr. Winkler concluded that a POSA would understand there not to

---

they recited the same reactions. (Tr. at 519:18–22, 520:9–21 (Winkler)). Dr. Winkler also relied on one of the inventors, Dr. Batra, who testified that "Moriarty's process" "might be one of the terms" used to describe the Chicago process. (Tr. at 546:5–10 (Batra); *see also* JTX 2 at 1:28–31 ("Treprostinil, and other prostacyclin derivatives have been prepared as described in Moriarty . . . .")). No UTC witness disputed Dr. Winkler's statement that the Moriarty process was used in Chicago. In fact, UTC's witnesses relied on documents comparing the Chicago and Silver Spring products to demonstrate a structural difference. (*See* Tr. at 783:21–786:17 (Bunce); Tr. at 793:16–794:12, 799:4–802:19 (Walsh)). I therefore credit Dr. Winkler's testimony that the "Chicago process" and "Moriarty process" are the same.

be any "efficacy, toxicity," or "biological activity" differences between the treprostinil made according to Moriarty and the '066 treprostinil. (Tr. at 479:12–21 (Winkler)).

Dr. Winkler further testified that UTC had identical specification limits (with respect to unidentified impurities, identified impurities, and total related substances) on allowable impurities between the two processes' products. (Tr. at 469:15–471:23 (Winkler). *Compare* DTX 151 at 1 (Silver Spring Product Certificate of Analysis from 2020), *and* DTX 627A at 5–6 (Silver Spring Process Optimization Batches Release Testing Data), *with* DTX 627A at 7 (Chicago Release Testing Data)). UTC increased its purity assay range from 97–101% (Chicago) to 98–102% (Silver Spring). (Tr. at 784:23–786:9 (Bunce); DTX 70 at 3; DTX 151 at 1; DTX 627A at 7). But Dr. Winkler testified that the purity of 96 batches of treprostinil made by the Chicago process was 98.9%–100.3%, within both the 97–101% and 98–102% ranges. (Tr. at 470:21–473:5 (Winkler)). Dr. Winkler testified, and UTC did not refute, that the average purity of UTC's batches of UT-15 treprostinil made by the Chicago process and the Silver Spring process were the same: 99.7%. (Tr. at 473:16–477:18 (Winkler) (relying on the purity data submitted during the IPR for UTC's U.S. Patent No. 8,497,393 (DTX 664 at App. A ("Sample of product of Moriarty process")))).

No UTC expert or fact witness rebutted Dr. Winkler's opinions or provided testimony identifying any structural or functional difference between the Moriarty treprostinil free acid and the claimed treprostinil free acid product/composition. UTC only provided evidence relating to the functional and structural differences between the Moriarty treprostinil free acid and the claimed treprostinil salt product/composition. Dr. Walsh (inventor and former UTC employee) testified that the '066 process greatly reduced the 3AU90 impurity (an isomer of treprostinil) as compared to UTC's former Chicago process. (Tr. at 793:2–794:5, 795:12–796:12, 797:11–

802:19 (Walsh)). Dr. Walsh, however, did not compare the Moriarty treprostinil free acid prepared in Chicago and the claimed treprostinil free acid product/composition. Instead, he compared the treprostinil free acid prepared at the Chicago facility and the treprostinil diethanolamine salt prepared by the '066 process. (Tr. at 803:1–12 (Walsh)). Dr. Walsh confirmed that treprostinil diethanolamine salt is a different compound from treprostinil free acid. (Tr. at 804:17–19 (Walsh)). Thus, Dr. Walsh's testimony fails to identify any structural or functional differences between the treprostinil products.

UTC also argues that the '066 patent's "capability for making a pharmaceutical composition from treprostinil salt that had been stored at ambient temperature is novel over the prior art." (D.I. 413 at 24). UTC is improperly focusing on the process limitations of the claims. The storage and stability limitations in claims 6 and 9 relate to the intermediate salt generated during the process steps, not the final composition/product. The claims do not cover any stability or storage of the final treprostinil product. Nor is this "capability" a structural or functional difference which appears in the claimed product. Instead, UTC admitted that the claimed treprostinil free acid was not stable at room temperature, which presents no improvement over the Moriarty UT-15 treprostinil. (Tr. at 964:19–965:7 (UTC Closing)).

The product-by-process claims recite a "pharmaceutical composition[/product] comprising treprostinil *or* a pharmaceutically acceptable salt thereof." Thus, if the treprostinil product is anticipated, then the claims are invalid, regardless of whether the treprostinil salt is anticipated. *See Brown v. 3M*, 265 F.3d 1349, 1351 (Fed. Cir. 2001) ("When a claim covers several structures or compositions, either generically or as alternatives, the claim is deemed anticipated if any of the structures or compositions within the scope of the claim is known in the prior art."). UTC has not provided any evidence or expert testimony which compares the

claimed treprostinil free acid to the Moriarty UT-15 treprostinil, instead choosing to focus on the claimed treprostinil salt. Accordingly, there is no record evidence that contradicts Dr. Winkler's testimony that the claimed treprostinil product and Moriarty UT-15 treprostinil are the same.

Liquidia has shown by clear and convincing evidence that the claimed treprostinil product is functionally and structurally the same as the UT-15 treprostinil disclosed in Moriarty. Thus, I find that claims 1, 2, 3, 6, and 9 of the '066 patent are invalid as anticipated.

### B. Written Description (Claims 1, 2, 3, and 6)

#### 1. Legal Standard

The written description requirement contained in 35 U.S.C. § 112 requires that the specification "clearly allow persons of ordinary skill in the art to recognize that [the inventor] invented what is claimed." *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (en banc) (alteration in original). "In other words, the test for sufficiency is whether the disclosure of the application relied upon reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date." *Id.* "When determining whether a specification contains adequate written description, one must make an 'objective inquiry into the four corners of the specification from the perspective of a person of ordinary skill in the art.'" *Bos. Sci. Corp. v. Johnson & Johnson*, 647 F.3d 1353, 1366 (Fed. Cir. 2011) (quoting *Ariad*, 598 F.3d at 1351).

The written description inquiry is a question of fact. *Ariad*, 598 F.3d at 1351. "A party must prove invalidity for lack of written description by clear and convincing evidence." *Vasudevan Software, Inc. v. MicroStrategy, Inc.*, 782 F.3d 671, 682 (Fed. Cir. 2015).

#### 2. Findings of Fact

1. A POSA reading the '066 patent specification would have understood that the alkylation step results in a light brown material, the hydrolysis step

results in a pale yellow material, and the salt formation step results in an off-white material, indicating the generation and lowering of impurities from the alkylation and hydrolysis steps.

2. TLC may be used to qualitatively see the presence of impurities generated as the reaction proceeds. A POSA would have understood from the specification disclosure that monitoring the progress of a reaction by TLC would include identification of impurities generated during the reaction step.

### 3. Conclusions of Law

Liquidia asserts that there is no written description support for claim 1's limitation requiring that "a level of one or more impurities found in the starting batch of treprostinil is lower in the pharmaceutical composition." Claim 1 further requires "a starting batch of treprostinil having one or more impurities resulting from prior alkylation and hydrolysis steps . . . wherein said alkylation is alkylation of benzindene triol."

The specification provides adequate written description support for the impurities limitation. Specifically, the specification provides, "The impurities carried over from intermediate steps (i.e. alkylation of triol and hydrolysis of benzindene nitrile) are removed during the carbon treatment and the salt formation step." (JTX 2 at 17:29–32). Liquidia argues that this passage does not provide adequate written description support because it does not specify whether the impurities that are reduced are from the alkylation and hydrolysis of BTO. (D.I. 406 at 12–13). This argument, however, is based on Liquidia's narrow claim construction, which I rejected above. A POSA would understand that claim 1 encompasses any impurity generated during the alkylation and hydrolysis steps. Thus, based on this language in the specification, a POSA would understand that the inventors were in possession of the impurities limitation. (*See* Tr. at 818:1–22 (Scheidt)).

Yet, Liquidia argues that since the specification does not report the level of impurities generated during the alkylation and hydrolysis steps, the '066 patent does not provide any

written description of a "level of one or more impurities found in the starting batch of treprostinil" to compare to the pharmaceutical composition. (Tr. at 480:25–482:7 (Winkler); *see* JTX 2 at 9:49–10:37, 10:40–11:49). Liquidia argues, "[T]here is insufficient data and information in the specification of the '066 patent for a POSA to make such a comparison as claimed." (D.I. 406 at 10). This argument is not a written description argument; it might be an enablement argument. The specification need not report quantitative impurities data to provide written description support. While the '066 patent does not disclose quantitative impurities measurements, it provides qualitative measures that would alert a POSA to the generation and reduction of impurities as claimed.

As UTC's expert Dr. Scheidt testified, the '066 patent describes that the alkylation step results in a light brown material, the hydrolysis step results in a pale yellow material (i.e., the starting batch of treprostinil), and the salt formation step results in an off-white material. (Tr. at 810:13–811:1 (Scheidt); JTX 2 at 9:49–10:37 (alkylation of benzindene triol), 10:40–11:49 (hydrolysis of benzindene nitrile), 14:1–54 (conversion of treprostinil diethanolamine salt to treprostinil)). Dr. Scheidt credibly testified that a POSA would understand that these color changes indicate the generation and lowering of impurities from the alkylation and hydrolysis steps. (Tr. at 811:17–812:5, 817:5–25, 819:7–18 (Scheidt); *see also* Tr. at 484:2–8, 488:3–15, 532:16–24 (Winkler) (acknowledging that changes in color can indicate the presence of an impurity)). Liquidia faults Dr. Scheidt's analysis because the color differences do not show the specific impurity or the amount of impurity removed. (D.I. 406 at 11). This argument, however, relies on Liquidia's erroneous construction. A POSA would understand that claim 1 encompasses any impurity generated during the alkylation and hydrolysis steps. Further, the

claim simply requires the lowering of the impurities, so the specification need not disclose the specific amount of impurities removed to provide adequate written description support.

The '066 patent specification also provides that the progress of the alkylation and hydrolysis reactions were monitored by thin layer chromatography ("TLC"). (JTX 2 at 10:30–32, 11:13–16). TLC may be used to qualitatively see the presence of impurities generated as the reaction proceeds. (Tr. at 812:9–814:16 (Scheidt)). Although the patent does not disclose the use of TLC to identify or measure impurities, I credit Dr. Scheidt's testimony that a POSA would understand that the TLC would include identification of impurities generated during the reaction steps. (*Id.*).

I find that these disclosures in the '066 patent "reasonably convey[] to those skilled in the art that the inventor had possession" of the impurities limitation.[17] *Ariad*, 598 F.3d at 1351. Liquidia has not proven by clear and convincing evidence that claims 1, 2, 3, and 6 of the '066 patent are invalid for lack of written description.

---

[17] Liquidia relies on inventor testimony to show that the inventors did not possess the impurities limitation. (D.I. 406 at 10, 12–13). This inventor testimony does not alter my conclusion. The test for written description "requires an objective inquiry into the four corners of the specification." *Ariad*, 598 F.3d at 1351. The disclosures in the '066 patent reasonably convey possession of the claimed impurities limitation. I therefore see no reason to look beyond the four corners of the specification. *See Biogen Int'l GmbH v. Mylan Pharms. Inc.*, 28 F.4th 1194, 1202 (Fed. Cir. 2022) (Lourie, J., dissenting from the denial of the petition for rehearing en banc) ("Where the disclosure in a patent's specification plainly corresponds to what is claimed, extrinsic evidence should not be used to cast doubt on the meaning of what is disclosed."). Even if I were to consider the inventor testimony, I would find that it does not provide clear and convincing evidence that the claims lack written description.

## IV. INFRINGEMENT OF THE '793 PATENT

### A. Legal Standard

"Whoever actively induces infringement of a patent shall be liable as an infringer." 35 U.S.C. § 271(b); *Warner-Lambert Co. v. Apotex Corp.*, 316 F.3d 1348, 1363 (Fed. Cir. 2003). To prevail on a claim of induced infringement, the plaintiff must show (1) "that there has been direct infringement," and (2) "that the alleged infringer knowingly induced infringement and possessed specific intent to encourage another's infringement." *Enplas Display Device Corp. v. Seoul Semiconductor Co.*, 909 F.3d 398, 407 (Fed. Cir. 2018) (internal citation omitted).

In a Hatch-Waxman case, a plaintiff "can satisfy its burden to prove the predicate direct infringement by showing that if the proposed []NDA product were marketed, it would infringe the [asserted claims]." *Vanda Pharms. Inc. v. W.-Ward Pharms. Int'l Ltd.*, 887 F.3d 1117, 1130 (Fed. Cir. 2018). For method-of-treatment patents, if an NDA applicant's "proposed label instructs users to perform the patented method[,] . . . the proposed label may provide evidence of [the NDA applicant's] affirmative intent to induce infringement." *AstraZeneca LP v. Apotex, Inc.*, 633 F.3d 1042, 1060 (Fed. Cir. 2010). In that setting, the Federal Circuit has explained, "The label must encourage, recommend, or promote infringement." *Takeda Pharms. U.S.A., Inc. v. W.-Ward Pharm. Corp.*, 785 F.3d 625, 631 (Fed. Cir. 2015). Evidence that a proposed label will "inevitably lead some consumers to practice the claimed method" can suffice to support a finding of specific intent to induce infringement. *AstraZeneca*, 633 F.3d at 1060.

### B. Asserted Claims of the '793 patent

**1.** A method of treating pulmonary hypertension comprising administering by inhalation to a human suffering from pulmonary hypertension a therapeutically effective single event dose of a formulation comprising treprostinil or a pharmaceutically acceptable salt thereof with an inhalation device, wherein the therapeutically effective single event dose comprises from 15 micrograms to 90 micrograms of treprostinil or a pharmaceutically acceptable salt thereof delivered in 1 to 3 breaths.

**4.** The method of claim 1, wherein the inhalation device is a dry powder inhaler.

**6.** The method of claim 4, wherein the formulation is a powder.

**7.** The method of claim 6, wherein the powder comprises particles less than 5 micrometers in diameter.

**8.** The method of claim 1, wherein the formulation contains no metacresol.

**C. Findings of Fact**

1. A POSA would have a medical degree with a specialty in pulmonology or cardiology, plus at least two years of experience treating patients with PH as an attending, including with inhaled therapies, or equivalent degree or experience.

2. LIQ861 is administered "3 to 5 times per day." Each administration is a single event dose.

3. LIQ861 is administered in a single event dose that is therapeutically effective.

4. Treprostinil is a vasodilator that reduces vasoconstriction in the pulmonary vasculature, causing vasodilation (widening of vasculature) and reduction of pulmonary artery pressure ("PAP") and pulmonary vascular resistance ("PVR").

5. A single administration of treprostinil will improve a patient's hemodynamics.

6. A single administration of LIQ861 will have positive hemodynamic effects, i.e., reduce PAP and PVR.

7. Liquidia has knowledge of the '793 patent.

8. Liquidia's proposed LIQ861 label teaches all elements of the asserted claims of the '793 patent.

9. Knowing that the method of administering LIQ861 is infringing, Liquidia will encourage, recommend, and promote use of LIQ861 in an infringing manner, including by providing the label, patient instructions, and additional training and other information to physicians and patients.

### D. Conclusions of Law

#### 1. Act of Direct Infringement

Liquidia argues that UTC has failed to prove that LIQ861 is administered in "a therapeutically effective single event dose," as required by claim 1 and therefore every asserted claim.[18]

Liquidia argues that claim 1 is limited to one single event dose per day rather than multiple doses per day. (D.I. 411 at 13). Liquidia reasons that claim 1 recites a "single event dose" rather than simply a "dose." (*Id.*). Liquidia's argument lacks merit. The term "single" modifies "event," not "dose." The experts agree that "single event dose" refers to a dose that is delivered in a single treatment session (i.e., a "single event"), including a session that involves multiple breaths. (Tr. at 675:4–15 (Waxman); Tr. at 704:25–705:9 (Hill)).

The claim language does not limit the number of single event doses per day. The claim recites the administration of "a" single event dose. The Federal Circuit "has repeatedly emphasized that an indefinite article 'a' or 'an' in patent parlance carries the meaning of 'one or more' in open-ended claims containing the transitional phrase 'comprising.'" *KCJ Corp. v. Kinetic Concepts, Inc.*, 223 F.3d 1351, 1356 (Fed. Cir. 2000). There is no language in the claims or specification that necessitates a departure from this general rule. *See Baldwin Graphic Sys., Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1342–43 (Fed. Cir. 2008) ("An exception to the general rule that 'a' or 'an' means more than one only arises where the language of the claims themselves, the specification, or the prosecution history necessitate a departure from the rule.").

[18] Liquidia does not dispute infringement of the remaining limitations in claims 1, 4, 6, 7, and 8. (*See* D.I. 411 at 12–17).

The specification is consistent with the general meaning of "a." The specification expressly states, "Treprostinil can be administered a single time per day or several times per day." (JTX 3 at 8:1–2). Further, based on treprostinil's three- to four-hour half-life, a POSA would understand that a patient would need to receive more than one single event dose per day. (Tr. at 704:9–24 (Hill)). Accordingly, I conclude that the scope of claim 1 is not limited to one single event dose per day. I find that LIQ861 is administered in a single event dose. The proposed LIQ861 label states that LIQ861 "should be administered 3 to 5 times per day." (PTX 469 at 4). Each administration is a single event dose. (*See* Tr. at 676:15–20 (Waxman); Tr. at 705:1–9, 707:5–22 (Hill)).

The parties agree that claim 1 requires that each "single event dose" be "therapeutically effective." (Tr. at 651:5–22 (Waxman); Tr. at 683:2–9 (Hill)). The parties, however, dispute the plain and ordinary meaning of "therapeutically effective." UTC's expert Dr. Waxman testified that a therapeutically effective single event dose is one that causes a positive change in a patient's hemodynamics—i.e., "a therapeutically effective dose should cause a reduction in pulmonary artery pressure and cause a reduction in pulmonary vascular resistance." (Tr. at 651:3–22 (Waxman)). In contrast, Liquidia's expert Dr. Hill testified that a single event dose is therapeutically effective when it causes an "improvement in symptoms, in function, and/or in survival." (Tr. at 685:15–21 (Hill)). Based on the teachings of the '793 patent, I agree with Dr. Waxman that a POSA would understand the plain and ordinary meaning of "therapeutically effective single event dose" to be a dose given in a single treatment session that causes an improvement in a patient's hemodynamics (reduced PAP or PVR).

The examples in the specification studied the hemodynamic effects after a single event dose of treprostinil. (*See, e.g.*, JTX 3 at 8:57–18:11; 9:11–21 ("Pulmonary hemodynamics and

blood gases were measured at defined time points . . . . [Inhaled treprostinil sodium] doses of 30 µg, 45 µg and 60 µg reduced pulmonary vascular resistance (PVR) . . . . Reduction of PVR by a single inhalation of the two higher doses outlasted the observation period of 120 minutes."); 11:62–66 ("The application of an effective amount of treprostinil in only few or even one single breath was achieved with a highly concentrated treprostinil sodium solution.")). The examples in the patent do not report long-term measures like patient survival rate. (*See* Tr. at 702:12–20 (Hill)). A POSA reading the '793 patent would thus understand that a single event dose is therapeutically effective when it improves a patient's hemodynamics.

I find that UTC has proven by a preponderance of the evidence that LIQ861 is administered in a therapeutically effective single event dose. Treprostinil is a vasodilator that reduces vasoconstriction in the pulmonary vasculature, causing vasodilation (widening of vasculature) and reduction of PAP and PVR. (Tr. at 650:20–25 (Waxman); Tr. at 700:13–17 (Hill) (acknowledging that "the goal of using a vasodilator such as Treprostinil is to reduce the pulmonary arterial pressure and/or pulmonary vascular resistance")). Both experts agree that the '793 patent shows that the claimed single-event dosing of treprostinil improves a patient's hemodynamics. (Tr. at 637:22–25 (Waxman); Tr. at 702:1–4 (Hill) (agreeing that the '793 patent shows hemodynamic effectiveness from treprostinil); *see also* Tr. at 702:5–11 (Hill) (agreeing that on average, "a single administration of Treprostinil to someone suffering from pulmonary hypertension results in a beneficial reduction of pulmonary arterial pressure and/or vascular resistance")).

Liquidia argues that these disclosures are not evidence that a single event dose of LIQ861 will have hemodynamic effects because LIQ861 is administered in a completely different form than Tyvaso®. (D.I. 411 at 15). LIQ861 is a dry powder formulation, while Tyvaso® is a

liquid formulation delivered to the patient via a nebulizer. (Tr. at 696:6–12 (Hill)). But, as Dr. Hill acknowledged, Tyvaso® and LIQ861 involve the same molecule (treprostinil). (Tr. at 711:4–6 (Hill)). Dr. Hill testified that, because they involve the same molecule, he would expect Tyvaso® and LIQ861 to have similar effects on PAP and PVR. (Tr. at 711:4–11 (Hill); *see also* Tr. at 694:20–695:2 (Hill) (after a single event dose of LIQ861, "There might be a transient improvement in hemodynamics. There might be no effect on the hemodynamics, but in the longer term, the effect would dissipate within hours, and you would expect no therapeutic effect beyond those first few hours.")). In fact, Liquidia relied on Tyvaso®'s safety and efficacy data in its NDA. (PTX 573 at 7 ("The NDA for LIQ861 inhalational powder . . . rel[ies] on the FDA's previous finding of safety and effectiveness for Tyvaso, the selected reference listed drug (RLD) for demonstration of the effectiveness of treprostinil in the treatment of PAH."); *see also* PTX 1213 (demonstrating that LIQ861 and Tyvaso® have the same bioavailability)).

UTC's evidence shows that a single administration of treprostinil will improve a patient's hemodynamics, and thus proves by a preponderance of the evidence that a single administration of LIQ861 at the claimed doses will improve a patient's hemodynamics. I therefore find that UTC has proven by a preponderance of the evidence that the administration of LIQ861 will directly infringe claims 1, 4, 6, 7, and 8 of the '793 patent.

#### 2. Specific Intent to Induce Infringement

Liquidia argues that it lacks specific intent to induce infringement because the proposed LIQ861 label does not encourage administration of a "therapeutically effective single event dose." (D.I. 411 at 16–17). Liquidia argues that the label does not "instruct[] that LIQ861 produces hemodynamic changes after a single event dose" because the label does not contain any

hemodynamic data or instruction to doctors to measure hemodynamic changes after a single event dose. (*Id.*). The label, however, does not need to provide hemodynamic data to induce infringement. It just needs to instruct doctors and patients to administer a single event dose that is therapeutically effective. *See AstraZeneca*, 633 F.3d at 1060 (finding that evidence that a proposed label will "inevitably lead some consumers to practice the claimed method" can suffice to support a finding of intent to induce infringement). The LIQ861 label does so by instructing doctors and patients to administer LIQ861 "3 to 5 times per day" at the claimed doses. (*See* PTX 469 at 4–6). As discussed above, UTC has proven that a single administration of LIQ861 will be therapeutically effective. Thus, the label's instructions will "inevitably lead" to the administration of a "therapeutically effective single event dose."[19] UTC has met its burden to show intent to induce infringement.

I therefore find that UTC has proven by a preponderance of the evidence that Liquidia will induce infringement of claims 1, 4, 6, 7, and 8 of the '793 patent.

On July 19, 2022, the PTAB issued a Final Written Decision in the IPR of the '793 patent, invalidating all claims of the '793 patent as obvious. *Liquidia Techs., Inc. v. United Therapeutics Corp.*, No. IPR2021-00406, 2022 WL 2820717 (P.T.A.B. July 19, 2022). Liquidia argues that it therefore cannot be liable for induced infringement under the Supreme Court's decision in *Commil*. (D.I. 427).

---

[19] Liquidia also argues that the label does not encourage patients to use LIQ861 as a "single event dose" because the label instructs doctors and patients to administer LIQ861 "3 to 5 times per day." (D.I. 411 at 16–17). But, as discussed above, claim 1 is not limited to one single event dose per day. The LIQ861 label instructs and encourages the administration of LIQ861 as a "single event dose."

In *Commil*, the Supreme Court held that an accused infringer's "belief regarding patent validity" is not a defense to a claim of induced infringement. *Commil USA, LLC v. Cisco Sys., Inc.*, 575 U.S. 632, 642 (2015). The Supreme Court also stated, "[I]f . . . an act that would have been an infringement or an inducement to infringe pertains to a patent that is shown to be invalid, there is no patent to be infringed." *Id.* at 644. The Supreme Court further explained, "An accused infringer can, of course, attempt to prove that the patent in suit is invalid; if the patent is indeed invalid, and shown to be so under proper procedures, there is no liability." *Id.* The Supreme Court never stated, however, that a PTAB decision invalidating patent claims in an IPR will preclude liability before it becomes final and nonappealable. *Id.* at 644–45. The Court simply stated that an IPR proceeding is one procedure through which an accused infringer can pursue an invalidity challenge. *Id.* at 645. I therefore do not think that *Commil* compels this Court to treat the '793 patent as invalid for purposes of assessing Liquidia's induced infringement. (*See* D.I. 427 at 1).

Instead, the Federal Circuit has indicated that an IPR decision does not have collateral estoppel effect until that decision is affirmed or the parties waive their appeal rights. *See XY, LLC v. Trans Ova Genetics*, 890 F.3d 1282, 1294 (Fed. Cir. 2018) ("[A]n affirmance of an invalidity finding, whether from a district court or the Board, has a collateral estoppel effect on all pending or co-pending actions."); *Papst Licensing GMBH & Co. KG v. Samsung Elecs. Am., Inc.*, 924 F.3d 1243, 1249 (Fed. Cir. 2019) (finding IPR decision became final after appeals were voluntarily dismissed). Further, the PTAB's FWD does not cancel claims. The claims are cancelled when the Director issues a certificate confirming unpatentability, which only occurs after "the time for appeal has expired or any appeal has terminated." 35 U.S.C. § 318(b); *see*

*also Fresenius USA, Inc. v. Baxter Int'l, Inc.*, 721 F.3d 1330, 1346 (Fed. Cir. 2013) ("[I]t could hardly be clearer that Congress meant for cancellation to terminate pending suits.").

Therefore, I find that the PTAB's decision—which is not yet final—has no impact on my finding of induced infringement.

## V. INVALIDITY OF THE '793 PATENT

### A. Legal Standard

A patent's specification must enable the claimed invention. *In re Cortright*, 165 F.3d 1353, 1356 (Fed. Cir. 1999). For a patent claim to be enabled, "The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same[.]" 35 U.S.C. § 112(a). "The enablement requirement is met where one skilled in the art, having read the specification, could practice the invention without 'undue experimentation.'" *Streck, Inc. v. Rsch. & Diagnostic Sys., Inc.*, 665 F.3d 1269, 1288 (Fed. Cir. 2012) (citation omitted). Factors for assessing whether a disclosure would require undue experimentation include:

> (1) the quantity of experimentation necessary, (2) the amount of direction or guidance presented, (3) the presence or absence of working examples, (4) the nature of the invention, (5) the state of the prior art, (6) the relative skill of those in the art, (7) the predictability or unpredictability of the art, and (8) the breadth of the claims.

*In re Wands*, 858 F.2d 731, 737 (Fed. Cir. 1988).

"Enablement is a question of law based on underlying facts." *Wyeth & Cordis Corp. v. Abbott Lab'ys*, 720 F.3d 1380, 1384 (Fed. Cir. 2013). The party challenging validity must prove lack of enablement by clear and convincing evidence. *Cephalon, Inc. v. Watson Pharms., Inc.*, 707 F.3d 1330, 1336 (Fed. Cir. 2013).

## B. Findings of Fact

1. The '793 patent has a priority date of May 15, 2006.

2. With respect to treating PH, a POSA would have a medical degree with a specialty in pulmonology or cardiology, plus at least two years of experience treating patients with PH as an attending, including with inhaled therapies, or equivalent degree or experience. With respect to inhaled formulations used in treating PH, a POSA would have a Ph.D. in pharmaceutical science or a related discipline like chemistry or medicinal chemistry, plus two years of experience in pharmaceutical formulations, including inhaled products, or equivalents (e.g., an M.S. in the same fields, plus five years of experience).

3. A POSA would understand "treating pulmonary hypertension," as claimed, to encompass treating all five WHO Groups of pulmonary hypertension ("PH"), including both isolated Group 2 (also referred to as isolated postcapillary Group 2) and pre- and postcapillary combined Group 2.

4. Treprostinil is a member of the family of compounds referred to as prostacyclins or prostacyclin analogs. (JTX 3 at 5:37–39; Tr. at 573:21–22 (Hill)). Prostacyclins dilate, or widen, the blood vessels of the lungs. (Tr. at 574:10–15 (Hill)).

5. A POSA would understand that the claimed administration of treprostinil vasodilates the pulmonary vasculature and reduces PAP and PVR, even in Group 2 PH patients.

6. The processes involved in developing dry powder formulations were well known as of 2006 and utilized routine techniques for both manufacturing and analysis.

7. Numerous dry powder inhaler ("DPI") devices were available by 2006.

8. By 2006 it was common for a POSA to develop a powder blend and then choose an available DPI for delivery of the powder formulation. Not all DPI devices need to be separately developed or specifically chosen for a given patient population.

9. Using well-known and routine techniques, Dr. Smyth prepared treprostinil free acid and treprostinil diethanolamine dry powder formulations that delivered doses within the claimed 15–90 μg range with three weeks of testing. Dr. Smyth's testing demonstrated that PH patients could effectively inhale these dry powder formulations using a DPI.

10. Selecting a suitable form of treprostinil was routine as of 2006. Methods for determining suitable forms, including salt forms, of a particular API were well known and routine for several decades prior to 2006.

11. Lactose was the only FDA-approved carrier in 2006 and was also the most common excipient for use in dry powder inhalers.

12. The Maillard reaction was well known and understood as of 2006. A POSA would have understood how to monitor any Maillard reaction between treprostinil diethanolamine and lactose.

13. Meyer (PTX 1980) was available before the priority date and discloses that PH patients were able to obtain maximum inspiratory efforts of 5.2 kPa in females and 6.8 kPa in males, which is enough to use a DPI.

### C. Conclusions of Law

#### 1. Enablement of "Treating Pulmonary Hypertension"

The asserted claims of the '793 patent recite: "A method of treating pulmonary hypertension comprising administering by inhalation to a human suffering from pulmonary hypertension a therapeutically effective single event dose of a formulation comprising treprostinil or a pharmaceutically acceptable salt thereof . . . ." Liquidia argues that the full scope of "treating pulmonary hypertension" is not enabled.

Before addressing enablement, I must first resolve the parties' claim construction dispute. Liquidia asserts that the phrase "treating pulmonary hypertension" encompasses treating all five WHO groups of pulmonary hypertension ("PH"). (D.I. 406 at 14). UTC argues that the claims are limited to treating precapillary PH. (D.I. 413 at 29–30).

PH refers to abnormally high blood pressure in the lungs. (Tr. at 562:13–14, 563:18–21 (Hill); Tr. at 629:9–630:1, 677:21–678:7 (Waxman)). PH includes a range of conditions classified in five different WHO groups: Group 1, pulmonary arterial hypertension; Group 2, pulmonary venous hypertension, i.e., PH related to left heart disease; Group 3, PH associated with disorders damaging the lungs; Group 4, PH caused by chronic thrombotic or embolic disease, including chronic blood clots in the lungs; and Group 5, a miscellaneous category for conditions that do not fit well into the other four groups. (JTX 3 at 1:41–46; Tr. at 564:19–566:7, 575:22–576:4 (Hill); Tr. at 609:18–610:11 (Rubin); DTX 385 at 2).

PH Groups 1, 3, and 4 are classified as "precapillary" PH as they are characterized by conditions affecting the pulmonary arteries or precapillary vessels. (Tr. at 564:18–566:4, 591:24–592:1 (Hill)). In contrast, the high blood pressure in the lungs of Group 2 PH patients has a different underlying cause. Defects in the left side of the heart cause elevated pressure in the postcapillary veins which reflects back as high pressure in the pulmonary arteries. (Tr. at 565:4–16, 571:17–24 (Hill)). Because the left heart is downstream (in terms of blood flow) of the pulmonary capillaries, Group 2 PH is sometimes referred to as "postcapillary" PH. (Tr. at 564:5–17, 565:4–16 (Hill); Tr. at 630:10–17 (Waxman)). Group 2 PH patients can suffer from isolated postcapillary PH or combined pre- and postcapillary PH. (Tr. at 571:10–14 (Hill); Tr. at 659:8–14 (Waxman)). In combined Group 2 PH patients, the precapillary vessels undergo changes similar to those in precapillary Group 1 PH. (Tr. at 571:10–572:8 (Hill)).

