**Nos. 2022-2217, 2023-1021**

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

**UNITED THERAPEUTICS CORPORATION,**
*Plaintiff-Cross-Appellant,*

**v.**

**LIQUIDIA TECHNOLOGIES, INC.,**
*Defendant-Appellant.*

On Appeal from a Judgment of the United States District Court for the District of Delaware, No. 20-cv-755 (Andrews, J.)

## CROSS-APPELLANT'S PRINCIPAL AND RESPONSE BRIEF


Shaun R. Snader
UNITED THERAPEUTICS CORPORATION
1735 Connecticut Avenue, N.W.
Washington, DC 20009
(202) 304-1701

Douglas H. Carsten
Arthur P. Dykhuis
MCDERMOTT, WILL & EMERY LLP
18565 Jamboree Road, Ste. 250
Irvine, CA 92612
(949) 851-0633

Adam Burrowbridge
MCDERMOTT, WILL & EMERY LLP
500 N. Capitol Street, N.W.
Washington, DC 20001
(202) 756-8797

Jaime A. Santos
William C. Jackson
William M. Jay
Jenny J. Zhang
Rohiniyurie Tashima*
GOODWIN PROCTER LLP
1900 N Street, N.W.
Washington, DC 20036
(202) 346-4034

Gerard J. Cedrone
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210
(617) 570-1000

**Admitted only in New York and Virginia; not admitted in the District of Columbia. Practicing under the supervision of counsel admitted in the District of Columbia.*


December 14, 2022

*Counsel for Cross-Appellant*

**CORRECTED**

## PATENT CLAIMS AT ISSUE

**U.S. Patent No. 10,716,793:**

**1.** A method of treating pulmonary hypertension comprising administering by inhalation to a human suffering from pulmonary hypertension a therapeutically effective single event dose of a formulation comprising treprostinil or a pharmaceutically acceptable salt thereof with an inhalation device, wherein the therapeutically effective single event dose comprises from 15 micrograms to 90 micrograms of treprostinil or a pharmaceutically acceptable salt thereof delivered in 1 to 3 breaths.

**4.** The method of claim **1**, wherein the inhalation device is a dry powder inhaler.

**6.** The method of claim **4**, wherein the formulation is a powder.

**7.** The method of claim **6**, wherein the powder comprises particles less than 5 micrometers in diameter.

**8.** The method of claim **1**, wherein the formulation contains no metacresol.

**U.S. Patent No. 9,593,066:**

**1.** A pharmaceutical composition comprising treprostinil or a pharmaceutically acceptable salt thereof, said composition prepared by a process comprising providing a starting batch of treprostinil having one or more impurities resulting from prior alkylation and hydrolysis steps, forming a salt of treprostinil by combining the starting batch and a base, isolating the treprostinil salt, and preparing a pharmaceutical composition comprising treprostinil or a pharmaceutically acceptable salt thereof from the isolated treprostinil salt, whereby a level of one or more impurities found in the starting batch of treprostinil is lower in the pharmaceutical composition, and wherein said alkylation is alkylation of benzindene triol.

(continued)

**2.** The pharmaceutical composition of claim **1**, wherein the salt is isolated in crystalline form.

**3.** The pharmaceutical composition of claim **1**, wherein the base is selected from the group consisting of sodium, ammonia, potassium, calcium, ethanolamine, diethanolamine, N-methylglucamine, and choline.

**6.** The pharmaceutical composition of claim **1**, wherein the isolated salt is stored at ambient temperature.

**8.** A process of preparing a pharmaceutical product comprising treprostinil or a pharmaceutically acceptable salt thereof, comprising alkylating a triol intermediate of the formula:




hydrolyzing the resulting compound to form treprostinil, forming a salt of treprostinil stable at ambient temperature, storing the treprostinil salt at ambient temperature, and preparing a pharmaceutical product from the treprostinil salt after storage, wherein the pharmaceutical product comprises treprostinil or a pharmaceutically acceptable salt thereof.

## CERTIFICATE OF INTEREST

Counsel for Cross-Appellant certifies the following:

1. **The full name of every party represented by me is:**

   United Therapeutics Corporation.

2. **The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:**

   None.

3. **All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party represented by me are:**

   BlackRock Inc. may own 10% or more of the stock of United Therapeutics Corporation.

4. **The names of all law firms and the partners or associates that appeared for the party now represented by me in the trial court or are expected to appear in this court (and who have not or will not enter an appearance in this case) are:**

   MORRIS, NICHOLS, ARSHT & TUNNELL LLP: Jack B. Blumenfeld; Michael J. Flynn; Sarah Elizabeth Simonetti

   MCDERMOTT, WILL & EMERY LLP: Ian B. Brooks; Timothy M. Dunker; Mandy H. Kim; Amy Mahan; Katherine Pappas; Joshua Revilla; Jiaxiao Zhang

   WILSON, SONSINI, GOODRICH & ROSATI: Joshua Mack

   GOODWIN PROCTER LLP: Joel Broussard; Harrison Gunn; Eric Levi; Huiya Wu

   BOIES SCHILLER FLEXNER LLP: Bill Ward

**5. The title and number of any case known to me to be pending in this or any other court or agency that will directly affect or be directly affected by this Court's decision in the pending appeal are:**

None.

**6. Any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees):**

None.

December 14, 2022

/s/ *Jaime A. Santos*
Jaime A. Santos

# TABLE OF CONTENTS


Glossary ..... xii

Statement of Related Cases ..... xiv

Introduction ..... 1

Jurisdictional Statement ..... 4

Counter-Statement of the Issues on Appeal ..... 4

Statement of the Issues on Cross-Appeal ..... 5

Statement of the Case ..... 6

I. Factual Background ..... 6

A. Pulmonary Hypertension and UTC's Patented Inventions ..... 6

B. Liquidia's Proposed Product ..... 8

II. Procedural History ..... 9

A. Liquidia's NDA and the Ensuing Patent Litigations ..... 9

B. The District Court's Decision ..... 11

1. The '793 Patent ..... 11

2. The '066 Patent ..... 14

Summary of Argument ..... 18

Standard of Review ..... 23

Argument ..... 24

I. The district court correctly rejected Liquidia's sole basis for claiming it does not induce infringement. ..... 24

A. *Commil* provides no support for Liquidia's scienter argument. ..... 25

B. The PTAB's decision on the '793 Patent is not final and has no binding effect in this litigation. ..... 27

II. The district court did not clearly err in finding that the specification of the '793 Patent enables and adequately describes "treating pulmonary hypertension." ..... 31

A. Liquidia's arguments attack a caricature of the district court's decision and are meritless. 33

B. The claims of the '793 Patent are enabled. 39

C. The claims of the '793 Patent are supported by adequate written description. 46

D. In the alternative, understanding the relevant claims to cover the treatment of precapillary pulmonary hypertension defeats all of Liquidia's asserted errors. 49

III. The district court did not clearly err in finding claims 1-3 of the '066 Patent infringed. 52

A. The district court's detailed findings support infringement 52

B. Liquidia's "proxy" argument has no factual or legal support. 56

IV. The district court erred in concluding that Liquidia does not infringe the storage limitations of claims 6 and 8 of the '066 Patent. 60

A. Liquidia's NDA permits infringement of claims 6 and 8 of the '066 Patent 61

1. Liquidia's NDA seeks approval to market an infringing product. 62

2. Liquidia's promises not to sell infringing batches of Yutrepia provide no safe harbor. 65

B. The district court erred in construing "storage" for purposes of infringement of claims 6 and 8. 68

V. Liquidia additionally infringes claim 8 through ambient storage that occurs between steps 1-4 of Liquidia's PRINT process. 71

VI. Claims 1-3 and 6 of the '066 Patent are not anticipated by Moriarty 2004. 75

A. The district court erroneously disregarded specific impurities in the claimed pharmaceutical composition. 77

B. No evidence at trial established that the product of Moriarty 2004 had the same level of relevant impurities as the claimed product. ........ 82

C. UTC presented unrebutted evidence at trial that salt formation reduced specific impurities from alkylation and hydrolysis over the prior art. ........ 84

D. Comparisons between UTC's commercial processes were irrelevant to anticipation by Moriarty 2004. ........ 87

Conclusion ........ 89

Certificate of Service ........ 91

Certificate of Compliance ........ 92

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Alcon Rsch. Ltd. v. Barr Labs., Inc.*,
745 F.3d 1180 (Fed. Cir. 2014) ........................................................ 41

*Amgen Inc. v. F. Hoffman–La Roche Ltd.*,
580 F.3d 1340 (Fed. Cir. 2009) .............................................. 77, 78, 82

*Atlas Powder Co. v. E.I. du Pont De Nemours & Co.*,
750 F.2d 1569 (Fed. Cir. 1984) ........................................................ 44

*Auto. Techs. Int'l, Inc. v. BMW of N. Am., Inc.*,
501 F.3d 1274 (Fed. Cir. 2007) ........................................................ 23

*Biogen Int'l GmbH v. Mylan Pharm., Inc.*,
18 F.4th 1333 (Fed. Cir. 2021)......................................................... 48

*Caraco Pharm. Labs., Ltd. v. Forest Labs., Inc.*,
527 F.3d 1278 (Fed. Cir. 2008) ........................................................ 66

*Cephalon Inc. v. Watson Pharms., Inc.*,
707 F.3d 1330 (Fed. Cir. 2013) ........................................................ 45

*Commil USA, LLC v. Cisco Sys., Inc.*,
575 U.S. 632 (2015)..........................................2, 12, 18, 25, 26, 27, 29

*Crown Operations Int'l, Ltd. v. Solutia, Inc.*,
289 F.3d 1367 (Fed. Cir. 2002) ........................................................ 44

*In re Dinh-Nguyen*,
492 F.2d 856 (C.C.P.A. 1974)........................................................... 43

*Elbit Sys. of Am., LLC v. Thales Visionix, Inc.*,
881 F.3d 1354 (Fed. Cir. 2018) ........................................................ 38

*Eli Lilly & Co. v. Medtronic, Inc.*,
496 U.S. 661 (1990)........................................................................... 61

*Eli Lilly & Co. v. Teva Parenteral Meds., Inc.*,
845 F.3d 1357 (Fed. Cir. 2017) ........................................................ 23

*Endo Pharms. Sols., Inc. v. Custopharm Inc.*,
894 F.3d 1374 (Fed. Cir. 2018) ........................................................ 88

*Ferring B.V. v. Watson Labs., Inc.-Fla.*,
764 F.3d 1401 (Fed. Cir. 2014) ........................................................ 58

*Forest Labs., Inc. v. Ivax Pharm., Inc.*,
501 F.3d 1263 (Fed. Cir. 2007) ........................................................ 23

*Fromson v. Advance Offset Plate, Inc.*,
755 F.2d 1549 (Fed. Cir. 1985) ........................................................ 30

*Fujitsu Ltd. v. Netgear Inc.*,
620 F.3d 1321 (Fed. Cir. 2010) ........................................................ 67

*In re Geerdes*,
491 F.2d 1260 (C.C.P.A. 1974)......................................................... 51

*Greenliant Sys., Inc. v. Xicor LLC*,
692 F.3d 1261 (Fed. Cir. 2012) ........................................................ 77

*Intervet Inc. v. Merial Ltd.*,
617 F.3d 1282 (Fed. Cir. 2010) ........................................................ 70

*Kamstrup A/S v. Axioma Metering UAB*,
43 F.4th 1374 (Fed. Cir. 2022)................................................... 78, 81

*Kim v. ConAgra Foods, Inc.*,
465 F.3d 1312 (Fed. Cir. 2006) ........................................................ 59

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
358 F.3d 898 (Fed. Cir. 2004) .......................................................... 38

*Markman v. Westview Instruments, Inc.*,
52 F.3d 967 (Fed. Cir. 1995) ..................................................... 23, 70

*Microsoft Corp. v. i4i Ltd. P'ship*,
564 U.S. 91 (2011)........................................................................... 25

*Morton Int'l, Inc. v. Cardinal Chem. Co.*,
959 F.2d 948 (Fed. Cir. 1992), *vacated*, 508 U.S. 83 (1993)...............58

*In re Myers*,
410 F.2d 420 (C.C.P.A. 1969)...............43

*In re Nordt Dev. Co.*,
881 F.3d 1371 (Fed. Cir. 2018)...............79, 81

*Nuvo Pharm. (Ireland) Designated Activity Co. v. Dr. Reddy's Labs. Inc.*,
923 F.3d 1368 (Fed. Cir. 2019)...............23, 48

*Par Pharm., Inc. v. Hospira, Inc.*,
835 F. App'x 578 (Fed. Cir. 2020)...............67

*Personal Audio, LLC v. CBS Corp.*,
946 F.3d 1348 (Fed. Cir. 2020)...............28

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005)...............49

*Propellex Corp. v. Brownlee*,
342 F.3d 1335 (Fed. Cir. 2003)...............49

*Purdue Pharma L.P. v. Epic Pharma, LLC*,
811 F.3d 1345 (Fed. Cir. 2016)...............78

*Roche Diagnostics Corp. v. Meso Scale Diagnostics, LLC*,
30 F.4th 1109 (Fed. Cir. 2022)...............25

*Scott v. Finney*,
34 F.3d 1058 (Fed. Cir. 1994)...............36

*St. Mary's Honor Ctr. v. Hicks*,
509 U.S. 502 (1993)...............30

*Sunovion Pharms., Inc. v. Teva Pharms. USA, Inc.*,
731 F.3d 1271 (Fed. Cir. 2013)...............3, 21, 61, 62, 65, 66, 67, 68

*Trs. of Boston Univ. v. Everlight Elecs. Co.*,
896 F.3d 1357 (Fed. Cir. 2018)...............45

*United States v. UPS Customhouse Brokerage, Inc.*,
575 F.3d 1376 (Fed. Cir. 2009) .......... 63

*Vita-Mix Corp. v. Basic Holding, Inc.*,
581 F.3d 1317 (Fed. Cir. 2009) .......... 70

*XY, LLC v. Trans Ova Genetics*,
890 F.3d 1282 (Fed. Cir. 2018) .......... 28

**Statutes**

21 U.S.C. §355(b)(2)(A)(iv) .......... 1, 9

28 U.S.C. §1295 .......... 4

28 U.S.C. §1331 .......... 4

28 U.S.C. §1338 .......... 4

35 U.S.C. §271(e)(2) .......... 66

35 U.S.C. §318(a) .......... 28

35 U.S.C. §318(b) .......... 2, 28, 31

35 U.S.C. §319 .......... 30

**Other Authorities**

Manual of Patent Examining Procedure §2164.05 .......... 36

## GLOSSARY

| | |
|---|---|
| ’066 Patent | U.S. Patent No. 9,593,066 |
| ’393 Patent | U.S. Patent No. 8,497,393 |
| ’793 Patent | U.S. Patent No. 10,716,793 |
| ’901 Patent | U.S. Patent No. 9,604,901 |
| BTO | benzindene triol |
| DMF | Drug Master File |
| FIRST study | Califf et al., *A randomized controlled trial of epoprostenol therapy for severe congestive heart failure: The Flolan International Randomized Survival Trial (FIRST)*, Am. Heart J. 134(1):44-54 (July 1997) |
| LIQ861 | bulk inhalation powder that Liquidia processes from treprostinil sodium |
| Liquidia | Defendant-Appellant Liquidia Technologies, Inc. |
| Liquidia Br. | Liquidia’s Opening Brief, ECF No. 21 |
| Moriarty 2004 | Moriarty et al., *The Intramolecular Asymmetric Pauson-Khand Cyclization as a Novel and General Stereoselective Route to Benzindene Prostacyclins: Synthesis of UT-15*, 69 J. Org. Chem. 1890-1902 (2004) (Appx1471-1483) |
| NDA | new drug application |
| PH | pulmonary hypertension |
| POP | Precedential Opinion Panel of the PTAB |
| POSA | person of ordinary skill in the art |
| PRINT | Particle Replication in Nonwetting Templates |
| PTAB | Patent Trial and Appeal Board |
| PTO | U.S. Patent and Trademark Office |
| TN | treprostinil sodium |

| | |
|---|---|
| TN01 | benzindene nitrile (formed through alkylation of BTO) |
| TN02 | a starting batch of treprostinil formed through hydrolysis of benzindene nitrile |
| UTC | Plaintiff-Cross-Appellant United Therapeutics Corporation |

## STATEMENT OF RELATED CASES

None.