Because the cause of postcapillary PH is the left heart, not precapillary resistance, the "mainstay of treatment" by POSAs for postcapillary PH is a diuretic, not a vasodilator like treprostinil. (Tr. at 636:1–5 (Waxman); *see also* Tr. at 587:5–588:5, 600:2–9 (Hill) (stating that treating postcapillary PH patients with a vasodilator would be "stupid" because vasodilation can lead to pulmonary edema)).

Claim 1 requires "treating pulmonary hypertension comprising administering . . . treprostinil," a vasodilator. Based on this language, UTC argues that a POSA would understand claim 1 to be limited to "treating varieties of PH where using a vasodilator addresses the cause of the disease." (D.I. 413 at 30). Thus, because both experts agree that a POSA would not treat postcapillary PH with treprostinil, UTC contends that a POSA would read the claim to be limited to the treatment of precapillary PH.

This expert testimony, however, is no substitute for the clear disclosures in the '793 patent specification. The specification expressly includes all five Groups when describing "pulmonary hypertension." (JTX 3 at 1:41–45 ("Pulmonary hypertension may occur due to various reasons and the different entities of pulmonary hypertension were classified based on clinical and pathological grounds in 5 categories according to the latest WHO convention." (citing DTX 385)); *see also id.* at 1:37–38 ("Generally, pulmonary hypertension is defined through observations of pressures above the normal range . . . .")). The specification does not contain any disclosures which limit the scope of "pulmonary hypertension" to any particular subset of PH patients. Instead, the specification refers to both "precapillary pulmonary hypertension" and "pulmonary hypertension," demonstrating that the inventors viewed precapillary PH as a subset of the broadly claimed "pulmonary hypertension." (*Id.* at 9:36–37, 12:64–65, 16:64–65).

Based on these clear disclosures in the specification, I conclude that the scope of "treating pulmonary hypertension" includes treating all five Groups of PH.

Returning to enablement, Liquidia argues that it would require undue experimentation to practice the full scope of the claimed "treating pulmonary hypertension," specifically treating Group 2 PH patients. (D.I. 406 at 15–19). Dr. Hill testified that as of May 15, 2006, a POSA would have had significant safety concerns about administering inhaled treprostinil to treat Group 2 PH patients. (Tr. at 592:3–593:18 (Hill)). Several studies have indicated that Group 1 PH therapies like prostacyclins could exacerbate symptoms in Group 2 PH patients. In the FIRST trial, patients with Group 2 PH were treated intravenously with the prostacyclin epoprostenol. (Tr. at 582:12–583:23 (Hill)). Because more people died in the epoprostenol treatment group than in the control group, the study was prematurely stopped. (Tr. at 583:4–13,

585:10–14, 585:21–586:2 (Hill); DTX 358 at 1, 8–9 ("[C]hronic epoprostenol infusion in severe left ventricular failure resulted in increased mortality rates and no evidence of improved quality of life."); *see also* DTX 385 at 2 (citing the FIRST study when noting "epoprostenol therapy in patients with pulmonary venous hypertension [Group 2 PH] can be harmful")).

The label for Ventavis® (iloprost), which was the only inhaled prostacyclin approved for treatment of Group 1 PH as of May 15, 2006, similarly warned that treatment should be stopped if signs of pulmonary edema occur, as this may be a sign of pulmonary venous hypertension. (DTX 345 at 6; Tr. at 586:6–587:22 (Hill)). Dr. Hill testified that, based on this warning and the results of the FIRST trial, a POSA would have been extremely cautious about using intravenous and inhaled prostacyclins, like treprostinil, in Group 2 PH patients, as such use could create a potentially life-threatening situation in these patients. (Tr. at 587:5–588:5 (Hill)). Prostacyclins dilate the precapillary vessels, which allows more blood to flow through the capillaries and into the pulmonary veins. (*Id.*). According to Dr. Hill, this increased blood flow "could increase the pulmonary venous pressure, the pressure filling the left heart, and that increase in the capillaries can cause leakage of fluid into the gas exchanging areas of the lungs, interfering with oxygenation and creating a potentially life-threatening situation." (*Id.*).

The experts agree that the '793 patent only describes treating Groups 1, 3, and 4 PH, which are all precapillary. (*See* JTX 3 at 8:57–18:20; Tr. at 579:25–580:23, 590:25–592:2 (Hill); Tr. at 634:22–635:13 (Waxman)). Because there are no disclosures in the '793 patent or the prior art establishing the feasibility or safety of treating Group 2 PH patients with inhaled treprostinil, Dr. Hill concluded that a POSA would have had to conduct undue experimentation to treat Group 2 PH with treprostinil. (Tr. at 592:13–593:18 (Hill)). Specifically, a POSA would have had to "start at square one," conducting additional preclinical and clinical trials to

determine whether the treprostinil formulation was safe and effective in treating Group 2 PH patients. (Tr. at 593:2–18 (Hill)).

I have no doubt that a physician would have certain safety concerns about treating Group 2 PH patients—particularly isolated Group 2 PH patients—with treprostinil. (*See* Tr. at 635:16–636:10 (Waxman)). But the fact that a POSA would have safety concerns does not necessarily show a lack of enablement. The claims do not require "*safely and effectively* treating pulmonary hypertension," as Liquidia seems to be arguing. The claims instead require "treating pulmonary hypertension comprising administering . . . a therapeutically effective single event dose of a formulation comprising treprostinil."

As discussed above, a POSA would understand "a therapeutically effective single event dose" to be a dose given in a single treatment session that causes an improvement in a patient's hemodynamics (reduced PAP or PVR). Applying this construction, Liquidia has not shown by clear and convincing evidence that a POSA would have to conduct undue experimentation to practice the claimed method of treating PH.

There is no dispute that the '793 patent enables treatment of patients with Groups 1, 3, 4, and 5 PH. (*See* D.I. 406 at 16–17). The '793 patent describes the invention including the specific drug, conditions the invention is intended to treat (PH), dosages (15–90 µg), and mode and method of treatment (1–3 breaths by inhalation). (JTX 3 at 6:41–45, 7:7–12, 7:55–58, 7:64, 8:20–31, 18:1–6). The '793 patent also describes the improved hemodynamics that result from the use of the claimed invention, and the absence or reduction of side effects. (*Id.* at 8:57–18:11; Tr. at 637:22–638:3 (Waxman); Tr. at 702:1–11 (Hill)).

The record demonstrates that the claimed administration of treprostinil vasodilates the pulmonary vasculature and reduces pulmonary blood pressure, even in isolated Group 2 PH

patients. (*See* Tr. at 582:11–19, 583:14–585:23, 587:5–588:5 (Hill); Tr. at 637:18–640:5 (Waxman); DTX 358). The FIRST study, involving Flolan® (epoprostenol), showed that treating isolated Group 2 PH patients with a prostacyclin had preliminary clinical evidence of benefit and a statistically significant acute hemodynamic improvement, including a reduction of mean PAP, wedge pressure, and PVR, and improvements in exercise duration and dyspnea score. (Tr. at 582:11–19, 583:14–585:23 (Hill); DTX 358 at 1, 5–7). Thus, even with a risk of pulmonary edema, a POSA would understand that the claimed administration of treprostinil would vasodilate the pulmonary vasculature, affect hemodynamics, and treat a patient's elevated pulmonary blood pressure, i.e., treat PH. (*Id.*; JTX 3 at 1:33–40, 2:13–15, 2:30–38; Tr. at 587:5–588:5 (Hill); Tr. at 637:18–640:5 (Waxman)).

Liquidia has thus failed to show by clear and convincing evidence that it would require undue experimentation for a POSA to use treprostinil to improve a patient's hemodynamics, i.e., to treat PH as claimed. The fact that a physician might be cautious and need to monitor the patient more closely when administering treprostinil to isolated Group 2 PH patients does not change this result.

I therefore find that Liquidia has failed to show by clear and convincing evidence that claims 1, 4, 6, 7, and 8 of the '793 patent are invalid for lack of enablement.

### 2. Written Description of "Treating Pulmonary Hypertension"

Liquidia argues that the asserted claims of the '793 patent are invalid for lack of written description. Specifically, Liquidia contends that the '793 patent fails to convey with reasonable certainty that the inventors possessed the full scope of treating PH as claimed. Liquidia reasons that the '793 patent specification does not describe treating Group 2 PH patients with inhaled treprostinil and does not address the safety concerns that a POSA would have with respect to

treating Group 2 PH patients with treprostinil. (D.I. 406 at 19). But just like its enablement argument, Liquidia's position seems to be based on the flawed premise that the claims require "a method of safely and effectively treating pulmonary hypertension."

As the Federal Circuit has explained, to satisfy the written description requirement, "An inventor need not prove that a claimed pharmaceutical compound actually achieves a certain result. But when the inventor expressly claims that result, our case law provides that such result must be supported by adequate disclosure in the specification." *Biogen Int'l GMBH v. Mylan Pharms. Inc.*, 18 F.4th 1333, 1343 (Fed. Cir. 2021) (cleaned up). The '793 patent claims require "treating pulmonary hypertension comprising administering . . . a therapeutically effective single event dose of a formulation comprising treprostinil." The only effectiveness that is claimed is "a therapeutically effective single event dose of . . . treprostinil." The '793 patent contains adequate written description support for this claimed result.

The '793 patent describes how administering inhaled treprostinil targets the lungs, dilates the blood vessels, and reduces blood pressure. (*See* JTX 3 at 2:29–43, 3:25–5:2, 5:13–36, 8:57–18:11; Tr. at 637:22–25 (Waxman); Tr. at 702:1–11 (Hill)). Even though a POSA might have safety concerns regarding the treatment of isolated Group 2 PH patients, a POSA would understand, based on these disclosures, that treprostinil would effectively vasodilate the pulmonary vasculature, affect hemodynamics, and treat a patient's elevated pulmonary blood pressure. (*Id.*). Accordingly, these disclosures "reasonably convey[] to those skilled in the art that the inventor had possession" of the full scope of treating PH as claimed.

I therefore find that Liquidia has failed to prove by clear and convincing evidence that claims 1, 4, 6, 7, and 8 of the '793 patent are invalid for lack of written description.

### 3. Written Description of Dry Powder Formulations and Dry Powder Inhaler

Claim 1 of the '793 patent recites using an inhaled "formulation comprising treprostinil or a pharmaceutically acceptable salt thereof with an inhalation device." The parties agree that claim 1 encompasses inhaled liquid solutions delivered via nebulizers, soft mist inhalers, and metered dose inhalers, and dry powder formulations delivered via a dry powder inhaler ("DPI"). (*See* D.I. 406 at 21; D.I. 413 at 35). Further, dependent claims 4, 6, and 7 specifically recite the use of a DPI and a powder formulation of treprostinil. Liquidia argues that the '793 patent does not provide adequate written description support for the claimed dry powder formulation of treprostinil or corresponding DPI suitable for treating PH patients. (D.I. 406 at 21).

The '793 patent specification provides, "The inhalation device can be also a dry powder inhaler. In such case, the respiratory drug is inhaled in solid formulation, usually in the form of a powder with particle size less than 10 micrometers in diameter or less than 5 micrometers in diameter." (JTX 3 at 7:22–26). Liquidia argues that this statement is nothing more than a "mere wish or plan" for a powder formulation and that the '793 patent contains no other disclosures relevant to developing a dry powder formulation of treprostinil that can be used for the claimed method of treating PH. (D.I. 406 at 22). I disagree.

The '793 patent describes the delivery of a therapeutically effective bolus dose of 15–90 μg of treprostinil by inhalation in 1–3 breaths without the expected negative side effects. (JTX 3 at Exs. 1 and 2, 17:4–24, 17:42–43, 18:4–6; Tr. at 832:19–833:6, 835:7–13, 836:17–21 (Clark)). The '793 patent demonstrates the efficacy of the claimed bolus dose by presenting data from the administration of a liquid formulation of treprostinil in 1–3 breaths using a soft mist inhaler and an ultrasonic nebulizer. (JTX 3 at Exs. 1 and 2; Tr. at 832:19–833:6 (Clark)).

Liquidia claims that this information regarding liquid formulations in the ’793 patent does not inform the development of powder formulations, relying on testimony from the ’793 patent inventors Drs. Rubin and Seeger. (D.I. 406 at 21). But Dr. Rubin merely stated that a solution could not be used in a DPI; he never stated that information about an inhaled solution cannot be used to develop a powder formulation. (Tr. at 612:4–5 (Rubin)). Further, Dr. Seeger merely testified, “[B]ringing something down as a powder may or may not be simply identical to bringing something down with the fluid solution.” (Tr. at 297:12–23 (Seeger)). These statements are not clear and convincing evidence that information regarding liquid formulations cannot inform the development of powder formulations.

Rather, UTC’s expert Dr. Clark credibly testified that the “starting point for developing a powder formulation” is determining the dose and whether it is “safe to deliver it in a single bolus.” (Tr. at 833:10–20 (Clark)). Although the ’793 patent does not contain any examples of dry powder formulations or DPIs, the ’793 patent discloses the bolus dose and demonstrates its efficacy. The patent further states that the claimed bolus dose of treprostinil can be delivered using a DPI with a powder formulation consisting of particles less than ten microns and preferably less than five microns. (JTX 3 at 7:22–26; Tr. at 834:9–15 (Clark)). Numerous DPIs were available by 2006 and the process for developing dry powder formulations was well known and involved routine techniques. (Tr. at 758:8–10, 761:19–23 (Gonda); Tr. at 835:24–836:3, 837:19–838:1 (Clark); PTX 271 at 4; PTX 905).

Given the disclosures in the ’793 patent and the state of the art, I find that a POSA would have understood that the inventors possessed a method of treating PH using a dry powder

formulation of treprostinil with a DPI.[20] (*See* Tr. at 832:19–835:16 (Clark)); *Bos. Sci. Corp. v. Johnson & Johnson*, 647 F.3d 1353, 1366 (Fed. Cir. 2011) ("Because the specification is viewed from the perspective of one of skill, in some circumstances, a patentee may rely on information that is 'well-known in the art' for purposes of meeting the written description requirement.").

I therefore find that Liquidia has failed to prove by clear and convincing evidence that claims 1, 4, 6, 7, and 8 of the '793 patent are invalid for lack of written description.

**4. Enablement of Dry Powder Formulations and Dry Powder Inhaler**

Liquidia argues that the '793 patent does not enable the claimed method of treating PH patients with a dry powder treprostinil formulation and corresponding DPI. (D.I. 406 at 23–28).

The '793 patent does not provide any examples of treprostinil dry powder formulations, methods of manufacture of such powders, or DPI devices for the delivery of such formulations. (Tr. at 729:22–731:14 (Gonda); Tr. at 847:22–25 (Clark)). The processes involved in developing a dry powder formulation, however, were well known as of 2006. (Tr. at 837:19–838:1, 838:15–841:3, 842:6–844:11, 845:17–846:14 (Clark); Tr. at 864:15–865:25, 867:8–870:15 (Smyth)).

Liquidia's expert Dr. Gonda testified that to develop a treprostinil dry powder formulation, a POSA would need to (1) identify a suitable form of treprostinil; (2) identify a suitable carrier that is safe and compatible with the API; and (3) identify a suitable DPI that can

---

[20] Liquidia also provides inventor testimony and evidence of UTC's agreement with MannKind to show that the inventors did not possess a dry powder formulation of treprostinil as of 2006. (*See* D.I. 406 at 22 & n.4). I have found, however, that the four corners of the specification reasonably convey possession of this limitation. Thus, this extrinsic evidence is irrelevant. *See Biogen Int'l GmbH v. Mylan Pharms. Inc.*, 28 F.4th 1194, 1202 (Fed. Cir. 2022) (Lourie, J., dissenting from the denial of the petition for rehearing en banc) ("Where the disclosure in a patent's specification plainly corresponds to what is claimed, extrinsic evidence should not be used to cast doubt on the meaning of what is disclosed."); *Ariad Pharms.*, 598 F.3d at 1352 ("[T]he written description requirement does not demand . . . an actual reduction to practice[.]").

be used with the formulation to treat PH patients. (Tr. at 734:16–737:11 (Gonda)). Liquidia argues that a POSA would need to perform undue experimentation to perform these steps. (D.I. 406 at 24–25). Yet the experiments conducted by UTC's expert Dr. Smyth show otherwise.

With three weeks of testing, Dr. Smyth prepared treprostinil free acid and treprostinil diethanolamine dry powder formulations that delivered doses within the claimed 15–90 μg range. (Tr. at 863:6–864:14, 870:9–15, 876:18–879:8 (Smyth); PTX 1344; PTX 1345). Dr. Smyth used well-known and routine techniques for each step of his powder development process. (Tr. at 864:15–865:25, 867:8–876:17 (Smyth)). At a high level, Dr. Smyth's experiments involved jet milling the API several times, blending the formulations with lactose, adding the formulations to capsules, and testing the capsules using a DPI device and machine called a Next Generation Impactor, intended to mimic patient inhalation. (Tr. at 864:23–865:3 (Smyth)).

Based on this testing, I find that Liquidia has failed to prove by clear and convincing evidence that a POSA would need to perform undue experimentation to develop a treprostinil dry powder formulation. *See Bristol-Myers Squibb Co. v. Aurobindo Pharma USA Inc.*, 477 F. Supp. 3d 306, 352–53 (D. Del. 2020) (finding that defendants failed to prove lack of enablement where plaintiff's expert could successfully practice the claims), *aff'd sub nom. Bristol-Myers Squibb Co. v. Sigmapharm Lab'ys, LLC*, 858 F. App'x 359 (Fed. Cir. 2021).

First, Liquidia has failed to prove that a POSA would need to perform undue experimentation to identify a suitable form of treprostinil. The patent identifies the API to be used in the claimed invention: "treprostinil or a pharmaceutically acceptable salt thereof." (JTX 3 at claim 1; *see also id.* at 6:41–7:6 (defining what constitutes a "pharmaceutically acceptable salt" of treprostinil)). Methods for determining suitable forms, including salt forms, of a

particular API were well known and routine for several decades prior to 2006. (Tr. at 761:4–10 (Gonda); Tr. at 838:19–839:4, 841:4–21 (Clark)).

Dr. Smyth tested three forms of treprostinil: treprostinil free acid, treprostinil diethanolamine salt, and treprostinil sodium. Dr. Smyth was unable to develop a dry powder formulation of treprostinil sodium because it was too hygroscopic. (Tr. at 737:24–740:13 (Gonda); Tr. at 880:19–881:8 (Smyth)). Dr. Smyth attributed this to the lack of humidity control in his lab. (Tr. at 882:9–883:23 (Smyth)). I do not think Dr. Smyth's failure in developing a dry powder formulation of treprostinil sodium shows by clear and convincing evidence that a POSA would require undue experimentation to identify a suitable form of treprostinil. Dr. Smyth used routine techniques to determine that treprostinil sodium would not work. Further, Dr. Gonda testified that a POSA in 2006 would have a laboratory with temperature and humidity control. (Tr. at 762:4–14 (Gonda)).

Liquidia also faults Dr. Smyth's experiments with treprostinil free acid. Treprostinil free acid is not stable at room temperature and has the tendency to form dimers. (DTX 674 at 4; Tr. at 741:20–744:4 (Gonda)). Liquidia argues that despite this, Dr. Smyth did not test the stability of his treprostinil free acid powder formulation. (D.I. 406 at 27). Dr Smyth's failure to conduct additional testing is not clear and convincing evidence that undue experimentation would be required to select a suitable form of treprostinil. Dr. Gonda testified that "stability testing" was known and routine by 2006. (Tr. at 770:15–16 (Gonda)). Further, Liquidia did not perform extensive stability tests in selecting the API for LIQ861. (Tr. at 275:10–24 (Maynor)).

Second, Liquidia has failed to prove that a POSA would require undue experimentation to identify a suitable carrier. Although the '793 patent does not disclose any suitable carriers,

lactose was the only FDA-approved carrier for dry powder formulations as of 2006. (PTX 905 at 13; Tr. at 763:14–21 (Gonda); Tr. at 844:12–15 (Clark); Tr. at 866:1–4 (Smyth)). For this reason, Dr. Smyth selected lactose as the carrier for his dry powder formulations. (Tr. at 866:1–4 (Smyth)).

Dr. Gonda testified that "a POSA would have been reluctant to use lactose" as a carrier with treprostinil diethanolamine because lactose reacts with amines by the Maillard reaction. (Tr. at 754:1–11 (Gonda); *see also* DTX 481).[21] According to UTC's expert Dr. Clark, however, the Maillard reaction would not deter a POSA from attempting to formulate an amine drug with lactose unless the POSA witnessed an adverse reaction. (Tr. at 844:16–845:2 (Clark)). Dr. Clark reasoned that in 2006, the Physician's Desk Reference—which generally only describes approved drugs—described 72 examples of amine drugs formulated with lactose. (Tr. at 844:12–23 (Clark); Tr. at 866:5–867:7 (Smyth); PTX 47 at 2). Further, a POSA would have understood how to monitor any Maillard reaction between treprostinil diethanolamine and lactose. (Tr. at 844:16–845:2 (Clark); PTX 47 at 2; DTX 481 at 5). There is no evidence that Dr. Smyth noticed any Maillard reaction with treprostinil diethanolamine. (*See* Tr. at 867:22–870:15 (Smyth)). I am therefore not convinced that a POSA would require undue experimentation to select an appropriate carrier.

Third, Liquidia has not proven that identifying a suitable DPI for PH patients would require undue experimentation. A 2005 publication by Meyer et al. discloses that PH patients were able to obtain maximum inspiratory efforts of 5.2 kPa in females and 6.8 kPa in males,

---

[21] There is no amine in the treprostinil molecule itself, so a POSA would have no concern about the Maillard reaction with respect to combining treprostinil free acid and lactose. (Tr. at 767:23–768:8 (Gonda)).

which is enough to use a DPI. (PTX 1980 at 1; Tr. at 851:20–852:1, 852:14–854:20 (Clark)). Dr. Smyth's analytical testing involved the use of a Next Generation Impactor simulating a single breath at 4.0 kPa and 4.0L through a Plastiape RS01 low resistance inhaler (which was available as of 2006). (Tr. at 869:22–870:8 (Smyth); Tr. at 845:17–846:8 (Clark); PTX 905 at 7).[22] Dr. Smyth's testing resulted in an average emitted dose of 53.54 µg for treprostinil free acid and 52.60 µg for treprostinil diethanolamine, falling well within the claimed range of 15–90 µg. (PTX 1344 at 2; PTX 1345 at 2). Dr. Smyth's testing demonstrated that PH patients could effectively inhale his dry powder formulations using a DPI.

I find that a POSA reading the '793 patent would be able to develop a dry powder formulation of treprostinil and a corresponding DPI for treatment of PH with routine experimentation. Notably, Liquidia and its experts did not perform any experiments attempting to make dry powder formulations. Liquidia instead tries to discredit Dr. Smyth's testing. But, for the reasons discussed above, these efforts do not amount to clear and convincing evidence that a POSA would require undue experimentation. That Dr. Smyth would not administer his dry powder formulations to PH patients without conducting more studies makes no difference. (*See* D.I. 406 at 28). Of course, there is no expectation that Dr. Smyth test his formulations on actual patients for purposes of patent litigation.

---

[22] Liquidia challenges Dr. Smyth's testing on the basis that he "assumed large inhaled volumes and flow rates." (D.I. 406 at 28). Dr. Smyth did not explicitly set forth his assumed inspiratory effort (4.0 kPa) and inhaled volume (4.0 L) in his testimony, but these values were set forth on a demonstrative exhibit. (DDX 5.4). Liquidia argues that these values were too high as a 2021 article by Faria-Urbina et al. reported that PAH patients have a maximum inspiratory pressure of 2.6 ± 1.2 kPa and inhale a total volume of 1.4 ± 0.03 L. (DTX 468 at 4 (Table 2); Tr. at 751:14–754:13 (Gonda); Tr. at 854:16–20 (Clark)). I nevertheless find Dr. Smyth's testing to be credible. The assumed inspiratory pressure of 4.0 kPa is consistent with the maximum inspiratory pressure reported in Meyer (5.2 kPa in females, 6.8 kPa in males). Meyer was available to a POSA as of 2006, unlike the 2021 Faria-Urbina publication.

Liquidia also argues that UTC is improperly "attempting to use a POSA's knowledge as an entire substitute for a deficient specification." (*Id.* at 26 (citing *Trs. of Bos. Univ. v. Everlight Elecs. Co.*, 896 F.3d 1357, 1364 (Fed. Cir. 2018); *Auto. Techs. Int'l, Inc. v. BMW of N. Am., Inc.*, 501 F.3d 1274, 1283 (Fed. Cir. 2007))). I do not think that is the case. The '793 patent teaches a POSA that a bolus dose of 15–90 µg of treprostinil delivered by inhalation in 1–3 breaths provides therapeutic efficacy without the expected negative side effects. (JTX 3 at Exs. 1 and 2, 17:4–24, 17:42–43, 18:4–6; Tr. at 832:19–833:6, 835:7–13, 836:17–21 (Clark); *see also* JTX 3 at 2:60–62 ("Currently, there is no treatment for pulmonary hypertension that can be administered using a compact inhalation device such as a metered dose inhaler.")). UTC's experts Dr. Smyth and Dr. Clark supplemented these disclosures by showing that a POSA at the time of the invention would have been able to use well-known and routine techniques to make the claimed dry powder formulations. *See AK Steel Corp. v. Sollac*, 344 F.3d 1234, 1244 (Fed. Cir. 2003) ("[T]he artisan's knowledge of the prior art and routine experimentation can often fill gaps, interpolate between embodiments, and perhaps even extrapolate beyond the disclosed embodiments, depending upon the predictability of the art.").

I therefore find that Liquidia has failed to prove by clear and convincing evidence that claims 1, 4, 6, 7, and 8 of the '793 patent are invalid for lack of enablement.

## VI. CONCLUSION

UTC failed to prove by a preponderance of the evidence that Liquidia will infringe claim 8 of the '066 patent. Liquidia proved by clear and convincing evidence that claims 1, 2, 3, 6, and 9 of the '066 patent are invalid. UTC proved by a preponderance of the evidence that Liquidia will induce infringement of claims 1, 4, 6, 7, and 8 of the '793 patent.

The parties shall submit a final judgment consistent with this memorandum opinion within one week.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED THERAPEUTICS CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>LIQUIDIA TECHNOLOGIES, INC.,<br><br>Defendant. | ) | C.A. No. 20-755 (RGA) (JLH) |

**FINAL JUDGMENT**

At Wilmington, Delaware, this 9th day of September, 2022:

**WHEREAS,** Plaintiff United Therapeutics Corporation ("UTC") commenced this action against Defendant Liquidia Technologies, Inc. ("Liquidia") asserting infringement of U.S. Patent Nos. 9,593,066 (the "'066 patent"), 9,604,901 (the "'901 patent"), and 10,716,793 (the "'793 patent") by the products that are the subject of Liquidia's New Drug Application No. 213005 seeking approval by the U.S. Food and Drug Administration ("FDA") for the manufacture, use, and sale of its proposed product LIQ861 (Yutrepia™);

**WHEREAS,** on January 3, 2022, the Court granted UTC's stipulation of non-infringement of the '901 patent based on the Court's construction of the claim term "contacting the solution comprising treprostinil from step (b) with a base to form a salt of treprostinil," with UTC preserving all rights to appeal the Court's construction of that term (D.I. 278);

**WHEREAS,** at trial, UTC asserted infringement of claims 1, 2, 3, 6, 8, and 9 of the '066 patent and claims 1, 4, 6, 7, and 8 of the '793 patent against Liquidia, and Liquidia asserted counterclaims of non-infringement and invalidity of those claims;

**WHEREAS**, the Court held a bench trial in the above-captioned action on March 28 to March 31, 2022; and

**WHEREAS,** the Court issued a Trial Opinion setting forth its Findings of Facts and Conclusions of Law on August 31, 2022 (D.I. 433);

**IT IS HEREBY ORDERED AND ADJUDGED:**

1. Judgment is hereby entered in favor of Liquidia and against UTC that claims 1, 2, 3, 6, and 9 of the ’066 patent are invalid for the reasons set forth in the Court’s Trial Opinion of August 31, 2022 (D.I. 433);

2. Judgment is hereby entered in favor of Liquidia and against UTC that Liquidia’s proposed LIQ861 product will not infringe claim 6, 8, and 9 of the ’066 patent for the reasons set forth in the Court’s Trial Opinion of August 31, 2022 (D.I. 433);

3. Judgment is hereby entered in favor of UTC and against Liquidia that Liquidia’s proposed LIQ861 product will induce infringement of claims 1, 4, 6, 7, and 8 of the ’793 patent, and that those claims are not invalid, for the reasons set forth in the Court’s Trial Opinion of August 31, 2022 (D.I. 433); and

4. Pursuant to 35 U.S.C. § 271(e)(4)(A), it is hereby ordered that the effective date of any final approval by the FDA of Liquidia’s New Drug Application No. 213005 shall be a date which is not earlier than the expiration date of the ’793 patent.

**IT IS FURTHER ORDERED:**

5. In the event that any party appeals this Final Judgment, any motion for attorneys’ fees and/or costs under Fed. R. Civ. P. 54(d) and/or Local Rules 54.1 and/or 54.3, including any motion that this case is exceptional under 35 U.S.C. § 285, shall be considered timely if filed and served within thirty days after final disposition of any such appeal; and

6. In the event that no party appeals this Final Judgment, any motion for attorneys’ fees and/or costs under Fed. R. Civ. P. 54(d) and/or Local Rules 54.1 and/or 54.3, including any motion that this case is exceptional under 35 U.S.C. § 285, shall be considered timely if filed and

served within thirty days after the expiration of the time for filing a notice of appeal under Federal Rules of Appellate Procedure 3 and 4; and

7. Except as provided herein, all other claims and counterclaims in this action are withdrawn and dismissed with prejudice.

/s/ Richard G. Andrews
The Honorable Richard G. Andrews
United States District Judge

US009593066B2

(12) **United States Patent**
**Batra et al.**

(10) **Patent No.: US 9,593,066 B2**
(45) **Date of Patent: *Mar. 14, 2017**

(54) **PROCESS TO PREPARE TREPROSTINIL, THE ACTIVE INGREDIENT IN REMODULIN®**

(71) Applicant: **United Therapeutics Corporation**, Silver Spring, MD (US)

(72) Inventors: **Hitesh Batra**, Herndon, VA (US); **Sudersan M. Tuladhar**, Silver Spring, MD (US); **Raju Penmasta**, Herndon, VA (US); **David A. Walsh**, Palmyra, VA (US)

(73) Assignee: **United Therapeutics Corporation**, Silver Spring, MD (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **14/849,981**

(22) Filed: **Sep. 10, 2015**

(65) **Prior Publication Data**

US 2015/0376106 A1 Dec. 31, 2015

**Related U.S. Application Data**

(60) Division of application No. 13/933,623, filed on Jul. 2, 2013, now Pat. No. 9,156,786, which is a continuation of application No. 13/548,446, filed on Jul. 13, 2012, now Pat. No. 8,497,393, which is a continuation of application No. 12/334,731, filed on Dec. 15, 2008, now Pat. No. 8,242,305.

(60) Provisional application No. 61/014,232, filed on Dec. 17, 2007.