## INTRODUCTION

This case is about a prescription drug used to treat pulmonary hypertension—a rare, chronic, and often fatal disease. Pulmonary hypertension is characterized by increased pressure in the blood vessels between the heart and lungs. That increased pressure strains the heart and, over time, can result in heart failure and death. Plaintiff United Therapeutics Corporation (UTC) has pioneered several inventions related to the treatment of pulmonary hypertension using treprostinil. In U.S. Patent No. 9,593,066 ('066 Patent), UTC claims a novel process for preparing treprostinil, as well as the improved pharmaceutical composition the claimed process generates. In U.S. Patent No. 10,716,793 ('793 Patent), UTC claims a novel use of treprostinil by inhalation to treat pulmonary hypertension.

Defendant Liquidia Technologies has sought FDA approval to market its own inhaled pulmonary-hypertension drug. Because Liquidia's FDA application piggybacks on the agency's approval of UTC's patented drug, Liquidia certified that the '066 and '793 Patents are either invalid or not infringed by its proposed product. *See* 21 U.S.C. §355(b)(2)(A)(iv). But the district court found that Liquidia infringes

claims 1, 4, 6, 7, and 8 of the '793 Patent and that those claims are not invalid.

Liquidia presents no valid basis to reverse that judgment. Liquidia's only argument for reversal of the court's induced-infringement finding relies on a PTAB decision from earlier this year concluding that the claims of the '793 Patent are obvious. Citing *Commil USA, LLC v. Cisco Systems, Inc.*, 575 U.S. 632 (2015), Liquidia argues that the agency's decision—which the PTO has now effectively vacated due to errors in the PTAB's analysis—somehow precluded the district court from finding that Liquidia possessed the requisite scienter to induce infringement. But *Commil* provides no safe harbor to Liquidia. That case makes clear that a defendant's mental state as to invalidity has no relevance to induced infringement. *Id.* at 643-44. Only the *actual invalidation* of a patent prevents liability for infringement (because "an invalid patent cannot be infringed," *id.* at 644), and any PTAB decision of unpatentability has no invalidating effect until "any appeal has terminated." 35 U.S.C. §318(b). That has not happened—indeed, the PTAB's now-vacated decision is not even appealable yet.

Nor has Liquidia shown any clear error in the district court's finding that the specification of the '793 Patent describes and enables the claims. In an effort to secure *de novo* review, Liquidia attempts to manufacture a claim-construction dispute, but its quarrel is really with the district court's factfinding. And the record amply supports the district court's conclusion that a skilled artisan would have understood treprostinil to improve pulmonary-hypertension patients' hemodynamics—which is all the relevant claim language requires. The Court should therefore affirm the judgment as to the '793 Patent.

At the same time, the Court should reverse in part the district court's judgment as to the '066 Patent. While the district court correctly found that Liquidia infringes claims 1-3, it erred in concluding that Liquidia does not infringe claims 6 and 8. The district court found non-infringement because Liquidia represented that, following FDA approval, it will not sell any infringing commercial batches, even though its application seeks FDA approval to do so. Under this Court's case law, however, such a promise is "not enough to avoid infringement" in a pre-launch Hatch-Waxman case. *Sunovion Pharms., Inc. v. Teva Pharms. USA, Inc.*, 731 F.3d 1271, 1278 (Fed. Cir. 2013). The district court also

erred in concluding that claims 1-3 and 6 of the ’066 Patent are anticipated: the sole reference on which Liquidia and the district court rely does not disclose the claimed “pharmaceutical composition” as properly construed, and therefore cannot anticipate.

For these reasons, the Court should affirm in part and reverse in part.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §§1331 and 1338. The court entered final judgment on September 9, 2022. Appx00075-00077. Liquidia noticed its appeal on September 12, 2022, Appx31533-31534, and UTC timely noticed its cross-appeal on October 3, 2022, Appx36633-36636. This Court has jurisdiction under 28 U.S.C. §1295.

## COUNTER-STATEMENT OF THE ISSUES ON APPEAL

1. Whether the district court erred in concluding that a non-final PTAB decision does not shield Liquidia from liability for inducing infringement of the ’793 Patent.

2. Whether, in evaluating Liquidia’s invalidity challenges to the claims of the ’793 Patent, the district court:

a. erred in declining to import a new unstated safety-and-effectiveness limitation into the patent claims;

b. erred in concluding that the patent enables a method of treating pulmonary hypertension; and

c. clearly erred in finding that the patent adequately describes a method of treating pulmonary hypertension.

3. Whether the district court clearly erred in finding that Liquidia infringes claims 1-3 of the ’066 Patent in light of the unrebutted testimony of UTC’s expert about the impurity reductions in Liquidia’s manufacturing process.

## STATEMENT OF THE ISSUES ON CROSS-APPEAL

4. Whether the district court erred in concluding that Liquidia does not infringe claims 6 and 8 of the ’066 Patent by allowing Liquidia’s promises that it will not infringe to override the scope of Liquidia’s new drug application, or by erroneously construing “storage” to exclude storage that occurs during the manufacturing process.

5. Whether the district court erred in concluding that Liquidia does not infringe claim 8 of the ’066 Patent, when it effectively nullified the distinction between two distinct claim steps.

6. Whether the district court erred in concluding that claims 1, 2, 3, and 6 of the '066 Patent are invalid as anticipated by Moriarty 2004, when it failed to account for the novel structural features conferred by the claim limitations.

## STATEMENT OF THE CASE

### I. Factual Background

#### A. Pulmonary Hypertension and UTC's Patented Inventions

"Pulmonary hypertension" (PH) generally refers to elevated blood pressure in the blood vessels between the heart and lungs. Appx00059. Given pulmonary hypertension's various causes and symptoms, the World Health Organization uses five groups to categorize pulmonary hypertension based on the underlying cause: (1) pulmonary arterial hypertension, (2) pulmonary venous hypertension, (3) pulmonary hypertension associated with disorders damaging the lungs, (4) pulmonary hypertension caused by chronic thrombotic or embolic disease, and (5) a miscellaneous category for conditions that do not fit well into the other groups. Appx00059. These categories are not mutually exclusive; patients can fall into multiple categories. Appx13183-13184(631:6-632:14). Patients in Groups 1, 3, and 4 have

conditions affecting the pulmonary arteries or *pre*capillary vessels, while patients in Group 2 have defects in the left side of the heart that cause elevated pressure in the *post*capillary veins, which in turn leads to high pressure in the pulmonary arteries. Appx00060. Doctors typically treat "precapillary" patients with vasodilators (drugs that widen blood vessels), and typically treat "postcapillary" patients with diuretics (drugs that increase the excretion of water from the body). *Id.*; *see also* Appx13168(574:12-15), Appx13172(590:12-24), Appx13185(636:2-5, 637:5-7).

UTC is dedicated to finding a cure for pulmonary arterial hypertension and other life-threatening diseases. The company's CEO, Martine Rothblatt, founded UTC after her young daughter was diagnosed with pulmonary hypertension. Appx13037(50:20-51:4). UTC markets a pulmonary-hypertension medication called Tyvaso, which contains an inhaled solution formulation of the vasodilator treprostinil. Appx00021. Tyvaso is covered by the two patents at issue in this appeal. *Id.* The '066 Patent claims an improved treprostinil product prepared by taking a batch of treprostinil with impurities from prior alkylation and hydrolysis steps and reducing the level of those impurities through the

formation and isolation of a treprostinil salt. This novel process allows the isolated treprostinil salt to be stored at ambient temperature and results in a product with lower levels of synthetic impurities from alkylation and hydrolysis, while eliminating the solvents and manpower needed to purify intermediates along the way. Appx00021; *see* Appx00121-00132. The '793 Patent claims the use of delivering treprostinil by inhalation using a specific dosage regimen to treat pulmonary hypertension. Appx00021; *see* Appx00146-00170.

**B. Liquidia's Proposed Product**

This Hatch-Waxman litigation arises from Liquidia's plans to market a treprostinil inhalation product branded Yutrepia.

Liquidia purchases treprostinil sodium, the active pharmaceutical ingredient in Yutrepia, from Yonsung Fine Chemicals Co. Appx00024. Yonsung manufactures treprostinil sodium by (1) alkylating a batch of benzindene triol (BTO) to generate a batch of benzindene nitrile (TN01), (2) hydrolyzing the TN01 to make a batch of treprostinil (TN02), and (3) combining the TN02 with a base, sodium, to make treprostinil sodium (TN), a salt. *Id.* Yonsung then ships treprostinil sodium to Liquidia

through an administrative intermediary, LGM Pharma LLC. Appx00025.

To manufacture Yutrepia from the treprostinil sodium, Liquidia follows a six-step process it calls "Particle Replication in Nonwetting Templates" (PRINT). Appx00035, Appx29336. During the first four steps, Liquidia processes the treprostinil sodium into a bulk inhalation powder (LIQ861, or Liquidia's "bulk powder"). Appx29336. To do so, it prepares an aqueous stock solution, molds the solution into particles, and dries and collects the particles as bulk powder. Appx29336. Liquidia then ships the bulk powder to contractor Xcelience, LLC, which completes the last two steps of the PRINT process by encapsulating the bulk powder and packaging it into commercial drug-product kits for sale. Appx29346-29348, Appx00036.

## II. Procedural History

### A. Liquidia's NDA and the Ensuing Patent Litigations

Liquidia filed its NDA for Yutrepia in January 2020. As part of the application process, Liquidia certified pursuant to 21 U.S.C. §355(b)(2)(A)(iv) that three UTC patents—the '066 Patent, the '793 Patent, and U.S. Patent No. 9,604,901 ('901 Patent)—were invalid and not infringed by Liquidia's proposed product. Appx00022. UTC sued

Liquidia for infringement and induced infringement of all three patents. Appx00215-00224.

Liquidia also filed petitions seeking *inter partes* review (IPR) of the patents. The PTAB instituted review of the ’901 and ’793 Patents but declined to institute review of the ’066 Patent. The PTAB ultimately concluded that claims 1-5, 8, and 9 of the ’901 Patent were invalid as obvious, but that claims 6 and 7 were not. Appx05882, Appx05886. UTC’s appeal of the PTAB’s decision is pending in No. 2022-2133. Following claim construction, UTC stipulated before the district court to noninfringement of the asserted ’901 Patent claims. Appx06711-06713.

Liquidia’s challenge to the ’793 Patent followed a different trajectory. In the district court, Liquidia’s ’793 Patent invalidity defenses originally included the same obviousness and anticipation arguments that Liquidia was advancing before the PTAB. *See* Appx08810-08845. But Liquidia abandoned those defenses on the second day of trial, leaving them to be litigated solely in IPR proceedings; Liquidia offered only written-description and enablement invalidity arguments in district court. Appx30762. The PTAB subsequently concluded that the claims of the ’793 Patent were invalid as obvious. But the PTAB’s Precedential

Opinion Panel (POP) has since "determine[d] that the Board's Final Written Decision did not address adequately whether [certain] references qualify as prior art" and "whether [these] references were publicly accessible." Appx36648. The POP instructed the original panel to address those issues during rehearing proceedings, which remain pending. Appx36649.

### B. The District Court's Decision

After a bench trial, the district court concluded that: (1) claims 1, 4, 6, 7, and 8 of the '793 Patent are infringed and not invalid, and (2) claims 1, 2, and 3 of the '066 Patent are infringed, but claims 1, 2, 3, 6, and 9 of the '066 Patent are invalid as anticipated.

#### 1. The '793 Patent

a. The district court found that, by marketing Yutrepia, Liquidia would induce infringement of the asserted claims of the '793 Patent.

First, the court found that treating pulmonary-hypertension patients using Yutrepia would directly infringe by administering through inhalation a therapeutically effective single event dose of treprostinil. The court rejected Liquidia's argument that independent claim 1 was infringed only if patients administered Yutrepia just once per day, rather than multiple times. Appx00051. The court also rejected Liquidia's

argument that claim 1's requirement that each dose be "therapeutically effective" requires proof that a single dose must improve a patient's symptoms, function, or survival. Appx00052. Because a single event dose of treprostinil improved patients' hemodynamics, the court concluded that the administration of Yutrepia "will directly infringe claims 1, 4, 6, 7, and 8" of the '793 Patent. Appx00052-00053.