(51) **Int. Cl.**

| | |
|---|---|
| ***C07C 59/72*** | (2006.01) |
| ***C07C 51/08*** | (2006.01) |
| ***C07C 51/41*** | (2006.01) |
| ***C07C 213/08*** | (2006.01) |
| ***C07C 405/00*** | (2006.01) |
| *A01N 37/10* | (2006.01) |
| *C07C 39/12* | (2006.01) |
| *C07C 39/17* | (2006.01) |
| *C07C 59/60* | (2006.01) |

(52) **U.S. Cl.**

CPC .............. ***C07C 59/72*** (2013.01); ***C07C 51/08*** (2013.01); ***C07C 51/41*** (2013.01); ***C07C 51/412*** (2013.01); ***C07C 213/08*** (2013.01); ***C07C 405/0075*** (2013.01); *A01N 37/10* (2013.01); *C07C 39/12* (2013.01); *C07C 39/17* (2013.01); *C07C 59/60* (2013.01)

(58) **Field of Classification Search**

CPC ......... C07C 59/72; C07C 51/08; C07C 51/41; C07C 51/412; C07C 213/08; C07C 405/0075

See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,703,544 A | 11/1972 | Morozowich | |
| 3,888,916 A | 6/1975 | Sinkula | |
| 4,306,075 A | 12/1981 | Aristoff | |
| 4,306,076 A | 12/1981 | Nelson | |
| 4,424,376 A | 1/1984 | Moniot et al. | |
| 4,434,164 A | 2/1984 | Lombardino | |
| 4,463,183 A | 7/1984 | Haslanger | |
| 4,486,598 A | 12/1984 | Aristoff | |
| 4,544,764 A | 10/1985 | Aristoff | |
| 4,668,814 A | 5/1987 | Aristoff | |
| 4,683,330 A | 7/1987 | Aristoff | |
| 5,153,222 A | 10/1992 | Tadepalli et al. | |
| 5,466,713 A | 11/1995 | Blitstein-Willinger et al. | |
| 5,506,265 A | 4/1996 | Blitstein-Willinger | |
| 6,054,486 A | 4/2000 | Crow et al. | |
| 6,441,245 B1 | 8/2002 | Moriarty et al. | |
| 6,521,212 B1 | 2/2003 | Cloutier et al. | |
| 6,528,688 B2 | 3/2003 | Moriarty et al. | |
| 6,700,025 B2 | 3/2004 | Moriarty et al. | |
| 6,706,283 B1 | 3/2004 | Appel et al. | |
| 6,756,033 B2 | 6/2004 | Cloutier et al. | |
| 6,765,117 B2 | 7/2004 | Moriarty et al. | |
| 6,803,386 B2 | 10/2004 | Shorr et al. | |
| 6,809,223 B2 | 10/2004 | Moriarty et al. | |
| 7,199,157 B2 | 4/2007 | Wade et al. | |
| 7,384,978 B2 | 6/2008 | Phares et al. | |
| 7,417,070 B2 | 8/2008 | Phares et al. | |
| 8,242,305 B2 * | 8/2012 | Batra | C07C 51/08 562/466 |
| 2001/0038855 A1 | 11/2001 | Desjardin et al. | |
| 2001/0056095 A1 | 12/2001 | Mylari | |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CN | 101891596 A | 11/2010 |
| CN | 101891715 A | 11/2010 |

(Continued)

OTHER PUBLICATIONS

Alexander et al., "The Synthesis of Benzindene Prostacyclin Analogs as Potential Antiulcer Agents," Prostaglandins, 1986, 32(5):647-653.
Aristoff et al., "Synthesis and Structure-Activity Relationship of Novel Stable Prostacyclin Analogs," Advances in Prostaglandin, Thromboxane, and Leukotriene Research, Samuelsson et al., Eds., 1983, 11:267-274.
Aristoff et al., "Synthesis of Benzopyran Prostaglandins, Potent Stable Prostacyclin Analogs, Via an Intramolecular Mistunobu Reaction," Tetrahedron Letters, 1984, 25(36):3955-3958.

(Continued)

*Primary Examiner* — Yevegeny Valenrod
(74) *Attorney, Agent, or Firm* — Foley & Lardner LLP

(57) **ABSTRACT**

This present invention relates to an improved process to prepare prostacyclin derivatives. One embodiment provides for an improved process to convert benzindene triol to treprostinil via salts of treprostinil and to purify treprostinil.

**10 Claims, No Drawings**

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2002/0173672 | A1 | 11/2002 | Moriarty et al. |
| 2004/0176645 | A1 | 9/2004 | Moriarty et al. |
| 2005/0085540 | A1 | 4/2005 | Phares et al. |
| 2005/0101608 | A1 | 5/2005 | Santel |
| 2005/0165111 | A1 | 7/2005 | Wade et al. |
| 2005/0282901 | A1 | 12/2005 | Phares et al. |
| 2005/0282903 | A1 | 12/2005 | Wade et al. |
| 2007/0078095 | A1 | 4/2007 | Phares et al. |
| 2007/0078182 | A1 | 4/2007 | Phares et al. |
| 2008/0200449 | A1 | 8/2008 | Olschewski et al. |
| 2008/0249167 | A1 | 10/2008 | Phares et al. |
| 2008/0280986 | A1 | 11/2008 | Wade et al. |
| 2009/0036465 | A1 | 2/2009 | Roscigno et al. |
| 2009/0163738 | A1 | 6/2009 | Batra et al. |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| CN | 2 710 726 | A1 | 1/2012 |
| EP | 0 004 335 | A2 | 10/1979 |
| EP | 0 087 237 | B1 | 5/1986 |
| EP | 0 175 450 | B1 | 3/1989 |
| EP | 0 159 784 | B1 | 6/1989 |
| EP | 0 496 548 | A1 | 7/1992 |
| JP | 56-122328 | A | 9/1981 |
| JP | 59-044340 | A | 3/1984 |
| WO | WO 98/18452 | A1 | 5/1998 |
| WO | WO 98/39337 | A1 | 9/1998 |
| WO | WO 99/21830 | A1 | 5/1999 |
| WO | WO 03/070163 | A2 | 8/2003 |
| WO | WO 2005/007081 | A2 | 1/2005 |
| WO | WO 2007/134292 | A2 | 11/2007 |
| WO | WO 2008/100977 | A2 | 8/2008 |
| WO | WO 2009/117095 | A1 | 9/2009 |
| WO | WO 2012/009816 | A1 | 1/2012 |

OTHER PUBLICATIONS

Aristoff et al., "Total Synthesis of a Novel Antiulcer Agent via a Modification of the Intramolecular Wadsworth-Emons-Wittig Reaction," J. Am. Chem. Soc., 1985, 107:7967-7974.

Batra et al., "Crystallization Process Development for a Stable Polymorph of Treprostinil Diethanolamine (UT-15C) by Seeding," Organic Process Research & Development, 2009, 13:242-249.

Belch et al., "Randomized, Double-Bling, Placebo-Controlled Study Evaluating the Efficacy and Safety of AS-013, a Prostaglandin E1 Prodrug, in Patients with Intermittent Claudication," Circulation, May 6, 1997, 95(9):2298-2302.

Chemburkar et al., "Dealing with the Impact of Ritonavir Polymorphs on the Late Stages of Bulk Drug Process Development," Organic Process Research & Development, 2000, 4:413-417.

Chung et al., "Promoters for the (Alkyne)hexacarbonyldicobalt-Based Cyclopentenone Synthesis," Organometallics, 1993, 12:220-223.

Clark et al., "High-Performance Liquid Chromatographic Method for Determining the Enantiomeric Purity of a Benzindene Prostaglandin by a Diastereomeric Separation," Journal of Chromatography, 1987, 408:275-283.

Hardinger et al., "Triply-Convergent Syntheses of Two Homochiral Arene-Fused Prostacyclin Analogs Related to U68,215," Bioorganic & Medicinal Chemistry Letters, 1991, 1(1):79-82.

Hicks et al., "A Practical Titanium-Catalyzed Synthesis of Bicyclic Cyclopentenones and Allylic Amines," J. Org. Chem., 1996, 61:2713-2718.

Jeong et al., "Catalytic Version of the Intramolecular Pauson-Khand Reaction," J. Am. Chem. Soc., 1994, 116:3159-3160.

Khand et al., "Organocobalt Complexes. Part II. Reaction of Acetylenehexacarbonyl-dicobalt Complexes, ($R^1$ $C_2$ $R^2$ )$Co_2$ $(CO)_6$ , with Norbornene and its Derivatives," J. Chem. Soc., J.C.S. Perkin I., 1973, 977-981.

Mathre et al., "A Practical Enantioselective Synthesis of α,α-Diaryl-2-pyrrolidinemethanol. Preparation and Chemistry of the Corresponding Oxazaborolidines," J. Org. Chem., 1991, 56:751-762.

Moriarty et al., "The Intramolecular Asymmetric Pauson-Khand Cyclization as a Novel and General Stereoselective Route to Benzindene Prostacyclins: Synthesis of UT-15 (Treprostinil)," *J. Org. Chem.* 2004, 69, 1890-1902.

Mulzer et al., "Asymmetric Synthesis of Carbacyclin Precursors by Pauson-Khand Cyclization," Liebigs Ann. Chem., 1988, 891-897.

Nelson, Norman A., "Prostaglandin Nomenclature," J. Med. Chem., Sep. 1974, 17(9):911-918.

Pagenkopf et al., "Photochemical Promotion of the Intramolecular Pauson-Khand Reaction. A New Experimental Protocol for Cobalt-Catalyzed [2 + 2 + 1] Cycloadditions," J. Am. Chem. Soc., 1996, 118:2285-2286.

Pagenkopf, Brian L., "Substrate and Reagent Control of Diastereoselectivity in Transition Metal-Mediated Process: Development of a Catalytic Photo Promoted Pauson-Khand Reaction," Diss. Abstr. Int., 57(12)7535, 1977, Abstract.

Patterson et al., "Acute Hemodynamic Effects of the Prostacyclin Analog 15AU81 in Severe Congestive Heart Failure," Am. J. Cardio., 1995, 75:26A-33A.

Paulson, Peter L., "The Khand Reaction," Tetrahedron, 1985, 41(24):5855-5860.

Schore, Neil E., "Transition-Metal-Mediated Cycloaddition Reactions of Alkynes in Organic Synthesis," Chem. Rev., 1988, 88:1081-1119.

Shambayati et al., "N-Oxide Promjoted Pauson-Khand Cyclizations at Room Temperature," Tetrahedron Letters, 1990, 31(37):5289-5292.

Snell et al., "Investigating the Effect of Impurities on Macromolecule Crystal Growth in Microgravity," Crystal Growth & Design, 2001, 1(2):151-158.

Sorbera et al. "UT-15. Treatment of Pulmonary Hypertension Treatment of Peripheral Vascular Disease," *Drug of the Future*, 2001, 26(4), 364-374.

Takano et al., "Enantiodivergent Synthesis of Both Enantiomers of Sulcatol and Matsutake Alcohol from (R)-Epichlorohydrin," Chemistry Letters, 1987, 2017-2020.

Viedma, Cristobal, "Selective Chiral Symmetry Breaking during Crystallization: Parity Violation of Cryptochiral Environment in Control?" Crystal Growth & Design, 2007, 7(3):553-556.

Whittle et al., "Antithrombotic Assessment and Clinical Potential of Prostacyclin Analogues," Progress in Medicinal Chemistry, Ellis et al. Eds., 1984, Chapter 6, vol. 21, 238-279.

Zhang et al., "A Nickel(0)-Catalyzed Process for the Transformation of Enynes to Bicyclic Cyclopentenones," J. Org. Chem., 1996, 61:4498-4499.

*Steadymed Ltd.*, v. *United Therapeutics Corporation*, Petition for *Inter Partes* Review of U.S. Pat. No. 8,497,393, under 37 CFR 42.100, dated Oct. 1, 2015, with Exhibits 1009, 1010, 1017 and 1018.

Ege, S., *Organic Chemistry Second Edition*, 1989, 541-547.

Schoffstall et al., *Microscale and Miniscale Organic Chemistry Laboratory Experiments*, 2nd. Ed., 2004, 200-202.

Wiberg, Kenneth, *Laboratory Technique in Organic Chemistry*, 1960, 112.

Bighley et al., "Salt Forms of Drugs and Absorption," Encyclopedia of Pharmaceutical Technology, Swarbrick et al., Eds., 1995, 13:453-499.

Simonneau et al., "Continuous Subcutaneous Infusion of Treprostinil, a Prostacyclin Analogue in Patients with Pulmonary Arterial Hypertension," Am. J. Respir. Crit. Care Med., 2002, 165:800-804.

Redacted Petitioner's Reply to Patent Owner's Response to Petition filed on Sep. 27, 2016 in *Steadymed Ltd.* (*Petitioner*), v. *United Therapeutics Corporation* (*Patent Owner*), Case IPR2016-00006, U.S. Pat. No. 8,497,393, with Exhibits 1022-1028.

Petitioner's Demonstratives filed Nov. 28, 2016, in *Steadymed Ltd.* (*Petitioner*), v. *United Therapeutics Corporation* (*Patent Owner)*, Case IPR2016-00006, U.S. Pat. No. 8,497,393.

(56) **References Cited**

OTHER PUBLICATIONS

Patent Owner Response to Petition filed Nov. 23, 2016, in *Steadymed Ltd.* (*Petitioner*), v. *United Therapeutics Corporation* (*Patent Owner*), Case IPR2016-00006, U.S. Pat. No. 8,497,393, with Redacted Exhibits 2006, 2020, 2022, 2058 and 2059 filed Nov. 23, 2016, 1151 pages.
Patent Owner Demonstratives filed Nov. 23, 2016, in *Steadymed Ltd.* (*Petitioner*), v. *United Therapeutics Corporation* (*Patent Owner*), Case IPR2016-00006, U.S. Pat. No. 8,497,393, 62 pages.
Decision Redacted Institute of *Inter Partes* Review dated Nov. 23, 2016, in *Steadymed Ltd.* (*Petitioner*), v. *United Therapeutics Corporation* (*Patent Owner*), Case IPR2016-00006, U.S. Pat. No. 8,497,393, 53 pages.
Service Third Party Submission dated Oct. 16, 2016, filed but not entered in U.S. Appl. No. 14/849,981 on Oct. 16, 2016, with 6 indicated attachments, 822 pages.
Redacted Defendant Sandoz Inc.'s Invalidity Contentions dated Feb. 5, 2015, *United Therapeutics Corporation* (Plaintiff) v. *Sandoz Inc.* (Defendant), In The United States District Court for the District of New Jersey, Civil Action No. 3:14-cv-5499(PGH)(LHG), 90 pages.
Defendant Sandoz Inc.'s Invalidity Contention Chartss dated Feb. 5, 2015, *United Therapeutics Corporation* (Plaintiff) v. *Sandoz Inc.* (Defendant), In The United States District Court for the District of New Jersey, Civil Action No. 3:14-cv-5499(PGH)(LHG), 189 pages.
Defendant Actavis Laboratories FL, Inc. Preliminary Invalidity Contentions, dated Aug. 30, 2016, *United Therapeutics Corporation, and Supemus Pharmaceuticals, Inc.*, (Plaintiff) v. *Actavis Laboratories FL, Inc.*, (Defendant), In The United States District Court for the Districte of New Jersey, Civil Action No. 3:16-cv-01816-PGS-LHG, Civil Action No. 3:16-cv-03642-PGS-LHG, 330 pages, (see particularly pp. 18-20, 42-62 and 269-280).
Exhibit G, Invalidity Claim Chart for the '393 patent, Jan. 12, 2015, 66 pages.
Defendant Teva Pharmaceuticals USA, Inc.'s Amended Non-Infringement and Invalidity Contentions, dated Apr. 24, 2015, *United Therapeutics Corporation* (Plaintiff) v. *Teva Pharmaceuticals USA, Inc.* (Defendant), In The United States District Court for the District of New Jersey, Civil Action No. 3:14-cv-05498(PGS)(LHG), 94 pages, (see particularly pp. 22-54).
Arumugan et al., "A New Purification Process for Pharmaceutical and Chemical Industries," Organic Process Research & Development, 2005, 9:319-320.
Burk et al., "An Enantioselective Synthesis of (S)-(+)-3-Aminomethyl-5-methylhexanoic Acid via Asymmetric Hydrogenation," J. Org. Chem., 2003, 68:5731-5734.
Eliel et al., Stereochemistry of Organic Compounds, 1994, 322-325.
Harwood et al., Experimental organic chemistry: Principles and Practice, 1989, 127-134.
Jones, Maitland Jr., Organic Chemistry, 2nd Ed., 2000, 153-155.
Lin et al., "Benzindene Prostaglandins. Synthesis of Optically Pure 15-Deoxy-U-68,215 and Its Enantiomer via a Modified Intramolecular Wadsworth-Emmons-Wittig Reaction," J. Org. Chem., 1987, 52:5594-5601.
McManus et al., "Tetrazole Analogs of Plant Auxins," J. Org. Chem., 1959, 24:1464-1467.
Monson, Richard S., Advanced Organic Synthesis, Methods and Techniques, 1971, 178-188.
Ohno et al., "Development of Dual-Acting Benzofurans for Thromboxane A2 Receptor Antagonist and Prostacyclin Receptor Agonist: Synthesis, Structure-Activity Relationship, and Evaluation of Benzofuran Derivatives," J. Med. Chem., 2005, 48:5279-5294.
Olmsted III et al., Chemistry, The Molecular Science, Mosby-Year Book, Inc., Chapter 10 "Effects of Intermolecular Forces," 1994, 428-486.
Pavia et al., Introduction to Organic Laboratory Techniques, First Edition, 1998, 648.
Physicians' Desk Reference, 59 Edition, 2005, for Bicillin® L-A (penicillin G benzathine suspension), 5 pages.
Priscinzano et al., "Piperidine Analogues of 1-[2-[Bis(4-fluorophenyl)methoxy]ethyl]-4-(3-phenylpropyl)piperazine (GBR 12909): High Affinity Ligands for the Dopamine Transporter," J. Med. Chem., 2002, 45:4371-4374.
Remodulin® label, 2014, 17 pages.
Schoffstall, et al., Microscale and Miniscale Organic Chemistry Laboratory Experiments, 2004, 2nd Ed., 200-202.
Sorrell, Thomas N., Organic Chemistry, 1999, 755-758.
Wiberg, Laboratory Technique in Organic Chemistry, 1960, 112.
Yu et al., "Novel Synthetic Route of a Pivotal Intermediate for the Synthesis of 1β-Methyl Carbapenem Antibiotics," Organic Process Research & Development, 2006,10:829-832.
Redacted Defendant Watson Laboratories, Inc.'s Invalidity Contentions dated Dec. 11, 2015, *United Therapeutics Corporation* (Plaintiff) v. *Watson Laboratories, Inc.* (Defendant), In The United States District Court for the District of New Jersey, Civil Action No. 3:15-cv-05723-PGS-LHG, 35 pages.

* cited by examiner

# PROCESS TO PREPARE TREPROSTINIL, THE ACTIVE INGREDIENT IN REMODULIN®

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a Divisional of U.S. application Ser. No. 13/933,623, filed Jul. 2, 2013, which is a Continuation of U.S. application Ser. No. 13/548,446, filed Jul. 13, 2012, which is a Continuation of U.S. application Ser. No. 12/334,731, filed Dec. 15, 2008, which claims priority from U.S. Provisional Patent Application 61/014,232, filed Dec. 17, 2007, the entire contents of which are incorporated herein by reference.

## BACKGROUND

The present invention relates to a process for producing prostacyclin derivatives and novel intermediate compounds useful in the process.

Prostacyclin derivatives are useful pharmaceutical compounds possessing activities such as platelet aggregation inhibition, gastric secretion reduction, lesion inhibition, and bronchodilation.

Treprostinil, the active ingredient in Remodulin®, was first described in U.S. Pat. No. 4,306,075. Treprostinil, and other prostacyclin derivatives have been prepared as described in Moriarty, et al in *J. Org. Chem.* 2004, 69, 1890-1902, *Drug of the Future*, 2001, 26(4), 364-374, U.S. Pat. Nos. 6,441,245, 6,528,688, 6,765,117 and 6,809,223. Their teachings are incorporated by reference to show how to practice the embodiments of the present invention.

U.S. Pat. No. 5,153,222 describes use of treprostinil for treatment of pulmonary hypertension. Treprostinil is approved for the intravenous as well as subcutaneous route, the latter avoiding septic events associated with continuous intravenous catheters. U.S. Pat. Nos. 6,521,212 and 6,756,033 describe administration of treprostinil by inhalation for treatment of pulmonary hypertension, peripheral vascular disease and other diseases and conditions. U.S. Pat. No. 6,803,386 discloses administration of treprostinil for treating cancer such as lung, liver, brain, pancreatic, kidney, prostate, breast, colon and head-neck cancer. U.S. patent application publication No. 2005/0165111 discloses treprostinil treatment of ischemic lesions. U.S. Pat. No. 7,199,157 discloses that treprostinil treatment improves kidney functions. U.S. patent application publication No. 2005/0282903 discloses treprostinil treatment of neuropathic foot ulcers. U.S. application Ser. No. 12/028,471 filed Feb. 8, 2008, discloses treprostinil treatment of pulmonary fibrosis. U.S. Pat. No. 6,054,486 discloses treatment of peripheral vascular disease with treprostinil. U.S. patent application Ser. No. 11/873,645 filed Oct. 17, 2007 discloses combination therapies comprising treprostinil. U.S. publication No. 2008/0200449 discloses delivery of treprostinil using a metered dose inhaler. U.S. publication No. 2008/0280986 discloses treatment of interstitial lung disease with treprostinil. U.S. application Ser. No. 12/028,471 filed Feb. 8, 2008 discloses treatment of asthma with treprostinil. U.S. Pat. Nos. 7,417,070, 7,384,978 and U.S. publication Nos. 2007/0078095, 2005/0282901, and 2008/0249167 describe oral formulations of treprostinil and other prostacyclin analogs.

Because Treprostinil, and other prostacyclin derivatives are of great importance from a medicinal point of view, a need exists for an efficient process to synthesize these compounds on a large scale suitable for commercial production.

## SUMMARY

The present invention provides in one embodiment a process for the preparation of a compound of formula I, hydrate, solvate, prodrug, or pharmaceutically acceptable salt thereof.

(I)



The process comprises the following steps:

(a) alkylating a compound of structure II with an alkylating agent to produce a compound of formula III,

(II)



(III)



wherein

w-1, 2, or 3;

$Y_1$ is trans-CH—CH—, cis-CH—CH—, —$CH_2(CH_2)_m$—, or —C≡C—; m is 1, 2, or 3;

$R_7$ 1 S

(1) —$C_pH_{2p}$—$CH_3$, wherein p is an integer from 1 to 5, inclusive,

(2) phenoxy optionally substituted by one, two or three chloro, fluoro, trifluoromethyl, ($C_1$-$C_3$)alkyl, or ($C_1$-$C_3$)alkoxy, with the proviso that not more than two substituents are other than alkyl, with the proviso that $R_7$ is phenoxy or substituted phenoxy, only when $R_3$ and $R_4$ are hydrogen or methyl, being the same or different,

(3) phenyl, benzyl, phenylethyl, or phenylpropyl optionally substituted on the aromatic ring by one, two or three chloro, fluoro, trifluoromethyl, ($C_1$-$C_3$)alkyl, or ($C_1$-$C_3$)alkoxy, with the proviso that not more than two substituents are other than alkyl,

(4) cis-CH=CH $CH_2$ $CH_3$,

(5) —$(CH_2)_2$—CH(OH)—$CH_3$, or

(6) —$(CH_2)_3$—CH—$C(CH_3)_2$;

wherein —C($L_1$)-$R_2$ taken together is

(1) ($C_4$-$C_7$)cycloalkyl optionally substituted by 1 to 3 ($C_1$-$C_5$)alkyl;

(2) 2-(2-furyl)ethyl,

(3) 2-(3-thienyl)ethoxy, or

(4) 3-thienyloxymethyl;

$M_1$ is α-OH:β-$R_5$ or α-$R_5$:β-OH or α-$OR_2$:β-$R_5$ or α-$R_5$:β-$OR_2$, wherein $R_5$ is hydrogen or methyl, $R_2$ is an alcohol protecting group, and

$L_1$ is α-$R_3$:β-$R_4$, α-$R_4$:β-$R_3$, or a mixture of α-$R_3$:β-$R_4$ and α-$R_4$:β-$R_3$, wherein $R_3$ and $R_4$ are hydrogen, methyl, or fluoro, being the same or different, with the proviso that one of $R_3$ and $R_4$ is fluoro only when the other is hydrogen or fluoro.

(b) hydrolyzing the product of step (a) with a base,

(c) contacting the product of step (b) with a base B to for a salt of formula $I_s$

($I_s$)




(d) reacting the salt from step (c) with an acid to form the compound of formula I.

The present invention provides in another embodiment a process for the preparation of a compound of formula IV.

(IV)




The process comprises the following steps:

(a) alkylating a compound of structure V with an alkylating agent to produce a compound of formula VI,

(V)




-continued

(VI)




(b) hydrolyzing the product of step (a) with a base,

(c) contacting the product of step (b) with a base B to for a salt of formula $IV_s$, and

($IV_s$)




(d) reacting the salt from step (b) with an acid to form the compound of formula IV.

## DETAILED DESCRIPTION

The various terms used, separately and in combinations, in the processes herein described are defined below.

The expression "comprising" means "including but not limited to." Thus, other non-mentioned substances, additives, carriers, or steps may be present. Unless otherwise specified, "a" or "an" means one or more.

$C_{1-3}$-alkyl is a straight or branched alkyl group containing 1-3 carbon atoms. Exemplary alkyl groups include methyl, ethyl, n-propyl, and isopropyl.

$C_{1-3}$-alkoxy is a straight or branched alkoxy group containing 1-3 carbon atoms. Exemplary alkoxy groups include methoxy, ethoxy, propoxy, and isopropoxy.

$C_{4-7}$-cycloalkyl is an optionally substituted monocyclic, bicyclic or tricyclic alkyl group containing between 4-7 carbon atoms. Exemplary cycloalkyl groups include but not limited to cyclobutyl, cyclopentyl, cyclohexyl, and cycloheptyl.

Combinations of substituents and variables envisioned by this invention are only those that result in the formation of stable compounds. The term "stable", as used herein, refers to compounds which possess stability sufficient to allow manufacture and which maintains the integrity of the compound for a sufficient period of time to be useful for the purposes detailed herein.

As used herein, the term "prodrug" means a derivative of a compound that can hydrolyze, oxidize, or otherwise react under biological conditions (in vitro or in vivo) to provide an active compound. Examples of prodrugs include, but are not

limited to, derivatives of a compound that include biohydrolyzable groups such as biohydrolyzable amides, biohydrolyzable esters, biohydrolyzable carbamates, biohydrolyzable carbonates, biohydrolyzable ureides, and biohydrolyzable phosphate analogues (e.g., monophosphate, diphosphate or triphosphate).

As used herein, "hydrate" is a form of a compound wherein water molecules are combined in a certain ratio as an integral part of the structure complex of the compound.

As used herein, "solvate" is a form of a compound where solvent molecules are combined in a certain ratio as an integral part of the structure complex of the compound.

"Pharmaceutically acceptable" means in the present description being useful in preparing a pharmaceutical composition that is generally safe, non-toxic and neither biologically nor otherwise undesirable and includes being useful for veterinary use as well as human pharmaceutical use.

"Pharmaceutically acceptable salts" mean salts which are pharmaceutically acceptable, as defined above, and which possess the desired pharmacological activity. Such salts include acid addition salts formed with organic and inorganic acids, such as hydrogen chloride, hydrogen bromide, hydrogen iodide, sulfuric acid, phosphoric acid, acetic acid, glycolic acid, maleic acid, malonic acid, oxalic acid, methanesulfonic acid, trifluoroacetic acid, fumaric acid, succinic acid, tartaric acid, citric acid, benzoic acid, ascorbic acid and the like. Base addition salts may be formed with organic and inorganic bases, such as sodium, ammonia, potassium, calcium, ethanolamine, diethanolamine, N-methylglucamine, choline and the like. Included in the invention are pharmaceutically acceptable salts or compounds of any of the formulae herein.

Depending on its structure, the phrase "pharmaceutically acceptable salt," as used herein, refers to a pharmaceutically acceptable organic or inorganic acid or base salt of a compound. Representative pharmaceutically acceptable salts include, e.g., alkali metal salts, alkali earth salts, ammonium salts, water-soluble and water-insoluble salts, such as the acetate, amsonate (4,4-diaminostilbene-2,2-disulfonate), benzenesulfonate, benzonate, bicarbonate, bisulfate, bitartrate, borate, bromide, butyrate, calcium, calcium edetate, camsylate, carbonate, chloride, citrate, clavulariate, dihydrochloride, edetate, edisylate, estolate, esylate, fumarate, gluceptate, gluconate, glutamate, glycollylarsanilate, hexafluorophosphate, hexylresorcinate, hydrabamine, hydrobromide, hydrochloride, hydroxynaphthoate, iodide, isothionate, lactate, lactobionate, laurate, malate, maleate, mandelate, mesylate, methylbromide, methylnitrate, methylsulfate, mucate, napsylate, nitrate, N-methylglucamine ammonium salt, 3-hydroxy-2-naphthoate, oleate, oxalate, palmitate, pamoate (1,1-methene-bis-2-hydroxy-3-naphthoate, einbonate), pantothenate, phosphate/diphosphate, picrate, polygalacturonate, propionate, p-toluenesulfonate, salicylate, stearate, subacetate, succinate, sulfate, sulfosalicylate, suramate, tannate, tartrate, teoclate, tosylate, triethiodide, and valerate salts.

The present invention provides for a process for producing treprostinil and other prostacyclin derivatives and novel intermediate compounds useful in the process. The process according to the present invention provides advantages on large-scale synthesis over the existing method. For example, the purification by column chromatography is eliminated, thus the required amount of flammable solvents and waste generated are greatly reduced. Furthermore, the salt formation is a much easier operation than column chromatography. Moreover, it was found that the product of the process according to the present invention has higher purity. Therefore the present invention provides for a process that is more economical, safer, faster, greener, easier to operate, and provides higher purity.

One embodiment of the present invention is a process for the preparation of a compound of formula I, or a hydrate, solvate, prodrug, or pharmaceutically acceptable salt thereof.

(I)




The process comprises the following steps:

(a) alkylating a compound of formula II with an alkylating agent to produce a compound of formula III,

(II)




(III)




wherein

w=1, 2, or 3;

$Y_1$ is trans-CH═CH—, cis-CH═CH—, —$CH_2(CH_2)_m$—, or —C≡C—; m is 1, 2, or 3;

$R_7$ is

(1) —$C_pH_{2p}$—$CH_3$, wherein p is an integer from 1 to 5, inclusive,

(2) phenoxy optionally substituted by one, two or three chloro, fluoro, trifluoromethyl, ($C_1$-$C_3$)alkyl, or ($C_1$-$C_3$)alkoxy, with the proviso that not more than two substituents are other than alkyl, with the proviso that $R_7$ is phenoxy or substituted phenoxy, only when $R_3$ and $R_4$ are hydrogen or methyl, being the same or different,

(3) phenyl, benzyl, phenylethyl, or phenylpropyl optionally substituted on the aromatic ring by one, two or three chloro, fluoro, trifluoromethyl, ($C_1$-$C_3$)alkyl, or ($C_1$-$C_3$)alkoxy, with the proviso that not more than two substituents are other than alkyl,

(4) cis-CH═CH—$CH_2$—$CH_3$,

(5) —$(CH_2)_2$—CH(OH)—$CH_3$, or

(6) —$(CH_2)_3$—CH═$C(CH_3)_2$;

wherein $C(L_1)$-$R_2$ taken together is

(1) ($C_4$-$C_7$)cycloalkyl optionally substituted by 1 to 3 ($C_1$-$C_5$)alkyl;

(2) 2-(2-furyl)ethyl,

(3) 2-(3-thienyl)ethoxy, or

(4) 3-thienyloxymethyl;

$M_1$ is α-OH:β-$R_5$ or α-$R_5$:β-OH or α-$OR_2$:β-$R_5$ or α-$R_5$:β-$OR_2$, wherein $R_5$ is hydrogen or methyl, $R_2$ is an alcohol protecting group, and

$L_1$ is α-$R_3$:β-$R_4$, α-$R_4$:β-$R_3$, or a mixture of α-$R_3$:β-$R_4$ and α-$R_4$:β-$R_3$, wherein $R_3$ and $R_4$ are hydrogen, methyl, or fluoro, being the same or different, with the proviso that one of $R_3$ and $R_4$ is fluoro only when the other is hydrogen or fluoro.

(b) hydrolyzing the product of step (a) with a base,

(c) contacting the product of step (b) with a base B to for a salt of formula $I_s$

(Is)



(d) reacting the salt from step (c) with an acid to form the compound of formula I.

In one embodiment, the compound of formula I is at least 90.0%, 95.0%, 99.0%.

The compound of formula II can be prepared from a compound of formula XI, which is a cyclization product of a compound of formula X as described in U.S. Pat. No. 6,441,245.

(X)



(XI)



Wherein n is 0, 1, 2, or 3.

The compound of formula II can be prepared alternatively from a compound of formula XIII, which is a cyclization product of a compound of formula XII as described in U.S. Pat. No. 6,700,025.



(XII)



(XIII)



One embodiment of the present invention is a process for the preparation of a compound having formula IV, or a hydrate, solvate, or pharmaceutically acceptable salt thereof.

(IV)



The process comprises

(a) alkylating a compound of structure V with an alkylating agent such as $ClCH_2CN$ to produce a compound of formula VI,

(V)



(VI)



(b) hydrolyzing the product of step (a) with a base such as KOH,

(c) contacting the product of step (b) with a base B such as diethanolamine to for a salt of the following structure, and




(d) reacting the salt from step (b) with an acid such as HCl to form the compound of formula IV.

In one embodiment, the purity of compound of formula IV is at least 90.0%, 95.0%, 99.0%, 99.5%.

In one embodiment, the process further comprises a step of isolating the salt of formula $IV_s$.

In one embodiment, the base B in step (c) may be ammonia, N-methylglucamine, procaine, tromethanine, magnesium, L-lysine, L-arginine, or triethanolamine.

The following abbreviations are used in the description and/or appended claims, and they have the following meanings:

"MW" means molecular weight.

"Eq." means equivalent.