Second, the court found that Yutrepia's labeling would "inevitably lead" to an infringing use of the product, thereby inducing direct infringement. Appx00055. The court rejected Liquidia's argument that, based on the Supreme Court's decision in *Commil USA, LLC v. Cisco Systems, Inc.*, 575 U.S. 632 (2015), the PTAB's unaffirmed decision invalidating the claims of the '793 Patent precludes a finding of infringement. Appx00056.

b. Because Liquidia abandoned its obviousness and anticipation arguments (*see supra*, p. 10), the district court limited its invalidity analysis of the '793 Patent to Liquidia's §112 arguments. The court found that claims 1, 4, 6, 7, and 8 were enabled and adequately described. Appx00059-00065.

After concluding that claim 1's requirement of "treating pulmonary hypertension" includes treatment of all five types of PH, Appx00061, the court determined that the '793 Patent was not invalid. The court acknowledged that physicians might have safety concerns about treating Group 2 patients with treprostinil because vasodilators may exacerbate some Group 2 patients' symptoms. Appx00061-00063. But both experts agreed that treprostinil could be used to treat at least some Group 2 patients, and Liquidia's expert even testified that he had previously done so. Appx13185(636:6-637:1); Appx13175(599:9-12). Thus, "[t]he fact that a physician might be cautious and need to monitor the patient more closely when administering treprostinil to isolated Group 2 PH patients," the court reasoned, does not mean that "it would require undue experimentation for a POSA to use treprostinil to improve a patient's hemodynamics." Appx00064. Because the '793 Patent enables and describes the treatment of PH patients through improved hemodynamics that stem from using the claimed invention, the court concluded that claims 1, 4, 6, 7, and 8 of the '793 Patent are valid.

### 2. The ’066 Patent

a. The district court found that Liquidia infringes claims 1, 2, and 3 of the ’066 Patent. Appx00031.

The court began by rejecting Liquidia’s construction of the term “impurities resulting from prior alkylation and hydrolysis steps,” which would have limited the claimed impurities to those that “result from alkylation and hydrolysis *of ‘BTO*,’ not the alkylation and hydrolysis of any compound that may be present in the reaction vessel.” Appx00025-00026 (emphasis added). The court instead agreed with UTC that the claim language requires only that the impurities “result from the ‘prior alkylation and hydrolysis *steps*.’” Appx00025-00026. Thus, the court concluded, “a POSA would understand that any impurities generated during the alkylation and hydrolysis steps (including from side reactions) are within the scope of the claim.” Appx00026.

For infringement, the district court credited the testimony of UTC’s expert, Dr. Nuckolls, who analyzed Yonsung’s impurities data. Appx00028. As Dr. Nuckolls explained, Yonsung’s data demonstrated that the impurities increased between BTO and the starting batch of treprostinil and then decreased in treprostinil sodium, indicating that

impurities resulting from alkylation and hydrolysis were reduced following salt formation and isolation. Appx13044(77:23-80:18) (testifying that "[u]pon alkylation, the impurities go[] up" and "then upon hydrolysis, you still have a higher level of impurities in [the starting batch of treprostinil], and then it's drastically reduced on the salt formation, as required by the patent"); *see* Appx00028. The court rejected Liquidia's argument that Dr. Nuckolls' analysis was flawed because it compared impurities in the starting batch of treprostinil to those in the treprostinil sodium generated by the salt-formation process, rather than to the bulk powder generated by Liquidia's PRINT process. As the court noted, Liquidia had offered no evidence to rebut the testimony of Dr. Nuckolls, who explained why a POSA would use his comparison. As he testified, "it would be difficult for a POSA to test the impurities resulting from the alkylation and hydrolysis steps in the LIQ861 bulk powder," as Liquidia suggested, "because the composition has been mixed with other excipients." Appx00025-00026, Appx13058(133:25-134:3). Dr. Nuckolls also explained that the impurities in the treprostinil sodium "are representative of the impurities in the 'pharmaceutical composition' (LIQ861 bulk powder)." Appx00027. The court credited that unrebutted

testimony and found that Yutrepia will infringe claims 1, 2, and 3 of the '066 Patent.

b. The court, however, concluded that Liquidia would not infringe claims 6, 8, and 9, which require storage of the salt at ambient temperature. Before trial, the court had construed "ambient temperature" to mean "room temperature (equal to or less than the range of 15°C to 30°C)." Appx00031. The evidence showed that Liquidia's NDA permits storage at ambient temperature and that Liquidia has a history of not tracking storage temperature and of accepting and using shipments of isolated treprostinil sodium with documented storage well outside the 2°-8°C range recommended by Yonsung. Appx00031-00036. Nevertheless, the district court accepted Liquidia's pledge that, following FDA approval, it would store treprostinil sodium between 2°-8°C and not sell Yutrepia manufactured with treprostinil sodium that had been stored at ambient temperature.

c. Next, addressing invalidity, the district court concluded that claims 1, 2, 3, 6, and 9 were invalid as anticipated by a 2004 article by Robert Moriarty (Moriarty 2004), which taught the synthesis of treprostinil free acid (UT-15) through alkylation and hydrolysis of BTO.

Appx00040.[1] Everyone agrees that Moriarty 2004 did not disclose any salt-formation step. Nonetheless, the court concluded that the "product" disclosed in Moriarty 2004 is the same as the product claimed by the '066 Patent. That conclusion relied on three findings: (1) that "the UT-15 treprostinil taught by Moriarty [2004] is the same chemical structure as the treprostinil product of the [the '066 patent claims]"; (2) that the "average [total] purity of UTC's batches of UT-15 treprostinil made by Moriarty [2004] and the '066 process are the same: 99.7%"; and (3) that there are "no structural or functional differences between the UT-15 treprostinil taught by Moriarty [2004] and the treprostinil claimed in the '066 patent." Appx00039. The court did not address or make any findings comparing the levels of any particular impurities (*e.g.*, the synthetic impurities resulting from the alkylation and hydrolysis steps) in the product obtained from Moriarty 2004 to those obtained from the salt-formation process recited in the '066 Patent claims.[2]

---

[1] On appeal, UTC does not contest the district court's invalidity determination with respect to claim 9 and offers no arguments regarding claim 9 in this brief.

[2] The court separately concluded that claims 1, 2, 3, and 6 were not invalid for lack of written description. Appx00048.

## SUMMARY OF ARGUMENT

I. A non-final PTAB decision does not defeat Liquidia's liability for inducing infringement of the '793 Patent. Liquidia argues that it could not possess the requisite scienter as a matter of law in light of the PTAB's decision on the validity of the '793 Patent. But the Supreme Court has made clear that only *actual invalidation* of a patent is a defense to infringement. *See Commil USA, LLC v. Cisco Systems, Inc.*, 575 U.S. 632 (2015). And by statute, the PTAB's decision is not effective—nor the underlying patent canceled—before the parties have exhausted all appeals and the Director issues a certificate canceling the patent's claims. Regardless, the PTAB decision on which Liquidia relies is not final even from the PTO's perspective: the POP has instructed the original panel to reconsider it.

II. The district court did not clearly err in finding that the '793 Patent enabled and adequately described the claimed method of "treating pulmonary hypertension." Liquidia tries to gin up a legal dispute, arguing that the district court adopted a "*sua sponte*" construction that "excluded safety." The court did no such thing. It recognized that a physician prescribing treprostinil to a Group 2 patient would be wary of

safety concerns and appreciate the need for close monitoring. But the court declined to adopt Liquidia's unsupported argument that the claims impose an *additional* safety-and-efficacy limitation for every conceivable patient subgroup.

Liquidia's efforts to attack the district court's factual findings are equally unpersuasive. The district court's §112 decision rested on a series of well-supported factual determinations. As the court explained, treprostinil dilates the lung's blood vessels, and a skilled artisan would have appreciated from the specification that the claimed administration of treprostinil would improve a PH patient's hemodynamics—*i.e.*, "treat[] pulmonary hypertension," as the claims require. There is no error, let alone clear error, in that finding. Liquidia's arguments largely boil down to the contention that treprostinil would not have been a POSA's *preferred* treatment for a Group 2 patient. But that is not the standard for enablement or written description.

In the alternative, this Court could affirm because a POSA would have understood each claim, read as a whole and viewed in context from the perspective of a clinician POSA, to be directed to the treatment of *precapillary* pulmonary hypertension. Because Liquidia's arguments

rest on isolated Group 2 PH patients, which have postcapillary PH only, Liquidia's arguments fail.

III. The district court did not clearly err in finding claims 1-3 of the '066 Patent infringed. The district court found that a POSA would understand the relevant "impurities" to be those generated during the alkylation and hydrolysis steps used to create the starting batch of treprostinil. Liquidia does not contest that finding on appeal. The court also found that the impurities-lowering claim element was satisfied, crediting the unrebutted testimony of UTC's expert that (1) the level of impurities from alkylation and hydrolysis was lower in the treprostinil sodium used in Liquidia's pharmaceutical composition than in the starting batch of treprostinil used by Yonsung, and (2) those impurity levels in treprostinil sodium were representative of the relevant impurities in Liquidia's bulk powder. Liquidia fails to show clear error in the district court's acceptance of that unrebutted testimony.

IV. The district court erred in concluding that Liquidia does not infringe claims 6 and 8 of the '066 Patent, which require that treprostinil salt be stored at ambient temperature.

First, Liquidia's NDA permits storage by Liquidia, Yonsung, and LGM with no temperature restriction and expressly informs FDA that the treprostinil salt is stable at ambient temperature for six months. The court nevertheless found no infringement because Liquidia now promises not to make Yutrepia prepared with batches of treprostinil salt that were stored at ambient temperature. But under this Court's case law, those promises are "not enough" to avoid an infringement finding in pre-launch Hatch-Waxman cases. *Sunovion Pharms., Inc. v. Teva Pharms. USA, Inc.*, 731 F.3d 1271, 1280 (Fed. Cir. 2013).

Second, UTC demonstrated that Liquidia stores the isolated treprostinil salt in an ambient-temperature drybox before using it to prepare the bulk powder. In finding non-infringement, the district court construed the claim term "storage" to exclude storage that takes place in the drybox, reasoning that "storage" and Liquidia's PRINT process are mutually exclusive concepts. That erroneous construction conflicts with the court's earlier construction of "storage" to include storage concurrent with other events, such as shipment.

V. Liquidia also infringes claim 8 through ambient storage that occurs between steps 1-3 of Liquidia's PRINT process. The district court

concluded that no storage occurs between those steps, but it based that conclusion on an erroneous construction of when Liquidia begins preparing the "pharmaceutical composition" and "pharmaceutical product." The claims and Liquidia's NDA consistently treat the final "pharmaceutical product" of claim 8 as distinct from the accused "pharmaceutical composition" of claims 1-6. The district court's ruling effectively collapsed that distinction.

VI. The Moriarty 2004 publication does not anticipate claims 1-3 and 6 of the '066 Patent. The salt-formation-and-isolation process recited in these claims removes specific synthetic impurities resulting from the prior alkylation and hydrolysis steps, resulting in lower levels of those impurities compared to prior-art purification methods. In holding that Moriarty 2004 anticipated the claims, the district court failed to account for structural features of the claimed pharmaceutical composition conferred by the invention. Specifically, the court misconstrued the claimed pharmaceutical composition as directed to only the treprostinil compound and ignored the levels of specific synthetic impurities in the claimed product. The court therefore relied erroneously on findings about the chemical structure and overall purity level of the treprostinil

compound generated from the prior-art process—characteristics that are not distinguishing features of the product claimed by the patent. Properly understood, the claimed pharmaceutical composition cannot reasonably be found to be anticipated by Moriarty 2004.

## STANDARD OF REVIEW

"Infringement is a question of fact that, after a bench trial, [this Court] review[s] for clear error." *Eli Lilly & Co. v. Teva Parenteral Meds., Inc.*, 845 F.3d 1357, 1364 (Fed. Cir. 2017). Anticipation and satisfaction of the written-description requirement are questions of fact, which this Court reviews for clear error. *Nuvo Pharm. (Ireland) Designated Activity Co. v. Dr. Reddy's Labs. Inc.*, 923 F.3d 1368, 1376 (Fed. Cir. 2019) (written description); *Forest Labs., Inc. v. Ivax Pharm., Inc.*, 501 F.3d 1263, 1268 (Fed. Cir. 2007) (anticipation). Enablement "is a question of law" that is "reviewed de novo," although any "underlying facts" are "reviewed for clear error." *Auto. Techs. Int'l, Inc. v. BMW of N. Am., Inc.*, 501 F.3d 1274, 1281 (Fed. Cir. 2007). Similarly, this Court reviews questions of claim construction de novo, but reviews "any facts found in the course of interpreting the claims" for clear error. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 991 (Fed. Cir. 1995).

## ARGUMENT

### I. The district court correctly rejected Liquidia's sole basis for claiming it does not induce infringement.

Liquidia does not contest any element of induced infringement except intent. Nor does it even contest the findings establishing its intent: Liquidia knows that the labeling accompanying its product instructs direct infringement of the '793 Patent. Appx00050. Rather, Liquidia's only argument is that a non-final PTAB decision defeats the scienter element of inducement as a matter of law. But as Liquidia acknowledges, the PTAB's decision is not preclusive, nor has it resulted in cancellation of any claims; it is not even final or appealable yet.

Liquidia's claim that the PTAB's decision nonetheless controls the outcome in the district court rests on a fundamental misreading of *Commil*. Under *Commil*, Liquidia's belief as to a patent's invalidity is completely irrelevant to assessing induced infringement. Invalidity is relevant to infringement liability only once a *final* adjudication of invalidity means that there is no longer any patent to infringe. There has been no such adjudication here.

### A. *Commil* provides no support for Liquidia's scienter argument.

In *Commil*, the Supreme Court rejected a belief-in-invalidity defense to the scienter required for induced infringement. *Commil*, 575 U.S. at 642-45 ("because infringement and validity are separate issues ..., belief regarding validity cannot negate the scienter required under [35 U.S.C.] §271(b)" for induced-infringement liability).[3] The Court held that a belief-in-invalidity defense would erode the presumption of validity and the related requirement to prove invalidity by clear-and-convincing evidence in district court. *Id.* at 644 (citing *Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 112-14 (2011)). In other words, "[w]hen infringement is the issue, the validity of the patent is not the question to be confronted." *Id.* at 643.