"TLC" means thin layer chromatography.

"HPLC" means high performance liquid chromatography.

"PMA" means phosphomolybdic acid.

"AUC" means area under curve.

In view of the foregoing considerations, and specific examples below, those who are skilled in the art will appreciate that how to select necessary reagents and solvents in practicing the present invention.

The invention will now be described in reference to the following Examples. These examples are not to be regarded as limiting the scope of the present invention, but shall only serve in an illustrative manner.

## EXAMPLES

### Example 1

### Alkylation of Benzindene Triol






-continued




| Name | MW | Amount | Mol. | Eq. |
|---|---|---|---|---|
| Benzindene Triol | 332.48 | 1250 g | 3.76 | 1.00 |
| $K_2CO_3$ (powder) | 138.20 | 1296 g | 9.38 | 2.50 |
| $ClCH_2CN$ | 75.50 | 567 g | 7.51 | 2.0 |
| $Bu_4NBr$ | 322.37 | 36 g | 0.11 | 0.03 |
| Acetone | — | 29 L | — | — |
| Celite ®545 | — | 115 g | — | — |

A 50-L, three-neck, round-bottom flask equipped with a mechanical stirrer and a thermocouple was charged with benzindene triol (1250 g), acetone (19 L) and $K_2CO_3$ (powdered) (1296 g), chloroacetonitrile (567 g), tetrabutylammonium bromide (36 g). The reaction mixture was stirred vigorously at room temperature (23±2° C.) for 16-72 h. The progress of the reaction was monitored by TLC. (methanol/$CH_2Cl_2$; 1:9 and developed by 10% ethanolic solution of PMA). After completion of reaction, the reaction mixture was filtered with/without Celite pad. The filter cake was washed with acetone (10 L). The filtrate was concentrated in vacuo at 50-55° C. to give a light-brown, viscous liquid benzindene nitrile. The crude benzindene nitrile was used as such in the next step without further purification.

### Example 2

### Hydrolysis of Benzindene Nitrile



| Name | MW | Amount | Mol. | Eq. |
|---|---|---|---|---|
| Benzindene Nitrile | 371.52 | 1397 g* | 3.76 | 1.0 |
| KOH | 56.11 | 844 g | 15.04 | 4.0 |
| Methanol | — | 12 L | — | — |
| Water | — | 4.25 L | — | — |

*Note: This weight is based on 100% yield from the previous step. This is not isolated yield.

A 50-L, cylindrical reactor equipped with a heating/cooling system, a mechanical stirrer, a condenser, and a thermocouple was charged with a solution of benzindene nitrile in methanol (12 L) and a solution of KOH (844 g of KOH dissolved in 4.25 L of water). The reaction mixture was stirred and heated to reflux (temperature 72.2° C.). The progress of the reaction was monitored by TLC (for TLC purpose, 1-2 mL of reaction mixture was acidified with 3M HCl to pH 1-2 and extracted with ethyl acetate. The ethyl acetate extract was used for TLC; Eluent: methanol/$CH_2Cl_2$; 1:9, and developed by 10% ethanolic solution of PMA). After completion of the reaction (~5 h), the reaction mixture was cooled to −5 to 10° C. and quenched with a solution of hydrochloric acid (3M, 3.1 L) while stirring. The reaction mixture was concentrated in vacuo at 50-55° C. to obtain approximately 12-14 L of condensate. The condensate was discarded.

The aqueous layer was diluted with water (7-8 L) and extracted with ethyl acetate (2×6 L) to remove impurities soluble in ethyl acetate. To aqueous layer, ethyl acetate (22 L) was added and the pH of reaction mixture was adjusted to 1-2 by adding 3M HCl (1.7 L) with stirring. The organic layer was separated and the aqueous layer was extracted with ethyl acetate (2×11 L). The combined organic layers were washed with water (3×10 L) and followed by washing with a solution of $NaHCO_3$ (30 g of $NaHCO_3$ dissolved in 12 L of water). The organic layer was further washed with saturated solution of NaCl (3372 g of NaCl dissolved in water (12 L)) and dried over anhydrous $Na_2SO_4$ (950-1000 g), once filtered.

The filtrate was transferred into a 72-L reactor equipped with mechanical stirrer, a condenser, and a thermocouple. To the solution of treprostinil in reactor was added activated carbon (110-130 g). The suspension was heated to reflux (temperature 68-70° C.) for at least one hour. For filtration, a pad of Celite® 545 (300-600 g) was prepared in sintered glass funnel using ethyl acetate. The hot suspension was filtered through the pad of Celite® 545. The Celite® 545 was washed with ethyl acetate until no compound was seen on TLC of the washings.

The filtrate (pale-yellow) was reduced to volume of 35-40 L by evaporation in vacuo at 50-55° C. for direct use in next step.

Example 3

Conversion of Treprostinil to Treprostinil Diethanolamine Salt (1:1)




-continued




| Name | MW | Amount | Mol | Eq |
|---|---|---|---|---|
| Treprostinil | 390.52 | 1464 g* | 3.75 | 1.0 |
| Diethanolamine | 105.14 | 435 g | 4.14 | 1.1 |
| Ethanol | | 5.1 L | | |
| Ethyl acetate | | 35 L** | | |
| Treprostinil Diethanolamine Salt (seed) | | 12 g | | |

*Note: This weight is based on 100% yield from benzindene triol. It is not isolated yield. The treprostinil was carried from previous step in ethyl acetate solution and used as such for this step.
**Note: The total volume of ethyl acetate should be in range of 35-36 L (it should be 7 times the volume of ethanol used). Approximately 35 L of ethyl acetate was carried over from previous step and additional 1.0 L of ethyl acetate was used for rinsing the flask.

A 50-L, cylindrical reactor equipped with a heating/cooling system, a mechanical stirrer, a condenser, and a thermocouple was charged with a solution of treprostinil in ethyl acetate (35-40 L from the previous step), anhydrous ethanol (5.1 L) and diethanolamine (435 g). While stirring, the reaction mixture was heated to 60-75° C., for 0.5-1.0 h to obtain a clear solution. The clear solution was cooled to 55±5° C. At this temperature, the seed of polymorph B of treprostinil diethanolamine salt (~12 g) was added to the clear solution. The suspension of polymorph B was stirred at this temperature for 1 h. The suspension was cooled to 20±2° C. overnight (over a period of 16-24 h). The treprostinil diethanolamine salt was collected by filtration using Aurora filter equipped with filter cloth, and the solid was washed with ethyl acetate (2×8 L). The treprostinil diethanolamine salt was transferred to a HDPE/glass container for air-drying in hood, followed by drying in a vacuum oven at 50±5° C. under high vacuum.

At this stage, if melting point of the treprostinil diethanolamine salt is more than 104° C., it was considered polymorph B. There is no need of recrystallization. If it is less than 104° C., it is recrystallized in EtOH-EtOAc to increase the melting point.

Data on Treprostinil Diethanolamine Salt (1:1)

| Batch No. | Wt. of Benzindene Triol (g) | Wt. of Treprostinil Diethanolamine Salt (1:1) (g) | Yield (%) | Melting point (° C.) |
|---|---|---|---|---|
| 1 | 1250 | 1640 | 88.00 | 104.3-106.3 |
| 2 | 1250 | 1528 | 82.00* | 105.5-107.2 |

-continued

| Batch No. | Wt. of Benzindene Triol (g) | Wt. of Treprostinil Diethanolamine Salt (1:1) (g) | Yield (%) | Melting point (° C.) |
|---|---|---|---|---|
| 3 | 1250 | 1499 | 80.42** | 104.7-106.6 |
| 4 | 1236 | 1572 | 85.34 | 105-108 |

*Note: In this batch, approximately 1200 mL of ethyl acetate solution of treprostinil before carbon treatment was removed for R&D carbon treatment experiments.

**Note: This batch was recrystallized, for this reason yield was lower.

## Example 4

### Heptane Slurry of Treprostinil Diethanolamine Salt (1:1)

| Name | Batch No. | Amount | Ratio |
|---|---|---|---|
| Treprostinil Diethanolamine Salt | 1 | 3168 g | 1 |
| Heptane | — | 37.5 L | 12 |
| Treprostinil Diethanolamine Salt | 2 | 3071 g | 1 |
| Heptane | — | 36.0 L | 12 |

A 50-L, cylindrical reactor equipped with a heating/cooling system, a mechanical stirrer, a condenser, and a thermocouple was charged with slurry of treprostinil diethanolamine salt in heptane (35-40 L). The suspension was heated to 70-80° C. for 16-24 h. The suspension was cooled to 22±2° C. over a period of 1-2 h. The salt was collected by filtration using Aurora filter. The cake was washed with heptane (15-30 L) and the material was dried in Aurora filter for 1 h. The salt was transferred to trays for air-drying overnight in hood until a constant weight of treprostinil diethanolamine salt was obtained. The material was dried in oven under high vacuum for 2-4 h at 50-55° C.

Analytical data on and Treprostinil Diethanolamine Salt (1:1)

| Test | Batch 1 | Batch 2 |
|---|---|---|
| IR | Conforms | Conforms |
| Residue on Ignition (ROI) | <0.1% w/w | <0.1% w/w |
| Water content | 0.1% w/w | 0.0% w/w |
| Melting point | 105.0-106.5° C. | 104.5-105.5° C. |
| Specific rotation $[\alpha]^{25}_{589}$ | +34.6° | +35° |
| Organic volatile impurities | | |
| Ethanol | Not detected | Not detected |
| Ethyl acetate | Not detected | <0.05% w/w |
| Heptane | <0.05% w/w | <0.05% w/w |
| HPLC (Assay) | 100.4% | 99.8% |
| Diethanolamine | Positive | Positive |

## Example 5

### Conversion of Treprostinil Diethanolamine Salt (1:1) to Treprostinil




A 250-mL, round-bottom flask equipped with magnetic stirrer was charged with treprostinil diethanolamine salt (4 g) and water (40 mL). The mixture was stirred to obtain a clear solution. To the clear solution, ethyl acetate (100 mL) was added. While stirring, 3M HCl (3.2 mL) was added slowly until pH~1 was attained. The mixture was stirred for 10 minutes and organic layer was separated. The aqueous layer was extracted with ethyl acetate (2×100 mL). The combined organic layers was washed with water (2×100 mL), brine (1×50 mL) and dried over anhydrous $Na_2SO_4$. The ethyl acetate solution of treprostinil was filtered and the filtrate was concentrated under vacuum at 50° C. to give off-white solid. The crude treprostinil was recrystallized from 50% ethanol in water (70 mL). The pure treprostinil was collected in a Buchner funnel by filtration and cake was washed with cold 20% ethanolic solution in water. The cake of treprostinil was air-dried overnight and further dried in a vacuum oven at 50° C. under high vacuum to afford 2.9 g of treprostinil (Yield 91.4%, purity (HPLC, AUC, 99.8%).

Analytical Data on Treprostinil from Treprostinil Diethanolamine Salt (1:1) to Treprostinil

| Batch No. | Yield | Purity (HPLC) |
|---|---|---|
| 1 | 91.0% | 99.8% (AUC) |
| 2 | 92.0% | 99.9% (AUC) |
| 3 | 93.1% | 99.7% (AUC) |
| 4 | 93.3% | 99.7% (AUC) |
| 5 | 99.0% | 99.8% (AUC) |
| 6 | 94.6% | 99.8% (AUC) |

Example 6

Comparison of the Former Process and a Working Example of the Process According to the Present Invention

| Step No. | Steps | Former Process (Batch size: 500 g) | Working example of the Process according to the present invention (Batch size: 5 kg) |
|---|---|---|---|
| | | **Nitrile** | |
| 1 | Triol weight | 500 g | 5,000 g |
| 2 | Acetone | 20 L (1:40 wt/wt) | 75 L (1:15 wt/wt) |
| 3 | Potassium carbonate | 1,300 g (6.4 eq) | 5,200 g (2.5 eq) |
| 4 | Chloroacetonitrile | 470 g (4.2 eq) | 2,270 g (2 eq) |
| 5 | Tetrabutylammonium bromide | 42 g (0.08 eq) | 145 g (0.03 eq) |
| 6 | Reactor size | 72-Liter | 50-gallon |
| 7 | Reflux time | 8 hours | No heating, Room temperature (r.t.) 45 h |
| 8 | Hexanes addition before filtration | Yes (10 L) | No |
| 9 | Filter | Celite | Celite |
| 10 | Washing | Ethyl acetate (10 L) | Acetone (50 L) |
| 11 | Evaporation | Yes | Yes |
| 12 | Purification | Silica gel column Dichloromethane: 0.5 L Ethyl acetate: 45 L Hexane: 60 L | No column |
| 13 | Evaporation after column | Yes | No |
| 14 | Yield of nitrite | 109-112% | Not checked |
| | | **Treprostinil (intermediate)** | |
| 15 | Methanol | 7.6 L (50-L reactor) | 50 L (50-gal reactor) |
| 16 | Potassium hydroxide | 650 g (8 eq) | 3,375g (4 eq) |
| 17 | Water | 2.2 L | 17 L |
| 18 | % of KOH | 30% | 20% |
| 19 | Reflux time | 3-3.5 h | 4-5 h |
| 20 | Acid used | 2.6 L (3M) | 12 L (3M) |
| 21 | Removal of impurities | 3 × 3 L Ethyl acetate | 2 × 20 L Ethyl acetate |
| 22 | Acidification | 0.7 L | 6.5 L |
| 23 | Ethyl acetate extraction | 5 × 17 L = 35 L | 90 + 45 + 45 = 180 L |
| 24 | Water washing | 2 × 8 L | 3 × 40 L |
| 25 | Sodium bicarbonate washing | Not done | 120 g in 30 L water + 15 L brine |
| 26 | Brine washing | Not done | 1 × 40 L |
| 27 | Sodium sulfate | 1 kg | Not done |
| 28 | Sodium sulfate filtration | Before charcoal, 6 L ethyl acetate | N/A |
| 29 | Charcoal | 170 g, reflux for 1.5 h, filter over Celite, 11 L ethyl acetate | Pass hot solution (75° C.) through charcoal cartridge and clean filter, 70 L ethyl acetate |
| 30 | Evaporation | Yes, to get solid intermediate treprostinil | Yes, adjust to 150 L solution |
| | | **Treprostinil Diethanolamine Salt** | |
| 31 | Salt formation | Not done | 1,744 g diethanolamine, 20 L ethanol at 60-75° C. |
| 32 | Cooling | N/A | To 20° C. over weekend; add 40 L ethyl acetate; cooled to 10° C. |
| 33 | Filtration | N/A | Wash with 70 L ethyl acetate |
| 34 | Drying | N/A | Air-dried to constant wt., 2 days |
| | | **Treprostinil (from 1.5 kg Treprostinil diethanolamine salt)** | |
| 35 | Hydrolysis | N/A | 15 L water + 25 L ethyl acetate + HCl |
| 36 | Extraction | N/A | 2 × 10 L ethyl acetate |
| 37 | Water wash | N/A | 3 × 10 L |

-continued

| Step No. | Steps | Former Process (Batch size: 500 g) | Working example of the Process according to the present invention (Batch size: 5 kg) |
|---|---|---|---|
| 38 | Brine wash | N/A | 1 x 10 L |
| 39 | Sodium sulfate | N/A | 1 kg, stir |
| 40 | Filter | N/A | Wash with 6 L ethyl acetate |
| 41 | Evaporation | N/A | To get solid, intermediate Treprostinil |
| 42 | Crude drying on tray | 1 or 3 days | Same |
| 43 | Ethanol & water for cryst. | 5.1 L + 5.1 L | 10.2 L + 10.2 L (same %) |
| 44 | Crystallization in | 20-L rotavap flask | 50-L jacketed reactor |
| 45 | Temperature of crystallization | 2 h r.t., fridge −0° C. 24 h | 50° C. to 0° C. ramp, 0° C. overnight |
| 46 | Filtration | Buchner funnel | Aurora filter |
| 47 | Washing | 20% (10 L) cooled ethanol-water | 20% (20 L) cooled ethanol-water |
| 48 | Drying before oven | Buchner funnel (20 h) Tray (no) | Aurora filter (2.5 h) Tray (4 days) |
| 49 | Oven drying | 15 hours, 55° C. | 6-15 hours, 55° C. |
| 50 | Vacuum | <−0.095 mPA | <5 Torr |
| 51 | UT-15 yield weight | ~535 g | ~1,100 g |
| 52 | % yield from triol) | ~91% | ~89% |
| 53 | Purity | ~99.0% | 99.9% |

The quality of treprostinil produced according to this invention is excellent. The purification of benzindene nitrile by column chromatography is eliminated. The impurities carried over from intermediate steps (i.e. alkylation of triol and hydrolysis of benzindene nitrile) are removed during the carbon treatment and the salt formation step. Additional advantages of this process are: (a) crude treprostinil salts can be stored as raw material at ambient temperature and can be converted to treprostinil by simple acidification with diluted hydrochloric acid, and (b) the treprostinil salts can be synthesized from the solution of treprostinil without isolation. This process provides better quality of final product as well as saves significant amount of solvents and manpower in purification of intermediates.

Although the foregoing refers to particular preferred embodiments, it will be understood that the present invention is not so limited. It will occur to those of ordinary skill in the art that various modifications may be made to the disclosed embodiments and that such modifications are intended to be within the scope of the present invention.

All of the publications, patent applications and patents cited in this specification are incorporated herein by reference in their entirety.

What is claimed is:

**1**. A pharmaceutical composition comprising treprostinil or a pharmaceutically acceptable salt thereof, said composition prepared by a process comprising providing a starting batch of treprostinil having one or more impurities resulting from prior alkylation and hydrolysis steps, forming a salt of treprostinil by combining the starting batch and a base, isolating the treprostinil salt, and preparing a pharmaceutical composition comprising treprostinil or a pharmaceutically acceptable salt thereof from the isolated treprostinil salt, whereby a level of one or more impurities found in the starting batch of treprostinil is lower in the pharmaceutical composition, and wherein said alkylation is alkylation of benzindene triol.

**2**. The pharmaceutical composition of claim **1**, wherein the salt is isolated in crystalline form.

**3**. The pharmaceutical composition of claim **1**, wherein the base is selected from the group consisting of sodium, ammonia, potassium, calcium, ethanolamine, diethanolamine, N-methylglucamine, and choline.

**4**. The pharmaceutical composition of claim **3**, wherein the base is diethanolamine.

**5**. The pharmaceutical composition of claim **1**, wherein the base is combined with treprostinil that has not been previously isolated.

**6**. The pharmaceutical composition of claim **1**, wherein the isolated salt is stored at ambient temperature.

**7**. The pharmaceutical composition of claim **1**, which is a pharmaceutical solution.

**8**. A process of preparing a pharmaceutical product comprising treprostinil or a pharmaceutically acceptable salt thereof, comprising alkylating a triol intermediate of the formula:




hydrolyzing the resulting compound to form treprostinil, forming a salt of treprostinil stable at ambient temperature, storing the treprostinil salt at ambient temperature, and preparing a pharmaceutical product from the treprostinil salt after storage, wherein the pharmaceutical product comprises treprostinil or a pharmaceutically acceptable salt thereof.

**9**. A pharmaceutical product prepared by the process of claim **8**.

**10**. The process as claimed in claim **8**, wherein forming the salt of treprostinil stable at ambient temperature is performed by adding diethanolamine to treprostinil.

* * * * *

US009604901B2

(12) **United States Patent**
**Batra et al.**

(10) **Patent No.: US 9,604,901 B2**
(45) **Date of Patent: *Mar. 28, 2017**

(54) **PROCESS TO PREPARE TREPROSTINIL, THE ACTIVE INGREDIENT IN REMODULIN®**

(71) Applicant: **United Therapeutics Corporation**, Silver Spring, MD (US)

(72) Inventors: **Hitesh Batra**, Herndon, VA (US); **Sudersan M. Tuladhar**, Silver Spring, MD (US); **Raju Penmasta**, Herndon, VA (US); **David A. Walsh**, Palmyra, VA (US)

(73) Assignee: **United Therapeutics Corporation**, Silver Spring, MD (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **14/754,932**

(22) Filed: **Jun. 30, 2015**

(65) **Prior Publication Data**

US 2015/0299091 A1 Oct. 22, 2015

**Related U.S. Application Data**

(63) Continuation of application No. 13/933,623, filed on Jul. 2, 2013, which is a continuation of application No. 13/548,446, filed on Jul. 13, 2012, now Pat. No. 8,497,393, which is a continuation of application No. 12/334,731, filed on Dec. 15, 2008, now Pat. No. 8,242,305.

(60) Provisional application No. 61/014,232, filed on Dec. 17, 2007.

(51) **Int. Cl.**

| | |
|---|---|
| ***C07C 59/72*** | (2006.01) |
| ***C07C 51/08*** | (2006.01) |
| ***C07C 51/41*** | (2006.01) |
| ***C07C 213/08*** | (2006.01) |
| ***C07C 405/00*** | (2006.01) |
| *A01N 37/10* | (2006.01) |
| *C07C 39/12* | (2006.01) |
| *C07C 39/17* | (2006.01) |
| *C07C 59/60* | (2006.01) |

(52) **U.S. Cl.**
CPC .............. ***C07C 59/72*** (2013.01); ***C07C 51/08*** (2013.01); ***C07C 51/41*** (2013.01); ***C07C 51/412*** (2013.01); ***C07C 213/08*** (2013.01); ***C07C 405/0075*** (2013.01); *A01N 37/10* (2013.01); *C07C 39/12* (2013.01); *C07C 39/17* (2013.01); *C07C 59/60* (2013.01)

(58) **Field of Classification Search**
CPC ......... C07C 59/72; C07C 51/08; C07C 51/41; C07C 51/412; C07C 213/08; C07C 405/0075
USPC .......................................................... 562/466
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 3,703,544 | A | 11/1972 | Morozowich | |
| 3,888,916 | A | 6/1975 | Sinkula | |
| 4,306,075 | A | 12/1981 | Aristoff | |
| 4,306,076 | A | 12/1981 | Nelson | |
| 4,424,376 | A | 1/1984 | Moniot et al. | |
| 4,434,164 | A | 2/1984 | Lombardino | |
| 4,463,183 | A | 7/1984 | Haslanger | |
| 4,486,598 | A | 12/1984 | Aristoff | |
| 4,544,764 | A | 10/1985 | Aristoff | |
| 4,668,814 | A | 5/1987 | Aristoff | |
| 4,683,330 | A | 7/1987 | Aristoff | |
| 5,153,222 | A | 10/1992 | Tadepalli et al. | |
| 5,466,713 | A | 11/1995 | Blitstein-Willinger et al. | |
| 5,506,265 | A | 4/1996 | Blitstein-Willinger | |
| 6,054,486 | A | 4/2000 | Crow et al. | |
| 6,441,245 | B1 | 8/2002 | Moriarty et al. | |
| 6,521,212 | B1 | 2/2003 | Cloutier et al. | |
| 6,528,688 | B2 | 3/2003 | Moriarty et al. | |
| 6,700,025 | B2 | 3/2004 | Moriarty et al. | |
| 6,706,283 | B1 | 3/2004 | Appel et al. | |
| 6,756,033 | B2 | 6/2004 | Cloutier et al. | |
| 6,765,117 | B2 | 7/2004 | Moriarty et al. | |
| 6,803,386 | B2 | 10/2004 | Shorr et al. | |
| 6,809,223 | B2 | 10/2004 | Moriarty et al. | |
| 7,199,157 | B2 | 4/2007 | Wade et al. | |
| 7,384,978 | B2 | 6/2008 | Phares et al. | |
| 7,417,070 | B2 | 8/2008 | Phares et al. | |
| 8,242,305 | B2 * | 8/2012 | Batra | C07C 51/08 562/466 |
| 8,497,393 | B2 * | 7/2013 | Batra et al. | 562/466 |
| 2001/0038855 | A1 | 11/2001 | Desjardin et al. | |
| 2001/0056095 | A1 | 12/2001 | Mylari | |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| CA | 2 710 726 | A1 | 1/2012 |
| CN | 101891596 | A | 11/2010 |

(Continued)

OTHER PUBLICATIONS

Alexander et al., "The Synthesis of Benzindene Prostacyclin Analogs as Potential Antiulcer Agents," Prostaglandins, 1986, 32(5):647-653.

(Continued)

*Primary Examiner* — Yevegeny Valenrod
(74) *Attorney, Agent, or Firm* — Foley & Lardner LLP

(57) **ABSTRACT**

This present invention relates to an improved process to prepare prostacyclin derivatives. One embodiment provides for an improved process to convert benzindene triol to treprostinil via salts of treprostinil and to purify treprostinil.

**9 Claims, No Drawings**

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2002/0173672 | A1 | 11/2002 | Moriarty et al. |
| 2004/0176645 | A1 | 9/2004 | Moriarty et al. |
| 2005/0085540 | A1 | 4/2005 | Phares et al. |
| 2005/0101608 | A1 | 5/2005 | Santel |
| 2005/0282901 | A1 | 12/2005 | Phares et al. |
| 2005/0282903 | A1 | 12/2005 | Wade et al. |
| 2007/0078095 | A1 | 4/2007 | Phares et al. |
| 2007/0078182 | A1 | 4/2007 | Phares et al. |
| 2008/0200449 | A1 | 8/2008 | Olschewski et al. |
| 2008/0249167 | A1 | 10/2008 | Phares et al. |
| 2008/0280986 | A1 | 11/2008 | Wade et al. |
| 2009/0036465 | A1 | 2/2009 | Roscigno et al. |
| 2009/0163738 | A1 | 6/2009 | Batra et al. |

FOREIGN PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| CN | 101891715 | A | 11/2010 | |
| EP | 0 004 335 | A2 | 10/1979 | |
| EP | 0 087 237 | B1 | 5/1986 | |
| EP | 0 175 450 | B1 | 3/1989 | |
| EP | 0 159 784 | B1 | 6/1989 | |
| EP | 0 496 548 | A1 | 7/1992 | |
| JP | 56-122328 | | 9/1981 | |
| JP | 59-044340 | A | 3/1984 | |
| WO | WO 98/18452 | A1 | 5/1998 | |
| WO | WO 98/39337 | A1 | 9/1998 | |
| WO | WO 99/21830 | A1 | 5/1999 | |
| WO | WO 03/070163 | A2 | 8/2003 | |
| WO | WO 2005/007081 | A2 | 1/2005 | |
| WO | WO 2005007081 | A2 * | 1/2005 | ............ C07C 59/70 |
| WO | WO 2007/134292 | A2 | 11/2007 | |
| WO | WO 2008/100977 | A2 | 8/2008 | |
| WO | WO 2009/117095 | A1 | 9/2009 | |
| WO | WO 2012/009816 | A1 | 1/2012 | |

OTHER PUBLICATIONS

Aristoff et al., "Synthesis and Structure-Activity Relationship of Novel Stable Prostacyclin Analogs," Advances in Prostaglandin, Thromboxane, and Leukotriene Research, Samuelsson et al., .Eds., 1983, 11:267-274.
Aristoff et al., "Synthesis of Benzopyran Prostaglandins, Potent Stable Prostacyclin Analogs, Via an Intramolecular Mistunobu Reaction," Tetrahedron Letters, 1984, 25(36):3955-3958.
Aristoff et al., "Total Synthesis of a Novel Antiulcer Agent via a Modification of the Intramolecular Wadsworth-Emons-Witting Reaction," J. Am. Chem. Soc., 1985, 107:7967-7974.
Batra et al., "Crystallization Process Development for a Stable Polymorph of Treprostinil Diethanolamine (UT-15C) by Seeding," Organic Process Research & Development, 2009, 13:242-249.
Belch et al., "Randomized, Double-Blind, Placebo-Controlled Study Evaluating the Efficacy and Safety of AS-013, a Prostaglandin E1 Prodrug, in Patients with Intermittent Claudication," Circulation, May 6, 1997, 95(9):2298-2302.
Chemburkar et al., "Dealing with the Impact of Ritonavir Polymorphs on the Late Stages of Bulk Drug Process Development," Organic Process Research & Development, 2000, 4:413-417.
Chung et al., "Promoters for the (Alkyne)hexacarbonyldicobalt-Based Cyclopentenone Synthesis," Organometallics, 1993, 12:220-223.
Clark et al., "High-Performance Liquid Chromatographic Method for Determining the Enantiomeric Purity of a Benzindene Prostaglandin by a Diastereomeric Separation," Journal of Chromatography, 1987, 408:275-283.
Hardinger et al., "Triply-Convergent Syntheses of Two Homochiral Arene-Fused Prostacyclin Analogs Related to U68,215," Bioorganic & Medicinal Chemistry Letters, 1991, 1(1):79-82.
Hicks et al., "A Practical Titanium-Catalyzed Synthesis of Bicyclic Cyclopentenones and Allylic Amines," J. Org. Chem., 1996, 61:2713-2718.
Jeong et al., "Catalytic Version of the Intramolecular Pauson-Khand Reaction," J. Am. Chem. Soc., 1994, 116:3159-3160.
Khand et al., "Organocobalt Complexes. Part II. Reaction of Acetylenehexacarbonyl-dicobalt Complexes, $(R^1C_2R^2)Co_2(CO)_6$, with Norbornene and its Derivatives," J. Chem. Soc., J.C.S. Perkin I., 1973, 977-981.
Mathre et al., "A Practical Enantioselective Synthesis of α,α-Diaryl-2-pyrrolidinemethanol. Preparation and Chemistry of the Corresponding Oxazaborolidines," J. Org. Chem., 1991, 56:751-762.
Moriarty et al., "The Intramolecular Asymmetric Pauson-Khand Cyclization as a Novel and General Stereoselective Route to Benzindene Prostacyclins: Synthesis of UT-15 (Treprostinil)," *J. Org. Chem.* 2004, 69, 1890-1902.
Mulzer et al., "Asymmetric Synthesis of Carbacyclin Precursors by Pauson-Khand Cyclization," Liebigs Ann. Chem., 1988, 891-897.
Nelson, Norman A., "Prostaglandin Nomenclature," J. Med. Chem., Sep. 1974, 17(9):911-918.
Pagenkopf et al., "Photochemical Promotion of the Intramolecular Pauson-Khand Reaction. A New Experimental Protocol for Cobalt-Catalyzed [2 + 2 + 1] Cycloadditions," J. Am. Chem. Soc., 1996, 118:2285-2286.
Pagenkopf, Brian L., "Substrate and Reagent Control of Diastereoselectivity in Transition Metal-Mediated Process: Development of a Catalytic Photo Promoted Pauson-Khand Reaction," Diss. Abstr. Int., 57(12):7535, 1977, Abstract.
Patterson et al., "Acute Hemodynamic Effects of the Prostacyclin Analog 15AU81 in Severe Congestive Heart Failure," Am. J. Cardio., 1995, 75:26A-33A.
Paulson, Peter L., "The Khand Reaction," Tetrahedron, 1985, 41(24):5855-5860.
Schore, Neil E., "Transition-Metal-Mediated Cycloaddition Reactions of Alkynes in Organic Synthesis," Chem. Rev., 1988, 88:1081-1119.
Shamayati et al., "N-Oxide Promjoted Pauson-Khand Cyclization at Room Temperature," Tetrahedron Letters, 1990, 31(37):5289-5292.
Snell et al., "Investigating the Effect of Impurities on Marcomolecule Crystal Growth in Microgavity," Crystal Growth & Design, 2001, 1(2):151-158.
Sorbera et al. "UT-15. Treatment of Pulmonary Hypertension Treatment of Peripheral Vascular Disease," *Drug of the Future*, 2001, 26(4), 364-374.
Takano et al., "Enantiodivergent Synthesis of Both Enantiomers of Sulcatol and Matsutake Alcohol from (R)-Epichlorohydrin," Chemistry Letters, 1987, 2017-2020.
Viedma, Cristobal, "Selective Chiral Symmetry Breaking during Crystallization: Parity Violation of Cryptochiral Environment in Control?" Crystal Growth & Design, 2007, 7(3):553-556.
Whittle et al., "Antithrombotic Assessment and Clinical Potential of Prostacyclin Analogues," Progess in Medicinal Chemistry. Ellis et al. Eds., 1984, Chapter 6, vol. 21, 238-279.
Zhang et al., "A Nickel(0)-Catalyzed Process for the Transformation of Enynes to Bicyclic Cyclopentenones," J. Org. Chem., 1996, 61:4498-4499.
*Steadymed Ltd.*, v. *United Therapeutics Corporation*, Petition for Inter Partes Review of U.S. Pat. No. 8,497,393, under 37 CFR 42.100, dated Oct. 1, 2015, with Exhibits 1009, 1010, 1017 and 1018.
Ege, S., *Organic Chemistry Second Edition*, 1989, 541-547.
Schoffstall et al., *Microscale and Miniscale Organic Chemistry Laboratory Experiments*, 2nd. Ed., 2004, 200-202.
Wiberg, Kenneth, *Laboratory Technique in Organic Chemistry*, 1960, 112.
Redacted Petitioner's Reply to Patent Owner's Response to Petition filed on Sep. 27, 2016 in *Steadymed Ltd.* (Petitioner), v. *United Therapeutics Corporation* (Patent Owner), Case IPR2016-00006, U.S. Pat. No. 8,497,393, with Exhibits 1022-1028.
Bighley et al., "Salt Forms of Drugs and Absorption," Encyclopedia of Pharmaceutical Technology, Swarbrick et al., Eds., 1995, 13:453-499.