Liquidia argues (at 48) that under *Commil*, "knowledge" of invalidity can defeat scienter even though "beliefs" about invalidity cannot. But the Court drew no such contrast between "knowledge" and

[3] By contrast, a defendant's good-faith belief that it is not inducing infringement at all (*e.g.*, because it believes its conduct is licensed) *can* defeat scienter. *See Roche Diagnostics Corp. v. Meso Scale Diagnostics, LLC*, 30 F.4th 1109, 1118-19 (Fed. Cir. 2022). But Liquidia makes no such claim here.

"belief"—quite the contrary. The question presented was "whether *knowledge of, or belief in*, a patent's validity is required for induced infringement under §271(b)." 575 U.S. at 639 (emphasis added). And the answer was no: the Court flatly rejected the notion that the defendant's mental state *as to invalidity* had any relevancy to infringement at all. *See id.* at 644. Accepting such an argument "would conflate the issues of infringement and validity." *Id.* at 643. As the Court explained, "invalidity is not a defense to infringement, it is a defense to liability." *Id.* at 644.

*Commil* drew a different distinction: between *belief* and *actual invalidity*, not between belief and knowledge. If "an act that would have been an infringement or an inducement to infringe pertains to a patent that is shown to be invalid," the Court held, "there is no patent to be infringed." *Commil*, 575 U.S. at 644. Liquidia tries to spin that statement as an "expla[nation] that a good faith belief of invalidity stood in contrast to actual 'knowledge of' invalidity." Liquidia Br. 48. The Court said nothing of the sort—and nothing about knowledge.[4] The

[4] The word "knowledge" that Liquidia quotes (at 48) appears nowhere near the Court's holding that "a belief as to invalidity cannot negate the

Court merely acknowledged "a simple truth"—"that an invalid patent cannot be infringed, [and] that someone cannot be induced to infringe an invalid patent." *Commil*, 575 U.S. at 644. But as the district court correctly recognized, the Supreme Court never stated that a patent could be "shown to be invalid," and unable to be infringed, *id.*, until the relevant decision "becomes final and nonappealable." Appx00056. Liquidia's reasoning—that its "knowledge" of invalidity eliminates the requisite scienter—contradicts *Commil*'s reasoning that invalidity and infringement are entirely separate inquiries. 575 U.S. at 643-44.

### B. The PTAB's decision on the '793 Patent is not final and has no binding effect in this litigation.

Liquidia rests its argument on the PTAB's initial decision, but that decision is not final and has no preclusive effect on this litigation.[5] Indeed, that decision is not even final within the agency itself. In response to UTC's requests for rehearing and review by the POP (which includes the PTO Director and two supervisory administrative patent

---

scienter required for induced infringement," 575 U.S. at 645; it comes from three pages earlier, in a discussion about belief in *noninfringement*, not invalidity. *Id.* at 641.

[5] Even if there were a binding decision on validity, that does not impact a finding of infringement. "[I]nvalidity is not a defense to infringement, it is a defense to liability." *Commil*, 575 U.S. at 644.

judges), the POP identified two significant deficiencies in the PTAB's reasoning—its failure to adequately address whether certain references qualify as prior art and whether those references were publicly accessible. Appx36649. The POP therefore instructed the original panel to address those issues on rehearing, *id.*, and those proceedings remain pending. Until the original panel acts on those instructions, there is no final agency action.

Moreover, a final PTAB decision standing alone does not result in canceled claims, nor does it bind the parties in other litigation or the federal courts. Only after the time to appeal expires or the appeal "terminates" and the PTO Director issues a cancellation certificate does the patent become invalid. 35 U.S.C. §318(a)-(b). And this Court has squarely and repeatedly held that a PTAB decision of unpatentability has no preclusive effect on a patent owner that is seeking review of that decision until and unless this Court affirms it. *See XY, LLC v. Trans Ova Genetics*, 890 F.3d 1282, 1294 (Fed. Cir. 2018) (this Court's "affirmance [of the PTAB's decision] renders final a judgment on the invalidity of the [patent in suit]"); *Personal Audio, LLC v. CBS Corp.*, 946 F.3d 1348, 1354 (Fed. Cir. 2020) (this Court has "held that district court actions had to

terminate when a Board unpatentability ruling as to the relevant patent claims was affirmed on appeal").

Liquidia does not dispute the law regarding collateral estoppel or that preclusion does not attach here. Instead, Liquidia reads *Commil* as holding that an IPR decision—even a non-final one—destroys the scienter required for inducement. That is incorrect. *Commil* did not decide or even consider when a PTAB decision is binding on district courts—an issue that was not presented. *Commil* held that to defeat liability, invalidity must be proved "under proper procedures," not just believed by the infringer. 575 U.S. at 644. The Court gave three examples of how to "obtain a ruling to that effect": "file a declaratory judgment action"; "seek inter partes review ... and receive a decision as to validity within 12 to 18 months"; or "seek ex parte reexamination." *Id.* Liquidia now argues (at 49-50) that the mere mention of the 12-to-18-month decision timeframe must mean that a PTAB decision represents the end of "proper procedures." That is nonsense. *Commil* did not discuss or consider precisely *when* a PTAB decision binds a district court, nor did it mention appeals or the precise endpoint when a decision becomes "final" when discussing its three examples. The Court's reference to a

12-18-month timeframe is a descriptive aside at best; it does not define agency decisions as final and binding after that time period. None of those questions were even at issue, and so the Court had no cause to decide them.

Liquidia's argument effectively reads descriptive dicta in *Commil* as if it were subsections of a statute—an "undesirable" approach at best. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993). "[W]here holdings of the [Supreme] Court are not at issue," "the sentences of the United States Reports" should not be "dissect[ed] … as though they were the United States Code." *Id.* But that is what Liquidia tries to do. There simply is no basis to interpret *Commil* as even suggesting, much less holding, that the "proper procedures" for establishing the invalidity of a patent end at the PTAB, just as they do not end at the district court. To the contrary: a defendant who was found infringing but obtained a declaration of invalidity from a district court is still liable if this Court reverses the invalidity decision. *See, e.g.*, *Fromson v. Advance Offset Plate, Inc.*, 755 F.2d 1549, 1558-59 (Fed. Cir. 1985). The same principle applies when this Court reverses the PTAB. 35 U.S.C. §319.

If *Commil*'s reference to "proper procedures" means anything relevant to this case, it surely includes following the relevant statutory process for establishing invalidity. And the statutes applicable here make clear that a PTAB decision has no effect until the time for appeal has lapsed or appeals are exhausted. 35 U.S.C. §318(b). Liquidia's interpretation would require courts to immediately yield to all PTAB decisions—even those that are erroneous. That is not the law. Nothing in *Commil* allows an inducer to escape liability by citing its "knowledge" of an erroneous (or even potentially erroneous) non-final PTAB decision.

## II. The district court did not clearly err in finding that the specification of the '793 Patent enables and adequately describes "treating pulmonary hypertension."

The '793 Patent's claims are drawn to "[a] method of treating pulmonary hypertension." Appx00049. Liquidia does not dispute that the '793 Patent describes and enables "treating pulmonary hypertension" with inhaled treprostinil generally. Instead, it argues that the claims are invalid because the patent does not sufficiently describe and enable physicians to use inhaled treprostinil to treat one specific subtype of pulmonary-hypertension patients—those who exclusively have Group 2 pulmonary hypertension—with a sufficient degree of proven safety and

effectiveness. But the district court correctly found that the claims do not require the heightened safety-and-efficacy limitation Liquidia asked it to adopt.

Liquidia's arguments mischaracterize the district court's opinion and conflict with this Court's precedents. Attempting to secure *de novo* review, Liquidia argues (at 24) that the district court relied on a "*sua sponte*" claim construction. But the court did no such thing. Instead, it applied its prior (and unappealed) construction of the relevant terms and found that the claimed administration of a therapeutically effective single event dose of treprostinil would "affect hemodynamics, and treat a patient's elevated pulmonary blood pressure," including in isolated Group 2 patients. Appx00064. Nor did the district court adopt a claim construction that "exclude[d]" safety considerations, as Liquidia suggests (at 24). To the contrary, the court expressly recognized that physicians administering inhaled treprostinil to isolated Group 2 patients might have safety concerns. Appx00065. That is unsurprising—physicians always pay attention to safety risks when treating patients with a pharmaceutical product, and especially patients with a serious illness like pulmonary hypertension. Thus, far from ignoring safety, the court

simply refused to import an *additional* "safety and effectiveness" limitation that Liquidia had advocated post-trial because it was not present in the claims themselves. Based on those findings, the court concluded that the claims were enabled and adequately described. Appx00065. Liquidia identifies no clear error in these well-supported findings, nor flaws in the district court's ultimate conclusions.

### A. Liquidia's arguments attack a caricature of the district court's decision and are meritless.

The district court concluded that the '793 Patent describes and enables the use of treprostinil to treat pulmonary hypertension (*i.e.*, elevated pulmonary blood pressure), precisely as the claims describe. Appx00063, Appx00065. Crucially, the district court found this to be true even if a POSA might have had safety concerns about using that treatment in a subset of patients with Group 2 pulmonary hypertension. *Id.*

In an attempt to avoid clear-error review of these factual findings, Liquidia misconstrues the district court's opinion and argues that the court adopted a "*sua sponte*" claim construction that "exclude[s]" safety from the scope of the claims and permits the use of treprostinil in a way that will "kill[]" patients. Liquidia Br. 24-25, 28-29. That is not what

happened. Instead, the district court rejected Liquidia's invitation to import unstated limitations into the claims.

1. Liquidia tries to twist the district court's statement that the claims "do not require *safely and effectively* treating pulmonary hypertension," Appx00063 (quotation marks omitted), by arguing that the court adopted an aggressive, safety-is-irrelevant construction of its own accord. That is not true—*Liquidia itself* raised this issue in post-trial briefing when it asserted a lack of evidence that "a POSA would understand that prostacyclins like treprostinil could be safely and effectively used" to treat every sub-group of pulmonary-hypertension patients, including isolated Group 2 patients (who are commonly treated with diuretics rather than vasodilators). Appx30781. Based on this assertion, Liquidia argued that the specification lacks "information sufficient for a POSA to *safely* treat any Group 2 PH patient with inhaled treprostinil." Appx30782 (emphasis added and omitted).

The district court observed that Liquidia "seems to be arguing" that the claims required "*safely and effectively* treating pulmonary hypertension." Appx00063. The court then proceeded to assess—and reject—that argument because it required the court to import new

limitations into the claims. *Id.* The court instead applied its prior construction of claim 1's "therapeutically effective" limitation—requiring a showing of hemodynamic improvements—and found the enablement and written-description requirements readily satisfied. Appx00063-00065. In short, the court's decision was a specific rejection of Liquidia's post-trial attempt to smuggle in additional claim terms—not a bolt from the blue as Liquidia suggests.

2. Nor did the district court's decision "exclude" safety as a relevant consideration, as Liquidia repeatedly argues (at 1, 2, 17, 21, 23, 24, 27, 28, 29, 36, 43, 60). Under the court's interpretation, the '793 Patent does cover the use of treprostinil to safely and effectively treat pulmonary hypertension. The court simply noted that a physician deciding whether to prescribe treprostinil to certain patient sub-groups may need to "be cautious" and "monitor the patient more closely." Appx00064.

It is unclear why this is even controversial. Doctors *always* consider safety risks when deciding what drug to administer, taking into account things like comorbidities, the specific patient's disease state and etiology, a patient's medical history, the drug's pathophysiology, potential drug

interactions, medical research, and other factors. Appx13190-13191(658:2-661:20), Appx13196(680:11-18). Sometimes the safety risks inherent in treating certain patients or patient populations mean that physicians do not use a particular drug therapy for those patients. Other times the risks mean that physicians monitor the patients more closely to see if any safety issues manifest. Appx00063. In fact, this is precisely what Liquidia's expert, Dr. Hill, testified he did when administering treprostinil years ago to a Group 2 patient. Appx13176(605:8-20). The district court's rejection of Liquidia's attempt to import a limitation into the claims does not mean that safety is *excluded* from consideration. It merely recognizes that a proven level of safety and effectiveness is not an implied limitation requiring separate enablement and written-description support by clinical data in every method-of-treatment patent. *See Scott v. Finney*, 34 F.3d 1058, 1063 (Fed. Cir. 1994) ("Testing for the full safety and effectiveness of a prosthetic device is more properly left to the [FDA]."); M.P.E.P. §2164.05 (same).

That type of implied limitation is exactly what Liquidia says the district court should have found for purposes of its §112 analysis, though. Based on Liquidia's arguments, the inventors would have needed to show

or teach a level of demonstrated safety and effectiveness that would make treprostinil the preferred treatment option among doctors for all patient subgroups, assure physicians that this treatment would create no safety risks for any patient subgroup, or warrant FDA approval for every conceivable patient population. Liquidia cites no authority to support such an expansive approach to claim construction, enablement, or written description.[6]

3. Liquidia's proposed claim limitation also fails on its own terms: there is no basis to insert the words "safely and effectively" into the claims. Liquidia's opening brief does not cite any lexicography or express limitation in the specification defining "treating" or limiting it to treatment *with no safety concerns for any patient sub-group*. The only proffered support for Liquidia's construction comes in the form of attorney argument, newly cited (but weak) evidence in the specification, and inapposite expert testimony.

---

[6] Liquidia's approach is inconsistent with the same "treat[ing] pulmonary hypertension" language it used in its *own* patent on a dry-powder formulation of treprostinil. Appx13791; *see also* Appx13176(603:25-604:23). Under Liquidia's reasoning, its own patent would be rendered invalid as well.

First, Liquidia argues that the word "treating" in claim 1 requires accomplishing the goal of treatment "safely and effectively." Liquidia Br. 25. But Liquidia's argument is conclusory and unsupported by any case law or citation to the record. *Elbit Sys. of Am., LLC v. Thales Visionix, Inc.*, 881 F.3d 1354, 1359 (Fed. Cir. 2018) ("[A]ttorney argument is not evidence and cannot rebut other admitted evidence[.]" (quotation marks omitted)).

Second, Liquidia cites portions of the specification regarding side effects, acute safety, and tolerability of inhaled treprostinil at high concentrations and a low number of breaths that it says the court "ignored." Liquidia Br. 26-27. But Liquidia never advocated that or any other construction for "treating" or cited to the district court these new portions of the specification. And even if it had, the specification's discussion of safety and tolerability does not operate to limit the claims beyond their own terms. *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004) ("[I]t is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims … .").