(56) **References Cited**

OTHER PUBLICATIONS

Simonneau et al., "Continuous Subcutaneous Infusion of Treprostinil, a Prostacyclin Analogue, in Patients with Pulmonary Arterial Hypertension," Am. J. Respir. Crit. Care Med., 2002, 165:800-804.
Petitioner's Demonstratives filed Nov. 28, 2016, in *Steadymed Ltd.* (Petitioner), v. *United Therapeutics Corporation* (Patent Owner), Case IPR2016-00006, U.S. Pat. No. 8,497,393.
Patent Owner Response to Petition filed Nov. 23, 2016, in *Steadymed Ltd.* (Petitioner), v. *United Therapeutics Corporation* (Patent Owner), Case IPR2016-00006, U.S. Pat. No. 8,497,393, with Redacted Exhibits 2006, 2020, 2022, 2058 and 2059 filed Nov. 23, 2016, 1151 pages.
Patent Owner Demonstratives filed Nov. 23, 2016, in *Steadymed Ltd.* (Petitioner), v. *United Therapeutics Corporation* (Patent Owner), Case IPR2016-00006, U.S. Pat. No. 8,497,393, 62 pages.
Decision Redacted Institute of Inter Partes Review dated Nov. 23, 2016, in *Steadymed Ltd.* (Petitioner), v. *United Therapeutics Corporation* (Patent Owner), Case IPR2016-00006, U.S. Pat. No. 8,497,393, 53 pages.
Service copy of Third Party Submission dated Oct. 16, 2016, filed but not entered in U.S. Appl. No. 14/754,932 on Oct. 16, 2016, with 6 indicated attachments, 822 pages.
Redacted Defendant Sandoz Inc.'s Invalidity Contentions dated Feb. 5, 2015, *United Therapeutics Corporation* (Plantiff) v. *Sandoz Inc.* (Defendant), In The United States District Court for the District of New Jersey, Civil Action No. 3:14-cv-5499(PGH)(LHG), 90 pages.
Defendant Sandoz Inc.'s Invalidity Contention Charts dated Feb. 5, 2015, *United Therapeutics Corporation* (Plantiff) v. *Sandoz Inc.* (Defendant), In The United States District Court for the District of New Jersey, Civil Action No. 3:14-cv-5499(PGH)(LHG), 189 pages.
Defendant Actavis Laboratories FL, Inc. Preliminary Invalidity Contentions, dated Aug. 30, 2016, *United Therapeutics Corporationg, and Supernus Pharmaceuticals, Inc.*, (Plantiff) v. *Actavis Laboratories FL, Inc.*, (Defendant), In The United States District Court for the District of New Jersey, Civil Action No. 3:16-cv-01816-PGS-LHG, Civil Action No. 3:16-cv-03642-PGS-LHG, 330 pages, (see particularly pp. 18-20, 42-62 and 269-280).
Exhibit G, Invalidity Claim Chart for the '393 patent, Jan. 12, 2015, 66 pages.
Defendant Teva Pharmaceuticals USA, Inc.'s Amended Non-Infringement and Invalidity Contentions, dated Apr. 24, 2015, *United Therapeutics Corporation* (Plantiff) v. *Teva Pharmaceuticals USA, Inc.* (Defendant), In The United States District Court for the District of New Jersey, Civil Action No. 3:14-cv-05498(PGS)(LHG), 94 pages, (see particularly pp. 22-54).
Arumugan et al., "A New Purification Process for Pharmaceutical and Chemical Industries," Organic Process Research & Development, 2005, 9:319-320.
Burk et al., "An Enantioselective Synthesis of (S)-(+)-3-Aminomethyl-5-methylhexanoic Acide via Asymmetric Hydrogenation," J. Org. Chem., 2003, 68:5731-5734.
Eliel et al., Stereochemistry of Organic Compounds, 1994, 322-325.
Harwood et al., Experimental organic chemistry: Principles and Practice, 1989, 127-134.
Jones, Maitland Jr., Organic Chemistry, 2nd Ed., 2000, 153-155.
Lin et al., "Benzindene Prostaglandins. Synthesis of Optically Pure 15-Deoxy-U-68,215 and Its Enantiomer via a Modified Intramolecular Wadsworth-Emmons-Wittig Reaction," J. Org. Chem., 1987, 52:5594-5601.
McManus et al., "Tetrazole Analogs of Plant Auxims," J. Org, Chem., 1959, 24:1464-1467.
Monson, Richard S., Advanced Organic Synthesis, Methods and Techniques, 1971, 178-188.
Ohno et al., "Development of Dual-Acting Benzofurans for Thromboxane A2 Antagonist and Prostacyclin Receptor Agonist: Synthesis, Structure-Activity Relationship, and Evaluation of Benzofuran Derivatives," J. Med. Chem., 2005, 48:5279-5294.
Olmsted III et al., Chemistry, The Molecular Science, Mosby-Year Book, Inc., Chapter 10 "Effects of Intermolecular Forces," 1994, 428-486.
Pavia et al., Introduction to Organic Laboratory Techniques, First Edition, 1998, 648.
Physicians' Desk Reference, 59 Edition, 2005, for Bicillin® L-A (penicillin G benzathine suspension), 5 pages.
Priscinzano et al., "Piperidine Analogues of 1-[2-[Bis(4-fluorophenyl)methoxy]ethyl]-4-(3-phenylpropyl)piperazine (GBR 12909): High Affinity Ligands for the Dopamine Transporter," J. Med. Chem., 2002, 45:4371-4374.
Remodulin® label, 2014, 17 pages.
Schoffstall, et al., Microscale and Miniscale Oragnic Chemistry Laboratory Experiments, 2004, 2nd Ed., 200-202.
Sorrell, Thomas N., Organic Chemistry, 1999, 755-758.
Wiberg, Laboratory Technique in Organic Chemistry, 1960, 112.
Yu et al., "Novel Synthetic Route of a Pivotal Intermediate for the Synthesis of 1β-Methyl Carbapenem Antibiotics," Organic Process Research & Development, 2006, 10:829-832.
Redacted Defendant Watson Laboratories, Inc.'s Invalidity Contentions dated Dec. 11, 2015. *United Therapeutics Corporation* (Plantiff) v. *Watson Laboratories, Inc.* (Defendant), In The United States District Court for the District of New Jersey, Civil Action No. 3:15-cv-05723-PGS-LHG, 35 pages.

* cited by examiner

# PROCESS TO PREPARE TREPROSTINIL, THE ACTIVE INGREDIENT IN REMODULIN®

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a Continuation of U.S. application Ser. No. 13/933,623, filed Jul. 2, 2013, which is a Continuation of U.S. application Ser. No. 13/548,446, filed Jul. 13, 2012, which is a Continuation of U.S. application Ser. No. 12/334,731, filed Dec. 15, 2008, which claims priority from U.S. Provisional Patent Application 61/014,232, filed Dec. 17, 2007, the entire contents of which are incorporated herein by reference.

## BACKGROUND

The present invention relates to a process for producing prostacyclin derivatives and novel intermediate compounds useful in the process.

Prostacyclin derivatives are useful pharmaceutical compounds possessing activities such as platelet aggregation inhibition, gastric secretion reduction, lesion inhibition, and bronchodilation.

Treprostinil, the active ingredient in Remodulin®, was first described in U.S. Pat. No. 4,306,075. Treprostinil, and other prostacyclin derivatives have been prepared as described in Moriarty, et al in *J. Org. Chem.* 2004, 69, 1890-1902, *Drug of the Future,* 2001, 26(4), 364-374, U.S. Pat. Nos. 6,441,245, 6,528,688, 6,765,117 and 6,809,223. Their teachings are incorporated by reference to show how to practice the embodiments of the present invention.

U.S. Pat. No. 5,153,222 describes use of treprostinil for treatment of pulmonary hypertension. Treprostinil is approved for the intravenous as well as subcutaneous route, the latter avoiding septic events associated with continuous intravenous catheters. U.S. Pat. Nos. 6,521,212 and 6,756,033 describe administration of treprostinil by inhalation for treatment of pulmonary hypertension, peripheral vascular disease and other diseases and conditions. U.S. Pat. No. 6,803,386 discloses administration of treprostinil for treating cancer such as lung, liver, brain, pancreatic, kidney, prostate, breast, colon and head-neck cancer. U.S. patent application publication No. 2005/0165111 discloses treprostinil treatment of ischemic lesions. U.S. Pat. No. 7,199,157 discloses that treprostinil treatment improves kidney functions. U.S. patent application publication No. 2005/0282903 discloses treprostinil treatment of neuropathic foot ulcers. U.S. application Ser. No. 12/028,471 filed Feb. 8, 2008, discloses treprostinil treatment of pulmonary fibrosis. U.S. Pat. No. 6,054,486 discloses treatment of peripheral vascular disease with treprostinil. U.S. patent application Ser. No. 11/873,645 filed Oct. 17, 2007 discloses combination therapies comprising treprostinil. U.S. publication No. 2008/0200449 discloses delivery of treprostinil using a metered dose inhaler. U.S. publication No. 2008/0280986 discloses treatment of interstitial lung disease with treprostinil. U.S. application Ser. No. 12/028,471 filed Feb. 8, 2008 discloses treatment of asthma with treprostinil. U.S. Pat. Nos. 7,417,070, 7,384,978 and U.S. publication Nos. 2007/0078095, 2005/0282901, and 2008/0249167 describe oral formulations of treprostinil and other prostacyclin analogs.

Because Treprostinil, and other prostacyclin derivatives are of great importance from a medicinal point of view, a need exists for an efficient process to synthesize these compounds on a large scale suitable for commercial production.

## SUMMARY

The present invention provides in one embodiment a process for the preparation of a compound of formula I, hydrate, solvate, prodrug, or pharmaceutically acceptable salt thereof.

(I)




The process comprises the following steps:

(a) alkylating a compound of structure II with an alkylating agent to produce a compound of formula III,

(III)




(II)




wherein

w=1, 2, or 3;

$Y_1$ is trans-CH═CH—, cis-CH═CH—, —$CH_2(CH_2)_m$—, or —C≡C—; m is 1, 2, or 3;

$R_7$ is

(1) —$C_pH_{2p}$—$CH_3$, wherein p is an integer from 1 to 5, inclusive,

(2) phenoxy optionally substituted by one, two or three chloro, fluoro, trifluoromethyl, ($C_1$-$C_3$) alkyl, or ($C_1$-$C_3$)alkoxy, with the proviso that not more than two substituents are other than alkyl, with the proviso that $R_7$ is phenoxy or substituted phenoxy, only when $R_3$ and $R_4$ are hydrogen or methyl, being the same or different,

(3) phenyl, benzyl, phenylethyl, or phenylpropyl optionally substituted on the aromatic ring by one, two or three chloro, fluoro, trifluoromethyl, ($C_1$-$C_3$)alkyl, or ($C_1$-$C_3$)alkoxy, with the proviso that not more than two substituents are other than alkyl,

(4) cis-CH═CH—$CH_2$—$CH_3$,

(5) —$(CH_2)_2$—CH(OH)—$CH_3$, or

(6) —$(CH_2)_3$—CH═C$(CH_3)_2$;

wherein —C($L_1$)-$R_7$ taken together is

(1) ($C_4$-$C_7$)cycloalkyl optionally substituted by 1 to 3 ($C_1$-$C_5$)alkyl;

(2) 2-(2-furyl)ethyl,

(3) 2-(3-thienyl)ethoxy, or

(4) 3-thienyloxymethyl;

$M_1$ is α-OH:β-$R_5$ or α-$R_5$:β-OH or α-$OR_2$:β-$R_5$ or α-$R_5$:β-$OR_2$, wherein $R_5$ is hydrogen or methyl, $R_2$ is an alcohol protecting group, and

$L_1$ is α-$R_3$:β-$R_4$, α-$R_4$:β-$R_3$, or a mixture of α-$R_3$:β-$R_4$ and α-$R_4$:β-$R_3$, wherein $R_3$ and $R_4$ are hydrogen, methyl, or fluoro, being the same or different, with the proviso that one of $R_3$ and $R_4$ is fluoro only when the other is hydrogen or fluoro.

(b) hydrolyzing the product of step (a) with a base,

(c) contacting the product of step (b) with a base B to for a salt of formula $I_s$

($I_s$)



(d) reacting the salt from step (c) with an acid to form the compound of formula I.

The present invention provides in another embodiment a process for the preparation of a compound of formula IV.

(IV)



The process comprises the following steps:

(a) alkylating a compound of structure V with an alkylating agent to produce a compound of formula VI,



(VI)



(V)



(b) hydrolyzing the product of step (a) with a base,

(c) contacting the product of step (b) with a base B to for a salt of formula $IV_s$, and

($IV_s$)



(d) reacting the salt from step (b) with an acid to form the compound of formula IV.

DETAILED DESCRIPTION

The various terms used, separately and in combinations, in the processes herein described are defined below.

The expression "comprising" means "including but not limited to." Thus, other non-mentioned substances, additives, carriers, or steps may be present. Unless otherwise specified, "a" or "an" means one or more.

$C_{1-3}$-alkyl is a straight or branched alkyl group containing 1-3 carbon atoms. Exemplary alkyl groups include methyl, ethyl, n-propyl, and isopropyl.

$C_{1-3}$-alkoxy is a straight or branched alkoxy group containing 1-3 carbon atoms. Exemplary alkoxy groups include methoxy, ethoxy, propoxy, and isopropoxy.

$C_{4-7}$-cycloalkyl is an optionally substituted monocyclic, bicyclic or tricyclic alkyl group containing between 4-7

carbon atoms. Exemplary cycloalkyl groups include but not limited to cyclobutyl, cyclopentyl, cyclohexyl, and cycloheptyl.

Combinations of substituents and variables envisioned by this invention are only those that result in the formation of stable compounds. The term "stable", as used herein, refers to compounds which possess stability sufficient to allow manufacture and which maintains the integrity of the compound for a sufficient period of time to be useful for the purposes detailed herein.

As used herein, the term "prodrug" means a derivative of a compound that can hydrolyze, oxidize, or otherwise react under biological conditions (in vitro or in vivo) to provide an active compound. Examples of prodrugs include, but are not limited to, derivatives of a compound that include biohydrolyzable groups such as biohydrolyzable amides, biohydrolyzable esters, biohydrolyzable carbamates, biohydrolyzable carbonates, biohydrolyzable ureides, and biohydrolyzable phosphate analogues (e.g., monophosphate, diphosphate or triphosphate).

As used herein, "hydrate" is a form of a compound wherein water molecules are combined in a certain ratio as an integral part of the structure complex of the compound.

As used herein, "solvate" is a form of a compound where solvent molecules are combined in a certain ratio as an integral part of the structure complex of the compound.

"Pharmaceutically acceptable" means in the present description being useful in preparing a pharmaceutical composition that is generally safe, non-toxic and neither biologically nor otherwise undesirable and includes being useful for veterinary use as well as human pharmaceutical use.

"Pharmaceutically acceptable salts" mean salts which are pharmaceutically acceptable, as defined above, and which possess the desired pharmacological activity. Such salts include acid addition salts formed with organic and inorganic acids, such as hydrogen chloride, hydrogen bromide, hydrogen iodide, sulfuric acid, phosphoric acid, acetic acid, glycolic acid, maleic acid, malonic acid, oxalic acid, methanesulfonic acid, trifluoroacetic acid, fumaric acid, succinic acid, tartaric acid, citric acid, benzoic acid, ascorbic acid and the like. Base addition salts may be formed with organic and inorganic bases, such as sodium, ammonia, potassium, calcium, ethanolamine, diethanolamine, N-methylglucamine, choline and the like. Included in the invention are pharmaceutically acceptable salts or compounds of any of the formulae herein.

Depending on its structure, the phrase "pharmaceutically acceptable salt," as used herein, refers to a pharmaceutically acceptable organic or inorganic acid or base salt of a compound. Representative pharmaceutically acceptable salts include, e.g., alkali metal salts, alkali earth salts, ammonium salts, water-soluble and water-insoluble salts, such as the acetate, amsonate (4,4-diaminostilbene-2,2-disulfonate), benzenesulfonate, benzonate, bicarbonate, bisulfate, bitartrate, borate, bromide, butyrate, calcium, calcium edetate, camsylate, carbonate, chloride, citrate, clavulariate, dihydrochloride, edetate, edisylate, estolate, esylate, fumarate, gluceptate, gluconate, glutamate, glycollylarsanilate, hexafluorophosphate, hexylresorcinate, hydrabamine, hydrobromide, hydrochloride, hydroxynaphthoate, iodide, isothionate, lactate, lactobionate, laurate, malate, maleate, mandelate, mesylate, methylbromide, methylnitrate, methylsulfate, mucate, napsylate, nitrate, N-methylglucamine ammonium salt, 3-hydroxy-2-naphthoate, oleate, oxalate, palmitate, pamoate (1,1-methene-bis-2-hydroxy-3-naphthoate, einbonate), pantothenate, phosphate/diphosphate, picrate, polygalacturonate, propionate, p-toluenesulfonate, salicylate, stearate, subacetate, succinate, sulfate, sulfosalicylate, suramate, tannate, tartrate, teoclate, tosylate, triethiodide, and valerate salts.

The present invention provides for a process for producing treprostinil and other prostacyclin derivatives and novel intermediate compounds useful in the process. The process according to the present invention provides advantages on large-scale synthesis over the existing method. For example, the purification by column chromatography is eliminated, thus the required amount of flammable solvents and waste generated are greatly reduced. Furthermore, the salt formation is a much easier operation than column chromatography. Moreover, it was found that the product of the process according to the present invention has higher purity. Therefore the present invention provides for a process that is more economical, safer, faster, greener, easier to operate, and provides higher purity.

One embodiment of the present invention is a process for the preparation of a compound of formula I, or a hydrate, solvate, prodrug, or pharmaceutically acceptable salt thereof

(I)




The process comprises the following steps:

(a) alkylating a compound of formula II with an alkylating agent to produce a compound of formula III,

(II)




(III)




wherein

w=1, 2, or 3;

$Y_1$ is trans-CH═CH—, cis-CH═CH—, —$CH_2(CH_2)_m$—, or —C≡C—; m is 1, 2, or 3;

$R_7$ is

(1) —$C_pH_{2p}$—$CH_3$, wherein p is an integer from 1 to 5, inclusive,

(2) phenoxy optionally substituted by one, two or three chloro, fluoro, trifluoromethyl, ($C_1$-$C_3$) alkyl, or ($C_1$-$C_3$)alkoxy, with the proviso that not more than two substituents are other than alkyl, with the proviso that

$R_7$ is phenoxy or substituted phenoxy, only when $R_3$ and $R_4$ are hydrogen or methyl, being the same or different,

(3) phenyl, benzyl, phenylethyl, or phenylpropyl optionally substituted on the aromatic ring by one, two or three chloro, fluoro, trifluoromethyl, $(C_1$-$C_3)$alkyl, or $(C_1$-$C_3)$alkoxy, with the proviso that not more than two substituents are other than alkyl,

(4) cis-CH═CH—$CH_2$—$CH_3$,

(5) —$(CH_2)_2$—CH(OH)—$CH_3$, or

(6) —$(CH_2)_3$—CH═$C(CH_3)_2$;

wherein —$C(L_1)$-$R_7$ taken together is

(1) $(C_4$-$C_7)$cycloalkyl optionally substituted by 1 to 3 $(C_1$-$C_5)$alkyl;

(2) 2-(2-furyl)ethyl,

(3) 2-(3-thienyl)ethoxy, or

(4) 3-thienyloxymethyl;

$M_1$ is α-OH:β-$R_5$ or α-$R_5$:β-OH or α-$OR_2$:β-$R_5$ or α-$R_5$:β-$OR_2$, wherein $R_5$ is hydrogen or methyl, $R_2$ is an alcohol protecting group, and

$L_1$ is α-$R_3$:β-$R_4$, α-$R_4$:β-$R_3$, or a mixture of α-$R_3$:β-$R_4$ and α-$R_4$:β-$R_3$, wherein $R_3$ and $R_4$ are hydrogen, methyl, or fluoro, being the same or different, with the proviso that one of $R_3$ and $R_4$ is fluoro only when the other is hydrogen or fluoro.

(b) hydrolyzing the product of step (a) with a base,

(c) contacting the product of step (b) with a base B to for a salt of formula $I_s$

$(I_s)$



(d) reacting the salt from step (c) with an acid to form the compound of formula I.

In one embodiment, the compound of formula I is at least 90.0%, 95.0%, 99.0%.

The compound of formula II can be prepared from a compound of formula XI, which is a cyclization product of a compound of formula X as described in U.S. Pat. No. 6,441,245.

(XI)





(X)



Wherein n is 0, 1, 2, or 3.

The compound of formula II can be prepared alternatively from a compound of formula XIII, which is a cyclization product of a compound of formula XII as described in U.S. Pat. No. 6,700,025.

(XII)



(XIII)



One embodiment of the present invention is a process for the preparation of a compound having formula IV, or a hydrate, solvate, or pharmaceutically acceptable salt thereof.

(IV)



The process comprises

(a) alkylating a compound of structure V with an alkylating agent such as $ClCH_2CN$ to produce a compound of formula VI,

(VI)



(V)



(b) hydrolyzing the product of step (a) with a base such as KOH,

(c) contacting the product of step (b) with a base B such as diethanolamine to for a salt of the following structure, and



(d) reacting the salt from step (b) with an acid such as HCl to form the compound of formula IV.

In one embodiment, the purity of compound of formula IV is at least 90.0%, 95.0%, 99.0%, 99.5%.

In one embodiment, the process further comprises a step of isolating the salt of formula $IV_s$.

In one embodiment, the base B in step (c) may be ammonia, N-methylglucamine, procaine, tromethanine, magnesium, L-lysine, L-arginine, or triethanolamine.

The following abbreviations are used in the description and/or appended claims, and they have the following meanings:

"MW" means molecular weight.

"Eq." means equivalent.

"TLC" means thin layer chromatography.

"HPLC" means high performance liquid chromatography.

"PMA" means phosphomolybdic acid.

"AUC" means area under curve.

In view of the foregoing considerations, and specific examples below, those who are skilled in the art will appreciate that how to select necessary reagents and solvents in practicing the present invention.

The invention will now be described in reference to the following Examples. These examples are not to be regarded as limiting the scope of the present invention, but shall only serve in an illustrative manner.

## Examples

### Example 1

### Alkylation of Benzindene Triol



| Name | MW | Amount | Mol. | Eq. |
|---|---|---|---|---|
| Benzindene Triol | 332.48 | 1250 g | 3.76 | 1.00 |
| $K_2CO_3$ (powder) | 138.20 | 1296 g | 9.38 | 2.50 |
| $ClCH_2CN$ | 75.50 | 567 g | 7.51 | 2.0 |
| $Bu_4NBr$ | 322.37 | 36 g | 0.11 | 0.03 |
| Acetone | — | 29 L | — | — |
| Celite ® 545 | — | 115 g | — | — |

A 50-L, three-neck, round-bottom flask equipped with a mechanical stirrer and a thermocouple was charged with benzindene triol (1250 g), acetone (19 L) and $K_2CO_3$ (powdered) (1296 g), chloroacetonitrile (567 g), tetrabutylammonium bromide (36 g). The reaction mixture was stirred vigorously at room temperature (23±2° C.) for 16-72 h. The progress of the reaction was monitored by TLC. (methanol/$CH_2Cl_2$; 1:9 and developed by 10% ethanolic solution of PMA). After completion of reaction, the reaction mixture was filtered with/without Celite pad. The filter cake was washed with acetone (10 L). The filtrate was concentrated in vacuo at 50-55° C. to give a light-brown, viscous liquid benzindene nitrile. The crude benzindene nitrile was used as such in the next step without further purification.

Example 2

Hydrolysis of Benzindene Nitrile




| Name | MW | Amount | Mol. | Eq. |
|---|---|---|---|---|
| Benzindene Nitrile | 371.52 | 1397 g* | 3.76 | 1.0 |
| KOH | 56.11 | 844 g | 15.04 | 4.0 |
| Methanol | — | 12 L | — | — |
| Water | — | 4.25 L | — | — |

*Note:
This weight is based on 100% yield from the previous step. This is not isolated yield.

A 50-L, cylindrical reactor equipped with a heating/cooling system, a mechanical stirrer, a condenser, and a thermocouple was charged with a solution of benzindene nitrile in methanol (12 L) and a solution of KOH (844 g of KOH dissolved in 4.25 L of water). The reaction mixture was stirred and heated to reflux (temperature 72.2° C.). The progress of the reaction was monitored by TLC (for TLC purpose, 1-2 mL of reaction mixture was acidified with 3M HCl to pH 1-2 and extracted with ethyl acetate. The ethyl acetate extract was used for TLC; Eluent: methanol/$CH_2Cl_2$; 1:9, and developed by 10% ethanolic solution of PMA). After completion of the reaction (~5 h), the reaction mixture was cooled to −5 to 10° C. and quenched with a solution of hydrochloric acid (3M, 3.1 L) while stirring. The reaction mixture was concentrated in vacuo at 50-55° C. to obtain approximately 12-14 L of condensate. The condensate was discarded.

The aqueous layer was diluted with water (7-8 L) and extracted with ethyl acetate (2×6 L) to remove impurities soluble in ethyl acetate. To aqueous layer, ethyl acetate (22 L) was added and the pH of reaction mixture was adjusted to 1-2 by adding 3M HCl (1.7 L) with stirring. The organic layer was separated and the aqueous layer was extracted with ethyl acetate (2×11 L). The combined organic layers were washed with water (3×10 L) and followed by washing with a solution of $NaHCO_3$ (30 g of $NaHCO_3$ dissolved in 12 L of water). The organic layer was further washed with saturated solution of NaCl (3372 g of NaCl dissolved in water (12 L)) and dried over anhydrous $Na_2SO_4$ (950-1000 g), once filtered.

The filtrate was transferred into a 72-L reactor equipped with mechanical stirrer, a condenser, and a thermocouple. To the solution of treprostinil in reactor was added activated carbon (110-130 g). The suspension was heated to reflux (temperature 68-70° C.) for at least one hour. For filtration, a pad of Celite®545 (300-600 g) was prepared in sintered glass funnel using ethyl acetate. The hot suspension was filtered through the pad of Celite®545. The Celite®545 was washed with ethyl acetate until no compound was seen on TLC of the washings.

The filtrate (pale-yellow) was reduced to volume of 35-40 L by evaporation in vacuo at 50-55° C. for direct use in next step.

Example 3

Conversion of Treprostinil to Treprostinil Diethanolamine Salt (1:1)




| Name | MW | Amount | Mol | Eq |
|---|---|---|---|---|
| Treprostinil | 390.52 | 1464 g* | 3.75 | 1.0 |
| Diethanolamine | 105.14 | 435 g | 4.14 | 1.1 |
| Ethanol | — | 5.1 L | — | — |
| Ethyl acetate | — | 35 L** | — | — |

-continued

| Name | MW | Amount | Mol | Eq |
|---|---|---|---|---|
| Treprostinil Diethanolamine Salt (seed) | — | 12 g | — | — |

*Note:
This weight is based on 100% yield from benzindene triol. It is not isolated yield. The treprostinil was carried from previous step in ethyl acetate solution and used as such for this step.
**Note:
The total volume of ethyl acetate should be in range of 35-36 L (it should be 7 times the volume of ethanol used). Approximately 35 L of ethyl acetate was carried over from previous step and additional 1.0 L of ethyl acetate was used for rinsing the flask.

A 50-L, cylindrical reactor equipped with a heating/cooling system, a mechanical stirrer, a condenser, and a thermocouple was charged with a solution of treprostinil in ethyl acetate (35-40 L from the previous step), anhydrous ethanol (5.1 L) and diethanolamine (435 g). While stirring, the reaction mixture was heated to 60-75° C., for 0.5-1.0 h to obtain a clear solution. The clear solution was cooled to 55±5° C. At this temperature, the seed of polymorph B of treprostinil diethanolamine salt (~12 g) was added to the clear solution. The suspension of polymorph B was stirred at this temperature for 1 h. The suspension was cooled to 20±2° C. overnight (over a period of 16-24 h). The treprostinil diethanolamine salt was collected by filtration using Aurora filter equipped with filter cloth, and the solid was washed with ethyl acetate (2×8 L). The treprostinil diethanolamine salt was transferred to a HDPE/glass container for air-drying in hood, followed by drying in a vacuum oven at 50±5° C. under high vacuum.

At this stage, if melting point of the treprostinil diethanolamine salt is more than 104° C., it was considered polymorph B. There is no need of recrystallization. If it is less than 104° C., it is recrystallized in EtOH-EtOAc to increase the melting point.

Data on Treprostinil Diethanolamine Salt (1:1)

| Batch No. | Wt. of Benzindene Triol (g) | Wt. of Treprostinil Diethanolamine Salt (1:1) (g) | Yield (%) | Melting point (° C.) |
|---|---|---|---|---|
| 1 | 1250 | 1640 | 88.00 | 104.3-106.3 |
| 2 | 1250 | 1528 | 82.00* | 105.5-107.2 |
| 3 | 1250 | 1499 | 80.42** | 104.7-106.6 |
| 4 | 1236 | 1572 | 85.34 | 105-108 |

*Note:
In this batch, approximately 1200 mL of ethyl acetate solution of treprostinil before carbon treatment was removed for R&D carbon treatment experiments.
**Note:
This batch was recrystallized, for this reason yield was lower.

## Example 4

### Heptane Slurry of Treprostinil Diethanolamine Salt (1:1)

| Name | Batch No. | Amount | Ratio |
|---|---|---|---|
| Treprostinil Diethanolamine Salt | 1 | 3168 g | 1 |
| Heptane | — | 37.5 L | 12 |
| Treprostinil Diethanolamine Salt | 2 | 3071 g | 1 |
| Heptane | — | 36.0 L | 12 |

A 50-L, cylindrical reactor equipped with a heating/cooling system, a mechanical stirrer, a condenser, and a thermocouple was charged with slurry of treprostinil diethanolamine salt in heptane (35-40 L). The suspension was heated to 70-80° C. for 16-24 h. The suspension was cooled to 22±2° C. over a period of 1-2 h. The salt was collected by filtration using Aurora filter. The cake was washed with heptane (15-30 L) and the material was dried in Aurora filter for 1 h. The salt was transferred to trays for air-drying overnight in hood until a constant weight of treprostinil diethanolamine salt was obtained. The material was dried in oven under high vacuum for 2-4 h at 50-55° C.

Analytical Data on and Treprostinil Diethanolamine Salt (1:1)

| Test | Batch 1 | Batch 2 |
|---|---|---|
| IR | Conforms | Conforms |
| Residue on Ignition (ROI) | <0.1% w/w | <0.1% w/w |
| Water content | 0.1% w/w | 0.0% w/w |
| Melting point | 105.0-106.5° C. | 104.5-105.5° C. |
| Specific rotation $[\alpha]^{25}_{589}$ | +34.6° | +35° |
| Organic volatile impurities | | |
| Ethanol | Not detected | Not detected |
| Ethyl acetate | Not detected | <0.05% w/w |
| Heptane | <0.05% w/w | <0.05% w/w |
| HPLC (Assay) | 100.4% | 99.8% |
| Diethanolamine | Positive | Positive |

## Example 5

### Conversion of Treprostinil Diethanolamine Salt (1:1) to Treprostinil




A 250-mL, round-bottom flask equipped with magnetic stirrer was charged with treprostinil diethanolamine salt (4 g) and water (40 mL). The mixture was stirred to obtain a clear solution. To the clear solution, ethyl acetate (100 mL) was added. While stirring, 3M HCl (3.2 mL) was added slowly until pH ~1 was attained. The mixture was stirred for 10 minutes and organic layer was separated. The aqueous layer was extracted with ethyl acetate (2×100 mL). The

combined organic layers was washed with water (2×100 mL), brine (1×50 mL) and dried over anhydrous $Na_2SO_4$. The ethyl acetate solution of treprostinil was filtered and the filtrate was concentrated under vacuum at 50° C. to give off-white solid. The crude treprostinil was recrystallized from 50% ethanol in water (70 mL). The pure treprostinil was collected in a Buchner funnel by filtration and cake was washed with cold 20% ethanolic solution in water. The cake of treprostinil was air-dried overnight and further dried in a vacuum oven at 50° C. under high vacuum to afford 2.9 g of treprostinil (Yield 91.4%, purity (HPLC, AUC, 99.8%).