Third, Liquidia cites Dr. Hill's testimony that the POSA would have safety concerns with treating isolated Group 2 PH patients with inhaled treprostinil and that the FIRST study treating this patient population with epoprostenol was stopped early. The lack of a completed phase 3 clinical study may prevent FDA from approving treprostinil to treat this patient subgroup in the absence of further clinical trials, but it provides no reason to rewrite the claim terms to import a safety and effectiveness requirement akin to what is required to obtain FDA approval.

**B. The claims of the '793 Patent are enabled.**

Applying its construction of "therapeutically effective" as a "dose that causes an improvement in a patient's hemodynamics"—which Liquidia has not appealed—the district court concluded that "Liquidia has not shown by clear and convincing evidence that a POSA would have had to conduct undue experimentation to practice the claimed method of treating PH." Appx00063. Liquidia does not identify any error that would require this Court to set aside the court's enablement determination applying that construction.

The district court's enablement analysis rested on a series of sound factual determinations. The court found that treprostinil is a

prostacyclin, which is a family of compounds that dilates the lung's blood vessels. Appx00058. The court also found that "[a] POSA would understand that the claimed administration of treprostinil vasodilates the pulmonary vasculature and reduces [pulmonary arterial pressure] and [pulmonary vascular resistance], even in Group 2 PH patients." *Id.* As the court recognized, the FIRST study demonstrated that administering epoprostenol (a different prostacyclin) to Group 2 PH patients improved hemodynamics, pulmonary arterial pressure, pulmonary vascular resistance, dyspnea score, and exercise duration. Appx00064. Indeed, Liquidia's own expert testified that the study showed "significant changes" in hemodynamics that "would be considered improvements." Appx13171(585:4-14). "[E]ven with a risk of pulmonary edema," the court explained, "a POSA would understand that the claimed administration of treprostinil would vasodilate the pulmonary vasculature, affect hemodynamics, and treat a patient's elevated pulmonary blood pressure, i.e., treat PH." Appx00064. Based on these findings, the court concluded that Liquidia failed to show a lack of enablement, noting that "[t]he fact that a physician might be cautious and need to monitor the patient more closely when administering

treprostinil to isolated Group 2 PH patients does not change this result." *Id.*

Liquidia now insists that the specification does not enable the full scope of the '793 Patent's claims because diuretics are the "mainstay" of treatment for isolated Group 2 PH patients, and because a doctor typically would not administer treprostinil to patients in that sub-group. Liquidia Br. 36-37. There are several problems with this argument.

First, Liquidia misapplies the enablement standard. "To prove that a claim is invalid for lack of enablement, a challenger must show by clear and convincing evidence that a person of ordinary skill in the art *would not be able to* practice the claimed invention without 'undue experimentation.'" *Alcon Rsch. Ltd. v. Barr Labs., Inc.*, 745 F.3d 1180, 1188 (Fed. Cir. 2014) (emphasis added). That is a different question from the one Liquidia applies—namely, whether the skilled artisan would consider a particular claimed method to be a "mainstay." A patented method of treatment does not need to be physicians' *preferred* method for treating every patient subgroup to be enabled. For the same reason, Liquidia is wrong to argue (at 38) that UTC "admitted" facts that show a lack of enablement. UTC explained that a skilled artisan would not

typically administer treprostinil to an isolated Group 2 PH patient "in practice." But again, the question is whether the specification made "treating pulmonary hypertension" *possible*. The specification taught that method. *See supra* pp. 33-39.

Second, the '793 Patent enables the "therapeutically effective" treatment of all five groups. There is no dispute that the claims are enabled for treating precapillary PH, which includes patients in all five PH groups. The examples in the specification disclose the treatment of precapillary patients in Groups 1, 3, and 4, and Liquidia does not dispute that treprostinil can treat patients in Group 5. Appx00062-00063. As for Group 2, both experts agreed the POSA would know that inhaled treprostinil can be used for some pre- and postcapillary combined Group 2 PH patients. Appx13185(636:6-637:1); Appx13175(599:9-12; 599:15-18). Liquidia's expert even testified that he had used treprostinil to treat some Group 2 patients. Appx13175(599:9-12). And, again, the FIRST study demonstrated preliminary clinical evidence of statistically significant acute hemodynamic improvement in treating isolated Group 2 PH patients with a vasodilator. Appx00064, Appx13171(585:9-10), Appx00063, Appx29455, Appx29459-29461.

Third, under any construction Liquidia failed to show undue experimentation with respect to isolated Group 2 patients by clear and convincing evidence. As the district court aptly found, "even with a risk of pulmonary edema, a POSA would understand that the claimed administration of treprostinil would vasodilate the pulmonary vasculature, affect hemodynamics, and treat a patient's elevated pulmonary blood pressure." Appx00064, Appx13184-13185(634:6-639:25), Appx29455, Appx29459-29461. The claims do not require FDA approval or that no patient ever experiences complications. *See supra*, pp. 33-39. Liquidia has failed to show how assessing a patient's risk for pulmonary edema would require undue experimentation.

Finally, even if it could be said that treating isolated Group 2 pulmonary-hypertension patients is "inoperative," claims are not required to carve out all possible inoperative embodiments. *In re Dinh-Nguyen*, 492 F.2d 856, 858-59 (C.C.P.A. 1974) ("It is not a function of the claims to specifically exclude either possible inoperative substance or ineffective reactant proportions."); *In re Myers*, 410 F.2d 420, 426 (C.C.P.A. 1969) (claims excluding every inoperative element would be "so detailed as to obscure, rather than particularly point out and distinctly

claim, the invention.”). Allegedly inoperative embodiments demonstrate a lack of enablement only “if the number of inoperative combinations becomes significant, and in effect forces [a POSA] to experiment *unduly* in order to practice the invention.” *Atlas Powder Co. v. E.I. du Pont De Nemours & Co.*, 750 F.2d 1569, 1576 (Fed. Cir. 1984). More specifically, so long as a POSA has “the necessary information to limit the claims to operative embodiments,” it is not invalid. *Crown Operations Int’l, Ltd. v. Solutia, Inc.*, 289 F.3d 1367, 1380 & n.8 (Fed. Cir. 2002) (emphasis added).

Here, even assuming that Liquidia’s “safety concerns” render treatment of isolated Group 2 patients “inoperative,” the POSA would either already know that the treatment would be inoperative based on pathophysiology or could readily test a small number of patients using routine methods (such as repeating the FIRST study using treprostinil) to confirm. Either way, isolated Group 2 PH is at most a single embodiment, not a “substantial number,” and neither option involves undue experimentation. *Atlas Powder*, 750 F.3d at 1576. And while Liquidia trumpets its expert’s assertion that a POSA would have to “start at ‘square one,’” Liquidia Br. 35, “[u]nsubstantiated statements

indicating the experimentation would be 'difficult' and 'complicated' are not sufficient" to establish lack of enablement by clear and convincing evidence. *Cephalon Inc. v. Watson Pharms., Inc.*, 707 F.3d 1330, 1339 (Fed. Cir. 2013). Nor does repeating that unsubstantiated statement show clear error on appeal.

Liquidia's reliance (at 39) on *Trustees of Boston University v. Everlight Electronics Co.*, 896 F.3d 1357 (Fed. Cir. 2018) is misplaced. There, the patent owner obtained a construction specifically referencing certain embodiments, and the experts agreed one of them was *impossible* as of the priority date. By contrast, here the court expressly found, based on the FIRST study and Dr. Hill's testimony, that it *is* possible to treat even isolated Group 2 PH patients with a prostacyclin and achieve therapeutic effectiveness. Appx00063-00064.

Considering Liquidia's lack of clear and convincing evidence of undue experimentation, this Court should affirm the district court's conclusion that the '793 Patent fully enables "treating pulmonary hypertension."

### C. The claims of the ’793 Patent are supported by adequate written description.

Liquidia’s written-description arguments merely repeat its enablement arguments under a different doctrinal heading. They fail for largely the same reasons. As above, Liquidia does not dispute that the ’793 Patent adequately describes treating pulmonary hypertension generally. Instead, Liquidia again seeks to inject an additional effectiveness requirement into the claims by arguing that the ’793 Patent lacks written description to support treating the subset of isolated Group 2 PH patients. Liquidia fails to show any clear error in the district court’s rejection of that argument.

As discussed above, the claims require “treating pulmonary hypertension comprising administering … a therapeutically effective single event dose of a formulation comprising treprostinil.” Appx00049. The district court found that “a POSA would understand ‘a therapeutically effective single event dose’ to be a dose given in a single treatment session that causes an improvement in a patient’s hemodynamics.” Appx00063. Against this backdrop, the court did not clearly err in finding that the specification contains ample written-description support for the claimed result. *Id.* The ’793 Patent’s

specification describes how the administration of inhaled treprostinil functions to reduce blood pressure and provides two examples of testing the claimed invention in pulmonary hypertension patients. Appx00124(2:29-43), Appx00125-00126(3:25-5:2, 5:13-36), Appx00127-00132(8:57-18:11). Liquidia's expert agreed that, in view of these disclosures, "the '793 patent shows that there's hemodynamic effectiveness from Treprostinil," and that "[in] the average patient, a single administration of Treprostinil to someone suffering from pulmonary hypertension results in a beneficial reduction of pulmonary arterial pressure and/or vascular resistance." Appx13201(702:1-11).

Liquidia's assertion (at 43-44) that the court's decision was "refuted by both experts" is simply not true. Liquidia confuses the court's construction of "therapeutically effective" with the preferences and practices of clinicians. That a practicing physician may decide not to prescribe treprostinil as a first-line therapy—or at all—to a Group 2 patient says nothing about the adequacy of written-description support. Liquidia has pointed to no authority that adequate description requires disclosing a method of treatment that a physician would prefer or choose to prescribe to every patient in practice. Instead, Liquidia relies (at 42-

43) on this Court's decision in *Biogen International GmbH v. Mylan Pharmaceuticals, Inc.*, 18 F.4th 1333 (Fed. Cir. 2021), but that decision says only that there must be written-description support for a *claimed* result. Appx00065.

Liquidia's reliance (at 44-46) on *Nuvo*—a case in which a patent's descriptions were insufficient to support the efficacy of the claimed invention—is likewise misplaced. *Nuvo* emphasized that "[w]ritten-description analyses are highly fact specific" and thus "[e]ach case … must be decided on its own facts." 923 F.3d at 1383 (citation omitted). Moreover, like *Biogen*, *Nuvo* was about a lack of written description for an *expressly claimed result.* The claims required an amount of "uncoated PPI [proton pump inhibitor]" that was effective to raise gastrointestinal pH to 3.5 or higher. *Id.* at 1377. But the specification did not discuss or explain efficacy for uncoated PPI to achieve that result. *Id.* at 1380. Here, the "safety and effectiveness" limitation advocated by Liquidia is not a claimed result, and the district court found that the only claimed result (a "therapeutically effective" dosage, *i.e.*, one that shows hemodynamic improvements) *is* described in the specification. *See* Appx00065 ("The '793 patent describes how

administering inhaled treprostinil targets the lungs, dilates the blood vessels, and reduces blood pressure.”).

Liquidia’s argument simply ignores the district court’s unappealed construction of the “only effectiveness ... claimed” in the ’793 Patent. But Liquidia’s own expert, as well as the FIRST study, both refute the assertion that a POSA would not have expected treprostinil to be therapeutically effective in isolated Group 2 PH patients as construed by the district court. *See supra*, pp. 40-42. Accordingly, the district court did not clearly err in finding the claims of the ’793 patent adequately described.

**D. In the alternative, understanding the relevant claims to cover the treatment of precapillary pulmonary hypertension defeats all of Liquidia’s asserted errors.**

This Court could also affirm on the alternative ground that, reading the claims as a whole and in context, *see Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005), a POSA would understand them to be directed to the treatment of precapillary pulmonary hypertension because a POSA would have known that a vasodilator like treprostinil would not generally be used to treat postcapillary pulmonary hypertension. *See Propellex Corp. v. Brownlee*, 342 F.3d 1335, 1342 &

n.5 (Fed. Cir. 2003) ("[W]e may affirm a judgment of a district court on any ground the law and the record will support so long as that ground would not expand the relief granted." (quotation marks omitted)).

The asserted claims require treating pulmonary hypertension using a therapeutically effective single event dose of treprostinil. Appx00170. The instruction to use treprostinil is key to a POSA's understanding of the claim scope. A POSA would have understood that the claims are drawn to treating *precapillary* PH, because the POSA would have known that (1) precapillary PH is characterized by an increased resistance to blood flow and thus increased blood pressure, and (2) treprostinil is a vasodilator, meaning that it widens blood vessels due to relaxation of the muscle in the vessel wall. Appx13168(571:15-24, 574:10-15). But a POSA would have understood that *postcapillary* PH has a different cause—ventricle stiffening in the left heart—that is generally addressed with a different treatment. Appx13166(565:4-16), Appx13184-13185 (635:14-636:1-10). Indeed, both parties' experts agreed that the POSA would typically not treat isolated Group 2 PH with a vasodilator. Appx13172(587:5-588:5), Appx13185(636:1-5), Appx13175(600:2-9). Liquidia's expert, Dr. Hill, went so far as to call using a vasodilator to

treat isolated Group 2 PH "stupid" in light of safety concerns. Appx13175(600:2-9). More importantly, Dr. Hill acknowledged that the limitations in using treprostinil with specific patients depending on the nature of their disease would be readily apparent to clinicians. Appx13175(599:23-600:1).

For these reasons, the POSA would have understood the asserted claims to be directed to the treatment of precapillary pulmonary hypertension. "[E]very limitation in the claim must be given effect rather than considering one in isolation from the other." *In re Geerdes*, 491 F.2d 1260, 1262-63 (C.C.P.A. 1974). It does not matter whether a skilled artisan would have known that the term pulmonary hypertension can refer to five groups. The skilled artisan would have read the "treating pulmonary hypertension" limitation in light of the "administering … a therapeutically effective single event dose of … treprostinil" limitation and would have understood the asserted claims as directed to PH patient populations *where treprostinil would address the cause of the disease*. Thus, the core premise of Liquidia's arguments fails, and the Court may affirm the district court's judgment on this alternative ground.