Analytical Data on Treprostinil from Treprostinil Diethanolamine Salt (1:1) to Treprostinil

| Batch No. | Yield | Purity (HPLC) |
|---|---|---|
| 1 | 91.0% | 99.8% (AUC) |
| 2 | 92.0% | 99.9% (AUC) |
| 3 | 93.1% | 99.7% (AUC) |
| 4 | 93.3% | 99.7% (AUC) |
| 5 | 99.0 % | 99.8% (AUC) |
| 6 | 94.6% | 99.8% (AUC) |

## Example 6

### Comparison of the Former Process and a Working Example of the Process According to the Present Invention

| Step No. | Steps | Former Process (Batch size: 500 g) | Working example of the Process according to the present invention (Batch size: 5 kg) |
|---|---|---|---|
| | Nitrile | | |
| 1 | Triol weight | 500 g | 5,000 g |
| 2 | Acetone | 20 L (1:40 wt/wt) | 75 L (1:15 wt/wt) |
| 3 | Potassium carbonate | 1,300 g (6.4 eq) | 5,200 g (2.5 eq) |
| 4 | Chloroacetonitrile | 470 g (4.2 eq) | 2,270 g (2 eq) |
| 5 | Tetrabutyl-ammonium bromide | 42 g (0.08 eq) | 145 g (0.03 eq) |
| 6 | Reactor size | 72-Liter | 50-gallon |
| 7 | Reflux time | 8 hours | No heating, Room temperature (r.t.) 45 h |
| 8 | Hexanes addition before filtration | Yes (10 L) | No |
| 9 | Filter | Celite | Celite |
| 10 | Washing | Ethyl acetate (10 L) | Acetone (50 L) |
| 11 | Evaporation | Yes | Yes |
| 12 | Purification | Silica gel column Dichloromethane: 0.5 L Ethyl acetate: 45 L Hexane: 60 L | No column |
| 13 | Evaporation after column | Yes | No |
| 14 | Yield of nitrite | 109-112% | Not checked |
| | Treprostinil (intermediate) | | |
| 15 | Methanol | 7.6 L (50-L reactor) | 50 L (50-gal reactor) |
| 16 | Potassium hydroxide | 650 g (8 eq) | 3,375g (4 eq) |
| 17 | Water | 2.2 L | 17 L |
| 18 | % of KOH | 30% | 20% |
| 19 | Reflux time | 3-3.5 h | 4-5 h |
| 20 | Acid used | 2.6 L (3M) | 12 L (3M) |

-continued

| Step No. | Steps | Former Process (Batch size: 500 g) | Working example of the Process according to the present invention (Batch size: 5 kg) |
|---|---|---|---|
| 21 | Removal of impurities | 3 × 3 L Ethyl acetate | 2 × 20 L Ethyl acetate |
| 22 | Acidification | 0.7 L | 6.5 L |
| 23 | Ethyl acetate extraction | 5 × 17 L = 35 L | 90 + 45 + 45 = 180 L |
| 24 | Water washing | 2 × 8 L | 3 × 40 L |
| 25 | Sodium bicarbonate washing | Not done | 120 g in 30 L water + 15 L brine |
| 26 | Brine washing | Not done | 1 × 40 L |
| 27 | Sodium sulfate | 1 kg | Not done |
| 28 | Sodium sulfate filtration | Before charcoal, 6 L ethyl acetate | N/A |
| 29 | Charcoal | 170 g, reflux for 1.5 h, filter over Celite, 11 L ethyl acetate | Pass hot solution (75° C.) through charcoal cartridge and clean filter, 70 L ethyl acetate |
| 30 | Evaporation | Yes, to get solid intermediate treprostinil | Yes, adjust to 150 L solution |
| | Treprostinil Diethanolamine Salt | | |
| 31 | Salt formation | Not done | 1,744 g diethanolamine, 20 L ethanol at 60-75° C. |
| 32 | Cooling | N/A | To 20° C. over weekend; add 40 L ethyl acetate; cooled to 10° C. |
| 33 | Filtration | N/A | Wash with 70 L ethyl acetate |
| 34 | Drying | N/A | Air-dried to constant wt., 2 days |
| | Treprostinil (from 1.5 kg Treprostinil diethanolamine salt) | | |
| 35 | Hydrolysis | N/A | 15 L water + 25 L ethyl acetate + HCl |
| 36 | Extraction | N/A | 2 × 10 L ethyl acetate |
| 37 | Water wash | N/A | 3 × 10 L |
| 38 | Brine wash | N/A | 1 × 10 L |
| 39 | Sodium sulfate | N/A | 1 kg, stir |
| 40 | Filter | N/A | Wash with 6 L ethyl acetate |
| 41 | Evaporation | N/A | To get solid, intermediate Treprostinil |
| 42 | Crude drying on tray | 1 or 3 days | Same |
| 43 | Ethanol & water for cryst. | 5.1 L + 5.1 L | 10.2 L + 10.2 L (same %) |
| 44 | Crystallization in | 20-L rotavap flask | 50-L jacketed reactor |
| 45 | Temperature of crystallization | 2 h r.t., fridge −0° C. 24 h | 50° C. to 0° C. ramp, 0° C. overnight |
| 46 | Filtration | Buchner funnel | Aurora filter |
| 47 | Washing | 20% (10 L) cooled ethanol-water | 20% (20 L) cooled ethanol-water |
| 48 | Drying before oven | Buchner funnel (20 h) Tray (no) | Aurora filter (2.5 h) Tray (4 days) |
| 49 | Oven drying | 15 hours, 55° C. | 6-15 hours, 55° C. |
| 50 | Vacuum | <−0.095 mPA | <5 Torr |
| 51 | UT-15 yield weight | ~535 g | ~1,100 g |
| 52 | % yield from triol) | ~91% | ~89% |
| 53 | Purity | ~99.0% | 99.9% |

The quality of treprostinil produced according to this invention is excellent. The purification of benzindene nitrile

by column chromatography is eliminated. The impurities carried over from intermediate steps (i.e. alkylation of triol and hydrolysis of benzindene nitrile) are removed during the carbon treatment and the salt formation step. Additional advantages of this process are: (a) crude treprostinil salts can be stored as raw material at ambient temperature and can be converted to treprostinil by simple acidification with diluted hydrochloric acid, and (b) the treprostinil salts can be synthesized from the solution of treprostinil without isolation. This process provides better quality of final product as well as saves significant amount of solvents and manpower in purification of intermediates.

Although the foregoing refers to particular preferred embodiments, it will be understood that the present invention is not so limited. It will occur to those of ordinary skill in the art that various modifications may be made to the disclosed embodiments and that such modifications are intended to be within the scope of the present invention.

All of the publications, patent applications and patents cited in this specification are incorporated herein by reference in their entirety.

What is claimed is:

**1**. A pharmaceutical batch consisting of treprostinil or a salt thereof and impurities resulting from (a) alkylating a benzindene triol, (b) hydrolyzing the product of step (a) to form a solution comprising treprostinil, (c) containing the solution comprising treprostinil from step (b) with a base to form a salt of treprostinil, (d) isolating the salt of treprostinil, and (e) optionally reacting the salt of treprostinil with an acid to form treprostinil, and

wherein the pharmaceutical batch contains at least 2.9 g of treprostinil or its salt.

**2**. The pharmaceutical batch of claim **1**, which has been dried under vacuum.

**3**. A pharmaceutical product comprising a therapeutically effective amount of treprostinil from a pharmaceutical batch as claimed in claim **1**.

**4**. A pharmaceutical product comprising a therapeutically effective amount of a salt treprostinil from a pharmaceutical batch as claimed in claim **1**.

**5**. The product of claim **4**, wherein the salt is the diethanolamine salt of treprostinil.

**6**. A method of preparing a pharmaceutical product from a pharmaceutical batch as claimed in claim **1**, comprising storing a pharmaceutical batch of a salt of treprostinil as claimed in claim **1** at ambient temperature, and preparing a pharmaceutical product from the pharmaceutical batch after storage.

**7**. A method as claimed in claim **6**, wherein the salt of treprostinil is a diethanolamine salt.

**8**. A method of preparing a pharmaceutical batch as claimed in claim **1**, comprising (a) alkylating a benzindene triol, (b) hydrolyzing the product of step (a) to form a solution comprising treprostinil, (c) contacting the solution comprising treprostinil from step (b) with a base to form a salt of treprostinil, (d) isolating the salt of treprostinil, and (e) optionally reacting the salt of treprostinil with an acid to form treprostinil.

**9**. A method as claimed in claim **8**, wherein the salt of treprostinil is a diethanolamine salt.

* * * * *

UNITED STATES PATENT AND TRADEMARK OFFICE

# CERTIFICATE OF CORRECTION



PATENT NO. : 9,604,901 B2
APPLICATION NO. : 14/754932
DATED : March 28, 2017
INVENTOR(S) : Hitesh Batra et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

In the Claims

Column 17, Claim 1, Line 27, "(c) containing the" should be --(c) contacting the--.

Signed and Sealed this
Sixteenth Day of May, 2017

Michelle K. Lee

Michelle K. Lee
*Director of the United States Patent and Trademark Office*

US010716793B2

(12) **United States Patent**
**Olschewski et al.**

(10) **Patent No.: US 10,716,793 B2**
(45) **Date of Patent: *Jul. 21, 2020**

(54) **TREPROSTINIL ADMINISTRATION BY INHALATION**

(71) Applicant: **United Therapeutics Corporation**, Silver Spring, MD (US)

(72) Inventors: **Horst Olschewski**, Graz (AT); **Robert Roscigno**, Chapel Hill, NC (US); **Lewis J. Rubin**, LaJolla, CA (US); **Thomas Schmehl**, Giessen (DE); **Werner Seeger**, Giessen (DE); **Carl Sterritt**, Weybridge (GB); **Robert Voswinckel**, Giessen (DE)

(73) Assignee: **United Therapeutics Corporation**, Silver Spring, MD (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **16/778,662**

(22) Filed: **Jan. 31, 2020**

(65) **Prior Publication Data**

US 2020/0171044 A1 Jun. 4, 2020

**Related U.S. Application Data**

(60) Continuation of application No. 16/536,954, filed on Aug. 9, 2019, which is a continuation of application No. 15/011,999, filed on Feb. 1, 2016, now Pat. No. 10,376,525, which is a division of application No. 13/469,854, filed on May 11, 2012, now Pat. No. 9,339,507, which is a division of application No. 12/591,200, filed on Nov. 12, 2009, now Pat. No. 9,358,240, which is a continuation of application No. 11/748,205, filed on May 14, 2007, now abandoned.

(60) Provisional application No. 60/800,016, filed on May 15, 2006.

(51) **Int. Cl.**
***A61K 31/557*** (2006.01)
***A61K 9/00*** (2006.01)
***A61K 31/192*** (2006.01)

(52) **U.S. Cl.**
CPC ............ ***A61K 31/557*** (2013.01); ***A61K 9/008*** (2013.01); ***A61K 9/0078*** (2013.01); ***A61K 31/192*** (2013.01)

(58) **Field of Classification Search**
None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

3,664,337 A 5/1972 Lindsey et al.
4,001,650 A 1/1977 Romain
4,007,238 A 2/1977 Glenn
4,281,113 A 7/1981 Axen et al.
4,306,075 A 12/1981 Aristoff
4,306,076 A 12/1981 Nelson
4,349,689 A 9/1982 Aristoff
4,473,296 A 9/1984 Shofner et al.
4,486,598 A 12/1984 Aristoff
4,495,944 A 1/1985 Brisson et al.
4,635,647 A 1/1987 Choksi
4,668,814 A 5/1987 Aristoff
4,677,975 A 7/1987 Edgar et al.
4,683,330 A 7/1987 Aristoff
4,692,464 A 9/1987 Skuballa et al.
4,708,963 A 11/1987 Skuballa et al.
4,976,259 A 12/1990 Higson et al.
4,984,158 A 1/1991 Hillsman
5,063,922 A 11/1991 Hakkinen
5,080,093 A 1/1992 Raabe et al.
5,153,222 A 10/1992 Tadepalli et al.
5,234,953 A 8/1993 Crow et al.
5,322,057 A 6/1994 Raabe et al.
5,361,989 A 11/1994 Merchat et al.
5,363,842 A 11/1994 Mishelevich et al.
5,497,763 A 3/1996 Lloyd et al.
5,551,416 A 9/1996 Stimpson et al.
5,727,542 A 3/1998 King
5,865,171 A 2/1999 Cinquin
5,881,715 A 3/1999 Shibasaki
5,908,158 A 6/1999 Cheiman
6,054,486 A 4/2000 Crow et al.
6,123,068 A 9/2000 Lloyd et al.
6,357,671 B1 3/2002 Cewers
6,521,212 B1 2/2003 Gilles et al.
6,626,843 B2 9/2003 Hillsman
6,756,033 B2 6/2004 Cloutier et al.
6,765,117 B2 7/2004 Moriarty et al.
(Continued)

FOREIGN PATENT DOCUMENTS

AU 1999959533 B2 2/2000
DE 19838711 C1 6/2000
(Continued)

OTHER PUBLICATIONS

Abe et al., "Effects of inhaled prostacyclin analogue on chronic hypoxic pulmonary hypertension," J. Cardiovascular Pharmacology, 2001, 37, 239 251.
Agnew JE, Bateman RM, Pavia D, Clarke SW. (1984) Radionuclide demonstration of ventilatory abnormalities in mild asthma. Clinical Science; 66: 525-531.
(Continued)

*Primary Examiner* — Jeffrey S Lundgren
*Assistant Examiner* — Michael J Schmitt
(74) *Attorney, Agent, or Firm* — Foley & Lardner LLP

(57) **ABSTRACT**

Treprostinil can be administered using a metered dose inhaler. Such administration provides a greater degree of autonomy to patients. Also disclosed are kits that include a metered dose inhaler containing a pharmaceutical formulation containing treprostinil.

**8 Claims, 12 Drawing Sheets**

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 6,803,386 | B2 | 10/2004 | Shorr et al. | |
| 6,809,223 | B2 | 10/2004 | Moriarty et al. | |
| 7,172,557 | B1 | 2/2007 | Parker | |
| 7,199,157 | B2 | 4/2007 | Wade et al. | |
| 7,261,102 | B2 | 8/2007 | Barney et al. | |
| 7,384,978 | B2 | 6/2008 | Phares et al. | |
| 7,417,070 | B2 | 8/2008 | Phares et al. | |
| 7,544,713 | B2 | 6/2009 | Phares et al. | |
| 7,726,303 | B2 | 7/2010 | Tyvoll et al. | |
| 9,339,507 | B2 * | 5/2016 | Olschewski | A61P 9/12 |
| 9,358,240 | B2 * | 6/2016 | Olschewski | A61P 43/00 |
| 10,376,525 | B2 * | 8/2019 | Olschewski | A61P 11/00 |
| 2003/0192532 | A1 | 10/2003 | Hopkins | |
| 2004/0063912 | A1 | 4/2004 | Blumberg et al. | |
| 2004/0105819 | A1 | 6/2004 | Hale et al. | |
| 2004/0149282 | A1 | 8/2004 | Hickle | |
| 2004/0265238 | A1 | 12/2004 | Chaudry | |
| 2005/0165111 | A1 | 7/2005 | Wade et al. | |
| 2005/0166913 | A1 | 8/2005 | Sexton et al. | |
| 2005/0183719 | A1 | 8/2005 | Wuttke et al. | |
| 2005/0282901 | A1 | 12/2005 | Phares et al. | |
| 2006/0147520 | A1 | 7/2006 | Ruegg | |
| 2006/0201500 | A1 | 9/2006 | Von Hollen et al. | |
| 2008/0200449 | A1 | 8/2008 | Olschewski et al. | |
| 2008/0280986 | A1 | 11/2008 | Wade et al. | |
| 2009/0036465 | A1 | 2/2009 | Roscigno et al. | |
| 2010/0076083 | A1 | 3/2010 | Olschewski et al. | |
| 2010/0236545 | A1 | 9/2010 | Kern | |
| 2010/0282622 | A1 | 11/2010 | Phares | |
| 2012/0177693 | A1 | 7/2012 | Cipolla et al. | |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| DE | 19934582 | A1 | 1/2001 |
| FR | 2783431 | A1 | 3/2000 |
| JP | 2003-522003 | A | 7/2003 |
| JP | 2004-512101 | A | 4/2004 |
| JP | 2005-034341 | A | 2/2005 |
| WO | WO 93/00951 | A1 | 1/1993 |
| WO | WO 01/58514 | A1 | 8/2001 |
| WO | WO 01/85241 | A1 | 11/2001 |
| WO | WO 02/34318 | A2 | 5/2002 |

OTHER PUBLICATIONS


Annals of the International Commission on Radiological Protection (ICRP) vol. 28, No. 3, 1998, Publication 80, Radiation Dose to Patients from Radiopharmaceuticals.

Aradigm Corporation news release Oct. 24, 2005, "Aradigm and United Therapeutics Sign Development and Commercialization Agreement Targeting Pulmonary Hypertension," Red Orbit News, http://www.redorbit.com/modules/news/tools.php?tool–print&id–281787, 2 pages.

Aristoff et al., "Synthesis of benzopyran prostaglandins, potent stable prostacyclin analogs, via an intermolecular mitsunobu reaction," Tetrahedron Letters, 1984, 25(36):3955-3958.

Badesch et al., "Prostanoid Therapy for Pulmonary Arterial Hypertension," Journal of the American College of Cardiology, 2004, 43(12:Suppl.S):56S-61S.

Bein et al., "Cardiovascular and pulmonary effects of aerosolized prostacyclin administration in severe respiratory failure using a ventilator nebulization system," J. Cardiovascular Pharmacology, 1996, 27, 583-586.

Benedict et al., "Evidence-based pharmacologic management of pulmonary arterial hypertension," Clinical Therapeutics, 2007, 29, 2134-2153.

Bindl et al., "Aerosolised prostacyclin for pulmonary hypertension in neonates," Archives of disease in childhood, Fetal and neonatal edition, 1994, 71(3), F214-6.

Blanchard, J.D., Cipolla, D., Liu, K., Morishige, R., Mudumba, S., Thipphawong, J., Taylor, G., Warren, S., Radhakrishnan, R., Van Vlasselaer, R., Visor , G. and Starko, K. (2003) Lung Deposition of Interferon Gamma-1b following Inhalation via AERx® System vs. Respirgard II™ Nebulizer Proc. ATS Annual Meeting (Abstract A373), Seattle.

Booke et al., "Prostaglandins in Patients with Pulmonary Hypertension: The Route of Administration," Anesth. Analg., 1998, 86:917, Letter to the Editor.

Boyd, B., Noymer, P., Liu, K., Okikawa, J., Hasegawa, D., Warren, S., Taylor, G., Ferguson, E., Schuster, J., Farr, S., and Gonda, I. (2004) Effect of Gender and Device Mouthpiece Shape on Bolus Insulin Aerosol Delivery Using the AERx Pulmonary Delivery System. Pharmaceutical Research. 21 (10) 1776-1782.

Byron, Peter R., "Drug Delivery Devices, Issues in Drug Development," Proc. Am. Thorac. Soc., 2004, 1:321-328.

Channick et al., "Safety and efficacy of inhaled treprostinil as add-on therapy to bosentan in pulmonary arterial hypertension," J. American College of Cardiology, 2006, 48, 1433-1437.

Colthorpe P, Taylor G, Farr SJ. (1997) A comparison of two non-invasive methods for quantifying aerosol deposition in the lungs of rabbits. J. Aerosol Med.; 10:255.

Defendant Watson Laboratories, Inc.'s Invalidity Contentions for U.S. Pat. No. 9,339,507 and 9,358,240, in The United States District Court for the District of New Jersey, Civil Action No. 3.15:cv-05723-PGS-LHG, Aug. 5, 2016. 56 pages.

Doyle et al., "Inhaled prostacyclin as a selective pulmonary vasodilator," Anaesthesia and Intensive Care, Aug. 1996, 24(4):514-515.

Dumas et al,. "Hypoxic pulmonary vasoconstriction," General Pharmacology, 1999, 33, 289-297.

Dworetz et al., "Survival of infants with persistent pulmonary hypertension without extracorporeal membrane oxygenation," Pediatrics, 1989, 84, 1-6.

EPA Integrated Risk Information System (IRIS): data sheet for 3-methylphenol (m-cresol). Accessed at http://www.epa.gov/iris/subst/0301/htm on Mar. 9, 2014.

EU Community Register. Annexes to Commission Decision C(2005)3436, Sep. 5, 2005, http://ec.europa.eu/health/documents/communityregister/2005/20050905 10259/anx_10259_en.pdf (Annex III—Ventavis® Labelling and Package Leaflet). 30 pages.

Ewert et al., "Aerosolized iloprost for primary pulmonary hypertension," New England Journal of Medicine, 2000, 343, 1421-1422.

Ewert et al., "Iloprost als inhalative bzw. Intravenose langzeitbehandlung von patienten mit primarer pulmonaler hypertonie," Z. Kardiol., 2000, 89, 987-999.

Farr et al., "Comparison of in vitro and in vivo efficiencies of a novel unit-dose liquid aerosol generator and a pressurized metered dose inhaler," International Journal of Pharmaceutics, 2000, 198:63-70.

Final Office Action dated Oct. 10, 2014 in U.S. Appl. No. 12/591,200.

Final Office Action dated Oct. 17, 2012 in U.S. Appl. No. 12/591,200.

Final Office Action dated Nov. 4, 2013 in U.S. Appl. No. 12/303,877.

Final Office Action dated Dec. 22, 2011 in U.S. Appl. No. 12/591,200.

Final Office Action dated Jul. 2, 2013 in U.S. Appl. No. 13/120,015.

Final Office Action dated Jul. 20, 2015 in U.S. Appl. No. 13/120,015.

Final Office Action dated Aug. 1, 2012 in U.S. Appl. No. 12/303,877.

Findlay et al., "Radioimmunoassay for the Chemical Stable Prostacyclin Analog, 15AU81: a Preliminary Pharmacokinetics Study in the Dog." Prostaglandins Leukot. Essent. Fatty Acids, Feb. 1993, 48(2):167-174.

Fink et al., "Use of Prostacyclin and its Analogues in the Treatment of Cardiovascular Disease," Heart Disease, 1999, 1:29-40.

Gessler et al., "Ultrasonic versus jet nebulization of iloprost in severe pulmonary hypertension," Eur. Respir. J., 2001, 17, 14-19.

Ghofrani et al., "Hypoxia- and non-hypoxia-related pulmonary hypertension—Established and new therapies," Cardiovascular Research, 2006, 72:30-40.

Ghofrani et al., "New therapies in the treatment of pulmonary hypertension," Herz (Heart), 2005, 4:296-302, with English translation.

Hallioglu et al., "Comparison of Acute Hemodynamic Effects of Aerosolized and Intravenous *Iloprost* in Secondary Pulmonary Hypertension in Children With Congenital Heart Disease," Am. J. Cardiol., 2003, 92:1007-1009.

(56) **References Cited**

OTHER PUBLICATIONS

Haraldsson et al., "Comparison of inhaled nitric oxide and inhaled aerosolized prostacyclin in the evaluation of heart transplant candidates with elevated pulmonary vascular resistance," Chest, 1998, 114, 780-786.
Hoeper et al., "A comparison of the acute hemodynamic effects of inhaled nitric oxide and aerosolized iloprost in primary hypertension," J. American College of Cardiology, 2000, 35, 176-182.
Hoeper et al., "Effects of inhaled nitric oxide and aerosolized iloprost in pulmonary veno-occlusive disease," Respiratory Medicine, 1999, 93. 62-70.
Hoeper et al., "Long term treatment of primary pulmonary hypertension with aerosolized iloprost, a prostacyclin analogue," New England Journal of Medicine, 2000, 342, 1866-1870.
Horn et al., "Treprostinil therapy for pulmonary artery hypertension," Expert Opinion on Investigational Drugs, 2002, 11(11):1615-1622.
Howarth, P.H., "Why particle size should affect clinical response to inhaled therapy," Journal of Aerosol Medicine, 2001, 14 Supp. 1, S-27-S-34.
Ichida et al., "Additive effects of beraprost on pulmonary vasodilation by inhaled nitric oxide in children with pulmonary hypertension," American Journal of Cardiology, 1997, 80, 662-664.
Konorza et al., "Klinisch-pharmakologische Austestung bei pulmonaler Hypertonie zur Therapiefuehrung," Herz, 2005, 30:286-295, English abstract on first page.
Krause et al., "Pharmacokinetics and pharmacodynamics of the prostacyclin analogue iloprost in man," Eur. J. Clin. Pharmacol., 1986, 30, 61-68.
Labiris et al., "Pulmonary drug delivery. Part II: The role of inhalant delivery devices and drug formulations in therapeutic effectiveness of aerosolized medications," Br. J. Clin. Pharmacol., 2003, 56(6):600-612.
Lee et al., "Current strategies for pulmonary arterial hypertension," J. Internal Medicine, 2005, 258, 199-215.
Martin, John C., "Inhaled Form of Remodulin in the Pipeline," http://www.phneighborhood.com/content/in_the_news/archive_2320,aspx, ph Neighborhood, Oct. 28, 2005, 2 pages.
Max et al., "Inhaled prostacyclin in the treatment of pulmonary hypertension," Eur. J. Pediatr., 1999, 158 Suppl 1, S23-S26.
McNulty et al., "The Pharmacokinetics and Pharmacodynamics of the Prostacyclin Analog 15AU81 in the Anesthetized Beagle Dog," Prostaglandins Leukot. Essent. Fatty Acids, Feb. 1993, 48(2):159-166.
Miller et al., "Standardisation of spirometry. Series ATS/ERS Task Force: Standardisation of Lung Function Testing" Eur Respir J 2005; 26: 319-338.
Mueller et al., "Inhaled iloprost in the management of pulmonary hypertension in infants undergoing congenital heart surgery," European Journal of Anaesthesiology, Jun. 2004, 21(Suppl.33):3, Abstract No. 084.
National Radiological Protection Board. Doses to Patients from Medical Radiological Examinations in Great Britain. (1986) Radiological Protection Bulletin No. 77.
Nebu-Tec med. Produkte Eike Kern GmbH, VENTA-NEB®-ir A-I-C-I® Operating Instrutions, Sep. 2005.
Non-Final Office Action dated Jan. 29, 2015 in U.S. Appl. No. 13/120,015.
Non-Final Office Action dated Oct. 11, 2011 in U.S. Appl. No. 12/303,877.
Non-Final Office Action dated Oct. 31, 2012 in U.S. Appl. No. 13/120,015.
Non-Final Office Action dated Dec. 30, 2014 in U.S. Appl. No. 12/303,877.
Non-Final Office Action dated Mar. 15, 2013 in U.S. Appl. No. 12/303,877.
Non-Final Office Action dated Mar. 9, 2014 in U.S. Appl. No. 12/591,200.
Notes for Guidance on the Clinical Administration of Radiopharmaceuticals and Use of Sealed Radioactive Sources. Administration of Radioactive Substances Advisory Committee (ARSAC) (Mar. 2006). ARSAC Secretariat, Chilton, Didcot, Oxon. OX11 0RQ.
Notice of Allowance dated Jun. 11, 2015 in U.S. Appl. No. 12/303,877.
Olschewski et al. For the German PPH Study Group, "Inhaled iloprost to treat severe pulmonary hypertension An uncontrolled trial," Annals of Internal Medicine, 2000, 132, 435-443.
Olschewski et al., Aerosolized prostacyclin and iloprost in severe pulmonary hypertension,: Annals of Internal Medicine, 1996, 124, 820 824.
Olschewski et al., "Inhaled Iloprost for Severe Pulmonary Hypertension," N. Eng. J. Med., Aug. 1, 2002, 347(5):322-329.
Olschewski et al., "Inhaled prostacyclin and iloprost in severe pulmonary hypertension secondary to lung fibrosis," Am. Respir. Crit. Care Med., 1999, 160, 600-607.
Olschewski et al., "Pharmacodynamics and pharmacokinetics of inhaled iloprost, aerosolized by three different devices, in severe pulmonary hypertension," Chest, 2003, 124, 1294-1304.
Olschewski et al., "Prostacyclin and its analogues in the treatment of pulmonary hypertension," Pharmacology and Therapeutics, 2004, 102, 139-153.
Olschewski et al., "Recovery from circulatory shock in severe primary pulmonary hypertension (PPH) with aerosolization of iloprost," Intensive Care Med., 1998, 24, 631-634.
Olschewski, Horst, "Therapie der pulmonalen Hypertonie," Pneumologe, 2004, 1:95-101.
OPTINEB®-ir Operating Instructions, Unit Type ON-100/2-2.4 MHz, 2005, 33 pages, verified English translation.
Pappert et al., "Aerosolized Prostacyclin Versus Inhaled Nitric Oxide in Children with Severe Acute Respiratory Distress Syndrome," Anesthesiology, Jun. 1995, 82(6):1507-1511.
Publications of the International Commission on Radiological Protection (ICRP) (1977) Recommendations of the International Commission on Radiological Protection 26.
Pulmonary Delivery, ONdrugDelivery, 2006, 5 pages.
Rigby, Jonathan, Aradigm Corporation, "Technological advances for success: Product pipeline in targeted pulmonary delivery," Pulmonary Delivery Innovative Technologies Breathing New Life into Inhalable Therapeutics, ONdrugDelivery, http://www.ondrugdelivery.com/publications/Pulmonary.pdf, 2006, 17-19.
Rubin et al., "Pulmonary Arterial Hypertension: A Look to the Future," Journal of the American College of Cardiology, Jun. 18, 2004, 43(12,Suppl.S):89S-90S.
Saini et al., "Effect of Electrostatic Charge and Size Distributions on Respirable Aerosol Deposition in Lung Model," Industry Applications Conference, 2004, 39th IAS Annual Meeting, Conference Record of the 2004 IEEE Seattle, WA, Oct. 3-7, 2004, 2:948-952.
Sandifer et al., "Effects of Aerosol vs IV UT-15 on Prostaglandin $H_2$ Analog-Induced Pulmonary Hypertension in Sheep," Chest, 2005, 128:616S.
Sandifer et al., "Potent effects of aerosol compared with intravenous treprostinil on the pulmonary circulation," J. Appl. Physiol., 2005, 99:2363-2368.
Santak et al., "Prostacyclin aerosol in an infant with pulmonary hypertension," Eur. J. Pediatr., 1995, 154, 233-235.
Scientific discussion for the approval of Ventavis, European Medicines Agency (EMEA), Oct. 20, 2004, 30 pages.
Soditt et al., "Improvement of oxygenation induced by aerosolized prostacyclin in a preterm infant with persistent pulmonary hypertension of the newborn," Intensive Care Med., 1997, 23, 1275-1278.
Steffen et al., "The Effects of 15AU81, a Chemically Stable Prostacyclin Analog, on the Cardiovascular and Renin-Angiotensis Systems of Anesthetized Dogs," Prostaglandins, Leukotrienes and Essential Fatty Acids, 1991, 43:277-286.
Stricker et al., "Sustained improvement of performance and haemodynamics with long-term aerosolized prostacyclin therapy in severe pulmonary hypertension," Schweiz Med. Wochenschr., 1999, 129, 923-927.
Van Heerden et al., "Inhaled aerosolized prostacyclin as a selective pulmonary vasodilator for the treatment of severe hypertension," Anaesthesia and Intensive Care, 1996, 24, 87-90.

(56) **References Cited**

OTHER PUBLICATIONS


Van Heerden et al., "Re: Delivery of inhaled aerosolized prostacyclin (IAP)," Anaesthesia and Intensive Care, 1996, 24, 624-625.

Voswinckel et al., "Acute effects of the combination of sildenafil and inhaled treprostinil on haemodynamics and gas exchange in pulmonary hypertension," Pulmonary Pharmacology & Therapeutics, 2008, 21, 824-832.

Voswinckel et al., "Favorable Effects of Inhaled Treprostinil in Severe Pulmonary Hypertension," Journal of the American College of Cardiology, 2006, 48(8):1672-1681.

Voswinckel et al., "Inhaled Treprostinil for Treatment of Chronic Pulmonary Arterial Hypertension," Annals of Internal Medicine, Jan. 17, 2006, 144(2):149-150.

Voswinckel et al., "Inhaled treprostinil is a potent pulmonary vasodilator in severe pulmonary hypertension," European Heart Journal, Journal of the European Society of Cardiology, ESC Congress, Aug. 28-Sep. 1, 2004, Munich, Germany, p. 22, abstract 218.

Voswinckel et al., "Inhaled Treprostinil Sodium (TRE) for the Treatment of Pulmonary Hypertension," Circulation, Oct. 2004, Abstract 1414, 110, 17 Supplement.