## III. The district court did not clearly err in finding claims 1-3 of the ’066 Patent infringed.

Liquidia’s challenge to the court’s finding that it infringes claims 1-3 of the ’066 Patent rests on one claim limitation: the requirement in claim 1 that “a level of one or more impurities” be “lower in the pharmaceutical composition” than that “found in the starting batch of treprostinil.” Liquidia argues that the district court’s infringement finding is flawed because UTC’s expert looked at impurities in the wrong sample—the treprostinil salt, rather than a composition further downstream in the manufacturing process. This argument, which ignores the district court’s detailed factual findings and misreads this Court’s case law, should be rejected.

### A. The district court’s detailed findings support infringement

Understanding the Yutrepia manufacturing process exposes the flaw in Liquidia’s argument. As discussed above, the manufacturing process for the drug substance for Yutrepia begins at Yonsung, which alkylates and hydrolyzes a batch of a precursor compound, BTO, to obtain a batch of treprostinil (TN02). Appx29061-29062, Appx29076-29077, Appx29089-29090; *see supra*, p. 8. Yonsung then forms and isolates a treprostinil salt (treprostinil sodium (TN)), which it sells to

Liquidia. Appx29062, Appx29078, Appx29091, Appx29057; *see also* Appx00030. Liquidia then combines the treprostinil sodium with excipients, molds it into particle shapes, dries it into a bulk powder (LIQ861), and finally ships the bulk powder to a contractor to encapsulate and prepare commercial drug product kits for commercial sale. Appx00025-00027, Appx29336-29340, Appx13211(741:7-16), Appx14132. Thus, the starting batch of treprostinil (TN02) contains synthetic impurities resulting from the alkylation and hydrolysis steps, and those impurities carry over, unless reduced, to the treprostinil sodium (TN) and downstream products, including Liquidia's bulk powder (LIQ861).

The court found that a POSA would understand the relevant impurities to be those generated during the alkylation and hydrolysis steps used to generate the starting batch of treprostinil. Appx00025. Liquidia does not contest this factual finding on appeal. The court then found that the number and level of impurities from alkylation and hydrolysis were lower in the treprostinil sodium (TN) used in Liquidia's pharmaceutical composition than in the starting batch of treprostinil (TN02) used by Yonsung, and that the relevant impurities in treprostinil

sodium were representative of the relevant impurities in Liquidia's bulk powder (LIQ861). Appx00026. Based on that reasoning, the court found the relevant claim limitations satisfied. *Id.*

There was ample support in the record for these findings. At trial, UTC's expert, Dr. Nuckolls, compared the "'related substance' impurities" in Yonsung's starting batch of TN02 to the "'related substance' impurities" in Yonsung's treprostinil sodium, finding that the latter substance had fewer and lower amounts of relevant impurities. Appx00025; Appx13044(80:4-18), Appx13045(82:3-15). Dr. Nuckolls also testified that these "related substance" impurities include impurities resulting from the prior alkylation and hydrolysis steps because the level and amount of those impurities were higher in the starting batch of treprostinil (TN02) than in BTO, which is the pre-alkylation and pre-hydrolysis product. Appx00025, Appx00028-00029, Appx00132. The district court credited that testimony and made an express finding that the relevant impurity levels decreased as claimed. Appx00025-00029.

Dr. Nuckolls further testified that a POSA would consider the comparison of TN02 to Yonsung's treprostinil sodium to be the appropriate one. As he explained, he "'wouldn't expect' Liquidia's

processing of [treprostinil sodium] to impact the impurities from the alkylation and hydrolysis steps," Appx00027 (quoting Appx13064(157:7-17)), and so "a POSA would understand" the relevant impurities profile of Liquidia's bulk powder to be "the same as" the "isolated salt that was prepared by Yonsung," Appx13058(135:11-13); *see also* Appx13058 (134:14-17) (similar). He also testified that it would be difficult to meaningfully compare the impurities from alkylation and hydrolysis found in Yonsung's treprostinil sodium directly to the relevant impurities in Liquidia's bulk powder because of the excipients added when preparing the bulk powder. Appx13058(133:25-134:3). Here too, the district court credited that testimony, noting that "Liquidia ha[d] not provided any expert testimony to rebut" it. Appx00027. Based on that testimony, the court made express factual findings that the measure of impurities in Yonsung's treprostinil sodium "is a reliable and accurate measure of impurities in the pharmaceutical composition resulting from the alkylation and hydrolysis steps" and that "Liquidia's processing of the [treprostinil sodium] into the pharmaceutical composition (LIQ861 bulk powder) does not affect those impurities." Appx00025.

Liquidia points to no clear error in those findings, and, as discussed below, having chosen not to put on an expert to rebut UTC's evidence, Liquidia cannot not try to backfill by simply labeling Dr. Nuckolls' testimony "unsupported." Liquidia Br. 58.[7]

### B. Liquidia's "proxy" argument has no factual or legal support

With no evidence of its own to contradict Dr. Nuckolls' testimony, Liquidia tries to challenge the district court's findings by suggesting that Dr. Nuckolls' testimony constitutes improper "proxy" evidence. Liquidia argues (at 56-60) that impurities found in treprostinil sodium cannot serve as a "proxy" for the impurities found in Liquidia's "pharmaceutical composition." This argument is both factually unsupported and legally erroneous.

As noted above (and as the district court found), claims 1-3 are directed specifically to a reduction in impurities *resulting from* the alkylation and hydrolysis steps. Appx00025. The claim requires the level

---

[7] Liquidia asserts that it provided expert testimony to rebut Dr. Nuckolls' opinions—evidence that, it says, "the district court ignored." Liquidia Br. 59. But Liquidia's supposed smoking gun is simply trial testimony from a variety of witnesses (including Dr. Nuckolls) generally describing Liquidia's manufacturing process. *Id.* (citing Appx13043 (74:21-75:5), Appx13061(146:20-147:8), Appx13206(722:10-19)).

of one or more of those impurities to decrease after the starting batch of treprostinil is made into a salt that is then isolated, which removes the relevant impurities by excluding them from the salt and washing them away. Appx13070(183:22-184:21). As the district court found, a POSA would understand that the claims are directed to those impurities specifically, not *any* impurities found in the pharmaceutical composition. The relevant "impurities" are therefore fixed after the salt-formation and isolation steps in the manufacturing process. Appx00025. The claim is agnostic to whether later processing steps add other "impurities" because such "impurities" are not "impurities resulting from prior alkylation and hydrolysis steps." Appx00132.

Because Liquidia's handling of the treprostinil sodium does not involve alkylation or hydrolysis steps—Yonsung conducts those reactions—it cannot add impurities from those steps. Liquidia has told FDA as much. Liquidia's NDA relies on Yonsung's DMF data for all treprostinil drug substance information, including characterization and measurements of the relevant impurities, *i.e.*, impurities resulting from the prior alkylation and hydrolysis steps. Appx13888 ("Treprostinil sodium drug substance process impurities are controlled by the

manufacturer, Yonsung Fine Chemicals Co., Ltd. (Yonsung)."), Appx14209 ("Impurities of treprostinil sodium drug substance are provided via cross reference to Yonsung DMF"), Appx13064(157:7-17), Appx00027.

Liquidia concedes that this Court's precedent permits use of a proxy for its infringement analysis "if that proxy is representative of the accused product." Liquidia Br. 56. The district court expressly found that was so here, based on unrebutted expert testimony. That finding is not clearly erroneous. Appx00025.

The cases Liquidia cites are inapposite. In *Ferring*, this Court overturned a finding of infringement because the district court's judgment improperly relied on four individual tablets that were "very atypical and aberrant" and not representative of the hundreds of others tested. *Ferring B.V. v. Watson Labs., Inc.-Fla.*, 764 F.3d 1401, 1409 (Fed. Cir. 2014). In *Morton*, the court affirmed a district court judgment of no infringement because the district court did not clearly err in finding that there was "no objective support for the actual existence" of the claimed structures in the accused product beyond theories suggesting "possibility of the[ir] existence." *Morton Int'l, Inc. v. Cardinal Chem. Co.,* 959 F.2d

948, 951 (Fed. Cir. 1992), *vacated*, 508 U.S. 83 (1993). Finally, in *Kim*, the court affirmed a judgment of non-infringement because—unlike the claims at issue here—the claim there was directed to a composition "consisting essentially of" enumerated ingredients, and "there is no infringement where the accused product contains additional, unclaimed ingredients that materially affect the basic and novel properties of the invention." *Kim v. ConAgra Foods, Inc.*, 465 F.3d 1312, 1319-20 (Fed. Cir. 2006).

Here, there was nothing atypical or aberrant about the Yonsung data that the district court relied on to find a reduction of impurities during salt formation. Indeed, Liquidia has relied on the same data for FDA approval of its proposed product. And as discussed, the district court had ample grounds to support its conclusion that the impurities from alkylation and hydrolysis measured in treprostinil sodium were representative of those in the pharmaceutical composition—particularly given Liquidia's failure to present rebuttal testimony. Thus, the court's finding of infringement was not clearly erroneous.

## IV. The district court erred in concluding that Liquidia does not infringe the storage limitations of claims 6 and 8 of the ’066 Patent.

Dependent claim 6 of the ’066 Patent requires that “the isolated salt” from claim 1 be “stored at ambient temperature.” Appx00031; Appx00132. Claim 8 similarly requires storage of the treprostinil salt before the “pharmaceutical product” is prepared but does not require isolation. Appx00132. The district court made two errors in concluding that Liquidia does not infringe these claims; either error warrants reversal of the district court’s non-infringement determination.

First, UTC demonstrated at trial that Liquidia’s NDA permits Liquidia, Yonsung, and LGM to store treprostinil at ambient temperatures and relies on clinical-trial data that used treprostinil stored at ambient temperature. *See, e.g.*, Appx14921, Appx14193, Appx14175, Appx13582, Appx13049(98:14-99:15), Appx13677, Appx14212, Appx14888-14889, Appx14920-14921. The district court, however, based its non-infringement determination on Liquidia’s promises that it would not store treprostinil at ambient temperatures and would instead follow Yonsung’s recommendation to store treprostinil between 2°-8°C. This was legal error.

Second, the district court construed the "storage" requirement in inconsistent ways, incongruously interpreting the plain and ordinary meaning of "storage" to include storage that takes place during the shipment process, but to exclude "storage" that takes place in a drybox during a portion of the extended manufacturing process.

### A. Liquidia's NDA permits infringement of claims 6 and 8 of the '066 Patent

Liquidia's NDA seeks FDA approval to manufacture a treprostinil product through a process that includes storage of isolated treprostinil salt with no temperature restriction. That makes Liquidia liable for infringement: where "a drug manufacturer seeks FDA approval to market a … compound within the scope of a valid patent, it is an infringement as a matter of law." *Sunovion Pharms., Inc. v. Teva Pharms. USA, Inc.*, 731 F.3d 1271, 1280 (Fed. Cir. 2013).[8] While Liquidia now promises not to sell Yutrepia prepared with batches of treprostinil

[8] *Sunovion* involved a §505(j) application to market a generic drug, but the current §505(b)(2) application here makes no difference. In both contexts, filing an application for FDA approval is an artificial act of infringement, *Eli Lilly & Co. v. Medtronic, Inc.*, 496 U.S. 661, 678 (1990), and §505(b)(2) NDA applicants are equally bound by what they are seeking approval to market.

salt that spent time in storage at ambient temperature, those promises are “not enough to avoid infringement.” *Id.*

### 1. Liquidia’s NDA seeks approval to market an infringing product.

Liquidia’s NDA seeks approval to market a product using treprostinil sodium manufactured by Yonsung, which stores the isolated treprostinil salt without any requirement to store in refrigerated (non-ambient) conditions. Liquidia’s NDA specifically incorporates Yonsung’s drug master file (DMF), including all properties and characteristics of the treprostinil sodium as described in the DMF, and represents to FDA that the treprostinil sodium is stable at room (ambient) temperature for six months, enclosing stability data to that effect. *See* Appx13596 (incorporating DMF’s information about treprostinil sodium’s “physical and chemical properties, characterization, … and stability attributes”), Appx13802, Appx14209, Appx14211, Appx14219 (NDA incorporating DMF’s stability summary and conclusions “via cross reference”), Appx14207 (NDA referring to a “Letter of Authorization allowing review of th[e] DMF”); Appx14739-14772 (DMF explaining treprostinil sodium stability at ambient temperature); *see* Appx13039(59:4-14); Appx13123(393:17-19). The NDA also offers clinical-trial data based on

batches of Liquidia's bulk powder prepared from Yonsung's isolated treprostinil salt *that was stored at ambient temperature*, and characterizes these batches (as it must for approval) as "representative" of the product Liquidia plans to market. *See, e.g.*, Appx13049(98:14-99:15), Appx13677, Appx14212, Appx14888-14889, Appx14920-14921. To be sure, Yonsung's DMF, which Liquidia incorporates into its NDA, *recommends* that the treprostinil salt be stored below ambient temperature, but does not *require* as much for purposes of stability or safety. The DMF says only that the treprostinil salt "*[s]hould* be kept in a tight container, … and stored at 2°C to 8°C"—a permissive term,[9] as Liquidia's own expert agreed. Appx13124(396:18-24).

Moreover, the record showed that even before FDA tentative approval, the DMF's recommendation was routinely disregarded. Undisputed evidence showed that Yonsung frequently stored treprostinil salt well below 2°C for lengthy periods (days and weeks). *See* Appx13108(332:24-333:15), Appx13109(336:16-338:15), Appx14921. Yet, Liquidia accepted the shipments and used the treprostinil salt to prepare

[9] *See, e.g.*, *United States v. UPS Customhouse Brokerage, Inc.*, 575 F.3d 1376, 1382 (Fed. Cir. 2009).

Yutrepia. *See* Appx13108(332:24-333:15), Appx13109(336:16-338:15), Appx14921. Treprostinil salt was also stored above 8°C, and again, Liquidia accepted those shipments just as it did with batches that stayed within the 2°-8° range. Appx14921 (treprostinil sodium experiencing ambient temperature), Appx14193 (explaining that LGM released treprostinil sodium shipment stored at ambient temperature for nine days), Appx14175 (Liquidia accepting delivery), Appx13582 (logging temperatures below -20°C and above 16°C). Only *after* Liquidia was sued and its witness responsible for analytical testing was deposed about those batches did Liquidia assert that they would not be used to make a pharmaceutical product that would be marketed for sale, despite every indication to the contrary until then. Appx13112(348:15-350:2).