Voswinckel et al., "Inhaled Treprostinil Sodium (TRE) for the Treatment of Pulmonary Hypertension," Circulation, Oct. 26, 2004, Supplement, 110(17):295, abstract 1414.

Walmrath et al., "Effects of inhaled versus intravenous vasodilators in experimental pulmonary hypertension," Eur. Respir. J., 1997, 10, 1084-1092.

Wasserman et al., "Bronchodilator effects of prostacyclin (PGI2) in dogs and guinea pigs," European Journal of Pharmacology, 1980, 66, 53-63.

*Watson Laboratories, Inc.* (Petitioner) v. *United Therapeutics Corp.* (Patent Owner), Decision Granting Institute of Inter Partes Review 37 C.F.R. 42.108, IRP2017-01621, U.S. Pat. No. 9,358,240, Jan. 11, 2018.

*Watson Laboratories, Inc.* (Petitioner) v. *United Therapeutics Corp.* (Patent Owner), Decision Granting Institute of Inter Partes Review 37 C.F.R. 42.108, IRP2017-01622, U.S. Pat. No. 9,339,507, Jan. 11, 2018.

*Watson Laboratories, Inc.* (Petitioner) v. *United Therapeutics Corp.* (Patent Owner), Petition for Inter Partes Review, IRP2017-01622, U.S. Pat. No. 9,339,507, with all Exhibits on exhibit list.

*Watson Laboratories, Inc.* (Petitioner) v. *United Therapeutics Corp.* (Patent Owner), Petition for Inter Partes Review, IRP2017-01621, U.S. Pat. No. 9,358,240, with only Exhibits 1002, 1059, 1161 and 1164 and not including exhibits already provide with C2.

Webb et al., "The use of inhaled aerosolized prostacyclin (IAP) in the treatment of pulmonary hypertension secondary to pulmonary embolism," Intensive Care Med., 1996, 22, 353-355.

Wensel et al., "Effects of iloprost inhalation on exercise capacity and ventilator efficiency in patients with primary pulmonary hypertension," Circulation, 2000, 101, 2388-2392.

Wetzel, R.C., "Aerosolized prostacyclin: in search of the ideal pulmonary vasodilator," Anesthesiology, 1995, 82, 1315-1317.

Wittwer et al., "Inhalative Pre-Treatment of Donor Lungs Using the Aerosolized Prostacyclin Analog Iliprost Ameliorates Reperfusion Injury." J. Heart Lung Transplant, 2005, 24:1673-1679.

Zanen et al., "Optimal particle size for beta 2 agonist and anticholinergic aerosols in patients with severe airflow obstruction," Thorax, 1996, 51, 977-980.

Zanen et al., "The optimal particle size for β-adrenergic aerosols in mild asthmatics," International Journal of Pharmaceutics, 1994, 107, 211-217.


* cited by examiner

FIGURE 1


PAP
PVR
SAP
SVR
% of baseline values
time [min]
Placebo (n=4)
30µg Treprostinil (n=12)
45µg Treprostinil (n=9)
60µg Treprostinil (n=20)

FIGURE 2


CO
HR
SaO2
SvO2
% of baseline values
time [min]
Placebo (n=4)
30μg Treprostinil (n=12)
45μg Treprostinil (n=9)
60μg Treprostinil (n=20)

FIGURE 3


PVR-AUC 0-120 minutes [%*min]
3000
2000
1000
0
-1000
-2000
-3000
-4000
-5000
Placebo
30µg
45µg
60µg
Treprostinil dose

FIGURE 4


Baseline
Nitric Oxide
Treprostinil
Percent of Lung Perfusion
0
10
20
30
40
50
60
70
80
Shuntflow
0-0.01
0.01-0.1
0.1-1
1-10
10-100
Deadspace
Ventilation / Perfusion Ratios

FIGURE 5


a
PVR
iloprost
treprostinil
% of baseline value
time [min]
b
PVR
iloprost
treprostinil
% of baseline value
time [min]

FIGURE 6


PVR
SAP
a
7.5 µg iloprost - 6 min
7.5 µg treprostinil - 6 min
b
7.5 µg iloprost - 6 min
15 µg treprostinil - 6 min
c
7.5 µg iloprost - 6min
15 µg treprostinil - 3min
% of baseline value
time [min]

FIGURE 7


PVR
PAP
SAP
CO
iloprost
treprostinil
% of baseline value
time [min]
110
100
90
80
70
130
120
0
20
40
60

FIGURE 8


PAP
PVR
SAP
CO
SaO2
SvO2
placebo
30 µg treprostinil
60 µg treprostinil
90 µg treprostinil
% of baseline value
time [min]

FIGURE 9



# FIGURE 10


PAP
SAP
PVR
CO
% of baseline value
time [min]
placebo
15µg TRE - 18 pulses
15µg TRE - 9 pulses
15µg TRE - 3 pulses
15µg TRE - 2 pulses
15µg TRE - 1 pulse

FIGURE 11


PAP
SAP
PVR
CO
SaO2
SvO2
ABC [%]
15µg TRE - 18 pulses
15µg TRE - 9 pulses
15µg TRE - 3 pulses
15µg TRE - 2 pulses
15µg TRE - 1 pulse

FIGURE 12


30µg TRE (n=4)
60µg TRE (n=4)
90µg TRE (n=1)
120µg TRE (n=2)
treprostinil plasma concentration [ng/ml]
0
1
2
3
4
time after end of inhalation [min]
0
20
40
60
80
100
120
140
160
180
200
220
240

# TREPROSTINIL ADMINISTRATION BY INHALATION

## CROSS REFERENCE TO RELATED APPLICATIONS

The present application is a Continuation of U.S. application Ser. No. 16/536,954, filed Aug. 9, 2019, which is a Continuation of U.S. application Ser. No. 15/011,999, filed Feb. 1, 2016, which is a Divisional of U.S. application Ser. No. 13/469,854, filed May 11, 2012, Divisional of U.S. application Ser. No. 12/591,200, filed Nov. 12, 2009, which is a Continuation of U.S. application Ser. No. 11/748,205, filed May 14, 2007, which claims priority to U.S. provisional application No. 60/800,016 filed May 15, 2006, which are incorporated herein by reference in their entirety.

## FIELD OF THE INVENTION

The present application relates to methods and kits for therapeutic treatment and, more particularly, to therapeutic methods involving administering treprostinil using a metered dose inhaler and related kits.

## BACKGROUND OF THE INVENTION

All blood is driven through the lungs via the pulmonary circulation in order, among other things, to replenish the oxygen which it dispenses in its passage around the rest of the body via the systemic circulation. The flow through both circulations is in normal circumstances equal, but the resistance offered to it in the pulmonary circulation is generally much less than that of the systemic circulation. When the resistance to pulmonary blood flow increases, the pressure in the circulation is greater for any particular flow. The above described condition is referred to as pulmonary hypertension (PH). Generally, pulmonary hypertension is defined through observations of pressures above the normal range pertaining in the majority of people residing at the same altitude and engaged in similar activities.

Pulmonary hypertension may occur due to various reasons and the different entities of pulmonary hypertension were classified based on clinical and pathological grounds in 5 categories according to the latest WHO convention, see e.g. Simonneau G., et al. J. Am. Coll. Cardiol. 2004; 43(12 Suppl S):5S-12S. Pulmonary hypertension can be a manifestation of an obvious or explicable increase in resistance, such as obstruction to blood flow by pulmonary emboli, malfunction of the heart's valves or muscle in handling blood after its passage through the lungs, diminution in pulmonary vessel caliber as a reflex response to alveolar hypoxia due to lung diseases or high altitude, or a mismatch of vascular capacity and essential blood flow, such as shunting of blood in congenital abnormalities or surgical removal of lung tissue. In addition, certain infectious diseases, such as HIV and liver diseases with portal hypertension may cause pulmonary hypertension. Autoimmune disorders, such as collagen vascular diseases, also often lead to pulmonary vascular narrowing and contribute to a significant number of pulmonary hypertension patients. The cases of pulmonary hypertension remain where the cause of the increased resistance is as yet inexplicable are defined as idiopathic (primary) pulmonary hypertension (iPAH) and are diagnosed by and after exclusion of the causes of secondary pulmonary hypertension and are in the majority of cases related to a genetic mutation in the bone morphogenetic protein receptor-2 gene. The cases of idiopathic



pulmonary arterial hypertension tend to comprise a recognizable entity of about 40% of patients cared for in large specialized pulmonary hypertension centers. Approximately 65% of the most commonly afflicted are female and young adults, though it has occurred in children and patients over 50. Life expectancy from the time of diagnosis is short without specific treatment, about 3 to 5 years, though occasional reports of spontaneous remission and longer survival are to be expected given the nature of the diagnostic process. Generally, however, disease progress is inexorable via syncope and right heart failure and death is quite often sudden.

Pulmonary hypertension refers to a condition associated with an elevation of pulmonary arterial pressure (PAP) over normal levels. In humans, a typical mean PAP is approximately 12-15 mm Hg. Pulmonary hypertension, on the other hand, can be defined as mean PAP above 25 mmHg, assessed by right heart catheter measurement. Pulmonary arterial pressure may reach systemic pressure levels or even exceed these in severe forms of pulmonary hypertension. When the PAP markedly increases due to pulmonary venous congestion, i.e. in left heart failure or valve dysfunction, plasma can escape from the capillaries into the lung interstitium and alveoli. Fluid buildup in the lung (pulmonary edema) can result, with an associated decrease in lung function that can in some cases be fatal. Pulmonary edema, however, is not a feature of even severe pulmonary hypertension due to pulmonary vascular changes in all other entities of this disease.

Pulmonary hypertension may either be acute or chronic. Acute pulmonary hypertension is often a potentially reversible phenomenon generally attributable to constriction of the smooth muscle of the pulmonary blood vessels, which may be triggered by such conditions as hypoxia (as in high-altitude sickness), acidosis, inflammation, or pulmonary embolism. Chronic pulmonary hypertension is characterized by major structural changes in the pulmonary vasculature, which result in a decreased cross-sectional area of the pulmonary blood vessels. This may be caused by, for example, chronic hypoxia, thromboembolism, collagen vascular diseases, pulmonary hypercirculation due to left-to-right shunt, HIV infection, portal hypertension or a combination of genetic mutation and unknown causes as in idiopathic pulmonary arterial hypertension.

Pulmonary hypertension has been implicated in several life-threatening clinical conditions, such as adult respiratory distress syndrome ("ARDS") and persistent pulmonary hypertension of the newborn ("PPHN"). Zapol et al., Acute Respiratory Failure, p. 241-273, Marcel Dekker, New York (1985); Peckham, J. Ped. 93:1005 (1978). PPHN, a disorder that primarily affects full-term infants, is characterized by elevated pulmonary vascular resistance, pulmonary arterial hypertension, and right-to-left shunting of blood through the patent ductus arteriosus and foramen ovale of the newborn's heart. Mortality rates range from 12-50%. Fox, Pediatrics 59:205 (1977); Dworetz, Pediatrics 84:1 (1989). Pulmonary hypertension may also ultimately result in a potentially fatal heart condition known as "cor pulmonale," or pulmonary heart disease. Fishman, "Pulmonary Diseases and Disorders" 2nd Ed., McGraw-Hill, New York (1988).

Currently, there is no treatment for pulmonary hypertension that can be administered using a compact inhalation device, such as a metered dose inhaler.

## SUMMARY OF THE INVENTION

One embodiment is a method of delivering to a subject in need thereof a therapeutically effective amount of trepros-

tinil, or treprostinil derivative or a pharmaceutically acceptable salt thereof comprising administering to the subject a therapeutically effective amount of the treprostinil or treprostinil derivative or a pharmaceutically acceptable salt thereof using a metered dose inhaler.

Another embodiment is a method for treating pulmonary hypertension comprising administering to a subject in need thereof treprostinil or its derivative, or a pharmaceutically acceptable salt thereof using a metered dose inhaler.

Yet another embodiment is a kit comprising a metered dose inhaler containing a pharmaceutical formulation comprising treprostinil or treprostinil derivative, or a pharmaceutically acceptable salt thereof.

And yet another embodiment is a kit for treating pulmonary hypertension in a subject, comprising (i) an effective amount of treprostinil or its derivative, or a pharmaceutically acceptable salt thereof; (ii) a metered dose inhaler; (iii) instructions for use in treating pulmonary hypertension.

Administration of treprostinil using a metered dose inhaler can provide patients, such as pulmonary hypertension patients, with a high degree of autonomy.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** pulmonary and systemic changes in hemodynamics following the inhalation of placebo (open circles), 30 μg treprostinil (triangles), 45 μg treprostinil (squares) or 60 μg TREprostinil (black circles) applied by a Metered Dose Inhaler (MDI-TRE). A single short inhalation of treprostinil induced sustained reduction of PAP and PVR that outlasted the observation period of 120 minutes at doses of 45 and 60 μg MDI-TRE. Systemic arterial pressure and resistance were not significantly affected. PAP=mean pulmonary artery pressure; PVR=pulmonary vascular resistance; SAP=mean systemic arterial pressure; SVR=systemic vascular resistance. Data are given as mean value±standard error of the mean (SEM).

FIG. **2** presents hemodynamic changes induced by the inhalation of placebo (open circles), 30 μg treprostinil (triangles), 45 μg treprostinil (squares) or 60 μg treprostinil (black circles) applied by a metered dose inhaler. Treprostinil induced sustained elevation of cardiac output. Heart rate was rather unchanged as a sign for low spillover of MDI-TRE to the systemic circulation. Gas exchange was not negatively affected. CO=cardiac output; HR=heart rate; SaO2=arterial oxygen saturation; SvO2=central venous oxygen saturation. Data are given as mean value±SEM.

FIG. **3** shows areas under the curve for changes in pulmonary vascular resistance (PVR) calculated for an observation period of 120 minutes after inhalation treprostinil using a metered dose inhaler. PVR was markedly lowered by treprostinil inhalation. The increased pulmonary vasodilation over time with the two highest doses mainly relies on the more sustained effect over time. Data are shown as mean value±95% confidence intervals.

FIG. **4** demonstrates Ventilation-perfusion matching measured with the multiple inert gas elimination technique. Five patients (30 μg TRE, n=2; 45 μg TRE, n=1; 60 μg TRE, n=2) with pre-existing gas exchange problems were investigated for changes in ventilation-perfusion ratios. All patients had significant shunt flow at baseline. Shunt-flow and low V/Q areas were not significantly changed by nitric oxide (NO) inhalation or treprostinil inhalation using a metered dose inhaler (MDI-TRE). MDI-TRE applied at high treprostinil concentrations did not negatively affect ventilation-perfusion matching and gas-exchange. Data are given as mean value±95% confidence intervals.



FIG. **5** presents response of pulmonary vascular resistance (PVR) to inhaled treprostinil vs. iloprost period effects. a) First inhalation with treprostinil (n=22) vs. first inhalation with iloprost (n=22); b) second inhalation with treprostinil (n=22) vs. second inhalation with iloprost (n=22). The PVR decrease with treprostinil was delayed and prolonged, compared to iloprost. Due to carryover effects from the first period, in the second period, the effects of both drugs appeared shortened. Data are shown as percent of baseline values (mean value±95% confidence interval).

FIG. **6** presents response of PVR and systemic arterial pressure (SAP) to inhalation of treprostinil vs. iloprost—dose effects. a) Inhalation of 7.5 μg iloprost (in 6 min) vs. 7.5 μg treprostinil (6 min) (n=14, in a randomized order). b) Inhalation of 7.5 μg iloprost (6 min) vs. 15 μg treprostinil (6 min) (n=14, in randomized order). c) Inhalation of 7.5 μg iloprost (6 min) vs. 15 μg treprostinil (3 min) (n=16, in randomized order). Data are shown as percent of baseline values (mean±95% confidence interval). Iloprost, filled circles; Treprostinil, open triangles.

FIG. **7** presents hemodynamic response to inhalation of treprostinil vs. iloprost. Data from n=44 patients, who inhaled both drugs in randomized order, shown as percent of baseline values (mean value±95% confidence interval). PVR, pulmonary vascular resistance; PAP, mean pulmonary arterial pressure; SAP, mean systemic arterial pressure; CO, cardiac output.

FIG. **8** presents pharmacodynamics after treprostinil inhalation vs. placebo. Placebo or treprostinil in doses of 30 μg, 60 μg or 90 μg were inhaled (means±95% confidence intervals). Maximal decrease of PVR was comparable for all doses. The duration of pulmonary vasodilation (PVR-decrease) appeared to be dose dependent. PVR, pulmonary vascular resistance; PAP, mean pulmonary arterial pressure; SAP, mean systemic arterial pressure; CO, cardiac output; SaO2, arterial oxygen saturation; SvO2, mixed venous oxygen saturation.

FIG. **9** presents Areas Between the placebo and the treprostinil Curves (ABC). ABCs were calculated for a 3-hour period after inhalation of TRE or placebo from the relative changes of hemodynamic parameters (means±95% confidence intervals). PVR, pulmonary vascular resistance; PAP, mean pulmonary arterial pressure; SAP, mean systemic arterial pressure; SVR, systemic vascular resistance.

FIG. **10** presents hemodynamic responses to the inhalation of 15 μg treprostinil. The inhalation time by increasing treprostinil concentration. A pulse of aerosol was generated every 6 seconds. TRE aerosol was inhaled in concentrations of 100 μg/ml (18 pulses; n=6), 200 μg/ml (9 pulses; n=6), 600 μg/ml (3 pulses; n=21), 1000 μg/ml (2 pulses; n=7) and 2000 μg/ml (1 pulse; n=8). Placebo data correspond to FIG. **8**. Data are shown as means±95% confidence intervals. PVR, pulmonary vascular resistance; PAP, mean pulmonary arterial pressure; SAP, mean systemic arterial pressure; CO, cardiac output.

FIG. **11** presents areas between the placebo curve and the responses to 15 μg treprostinil applied at increasing concentrations to minimize inhalation time. Mean±SEM of relative changes of hemodynamic parameters (observation time 120 min). PAP, pulmonary arterial pressure, SAP, systemic arterial pressure, PVR, pulmonary vascular resistance, CO, cardiac output, SaO2, systemic arterial oxygen saturation, SvO2, pulmonary arterial oxygen saturation.

FIG. **12** presents pharmacokinetics of treprostinil after a single inhalation. Treprostinil plasma levels after inhalation of 30 μg, 60 μg, 90 μg or 120 μg treprostinil (6 min

inhalation period; experiments correspond to those shown in FIGS. **8** and **9**). Data with error bars represent mean values±SEM.

## DETAILED DESCRIPTION OF THE INVENTION

Unless otherwise specified, the term "a" or "an" used herein shall mean "one or more."

The present application incorporates herein by reference in its entirety Voswinckel R, et al. J. Am. Coll. Cardiol. 2006; 48:1672-1681.

The inventors discovered that a therapeutically effective dose of treprostinil can be administered in a few single inhalations using a compact inhalation device, such as a metered dose inhaler. Furthermore, the inventors discovered that such administering does not cause significant side effects, especially no significant side effects related to systemic blood pressure and circulation as well as no gas exchange deteriorations or disruptions.

Accordingly, one embodiment of the invention is a method of delivering to a subject in need thereof, such as a human being, a therapeutically effective amount of treprostinil comprising administering to the subject a formulation comprising a therapeutically effective amount of treprostinil, its derivative or a pharmaceutically acceptable salt thereof using a metered dose inhaler. Treprostinil can be administered via a metered dose inhaler to a subject affected with a condition or disease, which can be treated by treprostinil, such as asthma, pulmonary hypertension, peripheral vascular disease or pulmonary fibrosis.

Another embodiment of the invention is a method for treating pulmonary hypertension, comprising administering to a subject in need thereof, such as a human being, treprostinil or its derivative, or a pharmaceutically acceptable salt using a metered dose inhaler.

Treprostinil, or 9-deoxy-2',9-alpha-methano-3-oxa-4,5,6-trinor-3,7-(1'3'-interphenylene)-13,14-dihydro-prostaglandin F1, is a prostacyclin analogue, first described in U.S. Pat. No. 4,306,075. U.S. Pat. No. 5,153,222 describes use of treprostinil for treatment of pulmonary hypertension. Treprostinil is approved for the intravenous as well as subcutaneous route, the latter avoiding septic events associated with continuous intravenous catheters. U.S. Pat. Nos. 6,521,212 and 6,756,033 describe administration of treprostinil by inhalation for treatment of pulmonary hypertension, peripheral vascular disease and other diseases and conditions. U.S. Pat. No. 6,803,386 discloses administration of treprostinil for treating cancer such as lung, liver, brain, pancreatic, kidney, prostate, breast, colon and head-neck cancer. US patent application publication No. 2005/0165111 discloses treprostinil treatment of ischemic lesions. U.S. Pat. No. 7,199,157 discloses that treprostinil treatment improves kidney functions. US patent application publication No. 2005/0282903 discloses treprostinil treatment of neuropathic foot ulcers. U.S. provisional application No. 60/900,320 filed Feb. 9, 2007, discloses treprostinil treatment of pulmonary fibrosis.

The term "acid derivative" is used herein to describe C1-4 alkyl esters and amides, including amides wherein the nitrogen is optionally substituted by one or two C1-4 alkyl groups.

The present invention also encompasses methods of using Treprostinil or its derivatives, or pharmaceutically acceptable salts thereof. In one embodiment, a method uses Treprostinil sodium, currently marketed under the trade name of REMODULIN®. The FDA has approved Treprostinil sodium for the treatment of pulmonary arterial hypertension by injection of dose concentrations of 1.0 mg/mL, 2.5 mg/mL, 5.0 mg/mL and 10.0 mg/mL. The chemical structure formula for Treprostinil sodium is:




Treprostinil sodium is sometimes designated by the chemical names: (a) [(1R,2R,3aS,9aS)-2,3,3a,4,9,9a-hexahydro-2-hydroxy-1-[(3S)-3-hydroxyoctyl]-1H-benz[f]inden-5-yl]oxy]acetic acid; or (b) 9-deoxy-2',9-α-methano-3-oxa-4,5,6-trinor-3,7-(1',3'-interphenylene)-13,14-dihydro-prostaglandin $F_1$. Treprostinil sodium is also known as: UT-15; LRX-15; 15AU81; UNIPROST™; BW A15AU; and U-62,840. The molecular weight of Treprostinil sodium is 390.52, and its empirical formula is $C_{23}H_{34}O_5$.

In certain embodiments, treprostinil can be administered in combination with one or more additional active agents. In some embodiments, such one or more additional active agents can be also administered together with treprostinil using a metered dose inhaler. Yet in some embodiments, such one or more additional active agents can be administered separately from treprostinil. Particular additional active agents that can be administered in combination with treprostinil may depend on a particular disease or condition for treatment or prevention of which treprostinil is administered. In some cases, the additional active agent can be a cardiovascular agent such as a calcium channel blocker, a phosphodiesterase inhibitor, an endothelial antagonist, or an antiplatelet agent.

The present invention extends to methods of using physiologically acceptable salts of Treprostinil, as well as non-physiologically acceptable salts of Treprostinil that may be used in the preparation of the pharmacologically active compounds of the invention.

The term "pharmaceutically acceptable salt" refers to a salt of Treprostinil with an inorganic base, organic base, inorganic acid, organic acid, or basic or acidic amino acid. Salts of inorganic bases can be, for example, salts of alkali metals such as sodium or potassium; alkaline earth metals such as calcium and magnesium or aluminum; and ammonia. Salts of organic bases can be, for example, salts trimethylamine, triethylamine, pyridine, picoline, ethanolamine, diethanolamine, and triethanolamine. Salts of inorganic acids can be, for example, salts of hydrochloric acid, hydroboric acid, nitric acid, sulfuric acid, and phosphoric acid. Salts of organic acids can be, for example, salts of formic acid, acetic acid, trifluoroacetic acid, fumaric acid, oxalic acid, lactic acid, tartaric acid, maleic acid, citric acid, succinic acid, malic acid, methanesulfonic acid, benzenesulfonic acid, and p-toluenesulfonic acid. Salts of basic amino acids can be, for example, salts of arginine, lysine and ornithine. Salts of acidic amino acids can include, for example, salts of aspartic acid and glutamic acid. Quaternary ammonium salts can be formed, for example, by reaction with lower alkyl halides, such as methyl, ethyl, propyl, and butyl chlorides, bromides, and iodides, with dialkyl sul-

phates, with long chain halides, such as decyl, lauryl, myristyl, and stearyl chlorides, bromides, and iodides, and with aralkyl halides, such as benzyl and phenethyl bromides.

Preferred pharmaceutically acceptable salts are disclosed, for example, in US patent application publication No. 20050085540.

Treprostinil can be administered by inhalation, which in the present context refers to the delivery of the active ingredient or a combination of active ingredients through a respiratory passage, wherein the subject in need of the active ingredient(s) through the subject's airways, such as the subject's nose or mouth.

A metered dose inhaler in the present context means a device capable of delivering a metered or bolus dose of respiratory drug, such as treprostinil, to the lungs. One example of the inhalation device can be a pressurized metered dose inhaler, a device which produces the aerosol clouds for inhalation from solutions and/or suspensions of respiratory drugs in chlorofluorocarbon (CFC) and/or hydrofluoroalkane (HFA) solutions.

The inhalation device can be also a dry powder inhaler. In such case, the respiratory drug is inhaled in solid formulation, usually in the form of a powder with particle size less than 10 micrometers in diameter or less than 5 micrometers in diameter.

The metered dose inhaler can be a soft mist inhaler (SMI), in which the aerosol cloud containing a respiratory drug can be generated by passing a solution containing the respiratory drug through a nozzle or series of nozzles. The aerosol generation can be achieved in SMI, for example, by mechanical, electromechanical or thermomechanical process. Examples of soft mist inhalers include the Respimat® Inhaler (Boeringer Ingelheim GmbH), the AERx® Inhaler (Aradigm Corp.), the Mystic™ Inhaler (Ventaira Pharmaceuticals, Inc) and the Aira™ Inhaler (Chrysalis Technologies Incorporated). For a review of soft mist inhaler technology, see e.g. M. Hindle, The Drug Delivery Companies Report, Autumn/Winter 2004, pp. 31-34. The aerosol for SMI can be generated from a solution of the respiratory drug further containing pharmaceutically acceptable excipients. In the present case, the respiratory drug is treprostinil, its derivative or a pharmaceutically acceptable salt thereof, which can be formulated in SMI is as a solution. The solution can be, for example, a solution of treprostinil in water, ethanol or a mixture thereof. Preferably, the diameter of the treprostinil-containing aerosol particles is less than about 10 microns, or less than about 5 microns, or less than about 4 microns.

Treprostinil concentration in an aerosolable formulation, such as a solution, used in a metered dose inhaler can range from about 500 μg/ml to about 2500 μg/ml, or from about 800 μg/ml to about 2200 μg/ml, or from about 1000 μg/ml to about 2000 μg/ml.

The dose of treprostinil that can be administered using a metered dose inhaler in a single event can be from about 15 μg to about 100 μg or from about 15 μg to about 90 μg or from about 30 μg to about 90 μg or from about 30 μg to about 60 μg.

Administering of treprostinil in a single event can be carried out in a limited number of breaths by a patient. For example, treprostinil can be administered in 20 breaths or less, or in 10 breaths or less, or than 5 breaths or less. Preferably, treprostinil is administered in 3, 2 or 1 breaths.

The total time of a single administering event can be less than 5 minutes, or less than 1 minute, or less than 30 seconds.

Treprostinil can be administered a single time per day or several times per day.

In some embodiments, the method of treatment of pulmonary hypertension can further comprise administering at least one supplementary agent selected from the group consisting of sildenafil, tadalafil, calcium channel blockers (diltiazem, amlodipine, nifedipine), bosentan, sitaxsentan, ambrisentan, and pharmaceutically acceptable salts thereof. In some embodiments, the supplementary agents can be included in the treprostinil formulation and, thus, can be administered simultaneously with treprostinil using a metered dose inhaler. In some embodiments, the supplementary agents can be administered separately from treprostinil. In some embodiments, the application of intravenous prostacyclin (flolan), intravenous iloprost or intravenous or subcutaneous treprostinil can be administered in addition to treprostinil administered via inhalation using a metered dose inhaler.

The present invention also provides a kit that includes a metered dose inhaler containing a pharmaceutical formulation comprising treprostinil or its derivative, or a pharmaceutically acceptable salt thereof. Such a kit can further include instructions on how to use the metered dose inhaler for inhaling treprostinil. Such instructions can include, for example, information on how to coordinate patient's breathing, and actuation of the inhaler. The kit can be used by a subject, such as human being, affected with a disease or condition that can be treated by treprostinil, such as asthma, pulmonary hypertension, peripheral vascular disease or pulmonary fibrosis.

In some cases, the kit is a kit for treating pulmonary hypertension, that includes (i) a metered dose inhaler containing a pharmaceutical formulation comprising treprostinil or its derivative, or a pharmaceutically acceptable salt thereof; and (ii) instructions for use of the metered dose inhaler containing treprostinil in treating pulmonary hypertension.

As used herein, the phrase "instructions for use" shall mean any FDA-mandated labeling, instructions, or package inserts that relate to the administration of Treprostinil or its derivatives, or pharmaceutically acceptable salts thereof, for treatment of pulmonary hypertension by inhalation. For example, instructions for use may include, but are not limited to, indications for pulmonary hypertension, identification of specific symptoms associated with pulmonary hypertension, that can be ameliorated by Treprostinil, recommended dosage amounts for subjects suffering from pulmonary hypertension and instructions on coordination of individual's breathing and actuation of the metered dose inhaler.

The present invention can be illustrated in more detail by the following example, however, it should be understood that the present invention is not limited thereto.

## Example 1

### Open Label Study Upon Acute Safety, Tolerability and Hemodynamic Effects of Inhaled Treprostinil Delivered in Seconds

A study was conducted of acute vasodilator challenge during right heart catheter investigation to determine the safety, tolerability and pulmonary vasodilatory potency of inhaled treprostinil applied in seconds by a soft mist inhaler (SMI-TRE). The study produced evidence for a long lasting

favourable effect of SMI-TRE on pulmonary hemodynamics in absence of systemic side effects and gas exchange disruptions.

Summary:

Inhaled nitric oxide (20 ppm; n=45) and inhaled treprostinil sodium (TRE; n=41) or placebo (n=4) were applied once during right heart catheter investigation. TRE was delivered in 2 breaths (1000 μg/ml aerosol concentration; 30 μg dose; n=12), 3 breaths (1000 μg/ml; 45 μg; n=9) or 2 breaths (2000 μg/ml; 60 μg; n=20) from a Respimat® SMI. Pulmonary hemodynamics and blood gases were measured at defined time points, observation time following TRE application was 120 minutes. TRE doses of 30 μg, 45 μg and 60 μg reduced pulmonary vascular resistance (PVR) to 84.4±8.7%, 71.4±17.5% and 77.5±7.2% of baseline values, respectively (mean±95% confidence interval). The 120 minute area under the curve for PVR for placebo, 30 μg, 45 μg and 60 μg TRE was 1230±1310, −870±940, −2450±2070 and −2000±900 min %, respectively. Reduction of PVR by a single inhalation of the two higher doses outlasted the observation period of 120 minutes. Reduction of systemic vascular resistance and pressure was negligible, showing a high pulmonary selectivity for SMI-TRE. Intrapulmonary selectivity was also provided by SMI-TRE as ventilation/perfusion matching, assessed by the multiple inert gas elimination technique in 5 patients with gas exchange problems, was not significantly different after SMI-TRE compared to inhaled nitric oxide or no treatment. No significant side effects were observed.

Conclusions: The acute application of inhaled treprostinil with a metered dose inhaler in 2-3 breaths was safe, well tolerated and induced a strong and sustained pulmonary selective vasodilation.

Methods and Patients

A total number of 45 patients with moderate to severe precapillary pulmonary hypertension were enrolled. Patient characteristics were: female to male ratio (f/m)=29/16, age 59±2.3 years, pulmonary artery pressure (PAP) 45±1.8 mmHg, pulmonary vascular resistance (PVR) 743±52 dynes·s·cm$^{-5}$, pulmonary artery wedge pressure (PAWP) 8.6±0.5 mmHg, central venous pressure (CVP) 6.4±0.7 mmHg, cardiac output (CO) 4.5±0.2 l/min, central venous oxygen saturation (SvO2) 62.3±1.2 mmHg (mean±Standard Error of the Mean). Disease etiologies were idiopathic PAH (iPAH) (n=13), PAH other (n=11), chronic thromboembolic pulmonary hypertension (CTEPH) (n=17) and pulmonary fibrosis (n=4). Table 1 presents the patient characteristics of the different groups.