Additionally, the record showed many shipments, including batches the NDA describes as "representative," where the storage temperature was not monitored at all. *See* Appx14932-14948 (lacking temperature data), Appx14949-14962 (same), Appx14995-15020 (same). Here too, Liquidia did not refuse shipment. *See* Appx14932-14948, Appx14949-14962, Appx14995-15020. The DMF's permissive ("should")

recommendation of refrigerated storage is not—and has never been—a requirement. It certainly is not a condition of FDA approval.[10]

That should be the end of the infringement inquiry under *Sunovion*: what an "applicant asks for and receives approval to market, if within the scope of a valid claim, is an infringement." 731 F.3d at 1279. Because the plain terms of the NDA seek FDA approval to market Yutrepia within the scope of the storage limitation, "it is an infringement as a matter of law." *Id.* at 1280.

**2. Liquidia's promises not to sell infringing batches of Yutrepia provide no safe harbor.**

The district court found no infringement based on Liquidia's "represent[ations]" that it will "store treprostinil sodium between 2°C to 8°C." Appx00031. The court posited that, if any batches fall outside of that range, Liquidia will not use those batches until after Liquidia "conduct[s] a full investigation"—never mind that Liquidia's NDA requires no such investigation, Liquidia made no promises that it would

[10] The DMF's permissive "should" language also allows Liquidia to use treprostinil salt that was stored at ambient temperature without needing to bypass its internal protocol—a protocol that Liquidia has admitted it can change without informing FDA to require storage at ambient temperature. *See* Appx13080(224:14-17).

conduct such an investigation, and no one is authorized to monitor any such hypothetical investigation to ensure that Liquidia keeps its promises. Appx00031-00032. In light of these representations, the court said, "the fact that Liquidia might, in some circumstances, be permitted to use [treprostinil salt] exposed to ambient temperatures is insufficient to show that Liquidia will do so." Appx00032. Accordingly, the court faulted UTC for not proving *actual past infringement*. Appx00032-00035. The court's analysis misunderstands the infringement inquiry in the Hatch-Waxman context and conflicts with *Sunovion*.

In pre-launch Hatch-Waxman cases seeking approval of an ANDA or §505(b)(2) NDA, the question is whether the application "seeks FDA approval to market a … compound within the scope of a valid patent." *Sunovion*, 731 F.3d at 1280. Plaintiffs are not required to prove actual past infringement to win a *pre*-launch infringement judgment, because the "Hatch-Waxman framework presents a different set of circumstances than those which underlie an ordinary infringement action." *Caraco Pharm. Labs., Ltd. v. Forest Labs., Inc.*, 527 F.3d 1278, 1291 (Fed. Cir. 2008). Filing an ANDA or §505(b)(2) NDA is itself an artificial act of infringement, 35 U.S.C. §271(e)(2), so infringement is evaluated based on

whether what the applicant "is asking the FDA to approve for sale falls within the scope of an issued patent." *Sunovion*, 731 F.3d at 1278. If so, "a judgment of infringement must necessarily ensue" without separate evidence proving past or future infringement. *Id.*[11]

That finding of infringement cannot be "overrid[den]" by the applicant's "pledging not to infringe." *Id.* at 1280. Once the applicant has sought FDA approval to sell a product that falls within the scope of an issued patent, "[s]imply saying 'But I won't do it' is not enough to avoid infringement." *Id.* at 1278, 1280; *Par Pharm., Inc. v. Hospira, Inc.*, 835 F. App'x 578, 586 (Fed. Cir. 2020) ("Even where internal documents suggest that a generic product will not meet a claim limitation in practice, representations about the ANDA's scope control the infringement analysis."). And for good reason—as this Court explained, "it would be practically impossible" to monitor the applicant's compliance with its "pledge" to not avail itself of what the NDA permits once FDA approval is granted. *Sunovion*, 731 F.3d at 1279. Liquidia's

[11] For this reason, the district court's reliance on *Fujitsu Ltd. v. Netgear Inc.*, 620 F.3d 1321 (Fed. Cir. 2010)—a technology-patent case in a context where infringement is not determined by the scope of an NDA—was mistaken.

demonstrated history of not complying with its pledge to "store treprostinil sodium between 2°C to 8°C" *even before* FDA approval amply underscores this concern.

The district court's conclusion is irreconcilable with these principles. Nothing in Liquidia's NDA *requires* Liquidia to store treprostinil salt in refrigerated conditions. To the contrary, it permits storage outside of those conditions by relying on long-term stability at ambient temperature and incorporating clinical-trial data that include ambient-temperature storage for purposes of approval. Accordingly, Liquidia's "pledg[e]" not to avail itself of the full scope of the NDA is "not enough" to avoid a judgment of infringement. *Sunovion*, 731 F.3d at 1280. This Court should therefore reverse the district court's judgment of non-infringement of claims 6 and 8 of the '066 Patent.

### B. The district court erred in construing "storage" for purposes of infringement of claims 6 and 8.

Ambient storage of the treprostinil salt during Liquidia's PRINT manufacturing provides an independent reason for reversal. The district court rejected this storage as a basis for finding infringement of claims 6 and 8 by incongruously concluding that "storage" during the shipment process is still storage, but "storage" during a later phase of the

manufacturing process cannot be. That erroneous and internally inconsistent construction requires reversal of the district court's finding of non-infringement.

1. Step 1 of Liquidia's PRINT process calls for a sample of treprostinil sodium to be placed in a drybox before being used to make an aqueous stock solution. Appx00036. The district court acknowledged UTC's expert testimony that once treprostinil sodium is placed in the drybox, a POSA would understand it is stored there at ambient temperature for three hours before being used in the stock solution; the court did not credit or even discuss Liquidia's contrary argument. Appx00036. Nevertheless, the court held that this storage in the drybox categorically could not qualify as "storage" within the meaning of claims 6 and 8 because the storage occurred as part of "the manufacturing process." *Id.* (brackets and citation omitted).

2. This erroneous construction of "storage" is not only unsupported, but it is also inconsistent with the court's construction of "storage" elsewhere in its opinion. When evaluating whether "storage" that takes place during shipment can still qualify as "storage" under the claim, the court rejected Liquidia's argument that the claimed storage

must occur in a vacuum, exclusive of all other aspects of the manufacturing process. Appx00033. The term "storage" has a plain and ordinary meaning, Appx00031, and thus, the court held, "storage" that occurs during shipment is still "storage," Appx00033.

That same construction must govern storage in a drybox. *See, e.g.*, *Intervet Inc. v. Merial Ltd.*, 617 F.3d 1282, 1289-1290 (Fed. Cir. 2010) (remanding where construction in its infringement analysis was "inconsistent with the district court's otherwise correct claim construction" from *Markman* hearing); *Vita-Mix Corp. v. Basic Holding, Inc.*, 581 F.3d 1317, 1323-24 (Fed. Cir. 2009) (where district court's "apparent change in claim construction" "appears to be inconsistent with its earlier claim construction"). Just as "material can be stored during" the shipping process, Appx00033, so too can it be stored during later phases of the manufacturing process—here, in a drybox for three hours before the stored material is added to solution. And excluding storage in a drybox is inconsistent with a benefit of the claimed invention—a stable batch of treprostinil that can be handled without special storage conditions. The district court's finding of non-infringement despite ambient temperature storage in the drybox rested entirely on this

erroneous construction. For this independent reason, that finding must be reversed.

## V. Liquidia additionally infringes claim 8 through ambient storage that occurs between steps 1-4 of Liquidia's PRINT process.

Independent of the storage that occurs during the manufacturing and shipment of isolated treprostinil salt, Liquidia infringes claim 8 through ambient storage that occurs between steps of the manufacturing process before the "pharmaceutical product" (*i.e.*, the ultimate product sold to consumers) is prepared. Specifically, UTC demonstrated numerous instances of infringing ambient storage that occurred after steps 1, 2, and 3 of Liquidia's PRINT process—*i.e.*, *before* the steps that Liquidia's own NDA identifies as the preparation of the "Drug Product" through encapsulation of the bulk powder and assembly of the "commercial drug product" kits (PRINT steps 5-6). Appx14132. The district court's conclusion that no storage occurs between steps 1-4 was premised on an erroneous construction of when Liquidia begins preparing the "pharmaceutical composition" and when it begins preparing the "pharmaceutical product"—a construction that effectively

extinguished the distinction that the claims expressly draw between those two phases.

1. As noted above, claim 8 of the '066 Patent requires storage of treprostinil salt at ambient temperature. But, unlike claim 6, claim 8 does not require the treprostinil salt to be isolated at the time of storage, meaning the storage may occur at a later stage of the manufacturing process (*e.g.*, after the treprostinil salt is mixed with excipients). The storage simply must occur before preparation of the "pharmaceutical product" referenced in claim 8. Appx00132.

2. Liquidia's PRINT process has essentially two phases, summarized neatly in its NDA: in steps 1-4, Liquidia's bulk powder (the pharmaceutical composition from claims 1-6) is prepared from the treprostinil salt manufactured by Yonsung; then, in steps 5-6, the "Drug Product" is prepared by forming and packaging the final drug product for sale (the pharmaceutical product from claim 8). Appx14132.

Ambient storage occurs in between the bulk powder preparation steps (PRINT process steps 1-4) before the pharmaceutical product is prepared (PRINT process steps 5-6). In the first four steps of Liquidia's PRINT process, Liquidia processes the treprostinil sodium into its bulk

powder form (*i.e.*, the "pharmaceutical composition" of claim 1), which involves sequentially performing each PRINT step followed by a storage interval where the substance is held for a matter of hours or days until the next PRINT step is undertaken. Appx29336-29346, Appx00035. After Step 4, the resulting bulk powder may be held for up to six months before Liquidia ships that bulk powder to contractor Xcelience to prepare the final "Drug Product" by performing PRINT steps 5-6, which include encapsulating the bulk powder into the final dosage form for sale and packaging the pharmaceutical product into commercial drug product kits. Appx29346-29348, Appx00035, Appx29336.

The claims and Liquidia's NDA treat the final "pharmaceutical product" of claim 8 as distinct from the accused "pharmaceutical composition" of claims 1-6. The difference is not academic. The NDA provides that, when Liquidia is preparing the pharmaceutical composition in PRINT steps 1-4, it may be stored between those steps for hours or days at room temperature. Appx29337 (hold time after Step 1 up to 71 hours), Appx29338 (hold time after Step 2 up to 18 hours), Appx29339 (hold time after Step 3 up to 88 hours), Appx29336 ("manufacturing activities are conducted in … 18C to 24C … unless

otherwise specified"), Appx13040(61:4-63:5), Appx13065-13066(162:19-165:17). In contrast, the NDA specifies that the bulk powder after Step 4 may be held for *up to six months* before being used in Step 5. Appx29340. This clear jump from the hours-long or days-long intervals separating steps 1-4 to the months-long interval between steps 4 and 5 indicates the switch from preparing the pharmaceutical composition in steps 1-4 to then, sometime later, preparing the pharmaceutical product in steps 5-6.

The claims and Liquidia's process thus confirm that "preparing a pharmaceutical product" begins *not* when Liquidia first begins preparing the bulk powder (pharmaceutical composition) at PRINT step 1, but when contractor Xcelience begins preparing the pharmaceutical product at PRINT step 5 by preparing to encapsulate the bulk powder into its final dosage form. Appx29336, Appx29346-29348. Accordingly, these instances when Liquidia stores the treprostinil salt composition at room temperature in between PRINT steps 1-4 constitute ambient temperature storage within the scope of claim 8 and require reversal. Appx13065-13066(162:19-165:17) (Nuckolls).

3. The district court recognized that the "pharmaceutical product" in claim 8 is "distinct from the 'pharmaceutical composition'" of claim 6. Appx00037. But it effectively nullified that distinction by construing the preparation of "pharmaceutical product" and "pharmaceutical composition" as having no distinct starting points. That construction cannot be squared with the claim language and context discussed above, nor does it make logical sense. The "pharmaceutical composition" of claims 1-6 is not a ready-for-sale "product"; in contrast, the "pharmaceutical product" of claim 8 is the final ready-for-sale product in its final dosage form prepared for patient purchase and consumption—in this case, Liquidia's final commercial drug product kits. Because the district court's erroneous construction served as the basis for its finding of non-infringement based on ambient storage that occurs between PRINT steps 1-4, this Court should reverse.

## VI. Claims 1-3 and 6 of the '066 Patent are not anticipated by Moriarty 2004.

The invention recited in claim 1 of the '066 Patent, from which claims 2, 3, and 6 depend, is a pharmaceutical composition containing treprostinil and the unexpectedly reduced levels of certain impurities that remain after a novel process of purification by salt formation.

Appx00132. As the ’066 Patent explains, this process is particularly effective at removing synthetic impurities generated during alkylation and hydrolysis that are difficult to remove using prior-art methods (such as column chromatography) because they are very similar in size, shape, and charge to the treprostinil molecule itself. Appx00132(17:29-32, 17:60-62), Appx13519(17:29-32), Appx13070(183:22-184:21). The resulting pharmaceutical composition of treprostinil will therefore have lower levels of these synthetic impurities than a pharmaceutical composition of treprostinil purified using traditional methods.

In finding the claims of the ’066 Patent anticipated by Moriarty 2004, the district court failed to account for these critical structural features, which the claims conferred on the resulting product. It is undisputed that the Moriarty 2004 journal article does not teach purification through salt formation and discloses no information concerning any specific impurities from alkylation and hydrolysis that remain after the prior-art purification steps described. Due to the absence of information about specific impurities in Moriarty 2004, Liquidia could at most only try to compare the chemical structure and *overall* purity of the treprostinil *compound* disclosed in the publication

with the treprostinil *compound* in the claimed product. The district court accepted Liquidia's erroneous comparison and thus failed to examine the identified differences between the claimed composition and the prior art, *i.e.*, the lower levels of impurities from alkylation and hydrolysis that remain after purification via salt formation. When the claimed pharmaceutical composition is properly understood to require a pharmaceutical composition of treprostinil that includes reduced levels of specific impurities, there is no evidence in the record to support anticipation by Moriarty 2004.