TABLE 1

Patient characteristics of the different treatment groups. Data are given as mean ± Standard Error of the Mean (SEM).

| | Placebo (n = 4) | 30 μg TRE (n = 12) | 45 μg TRE (n = 9) | 60 μg TRE (n = 20) |
|---|---|---|---|---|
| Age [years] | 61 ± 8 | 53.9 ± 3.9 | 54.2 ± 5.7 | 65.5 ± 3.1 |
| PAP [mmHg] | 49.5 ± 10.1 | 45 ± 3.1 | 54.3 ± 2.8 | 39.7 ± 2.0 |
| PVR [Dynes] | 896 ± 163 | 597 ± 53.9 | 1049 ± 107 | 663 ± 81 |
| CO [l/min] | 4.46 ± 0.9 | 5.2 ± 0.4 | 3.9 ± 0.4 | 4.4 ± 0.3 |
| SAP [mmHg] | 98 ± 8.1 | 90.1 ± 3.2 | 82.8 ± 3.9 | 86.1 ± 2.0 |
| SaO2 [%] | 85.3 ± 4.5 | 90.0 ± 1.1 | 89.6 ± 1.1 | 90.6 ± 0.5 |
| SvO2 [%] | 57.5 ± 3.9 | 66.0 ± 1.6 | 59.1 ± 3.4 | 62.5 ± 1.6 |

PAP = pulmonary artery pressure; PVR = pulmonary vascular resistance; CO = cardiac output; SAP = systemic arterial pressure; SaO2 = arterial oxygen saturation; SvO2 = central venous oxygen saturation.

Baseline values were determined 20-30 minutes after placement of the catheter. Heart rate, pulmonary and systemic blood pressure and cardiac output were measured and blood gases were taken during each pharmacological intervention at defined time points. Pharmacological interventions included the inhalation of 20 ppm nitric oxide (NO) after evaluation of baseline parameters (n=45) and the consecutive inhalation of placebo (n=4), 30 μg SMI-TRE (n=12), 45 μg SMI-TRE (n=9) or 60 μg (n=20) SMI-TRE. Placebo and treprostinil was applied with the Respimat® SMI. For filling of this device with treprostinil sodium, the placebo solution was withdrawn from the device with a syringe and treprostinil solution was injected into the device under sterile conditions. Aerosol quality was controlled before and after refilling of the SMI devices by laser diffractometry, see e.g. Gessler T., Schmehl T., Hoeper M. M., Rose F., Ghofrani H. A., Olschewski H. et al. Ultrasonic versus jet nebulization of iloprost in severe pulmonary hypertension. Eur. Respir. J. 2001; 17:14-19 incorporated herein in its entirety. The aerosol sizes before (placebo) and after filling (treprostinil) were unchanged. The aerosol particles mass median aerodynamic diameter of treprostinil-aerosol was 4-5 μm, which can be at the upper limit for alveolar deposition. The aerosol volume delivered by one cycle from the SMI was 15 μl. The solution used for aerosol generation was prepared from treprostinil sodium salt using a standard protocol. The SMI was either filled with a concentration of 1000 μg/ml treprostinil sodium (one aerosol puff=15 μg TRE) or with 2000 μg/ml (one puff=30 μg TRE). The different doses were applied as 2 puffs 1000 μg/ml (30 μg), 3 puffs 1000 μg/ml (45 μg) and 2 puffs 2000 μg/ml (60 μg). The placebo was inhaled as 2 puffs from a placebo-SMI. Hemodynamics and gas-exchange parameters were recorded for 120 minutes after TRE inhalation. This study used the Respimat® device, because the implemented "soft mist" technology was well suited for the deposition of such highly active drugs like prostanoids.

The impact of SMI-TRE on ventilation-perfusion matching was assessed in five patients (30 μg TRE, n=2; 45 μg TRE, n=1; 60 μg TRE, n=2) with pre-existing gas exchange problems by use of the multiple inert gas elimination technique (MIGET), see e.g. Wagner P D, Saltzman H A, West J B. Measurement of continuous distributions of ventilation-perfusion ratios: theory. J Appl Physiol. 1974; 36:588-99; Ghofrani H A, Wiedemann R, Rose F, Schermuly R T, Olschewski H, Weissmann N et al. Sildenafil for treatment of lung fibrosis and pulmonary hypertension: a randomised controlled trial. Lancet. 2002; 360:895-900, both incorporated herein in their entirety.

Statistics:

Mean values, standard deviation, standard error of the mean and 95% confidence intervals were calculated. Statistical analysis was done by use of a paired t-test.

Results:

The inhalation of treprostinil sodium from the metered dose inhaler (SMI-TRE) was well tolerated, only mild and transient cough for a maximum of one minute was reported. No systemic side effects like headache, flush, nausea or dizziness were observed.

Two to three breaths of SMI-TRE induced a strong pulmonary vasodilation that outlasted the observation time of 120 minutes (45 and 60 μg). The lower dose of 30 μg TRE induced a somewhat shorter effect on pulmonary vascular resistance; however, the maximal pulmonary vasodilation was comparable. In contrast, placebo inhalation did not induce pulmonary vasodilation. In fact a slight increase in PVR over the time of the right heart catheter investigation could be recorded following placebo inhalation (FIG. 1). The effect of SMI-TRE on systemic vascular resistance and

pressure was very small and not clinically significant. Cardiac output was significantly increased over the whole observation period, whereas heart rate was rather unchanged. Gas exchange was not influenced by SMI-TRE (FIG. **2**). The maximal changes in hemodynamic and gas-exchange parameters compared to baseline values are depicted in Table 2.

TABLE 2

Extremes of the relative changes of hemodynamic and gas exchange parameters compared to baseline after inhalation of Placebo (n = 4), 30 μg treprostinil (n = 12), 45 μg treprostinil (n = 9) and 60 μg treprostinil (n = 20). Highest (max) and lowest (min) values during the observation period are shown. Data are given as percent of baseline values (mean ± SEM).

| | Placebo | 30 μg TRE | 45 μg TRE | 60 μg TRE |
|---|---|---|---|---|
| PAP (min) | 99.4 ± 3.0 | 83.4 ± 3.2 | 77.6 ± 6.8 | 79.5 ± 2.4 |
| PVR (min) | 101.4 ± 1.9 | 84.4 ± 4.4 | 71.4 ± 8.9 | 77.5 ± 3.7 |
| CO (max) | 99.7 ± 1.1 | 108.8 ± 3.8 | 108.6 ± 5.6 | 103.8 ± 2.0 |
| SVR (min) | 104.3 ± 4.3 | 97.7 ± 4.2 | 92 ± 3.9 | 91.3 ± 2.1 |
| SAP (min) | 102.7 ± 1.7 | 97.3 ± 1.9 | 96.1 ± 1.5 | 93.6 ± 2.9 |
| HR (max) | 105 ± 2.1 | 106.1 ± 2.9 | 99.1 ± 2.4 | 101.1 ± 0.9 |
| SaO2 (min) | 98.2 ± 0.4 | 101 ± 0.3 | 94.4 ± 1.8 | 95.8 ± 0.9 |
| SvO2 (max) | 104.5 ± 1.4 | 102.4 ± 1.3 | 104.5 ± 4.4 | 102 ± 1.0 |

PAP = pulmonary artery pressure; PVR = pulmonary vascular resistance; SVR = systemic vascular resistance; CO = cardiac output; SAP = systemic arterial pressure; HR = heart rate; SaO2 = arterial oxygen saturation; SvO2 = central venous oxygen saturation.

The areas under the curve for PVR were calculated for placebo and the different SMI-TRE doses over the 120 minute observation period (FIG. **3**). A dose effect of SMI-TRE with a trend to a more sustained effect with the two highest doses could be observed.

The inhalation of a highly concentrated aerosol can be in theory prone to disturbances of gas exchange because the deposition of even small amounts of aerosol may deliver high doses locally and thereby antagonize the hypoxic pulmonary vasoconstriction in poorly ventilated areas. This would then lead to increased shunt flow or increase of low ventilation/perfusion (V/Q) areas. This question was addressed in five patients with the multiple inert gas elimination technique (MIGET), the gold-standard for intrapulmonary V/Q ratio determination. The MIGET patients were selected for pre-existing gas exchange limitations. Characteristics of these patients were: PAP 54.6±3.2 mmHg, PVR 892±88 dynes, SaO2 91.7±0.5%, SvO2 65.2±1.8%. Etiologies were iPAH (n=1), CTEPH (n=3), pulmonary fibrosis (n=1). The maximal relative reduction of SaO2 after inhalation of SMI-TRE in these patients was −3.8±1.5% compared to baseline values. Shunt flow at baseline, NO-inhalation and 60 minutes after SMI-TRE was 6.4±4.3%, 5.4±3.0% and 8.3±3.4%, respectively (mean±95% confidence interval; FIG. **4**).

No significant increase in low V/Q areas or shunt fraction after inhalation of SMI-TRE was observed, in fact the distribution of perfusion was not different to that at baseline and during nitric oxide inhalation. This proves an excellent intrapulmonary selectivity of SMI-TRE, which is also reflected by unchanged arterial oxygen saturation.

Conclusion:

Treprostinil is tolerated at high doses with no systemic side effects. The application of an effective amount of treprostinil in only few or even one single breath was achieved with a highly concentrated treprostinil sodium solution. Treprostinil can be applied by a metered dose inhaler, such as Respimat® soft mist inhaler.

Example 2

Investigation of the Effects of Inhaled Treprostinil on Pulmonary Hemodynamics and Gas Exchange in Severe Pulmonary Hypertension

This study investigated the effects of inhaled treprostinil on pulmonary vascular resistance in severe pulmonary hypertension and addressed systemic effects and gas exchange as well as tolerability and efficacy of high doses of treprostinil given in short time. A total of 123 patients with a mean pulmonary artery pressure of about 50 mmHg were investigated in three separate randomized studies. Inhaled treprostinil exerted potent sustained pulmonary vasodilation with excellent tolerability and could be safely applied in a few breaths or even one breath.

Summary:

Three different studies were conducted on a total of 123 patients by means of right heart catheterization: i) a randomized crossover-design study (44 patients), ii) a dose escalation study (31 patients) and iii) a study of reduction of inhalation time while keeping the dose fixed (48 patients). The primary endpoint was the change in pulmonary vascular resistance (PVR).

The mean pulmonary artery pressure of the enrolled patients was about 50 mmHg. Hemodynamics and patient characteristics were similar in all studies. In study i) TRE and Iloprost (ILO), at an inhaled dose of 7.5 μg, displayed comparable PVR decrease, with a significantly different time course ($p<0.001$), TRE exhibiting a more sustained effect on PVR ($p<0.0001$) and less systemic side effects. In study ii) placebo, 30 μg, 60 μg, 90 μg or 120 μg TRE were applied with drug effects being observed for 3 hours after inhalation. A near-maximal acute PVR decrease was observed at 30 μg TRE. In study iii) TRE was inhaled with a pulsed ultrasonic nebulizer, mimicking a metered dose inhaler. 15 μg TRE was inhaled with 18 pulses (TRE concentration 100 μg/ml), 9 pulses (200 μg/ml), 3 pulses (600 μg/ml), 2 pulses (1000 μg/ml) or 1 pulse (2000 μg/ml), each mode achieving comparable, sustained pulmonary vasodilation.

Inhaled treprostinil exerts sustained pulmonary vasodilation with excellent tolerability at doses, which may be inhaled in a few or even one breath. Inhaled treprostinil is advantageous to inhaled iloprost in terms of duration of effect and systemic side effects. Inhaled treprostinil is well tolerated in concentrations up to 2000 mg/ml (bringing down inhalation time to a single breath) and in high doses (up to 90 μg).

Methods:

All inhalations were performed with the OPTINEB® ultrasonic nebulizer (Nebutec, Elsenfeld, Germany).

Study i) was a randomized, open-label, single-blind crossover study. The primary objective was to compare the acute hemodynamic effects and the systemic side effects of inhaled treprostinil with inhaled iloprost at comparable doses. A total number of 44 patients with moderate to severe precapillary pulmonary hypertension were enrolled. Patient characteristics and hemodynamic as well as gas exchange parameters are outlined in Table 3.

TABLE 3

Patient characteristics, hemodynamic parameters and gas exchange values at baseline, before challenge with inhalative prostanoids.

| | N | Age | Gender f/m | Etiology i/o/t/f | PAP [mmHg] | PVR [dyn * s * cm$^{-5}$] | SAP [mmHg] | CVP [mmHg] | PAWP [mmHg] | CO [l/min] | SaO2 [%] | SvO2 [%] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1a | 14 | 55.1 ± 4.8 | 11/3 | 4/4/2/4 | 53.8 ± 3.1 | 911 ± 102 | 95.4 ± 3.6 | 7.4 ± 1 | 8.0 ± 0.8 | 4.3 ± 0.4 | 93.8 ± 2 | 63.9 ± 2.4 |
| 1b | 14 | 54.1 ± 3.3 | 10/4 | 1/6/5/2 | 47.4 ± 3.8 | 716 ± 80 | 90.6 ± 3.3 | 5.9 ± 1.4 | 6.4 ± 0.7 | 4.7 ± 0.4 | 92 ± 1 | 64.4 ± 2.3 |
| 1c | 16 | 56 ± 2.9 | 7/9 | 6/3/6/1 | 47.5 ± 4.5 | 777 ± 102 | 92 ± 4.5 | 8.3 ± 1.4 | 8.6 ± 1.4 | 4.4 ± 0.5 | 91.4 ± 0.9 | 59.8 ± 2.6 |
| 2a | 8 | 60.8 ± 4 | 4/4 | 2/2/3/1 | 51.9 ± 4.9 | 849 ± 152 | 95.9 ± 4.8 | 7.6 ± 1.4 | 11.1 ± 1.7 | 4.4 ± 0.6 | 89.6 ± 2.8 | 60.1 ± 2.8 |
| 2b | 8 | 52.8 ± 6.6 | 6/2 | 1/3/3/1 | 49 ± 4 | 902 ± 189 | 92.4 ± 2.4 | 4.8 ± 1.1 | 7.2 ± 1.3 | 4.0 ± 0.4 | 92.4 ± 2.4 | 62.5 ± 1.7 |
| 2c | 6 | 56.8 ± 5.9 | 4/2 | 0/2/2/2 | 44.2 ± 3.5 | 856 ± 123 | 96.3 ± 3.9 | 5 ± 1.1 | 6 ± 1 | 3.8 ± 0.3 | 92.8 ± 1.5 | 63.6 ± 1.8 |
| 2d | 6 | 51.2 ± 3.8 | 4/2 | 2/2/2/0 | 55.5 ± 4.9 | 940 ± 110 | 91.2 ± 8.1 | 11.2 ± 1.2 | 10 ± 0.7 | 3.9 ± 0.4 | 92 ± 1.9 | 62 ± 5.8 |
| 2e | 3 | 57.3 ± 9.1 | 1/2 | 0/1/0/2 | 45.3 ± 5.2 | 769 ± 267 | 99 ± 3.2 | 5 ± 2.1 | 9 ± 0.6 | 4.5 ± 0.6 | 94.2 ± 1.3 | 66.3 ± 1.5 |
| 3a | 6 | 52.7 ± 6.6 | 4/2 | 2/4/0/0 | 53.8 ± 6.7 | 928 ± 145 | 92.7 ± 7.9 | 8.7 ± 2.7 | 8.8 ± 1.3 | 4.2 ± 0.6 | 90.4 ± 2.8 | 64.8 ± 4.3 |
| 3b | 6 | 58.3 ± 3.5 | 4/2 | 3/1/1/1 | 54.2 ± 6.1 | 808 ± 156 | 94.3 ± 2.8 | 7 ± 1.4 | 10 ± 1.3 | 5 ± 0.7 | 91.9 ± 0.7 | 63.5 ± 2.9 |
| 3c | 21 | 57.4 ± 5.6 | 8/3 | 7/7/6/1 | 46.1 ± 2.5 | 900 ± 99 | 88 ± 2.8 | 9 ± 1.4 | 9.2 ± 0.5 | 3.7 ± 0.3 | 91.7 ± 0.5 | 59.7 ± 2 |
| 3d | 7 | 55.6 ± 5.8 | 3/4 | 0/4/3/0 | 53.1 ± 7.1 | 732 ± 123 | 91.4 ± 5.6 | 7.9 ± 3.1 | 8.6 ± 1.3 | 5 ± 0.4 | 90.7 ± 1.4 | 61.3 ± 3.7 |
| 3e | 8 | 59 ± 5.2 | 7/1 | 0/4/4/0 | 45.1 ± 3.9 | 733 ± 114 | 92.8 ± 6.8 | 4.6 ± 0.8 | 8.1 ± 1.1 | 4.3 ± 0.2 | 90.7 ± 0.8 | 66.3 ± 2.8 |

Group 1 corresponds to study i); randomized crossover study comparing inhaled iloprost (ILO) and inhaled treprostinil (TRE).
a = 7.5 g ILO vs. 7.5 μg TRE,
b = 7.5 g ILO vs. 15 μg TRE (6 min inhalation time),
c = 7.5 g ILO vs. 15 μg TRE (3 min inhalation time).
Group 2 corresponds to study ii); evaluation of maximal tolerated dose of TRE.
a = placebo inhalation,
b = 30 μg TRE,
c = 60 μg TRE,
d = 90 μg TRE,
e = 120 μg TRE.
Group 3 corresponds to study iii); reduction of inhalation time by increase of TRE concentration, aiming at a total inhaled dose of 15 μg.
a = 18 pulses of 100 μg/ml TRE,
b = 9 pulses of 200 μg/ml TRE,
c = 3 pulses of 600 μg/ml TRE,
d = 2 pulses of 1000 μg/ml TRE,
e = 1 pulse 2000 μg/ml TRE.
Etiology of pulmonary hypertension was classified as idiopathic PAH (i), PAH of other causes (o), chronic thromboembolic PH (t), and pulmonary fibrosis (f).

Each patient inhaled both iloprost and treprostinil on the same day during right heart catheter investigation; the drugs were administered consecutively with a one hour interval between the drug applications. One half of the study patients initially inhaled treprostinil and then inhaled iloprost (n=22), while the other half initially inhaled iloprost and then inhaled treprostinil (n=22). Patients were randomized to one of the two groups and blinded as to the study drugs. Drug effects were monitored for 60 minutes after each inhalation. Iloprost was inhaled at 4 μg/ml (6 min inhalation time; n=44) and treprostinil was inhaled at a concentration of 4 μg/ml (6 min inhalation; n=14), 8 μg/ml (6 min inhalation; n=14) or 16 μg/ml (3 min inhalation; n=16). Based on previous biophysical characterization of the ultrasonic device with iloprost- and treprostinil-solution, this corresponds to a total inhaled dose of 7.5 μg iloprost and treprostinil (4 μg/ml) and 15 μg treprostinil (8 μg/ml and 16 μg/ml), respectively.

Study ii) was a randomized, open-label, single blind, placebo controlled study. The primary objectives were to describe the pharmacodynamic and pharmacokinetic effects of inhaled treprostinil at a well tolerated dose (30 μg) and to explore the highest tolerated single dose. A total number of 31 patients inhaled either placebo or treprostinil; each patient received one inhalation. The first 16 patients were randomized to 30 μg TRE (16 μg/ml, n=8) or placebo (stock solution in a concentration corresponding to TRE 16 μg/ml). Subsequent patients received 60 μg TRE (32 μg/ml; n=6), 90 μg TRE (48 μg/ml; n=6) and 120 μg TRE (64 μg/ml; n=3). Inhalation time was 6 minutes in all groups. Hemodynamics and gas-exchange as well as arterial treprostinil concentrations were recorded for 180 minutes.

Study iii) was a randomized, open-label, single blind study. The primary objective was to explore the shortest possible inhalation time for a 15 μg dose of inhaled treprostinil. A total of 48 patients inhaled one dose of TRE during right heart catheter investigation. The drug was applied in 18, 9, 3, 2 or 1 breaths. The aerosol was generated by a pulsed ultrasonic nebulizer (OPTINEB®, Nebutec, Elsenfeld, Germany) in cycles consisting of 2 seconds aerosol production (pulse) and 4 seconds pause. The device included an opto-acoustical trigger for the patient to synchronize the inspiration to the end of the aerosol pulse, thereby providing exact dosage. The TRE dose of 15 μg was either generated during 18 cycles (OPTINEB® filled with 100 μg/ml TRE, n=6), 9 cycles (200 μg/ml TRE, n=6), 3 cycles (600 μg/ml TRE, n=21), 2 cycles (1000 μg/ml TRE, n=7) or 1 cycle (2000 μg/ml TRE, n=8). Hemodynamics and gas exchange were recorded for 120-180 minutes.

Treprostinil plasma concentrations were assessed in study ii) at 10, 15, 30, 60 and 120 minutes after inhalation. Treprostinil quantification was done by Alta Analytical Laboratory (El Dorado Hills, Calif., USA) with a validated liquid chromatography atmospheric-pressure ionization tandem mass spectrometry as previously described Wade M., et al. J. Clin. Pharmacol. 2004; 44:503-9. Mixed venous blood was drawn at the depicted time points (FIG. 11) after inhalation, centrifuged and the plasma frozen at −80° C. until temperature controlled shipping on dry ice.

Statistics:

For statistical analysis of study i) the repeated PVR measurements after inhaled iloprost and treprostinil were subjected to a three-factorial analysis of variance (ANOVA; factors: time (A), drug (B), treprostinil concentration (C)) to avoid multiple testing. The time to maximum PVR decrease after inhalation of iloprost versus treprostinil was compared by paired t-test. Area under the curve (AUC) was calculated from start of inhalation until 60 min after inhalation. Means, standard error of the mean (SEM) and 95% confidence

intervals were calculated. For study ii) and iii) areas between curves (ABC) were calculated between placebo inhalation (study ii) and the respective treprostinil inhalation until 180 min (study ii)) and 120 min (study iii)) after end of inhalation.

Results:

The inhalation of iloprost as well as treprostinil in study i) resulted in a rapid decrease in PVR and PAP (FIG. **5-7**). No significant differences were observed for the areas under the curve (AUC) of PVR decrease after inhalation of 7.5 μg TRE in 6 minutes (AUC −12.6±7.0%), 15 μg TRE in 6 minutes (AUC −13.3±3.2%) and 15 μg TRE in 3 minutes (AUC −13.6±4.3%). The AUC for PVR after the inhalation of 7.5 μg iloprost in 6 minutes was −7.7±3.7% (mean±95% confidence interval). An overview of the pooled data of treprostinil inhalation as compared to iloprost inhalation is given in FIG. **7**. The maximum effect of iloprost and treprostinil on PVR was comparable but this effect was reached significantly later after treprostinil inhalation (18±2 min) compared to iloprost (8±1 min; mean±SEM, p<0.0001) and lasted considerably longer (after 60 min, PVR values in the treprostinil group had not yet returned to baseline). The increase in cardiac output was less acute but prolonged after treprostinil inhalation. Systemic arterial pressure (SAP) was unaffected by treprostinil inhalation, whereas a transient decrease was observed after iloprost inhalation. Iloprost and treprostinil did not affect gas exchange. Three-factorial ANOVA for PVR demonstrated a significant difference between repeated measurements after inhalation ($p_{(A)}$<0.0001), no significant difference between drugs ($p_B$=0.1), no difference between treprostinil concentrations ($p_{(C)}$=0.74) and a significant drug×time interaction ($p_{(A\times B)}$<0.0001). This translates into a significant effect of both drugs on PVR with comparable drug potency but a prolonged drug effect of treprostinil compared to iloprost.

In this study the occasionally observed mild side effects of iloprost inhalation at the given dose (transient flush, headache) were not observed with inhaled treprostinil. Bad taste was reported by most of the patients after inhalation of TRE. This was later found to be attributable to the metacresol preservative contained in the treprostinil solution.

In study ii) pharmacodynamics of inhaled placebo or treprostinil were observed for 180 minutes. Placebo inhalation was followed by a gradual increase in PVR over the entire observation time. Due to reduced patient numbers in the 120 μg TRE group (because of side effects, see below), the hemodynamic values for this group were not included in the graphs of this study (FIG. **8-9**). All TRE doses lead to comparable maximal decreases of PVR to 76.5±4.7% (30 μg), 73.7±5.8% (60 μg), 73.3±4.3% (90 μg) and 65.4±4.1% (120 μg) of baseline values. An extended duration of pulmonary vasodilation was noted, surpassing the 3 hour observation period for the 60 μg and 90 μg (and 120 μg) TRE doses, whereas in the 30 μg dose group the hemodynamic changes had just returned to baseline within this period. Even at the highest doses, TRE had only minor effects on systemic arterial pressure (FIG. **8**). Cardiac output was increased to a maximum of 106.8±3.2% (30 μg), 122.9±4.3% (60 μg), 114.3±4.8% (90 μg) and 111.3±3.9% (120 μg TRE). The areas between the response curves after placebo versus TRE inhalation were calculated for PVR, PAP, SVR and SAP (FIG. **9**). Areas between the curves for PVR were not significantly different for 30 μg, 60 μg and 90 μg TRE, a nearly maximal effect on PVR was already observed with 30 μg TRE. Effects on PAP and SAP were small and did not show a dose-response relationship. Gas exchange was not affected at doses up to 90 μg TRE, but arterial oxygen saturation was significantly decreased at a dose of 120 μg TRE in all 3 patients. Further dose increments were omitted due to this side effect and severe headache in one patient.

Again, bad taste of the TRE aerosol was reported by most patients. Other side effects were flushing (n=1; 30 μg TRE), mild transient cough (n=3; 60 μg TRE), mild transient bronchoconstriction that resolved after one inhalation of fenoterol (n=1; 30 μg TRE), moderate bronchoconstriction that resolved after one inhalation of fenoterol (n=1; 120 μg TRE), and severe headache (n=1; 120 μg TRE). The bad taste, the bronchoconstriction and the drop in SaO2 was attributed to metacresol in the original TRE solution. With the use of a metacresol-free solution of TRE (University Hospital Giessen, Germany; produced according to the manufacturer's protocol) in the following study, these side effects did no longer occur.

Study iii) was performed with metacresol-free TRE solution, having no specific taste and smell. A total of 48 patients were enrolled. This study aimed at the reduction of inhalation time and aerosol volume needed for pulmonary drug delivery. A modified OPTINEB® inhalation device was programmed to produce a constant amount of aerosol during repeatable pulses of aerosol generation. With this device, treprostinil could be safely utilized up to a concentration of 2000 μg/ml without considerable side effects. No relationship of number or type of side effects to TRE concentration was observed. Reported side effects were mild transient cough (n=6), mild headache (n=2) and mild jaw pain (n=1).

The reduction of PVR and PAP was comparable between all groups (FIG. **10**). TRE inhalation reduced PVR to 76.3±5.6% (18 pulses, 100 μg/ml), 72.9±4.9% (9 pulses, 200 μg/ml), 71.2±6.0% (3 pulses, 600 μg/ml), 77.4±4.5% (2 pulses, 1000 μg/ml) and 80.3±5.2% (1 pulse, 2000 μg/ml). PAP was reduced to 84.2±4.5% (18 pulses, 100 μg/ml), 84.2±4.1% (9 pulses, 200 μg/ml), 81.1±4.1% (3 pulses, 600 μg/ml), 86±4% (2 pulses, 1000 μg/ml) and 88±5.4% (1 pulse, 2000 μg/ml). Cardiac output was moderately increased in all groups, whereas systemic arterial pressure was not significantly affected.

The areas between the curves (ABC) for changes in hemodynamic and gas-exchange parameters after inhalation of 15 μg TRE versus placebo were calculated for an observation time of 120 minutes (FIG. **11**). The ABC for both PVR and PAP was comparable between all groups.

Pharmakokinetic results from study ii): Peak plasma concentrations of treprostinil were found 10-15 minutes after inhalation. Maximal treprostinil plasma concentrations ($C_{max}$) for the 30 μg, 60 μg, 90 μg and 120 μg doses were 0.65±0.28 ng/ml (n=4), 1.59±0.17 ng/ml (n=4), 1.74 ng/ml (n=1) and 3.51±1.04 ng/ml (n=2), respectively (mean±SEM; FIG. **12**).

Discussion:

These studies investigated whether i) the acute effects of inhaled treprostinil would be comparable to or possibly advantageous over inhaled iloprost in pulmonary hypertensive patients, ii) the inhaled prostanoid dose might be increased without substantial local or systemic side effects, and iii) if the time of inhalation, which is 6-12 minutes for iloprost, could be reduced significantly by increasing the concentration of treprostinil aerosol.

The patient population in these studies included different forms of precapillary pulmonary hypertension. All these patients had a need for therapy of pulmonary hypertension and reflected the typical population of a pulmonary hyper-

tension center. No major differences in patient characteristics or hemodynamic baseline values existed between the different groups (table 3).

In study i) it was shown that the inhalation of treprostinil and iloprost in similar doses resulted in a comparable maximum pulmonary vasodilatory effect. However, marked differences in the response profile were noted. The onset of the pulmonary vasodilatory effect of inhaled treprostinil was delayed compared to iloprost, but lasted considerably longer, with the PVR decrease continuing beyond the one-hour observation period. Although the average dose of treprostinil was higher than the iloprost dose, no systemic effects were noted after treprostinil inhalation, whereas flush and transient SAP decrease, accompanied by more prominent cardiac output increase, occurred after iloprost inhalation. Such side effects were more prominent than in previous studies with inhaled iloprost. This may have been caused by the fact that the iloprost dose used in this study was 50% higher than the recommended single inhalation dose (5 μg) and that the preceding treprostinil inhalation may have added to the systemic side effects caused by the iloprost inhalation. Surprisingly, with TRE there was no such systemic side effect, although the average effect on PVR was as potent as with iloprost.

This study used a cross-over design in order to minimize the effects of inter-individual differences in response to prostanoids. The short observation period of 1 hour was used to avoid an uncomfortably long catheter investigation. As a study limitation, the short observation interval may have caused carryover effects of the first to the second period as suggested by FIG. **5**. However, this still allowed for the interpretation of the study, that both drugs are potent pulmonary vasodilators and that treprostinil effects are significantly sustained compared to the iloprost effects.

The longer duration of action and the virtual absence of side effects (except the bitter taste of treprostinil aerosol, later attributed to metacresol) encouraged increasing the applied treprostinil dose in study ii). Observation time was extended to 3 hours to obtain precise pharmacodynamic data. Inhaled treprostinil resulted in a strong pulmonary vasodilation that outlasted the observation time of 3 hours when compared to placebo inhalation. Surprisingly, inhaled treprostinil was tolerated in doses up to 90 μg.

Study iii) successfully demonstrated that the inhalation time could be reduced to literally one single breath of 2000 μg/ml treprostinil solution, thereby applying a dose of 15 μg. This drug administration with a single breath induced pulmonary vasodilation for longer than 3 hours compared to placebo inhalation. Side effects were minor, of low frequency and not related to drug concentration. It was a surprising finding that such high concentrations of treprostinil were so well tolerated.

Conclusion:

Inhaled treprostinil can be applied in high doses (up to 90 μg) with a minimal inhalation time. Inhaled treprostinil exerts high pulmonary selectivity and leads to a long-lasting pulmonary vasodilation.

Although the foregoing refers to particular preferred embodiments, it will be understood that the present invention is not so limited. It will occur to those of ordinary skill in the art that various modifications may be made to the disclosed embodiments and that such modifications are intended to be within the scope of the present invention.

All of the publications, patent applications and patents cited in this specification are incorporated herein by reference in their entirety.

What is claimed is:

**1**. A method of treating pulmonary hypertension comprising administering by inhalation to a human suffering from pulmonary hypertension a therapeutically effective single event dose of a formulation comprising treprostinil or a pharmaceutically acceptable salt thereof with an inhalation device, wherein the therapeutically effective single event dose comprises from 15 micrograms to 90 micrograms of treprostinil or a pharmaceutically acceptable salt thereof delivered in 1 to 3 breaths.

**2**. The method of claim **1**, wherein the inhalation device is a soft mist inhaler.

**3**. The method of claim **1**, wherein the inhalation device is a pulsed ultrasonic nebulizer.

**4**. The method of claim **1**, wherein the inhalation device is a dry powder inhaler.

**5**. The method of claim **1**, wherein the inhalation device is a pressurized metered dose inhaler.

**6**. The method of claim **4**, wherein the formulation is a powder.

**7**. The method of claim **6**, wherein the powder comprises particles less than 5 micrometers in diameter.

**8**. The method of claim **1**, wherein the formulation contains no metacresol.

* * * * *

## CERTIFICATE OF COMPLIANCE

The foregoing filing complies with the type-volume limitations of the Federal Rules of Appellate Procedure and Federal Circuit Rules, has been prepared using a proportionally-spaced typeface, and includes 13,787 words.

Dated: October 21, 2022

*/s/ Sanya Sukduang*

Sanya Sukduang
Cooley LLP

*Counsel for Defendant-Appellant*
*Liquidia Technologies, Inc*