### A. The district court erroneously disregarded specific impurities in the claimed pharmaceutical composition.

The validity of a product-by-process claim focuses on "the product and not on the process of making it," unless "the process by which a product is made imparts 'structural and functional differences'" that distinguish the claimed product from the prior art. *Greenliant Sys., Inc. v. Xicor LLC*, 692 F.3d 1261, 1268 (Fed. Cir. 2012) (quoting *Amgen Inc. v. F. Hoffman–La Roche Ltd.,* 580 F.3d 1340, 1369-70 (Fed. Cir. 2009)). If so, then those differences "are relevant as evidence of no anticipation" regardless of whether they are "explicitly part of the claim." *Id.* "The

specification, the prosecution history, and any extrinsic evidence may enlighten whether structural and functional differences exist." *Kamstrup A/S v. Axioma Metering UAB*, 43 F.4th 1374, 1381 (Fed. Cir. 2022) (citing *Amgen*, 580 F.3d 1365-67; *Purdue Pharma L.P. v. Epic Pharma, LLC*, 811 F.3d 1345, 1353-54 (Fed. Cir. 2016)).

In reviewing the district court's holding of anticipation, "the first question … is whether, as a matter of claim construction, the district court erred." *Id.* Here, in finding anticipation, the district court failed to recognize the critical structural features of the claimed "pharmaceutical composition" that are imparted by the salt-formation purification process recited in the claims. Appx00041. The court erred by first limiting its assessment of the "pharmaceutical composition" to the "treprostinil" compound itself, to the exclusion of the "impurities" that are specifically recited in the claims. Appx00040-00041. The court then dismissed in a footnote UTC's argument that the impurities-reducing claim limitation—which requires that the "level of one or more impurities found in the starting batch of treprostinil is lower in the pharmaceutical composition"—defines structural features of the claimed product. Appx00041 n.15; *see also* Appx00121-00132. In doing so, the court

reasoned that the limitation "merely describes the process and does not impart any structural or functional differences in the claimed pharmaceutical composition," without addressing the intrinsic evidence to the contrary. That was erroneous.

The '066 Patent makes clear that "forming a salt of treprostinil" and "isolating the treprostinil salt" results in a product—*i.e.*, a "pharmaceutical composition"—that is structurally different from prior-art compositions of treprostinil, because the claimed product contains lower levels of impurities from the alkylation and hydrolysis reactions used to make treprostinil. These structural elements of the claimed "pharmaceutical composition" are apparent from the express impurities-reducing claim language described above Appx00132; *see supra* p. 78; *see, e.g.*, *In re Nordt Dev. Co.*, 881 F.3d 1371, 1376 (Fed. Cir. 2018) ("[T]he structural nature of [limitations] can be gleaned from the plain claim language ….") (collecting cases). Indeed, Liquidia's own expert (Dr. Winkler), when asked directly by Liquidia's counsel, testified unequivocally that these "impurities" elements of the claims "describ[e] the product" of the claims, not merely the process. Appx13126(406:3-5).

The structural significance of the claim language is underscored by the prosecution history, when UTC added the relevant "impurities" claim language to overcome validity challenges raised against the parent patent, U.S. Patent No. 8,497,393 ('393 Patent). The PTO has acknowledged this distinction between the claims of the '066 and '393 Patents. During *inter partes* review of the '393 Patent, the PTO found the challenged patent claims invalid notwithstanding data provided by UTC comparing levels of impurities in the claimed product to impurities in earlier processes, because "the challenged ['393] claims contain no limitations relating to the impurity profile of the recited product." Appx03740. In contrast, the PTO allowed the '066 patent claims based on the same data, concluding that "the product of Moriarty ha[s] a different impurity profile from the product [of] the instant claims where salt formation step is present." Appx03818; Appx03825. And later, when Liquidia sought *inter partes* review of the '066 patent, the Board denied institution because the prior art "does not suggest 'a level of one or more impurities found in the starting batch of treprostinil is lower in the pharmaceutical composition,' *as claim 1 requires*." Appx32004 (emphasis added). Thus, the inventors put the world on

notice—through the plain language of the claims and the prosecution history—that the structural difference between the claimed "pharmaceutical composition" and the prior art rests in the "impurities" from alkylation and hydrolysis that remain after salt purification.

As a matter of law, the district court misconstrued the claimed "pharmaceutical composition" as directed solely to the properties of the treprostinil *compound* rather than including the levels of impurities from alkylation and hydrolysis. While the claim elements concerning "impurities" relate to the salt-formation process, they also require differences in the structure of the resulting product that are integral to discerning the scope and content of the claimed "pharmaceutical composition." But the court ignored the intrinsic evidence in construing the claim, instead relying solely on the testimony of Dr. Winkler to conclude that the impurities limitation did not impart structural or functional differences in the claimed pharmaceutical composition. *See* Appx00041. That was erroneous under this court's reasoning in *Kamstrup* and *Nordt*, which directs courts to look to the intrinsic evidence to determine the structural features of a claimed product. *Kamstrup*, 43 F.4th at 1381; *Nordt Dev. Co.*, 881 F.3d at 1374-76.

Moreover, Dr. Winkler's testimony did not examine the hydrolysis and alkylation impurities at issue, and thus could not have served as any evidence, much less clear and convincing evidence, of anticipation of the claims as properly construed. Appx13139-13145(457:6-480:2).

### B. No evidence at trial established that the product of Moriarty 2004 had the same level of relevant impurities as the claimed product.

The patent challenger has the burden of establishing by clear and convincing evidence that the claimed product is the same as the product produced by prior art methods. *Amgen Inc.*, 580 F.3d at 1367. Thus, in *Amgen*, the court affirmed a judgment of no anticipation as a matter of law where the prosecution history and specification described structural differences (*i.e.*, molecular weight and charge) between "[the hormone] EPO purified from mammalian cells growing in culture" and prior art EPO derived from urine, holding that "no reasonable jury could find that the recombinant EPO described in the asserted claims … was an old product, given the structural distinctions between urinary and recombinant EPO attributable to recombinant EPO's source." *Id.*

Had the district court required Liquidia to establish that the product of Moriarty 2004 was the same as the product of the '066 Patent

claims with respect to the relevant impurities, Liquidia would not have been able to meet that burden. This is because the Moriarty 2004 publication provided *no* disclosure about the level of these or any other specific impurities, and Liquidia's expert Dr. Winkler did not recreate or test the Moriarty 2004 product. Appx13157(529:21-530:24, 531:7-16). There is no dispute that the text of Moriarty 2004 is silent on the specific impurities generated or removed during the process it describes. At trial, Liquidia not only provided no evidence (independent testing or otherwise) to establish the levels of specific synthetic impurities that would inherently result from the process described in Moriarty 2004, but it also affirmatively disclaimed any inherency argument. Appx31039.

The only information that Moriarty 2004 itself discloses about the presence of impurities in the treprostinil manufactured according to its process is the single statement that one batch had an overall purity of 99.7 percent. Appx00039. That was the number Liquidia offered, and the district court relied on, to compare against the overall percentage purity of treprostinil purified through salt formation as reported in the '066 patent. Appx00041. That was erroneous. Overall purity is not the distinguishing feature of the product claimed by the patent. Rather, as

the district court expressly found elsewhere, the invention is a pharmaceutical composition with a reduction in *specific impurities*—those resulting from alkylation and hydrolysis steps—after salt formation. Appx00025. Liquidia offered no evidence that Moriarty 2004 disclosed or produced a product with the same levels of alkylation and hydrolysis impurities as the claimed "pharmaceutical composition." Because the court misunderstood the novel structure that the manufacturing process conferred on the resulting product, it did not require any such evidence to be provided.

### C. UTC presented unrebutted evidence at trial that salt formation reduced specific impurities from alkylation and hydrolysis over the prior art.

Although it was not UTC's burden at trial to establish novelty, unrebutted testimony from UTC's witnesses established that the claimed salt-formation process leaves lower levels of specific impurities in the resulting pharmaceutical composition than prior-art processes.

For example, UTC's expert Dr. Toste testified that unlike traditional column chromatography purification methods, the claimed salt-formation process was able to effectively separate treprostinil from impurities generated during alkylation and hydrolysis that are nearly

identical in structure to treprostinil. Appx13068-13070(176:5-180:17, 183:22-184:21). This includes, for example, 3AU90 (which he referred to as 15-epi-treprostinil during his testimony). Appx13069(177:19-23). This difference was evident in the treprostinil sodium data that Yonsung and Liquidia submitted to FDA. Appx13070(181:4-182:1). But because the district court failed to recognize the structural importance of the specific impurities reduced through the '066 Patent's novel salt-formation process, it did not even address this evidence in its anticipation analysis.

Additionally, one of the '066 inventors, Dr. David Walsh, testified at trial that "the data on the salt of Treprostinil," showed that the inventors were "making batches [with] much fewer impurities in them than the old process." Appx13226(802:11-19). Specifically, Dr. Walsh testified that the salt-formation process resulted in lower levels of the synthetic impurity 3AU90 than treprostinil purified using older processes. Appx13225-13227(799:4-802:19) (discussing Appx27152; Appx27720-27743).

The district court erroneously disregarded Dr. Walsh's evidence merely because it compared treprostinil free acid manufactured without salt formation to treprostinil salt made through the claimed process

rather than to a free acid regenerated from that treprostinil salt. Appx00043-00044. The court's reasoning is internally inconsistent with its treatment of Dr. Winkler's testimony (which the court credited) about "[t]he average purity of UTC's batches of UT-15 treprostinil made by … the '066 process." Appx00039. Dr. Winkler's testimony assumed treprostinil salt and treprostinil free acid are comparable and representative of the claimed product—it relied on averaged data from batches of *both* treprostinil salt and treprostinil free acid, Appx29986 (100:4-9). The district court provided no explanation for why the two forms of treprostinil could be sufficiently comparable for Dr. Winkler to average but too different for Dr. Walsh to compare.

The district court's reasoning was also internally inconsistent with the district court's earlier finding that comparisons between treprostinil salt and a final treprostinil product are apt comparisons when it comes to evaluating the claimed specific impurities recited in claim 1. As discussed *supra* pp. 53-55, the court made an express factual finding elsewhere in its opinion that the impurities found in the salt, treprostinil sodium, are "representative" of the relevant impurities in the final pharmaceutical composition, regardless of what other impurities may be

added later. Appx00025. As the court found, the relevant "impurities" recited in the claims are impurities from the "prior alkylation and hydrolysis steps" that *precede* the salt formation step. And so, just as the district court found that Liquidia's formulation of its treprostinil sodium salt "does not affect" the alkylation and hydrolysis impurities in its bulk powder, *id.*, UTC's conversion of treprostinil diethanolamine back into a free acid similarly cannot affect the impurities relevant to the '066 Patent claims. Those findings are equally applicable to Dr. Walsh's testimony.

### D. Comparisons between UTC's commercial processes were irrelevant to anticipation by Moriarty 2004.

The district court's opinion also relied on UTC's statements to FDA that lots of commercial treprostinil manufactured at its Silver Spring, Maryland facility using the claimed salt-formation process are of the "same high quality and purity" as treprostinil previously manufactured in its Chicago facility. Appx00042.[12] In considering this evidence as probative of anticipation, the district court accepted conclusory testimony of Dr. Winkler that the Chicago process was the process disclosed in

[12] This reasoning sounds in on-sale bar rather than anticipation by a printed publication, but Liquidia disclaimed any on-sale bar argument. Appx31039.

Moriarty 2004, without addressing countervailing evidence by UTC that there were differences in the processes. Appx00042-00043. Moreover, even if the Chicago process was representative of the Moriarty 2004 process, Dr. Winkler provided no evidence, and the district court did not rely on any, that the levels of impurities from alkylation and hydrolysis are the same as those specific impurities in the claimed invention. Rather, the only comparisons pertained to characteristics of the treprostinil compound itself and to overall purity of the treprostinil, which as discussed above, *supra* pp. 82-84, are insufficient to establish anticipation of the claimed compositions. Appx00043 (discussing Winkler's testimony comparing overall purity assay ranges and average percentage purity of treprostinil batches); Appx00042 (discussing general statements to FDA concerning minimal quality and purity standards). Without an inherency argument—which Liquidia expressly disclaimed, Appx31039—Liquidia and Dr. Winkler's evidence regarding overall purity cannot gap-fill Moriarty 2004's disclosure. *See Endo Pharms. Sols., Inc. v. Custopharm Inc.*, 894 F.3d 1374, 1383 (Fed. Cir. 2018) (where relevant elements were neither necessarily present nor discernible from information reported in a printed publication, "the

incomplete description of the composition elements [in the printed publication] denied skilled artisans from having access to that composition, thereby precluding use of the inherency doctrine to fill in disclosure about the product missing from the [publications].”).

Thus, the district court’s finding of anticipation of the ’066 product by process claims relied on an erroneous reading of the claims and was unsupported by the evidence.

## CONCLUSION

This Court should affirm the district court’s conclusions regarding the ’793 Patent. This Court should also affirm the court’s finding that Liquidia infringes claims 1, 2, and 3 of the ’066 Patent. However, this Court should reverse the court’s conclusion that UTC did not prove infringement of claims 6 and 8 of the ’066 Patent by a preponderance of the evidence, as well as the court’s finding that claims 1, 2, 3, and 6 of the ’066 Patent were invalid as anticipated.

December 14, 2022

Respectfully submitted.

/s/ *Jaime A. Santos*
Jaime A. Santos
William C. Jackson
William M. Jay
Jenny J. Zhang
Rohiniyurie Tashima*
GOODWIN PROCTER LLP
1900 N Street, N.W.
Washington, DC 20036
(202) 346-4034

Gerard J. Cedrone
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210
(617) 570-1000

Shaun R. Snader
UNITED THERAPEUTICS CORPORATION
1735 Connecticut Avenue, N.W.
Washington, DC 20009
(202) 304-1701

Douglas H. Carsten
Arthur P. Dykhuis
MCDERMOTT, WILL & EMERY LLP
18565 Jamboree Road, Ste. 250
Irvine, CA 92612
(949) 851-0633

Adam Burrowbridge
MCDERMOTT, WILL & EMERY LLP
500 N. Capitol Street, N.W.
Washington, DC 20001
(202) 756-8797

**Admitted only in New York and Virginia; not admitted in the District of Columbia. Practicing under the supervision of counsel admitted in the District of Columbia.*

**CERTIFICATE OF SERVICE**

I, Jaime A. Santos, hereby certify that on December 14, 2022, I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF System. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ *Jaime A. Santos*
Jaime A. Santos

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Federal Circuit Rule 28.1(b)(2)(A). This brief contains 16,484 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 32(b)(2).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6). This brief has been prepared in a proportionally spaced typeface, 14-point Century Schoolbook font, using Microsoft Word for Office 365. As permitted by Fed. R. App. P. 32(g), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

/s/ *Jaime A. Santos*
Jaime A. Santos